John D. Hughes
Michael P. Thompson
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE, LLP
750 Lexington Avenue
New York, NY 10022
Telephone: (212) 308-4411
*Counsel to Allied World Assurance Company (U.S.), Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| REFCO INC., et al., | : | Case No. 05-60006 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

-----------------------------------------------------x

|  |  |  |
|---|---|---|
| JOSEPH MURPHY, et al., | : |  |
|  | : | Adv. Proc. No. 08-01133 (RDD) |
| Plaintiffs, | : |  |
| v. | : |  |
|  | : |  |
| ALLIED WORLD ASSURANCE | : |  |
| COMPANY (U.S.), INC. and ARCH | : |  |
| INSURANCE COMPANY, | : |  |
|  | : |  |
| Defendants, and. | : |  |
|  | : |  |
| JOHN D. AGOGLIA, EDWIN L. COX, | : |  |
| SUKHMEET DHILLON, THOMAS H. | : |  |
| DITTMER, STEPHEN GRADY, | : |  |
| THOMAS HACKL, ERIC G. LIPOFF, | : |  |
| PETER MCCARTHY | : |  |
| and FRANK MUTTERER, | : |  |
|  | : |  |
| Nominal Defendants | : |  |
|  | : |  |

-----------------------------------------------------x

## <u>TABLE OF CONTENTS</u>

RELEVANT FACTS ........................................................................................................... 3

ARCH MOTION FOR RELIEF ........................................................................................... 5

AXIS ADVERSARY PROCEEDINGS ................................................................................ 6

ALLIED WORLD MOTION FOR RELIEF ......................................................................... 7

ARGUMENT ....................................................................................................................... 8

THE REFERENCE TO BANKRUPTCY COURT SHOULD BE WITHDRAWN ..................... 8

   A.   The Standard for Withdrawal of the Reference ............................................... 8

   B.   The Allied World Adversary Proceeding is a Non-Core Proceeding ............... 10

   C.   Interests of Judicial Economy, Fairness and Timing Strongly Favor a Withdrawal of the Reference ......................................................................... 12

CONCLUSION .................................................................................................................. 13

BOS 621676.3

## Cases

131 Liquidating Corp., 222 B.R. 209 (S.D.N.Y. 1998) ................................................ 10

Abondolo v. GGR Holbrook Medford, Inc., 285 B.R. 101 (E.D.N.Y. 2002) .............................. 10

American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988 (S.D.N.Y.) ... 5

Best Payphones, Inc., 2007 WL 1630569 (S.D.N.Y. May 21, 2007) .......................................... 10

Burger Boys, Inc., 94 F.3d 755 (2d Cir.) .............................................................. 10

Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.)..... 5

Gardner, 913 F.2d 1515 (10th Cir.1990) ................................................................ 12

Kentile Floors, Inc., 1995 WL 479512 (S.D.N.Y. August 10,1995).......................................... 11

Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.) ......................... 5

Kirschner v. Grant Thornton LLP, et al., No. 2007-1-008818 (Ill. Cir. Ct.) ................................. 5

Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07-7074 (GEL) (S.D.N.Y.) ..................... 5

Magten Asset Mgt. Corp. v. Northwestern Corp. (In re Northwestern Corp.), 2005 WL
    2320113 (D. Del. September 22, 2005) ......................................................... 14

Maitland v. Mitchell (In re Harris Pine Mills), 44 F.3d 1431 (9th Cir. 1995)........................... 12

McMahon, 222 B.R. 205 (S.D.N.Y. 1988) ................................................................ 10

Mishkin v. Angeloff, 220 B.R. 784 (S.D.N.Y. 1998)...................................................... 14

Norkin v. DLA Piper Rudnik Gray Cary, LLP, 2006 WL 839079 (S.D.N.Y. March 31, 2006).. 12

Oneida Ltd. v. Pension Ben. Guar. Corp., 2007 WL 2067968 (S.D.N.Y. July 18, 2007) ....... 10

Orion Pictures Corp. v. Showtime Networks, Inc., 4 F.3d 1095 (2d Cir. 1993) ................... 10, 13

Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL)
    (S.D.N.Y.).................................................................................... 5

Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.)................................ passim

V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.) ....................... 5

Wood v. Wood (In re Wood), 825 F.2d 90 (5th Cir. 1987)........................................... 12

BOS 621676.3

**MOTION AND MEMORANDUM IN SUPPORT OF ALLIED WORLD
ASSURANCE CO. (U.S.) INC.'S MOTION TO WITHDRAW
THE REFERENCE FROM THE BANKRUPTCY COURT**

Defendant, Allied World Assurance Co. (U.S.) Inc. ("Allied World"), an issuer of an

Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197

(the "**Allied World Policy**,") to which Refco, Inc. ("**Refco**" or the "**Debtor**") is the Named

Corporation, hereby moves this Court for an Order pursuant to 28 U.S.C. § 157(d), Federal Rule of

Bankruptcy Procedure 5011(a) and Local Bankruptcy Rule 5011-1, for cause shown, withdrawing

the reference of this Adversary Proceeding to the Bankruptcy Court.  Plaintiffs assent to this

motion.

## RELEVANT FACTS

1.      Allied World is an excess directors' and officers' liability insurer of Refco and its

directors and officers.

2.      Allied World issued the Allied World Policy, the policy at issue in this litigation,

for the policy period of August 11, 2005 to August 11, 2006.  The Policy has a limit of liability

of $12.5 million excess of $27.5 million in underlying insurance.[1]

3.      The Debtor in conjunction with certain of its subsidiaries and affiliates

(collectively, the "**Debtors**") filed petitions for relief under chapter 11 of the Bankruptcy Code

on October 17, 2005 with the United States Bankruptcy Court for the Southern District of New

York (the "**Court**").

4.      On October 10, 2005, Refco announced that it had been carrying an undisclosed

receivable of $430 million from an entity controlled by Phillip R. Bennett, Refco's former

---

[1] Various other insurers also issued policies to Refco that are beneath Allied World's policy in the Refco tower of D&O
insurance.  U.S. Specialty Insurance Company issued a primary policy with a limit of $10 million excess of applicable retentions
(the "Followed or Primary Policy").  Lexington Insurance Company issued a first excess policy with a limit of $7.5 million
excess of $10 million (the "Lexington Policy").  Axis Reinsurance Company ("Axis") issued a second excess policy with a limit
of $10 million excess of $17.5 million (the "Axis Policy").

Chairman, President and Chief Executive Officer. The next day, Refco announced that Bennett had repaid the $430 million receivable in full and provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

5.      Beginning on or about October 12, 2005, various lawsuits were filed against the Plaintiffs, former directors and officers of Debtors (the "Underlying Litigation"), that allege, *inter alia*, that Refco's initial public offering registration statement and prospectus were materially false and misleading because they failed to disclose the existence of large receivables owed to Refco by an entity controlled by Bennett, as well as related-party transactions between Refco and that entity that were designed to hide those receivables. Plaintiff Tone Grant was also a defendant in one criminal action, in which trial began on March 24, 2008 and concluded with the conviction of Grant on April 17, 2008. Three senior officers of the Debtors, also named as defendants in criminal actions, have pled guilty and await sentencing.

6.      The Underlying Litigation includes: In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); American Financial International Group, et al. v.

Bennett, et al., No. 05 Civ. 8988 (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07-7074 (GEL) (S.D.N.Y.); and Kirschner v. Grant Thornton LLP, et al., No. 2007-1-008818 (Ill. Cir. Ct.).

7.     Allied World has denied coverage to the Plaintiffs under the Allied World Policy.  Likewise, Defendant Arch Insurance Company ("Arch") has also denied coverage to the Plaintiffs under its Excess Insurance Policy, policy number DOX0009322-00, issued by Arch to Refco (the "Arch Policy," together with the Allied World Policy, the "**Policies**").

## ARCH MOTION FOR RELIEF

8.     On May 1, 2006, Arch filed in the Bankruptcy Court a Motion for Relief from the Automatic Stay, to the Extent Applicable, to Prosecute Coverage Litigation Against Directors and Officers of Debtors (the "Arch Motion").  Arch had, before filing the Arch Motion, commenced litigation to resolve certain coverage issues (the "Coverage Litigation") in the Supreme Court of the State of New York, County of New York, against the several directors and officers of Debtors.  In the Arch Motion, Arch sought relief from the stay to continue to prosecute the Coverage Litigation and amend its pleadings in the Coverage Litigation.  The Debtors, the Chapter 11 Trustee, the Official Committee of Unsecured Creditors and others objected to the Arch Motion.

9.     The Bankruptcy Court signed an Order granting the Arch Motion (the "Arch Order") on June 20, 2006.  Under the Arch Order, the Bankruptcy Court lifted the automatic stay "for the limited purpose to permit Arch to prosecute the Coverage Litigation… provided, however, that nothing in [the Arch] Order shall be construed to permit Arch to amend its

complaint in the Coverage Litigation, without leave of the Bankruptcy Court, by (i) adding a claim for rescission or cancellation of the Policy or (ii) adding as defendants to the Coverage Litigation (x) Refco Inc. or any of its subsidiaries and corporate affiliates (collectively, the "Refco Entities") or (y) any person who, as of the date of the amendment in the Coverage Litigation, is a duly appointed or elected director or officer of any of the Refco Entities."  Arch Order, p. 2.

## AXIS ADVERSARY PROCEEDINGS

10.     On May 23, 2007, Axis filed an adversary proceeding before the Bankruptcy Court as a result of a coverage dispute between Axis and various former officers and directors of Refco (Adv. Proc. 07-01712 (RDD)) (the "Axis Adversary").  Axis' complaint in the Axis Adversary sought a declaration that the Axis Policy did not afford coverage for the Underlying Litigation.  On July 13, 2007, certain directors and officers, Klejna, Murphy, Silverman, Sexton and Sherer, filed answers, counterclaims, and a motion to force Axis to advance defense costs in the Underlying Litigation.  In addition, certain directors and officers moved to dismiss the Axis Adversary because the declaratory action was premature.  Arch sought to move to intervene in the Axis Adversary to oppose the efforts to force the advancement of defense costs before the adjudication of coverage issues.  On August 30, 2007, the Bankruptcy Court denied Arch's motion to intervene and granted the motion to dismiss the Axis Adversary.

11.     The Bankruptcy Court, in the Axis Adversary, retained jurisdiction over counterclaims by certain indicted officers seeking a declaration that Axis must advance defense costs under the Axis Policy.  The Bankruptcy Court directed Axis to advance defense costs to these certain indicted officers on September 11, 2007.  (Adv. Proc. 07-2005 (RDD)).

- 6 -

12.     On September 17, 2007, certain directors and officers filed a complaint and a motion to compel seeking a declaratory judgment and an order that Axis was required to advance defense costs of these directors and officers in connection with the Underlying Litigation.  (Adv. Proc. No. 07-02032).

13.     In the midst of the Axis Adversary, on September 7, 2007, Axis filed a Motion to Withdraw the Reference (the "Axis Motion to Withdraw") seeking to withdraw the Axis Adversary.  On October 5, 2007, this Court denied the Motion to withdraw because, *inter alia*, the Bankruptcy Court had expended significant time and energy in preparation for the October 12, 2007 hearing and because it appeared to this Court to be forum shopping.  This Court did find, on the record, that the Axis Adversary was a non-core proceeding.

14.     On September 25, 2007, certain officers and directors filed motions for summary judgment in the Bankruptcy Court seeking to require Axis to advance defense costs for the Underlying Litigation.

15.     On October 12, 2007, the Bankruptcy Court granted the certain directors' and officers' Motions for Summary Judgment and determined that Axis was required to advance defense costs.

16.     On November 13, 2007, this Court entered an Order withdrawing the various Axis Adversary proceedings from the Bankruptcy Court.

**ALLIED WORLD MOTION FOR RELIEF**

17.     On February 11, 2008, Allied World filed a Motion for Relief from the Stay (the "Motion for Relief") in order to resolve disputes with the Insureds arising under the Policy through arbitration or mediation, including any issues related to the advancement of defense costs. The Bankruptcy Court granted the Motion for Relief on March 13, 2008.

18.    On March 12, 2008, the eve of the Bankruptcy Court's hearing on the Motion for Relief, the Plaintiffs commenced an adversary proceeding against Allied World ("the Allied World Adversary Proceeding") seeking preliminary and permanent injunctions requiring Allied World to advance payment of their defense costs.

19.    The Plaintiffs amended their Complaint in the Allied World Adversary Proceeding to include Arch as a defendant on April 24, 2008.  In addition to their claims for preliminary and permanent injunctions, the Plaintiffs in the Amended Complaint bring claims for coverage, defense costs and other contractual issues under the Policies.

## ARGUMENT

## THE REFERENCE TO BANKRUPTCY COURT SHOULD BE WITHDRAWN

### A. The Standard for Withdrawal of the Reference

Pursuant to 28 U.S.C. §1334, district courts have original, but not exclusive jurisdiction of all civil proceedings "arising under title 11 or arising in or related to cases under title 11."  Under the amendments to Section 157(a), however, the district court may provide that "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district."  Pursuant to the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), any case or proceeding which falls under this rubric shall be routinely referred to the Bankruptcy Court.

Section 157(d), however, empowers a district court to withdraw a proceeding from the Bankruptcy Court on its own motion or on the timely motion of any party, and have the proceeding heard in district court, if there is "cause shown" for the removal.  "Cause shown" is not defined in the statute, and the legislative history of the 1984 Bankruptcy Amendments

- 8 -

provides little guidance in delineating factors which support permissive withdrawal of a bankruptcy reference.

The Second Circuit and the Southern District of New York, however, have provided general guidelines for consideration, which include whether the case is core or non-core, whether it is legal or equitable, interests of judicial economy, prevention of forum-shopping and confusion, promoting uniformity in bankruptcy administration, fostering the economical use of the debtor's and creditors' resources and the presence of a jury demand.  In re Burger Boys, Inc., 94 F.3d 755, 762 (2d Cir.); Orion Pictures Corp. v. Showtime Networks, Inc., 4 F.3d 1095, 1101 (2d Cir. 1993); Oneida Ltd. v. Pension Ben. Guar. Corp., 2007 WL 2067968 (S.D.N.Y. July 18, 2007); In re Best Payphones, Inc., 2007 WL 1630569 (S.D.N.Y. May 21, 2007); In re 131 Liquidating Corp., 222 B.R. 209, 211 (S.D.N.Y. 1998).

The most important factor in determining whether to withdraw the reference of an adversary proceeding is whether the proceeding is core or non-core.  Orion, 4 F.3d at 1101; Oneida, 2007 WL 2067968 at *4.  In a non-core proceeding, a decision by the Bankruptcy Court - - both on the law and the facts - - is subject to de novo review in the district court.  In re McMahon, 222 B.R. 205, 208 (S.D.N.Y. 1988); Abondolo v. GGR Holbrook Medford, Inc., 285 B.R. 101, 113 (E.D.N.Y. 2002).  Thus, in a non-core matter, it is a more efficient use of judicial resources for this Court to hear the adversary proceeding in the first place.  Id.; In re Kentile Floors, Inc., 1995 WL 479512 (S.D.N.Y. August 10,1995).  This factor strongly favors withdrawal of the reference. Id.  If this Court does not withdraw the reference, it will have to conduct a *de novo* review of the Bankruptcy Court's rulings upon a party's written objection, resulting in the re-litigation of claims and significant additional costs and expenditure of time and effort to both parties.  Id.

**B.  The Allied World Adversary Proceeding is a Non-Core Proceeding**

28 USC 157 (b) (1) gives the Bankruptcy Court jurisdiction over "core proceedings" as follows:

> Bankruptcy judges may hear and determine all cases under title 11 (11 USC 101, et seq.) and *all core proceedings* <u>arising under title 11. .</u> . ., or <u>arising in a case under title 11 .</u> . ., referred to under subsection (a) of this section, and may enter appropriate orders and judgments . . . .

(Emphasis added).

The Allied World Adversary Proceeding is a non-core proceeding.  This Court unequivocally stated that it believed the Axis Adversary to be non-core both when it denied the Axis Motion to Withdraw, and when it subsequently granted the Axis Motion to Withdraw. Because the Allied World Adversary Proceeding mirrors the Axis Adversary, this Court should undoubtedly make the same finding that the Allied World Adversary Proceeding is non-core.

Such a finding makes absolute sense as the Bankruptcy Code defines core proceedings to include, *inter alia,* matters concerning the administration of the estate; orders to turn over property of the estate; and other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship.  28 U.S.C. § 157(b) (2) (A), (E), and (O).  "A proceeding is core under section 157 [of the Bankruptcy Code] if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."  <u>Wood v. Wood</u> (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987).

A matter is "non-core" if it involves a dispute that relates to, arises under or affects the bankruptcy case and would have been litigated elsewhere but for the bankruptcy case.  <u>See</u> <u>Norkin v. DLA Piper Rudnik Gray Cary, LLP,</u> 2006 WL 839079 (S.D.N.Y. March 31, 2006) (a "core proceeding" with respect to which the Bankruptcy Court has jurisdiction must "arise

under" title 11 or "arise in" a bankruptcy case under title 11.); <u>In re Gardner</u>, 913 F.2d 1515, 1518 (10th Cir.1990) ("Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings.")

The causes of action asserted concerning defense costs and coverage under the Policies were not created or determined by a statutory provision of the Bankruptcy Code, and thus do not "arise under" title 11. Moreover, the insurance coverage disputes that relate to the Policies will not affect substantive rights under the Bankruptcy Code, do not depend on any bankruptcy laws, are not created nor determined by Bankruptcy Code provisions and could properly proceed in other forums outside of the Bankruptcy Court. <u>See</u> <u>e.g.</u>, <u>Maitland v. Mitchell</u> (In re Harris Pine Mills), 44 F.3d 1431, 1435 (9th Cir. 1995). Accordingly, they are non-core proceedings, pursuant to which the Bankruptcy Court has jurisdiction under 28 U.S.C. §157(c), as proceedings "related to" a case under Title 11.

As a non-core proceeding, the Bankruptcy Court's power will be limited to making recommendations to this Court. If the Bankruptcy Court's findings or conclusions are challenged, this Court would then be required to undertake a <u>de novo</u> review of the Bankruptcy Court's findings of fact and conclusions of law and enter a final order. As such, it would be a more efficient use of judicial resources for this Court to hear the Allied World Adversary Proceeding in the first place. <u>See</u> <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095 (2d Cir. 1993) (the fact that a bankruptcy court's determination on non-core matters is subject to <u>de novo</u> review by the district court could lead the latter to conclude that in a given case unnecessary costs could be avoided by a single proceeding in the district court).

C. **Interests of Judicial Economy, Fairness and Timing Strongly Favor a Withdrawal of the Reference**

This Court withdrew the reference of the Axis Adversary in a matter that mirrors the Allied World Adversary Proceeding before the Bankruptcy Court. This Court is now well acquainted with many of the coverage and contractual disputes that are at issue in the Allied World Adversary Proceeding. The interests of judicial economy and fairness should mandate that this Court also hear the Allied World Adversary Proceeding, as the Insureds are seeking the same relief in the Allied World Adversary Proceeding from Allied World and Arch as they sought in the Axis proceeding.

The Bankruptcy Court's retention of and decision on the Allied World Adversary Proceeding could lead to conflicting resolutions of the same issues, duplicative discovery and, thus, inequitable results. Indeed, Judge Drain implicitly recognized that an adversary such as this should be withdrawn when he suggested that "as a practical matter, it may make sense to move to withdraw the reference of this matter . . . ." Transcript of Hearing on August 30, 2007 p. 83 (Axis Adversary, Docket No. 81). Judge Drain then indicated during the hearing that he "would strongly encourage the parties if they were ultimately to pursue [the Axis Adversary] to pursue it in a different forum because of the jurisdictional concerns that I've raised." Id., Transcript at pp. 59-60. He further noted, "given the existence of a securities action and the inevitable tie-ins to settlements[,] that a district judge might want to have the reference. . . ." Id., Transcript at p. 87.

Moreover, withdrawing the reference in this matter will not adversely affect the uniform administration of bankruptcy law because the Allied World Adversary Proceeding raises issues governed solely by non-title 11 law.

BOS 621676.3

In addition, it is appropriate to withdraw the reference at this early stage of litigation.  <u>See</u> <u>Mishkin v. Angeloff,</u> 220 B.R. 784 (S.D.N.Y. 1998) (facts that proceedings were in the early stages of litigation favored the withdrawal of the reference); <u>Magten Asset Mgt.  Corp. v. Northwestern</u> <u>Corp. (In re Northwestern Corp.),</u> 2005 WL 2320113, at *2 (D. Del. September 22, 2005) (withdrawal of reference timely when made at "a relatively early stage in the proceedings and significant discovery has not yet occurred").  This Motion is filed approximately one and a half months after the Plaintiffs filed their initial Complaint for preliminary and permanent injunctions about which the Bankruptcy Court has held one hearing.  Moreover, the Amended Complaint was filed only a week ago.

Finally, withdrawing the reference in this matter will not promote forum shopping, as Allied World seeks to remove the Adversary Proceeding to this Court, which is presently the Court handling the Axis Adversary.

Accordingly, in light of all of these circumstances, withdrawal of the reference of this Adversary Proceeding is warranted.  Plaintiffs assent to this motion.

<u>**CONCLUSION**</u>

Allied World respectfully requests that, for all of the foregoing reasons, the Court grant Allied World's motion to withdraw the reference of the Adversary Proceeding.

Dated: New York, New York
April 30, 2008

EDWARDS ANGELL PALMER & DODGE LLP

By:  /s/ John D. Hughes
John D. Hughes
Michael P. Thompson
Robert W. DiUbaldo
750 Lexington Avenue, 8th Floor
New York, New York 10022
(212) 308-4411
*Attorneys for Allied World Assurance Company (U.S.), Inc.*

- 13 -

John D. Hughes
Michael P. Thompson
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE, LLP
750 Lexington Avenue
New York, NY 10022
Telephone: (212) 308-4411
*Counsel to Allied World Assurance Company (U.S.), Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                                      :
                                                      :
In re:                                                :      Chapter 11
                                                      :
REFCO INC., et al.,                                   :      Case No. 05-60006 (RDD)
                                                      :
                                                      :      (Jointly Administered)
                          Debtors.                    :
                                                      :
-----------------------------------------------------x
                                                      :
JOSEPH MURPHY, et al.,                                :
                                                      :      Adv. Proc. No. 08-01133 (RDD)
          Plaintiffs,                                 :
v.                                                    :
                                                      :
ALLIED WORLD ASSURANCE                                :
COMPANY (U.S.), INC. and ARCH                         :
INSURANCE COMPANY,                                    :
                                                      :
          Defendants, and.                            :
                                                      :
JOHN D. AGOGLIA, EDWIN L. COX,                        :
SUKHMEET DHILLON, THOMAS H.                           :
DITTMER, STEPHEN GRADY,                               :
THOMAS HACKL, ERIC G. LIPOFF,                         :
PETER MCCARTHY                                        :
and FRANK MUTTERER,                                   :
                                                      :
          Nominal Defendants                          :
                                                      :
-----------------------------------------------------x

**APPENDIX OF UNREPORTED DECISIONS CITED IN MEMORANDUM IN SUPPORT OF ALLIED WORLD ASSURANCE COMPANY'S MOTION TO WITHDRAW THE REFERENCE FROM THE BANKRUPTCY COURT**

John D. Hughes
Michael P. Thompson
Robert W. DiUbaldo
750 Lexington Avenue, 8th Floor
New York, New York 10022
(212) 308-4411

*Attorneys for Allied World
Assurance Company (U.S.), Inc.*

**Case**                                                                                                    **Tab**

*In re Best Payphones, Inc.,*
    Civil No. 05 Civ. 8561(RJH), 2007 WL 1630569
    (S.D.N.Y. May 21, 2007)..................................................................................................1

*In re Kentile Floors, Inc.,*
    Bankruptcy No. 92B46466 (BRL), 1995 WL 479512
    (S.D.N.Y. August 10,1995)............................................................................................2

*Magten Asset Mgt. Corp. v. Northwestern Corp. (In re Northwestern Corp.),*
    No. 03-12872, 04-53324, 04-1494 (JJF), 2005 WL 2320113, at *2
    (D. Del. September 22, 2005) ........................................................................................ 3

*Nemsa Establishment, S.A. v. Viral Testing Sys. Corp.,*
    No. 95 Civ. 0277 (LAP), 1995 WL 489711 *3
    (S.D.N.Y. Aug. 15, 1995) .............................................................................................4

*Norkin v. DLA Piper Rudnik Gray Cary, LLP,*
    No. 05 Civ 9137(DLC), 2006 WL 839079
    (S.D.N.Y. March 31, 2006)............................................................................................5

*Oneida Ltd. v. Pension Ben. Guar. Corp.,*
    No. 06 Civ. 15323(MGC), 2007 WL 2067968
    (S.D.N.Y. July 18, 2007) ..............................................................................................6

**TAB 1**

Westlaw.

370 B.R. 532                                                                                    Page 1
370 B.R. 532
**(Cite as: 370 B.R. 532)**

**H**In re Best Payphones, Inc.
S.D.N.Y.,2007.

United States District Court,S.D. New York.
In re BEST PAYPHONES, INC., Debtor.
**Civil No. 05 Civ. 8561(RJH).**
**Bankruptcy No. 01-15472(SMB).**

May 21, 2007.

**Background:** In Chapter 11 case, debtor moved to
withdraw reference.

**Holdings:** The District Court, Holwell, J., held that:
(1) mandatory withdrawal of reference was not
warranted, and
(2) permissive withdrawal of reference was not
warranted.

Motion denied.

West Headnotes

**[1] Bankruptcy 51 €━━2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to
District Court. Most Cited Cases
Mandatory withdrawal of reference to bankruptcy
court is narrowly applied, and is appropriate only
when substantial and material potential conflicts exist
between non-bankruptcy federal laws and Title 11.
28 U.S.C.A. § 157(d).

**[2] Bankruptcy 51 €━━2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to
District Court. Most Cited Cases
Mandatory withdrawal of reference to bankruptcy
court is fact specific determination, and thus
necessarily involves analysis in light of

circumstances involved in each case. 28 U.S.C.A. §
157(d).

**[3] Bankruptcy 51 €━━2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to
District Court. Most Cited Cases
In determining whether to permissively withdraw
reference to bankruptcy court, district court should
consider whether claim or proceeding is core or non-
core, whether it is legal or equitable, and
considerations of efficiency, prevention of forum
shopping, and uniformity in administration of
bankruptcy law. 28 U.S.C.A. § 157(d).

**[4] Bankruptcy 51 €━━2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to
District Court. Most Cited Cases
Mandatory withdrawal of reference to bankruptcy
court was not warranted in connection with city's
claims against debtor for fines imposed for operating
public pay phones without permit, despite debtor's
contention that city's franchise agreement violated
Telecommunications Act (TCA), where pending
cases in another district addressed debtor's TCA
claims, and bankruptcy court agreed to abstain. 28
U.S.C.A. § 157(d); Telecommunications Act of 1996,
§ 101, 47 U.S.C.A. § 253; Communications Act of
1934, § 276, 47 U.S.C.A. § 276.

**[5] Bankruptcy 51 €━━2103**

51 Bankruptcy
    51I In General
        51I(E) Reference
            51k2103 k. Withdrawal or Transfer to
District Court. Most Cited Cases
Permissive withdrawal of reference to bankruptcy
court was not warranted in connection with city's
claims against debtor for fines imposed for operating

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public pay phones without permit, despite debtor's contention that city's franchise agreement violated Telecommunications Act (TCA), where pending cases in another district addressed debtor's TCA claims, bankruptcy court agreed to abstain, declining to withdraw reference would not result in any additional delay or costs to parties, and claims, if allowed, would be paid from established reserves set out under confirmed plan. 28 U.S.C.A. § 157(d); Telecommunications Act of 1996, § 101, 47 U.S.C.A. § 253; Communications Act of 1934, § 276, 47 U.S.C.A. § 276.

*533Mayne Miller, Charles Henry Ryans, New York, NY, for Debtor.

Michael A. Cardozo, Corporation Counsel Office City of New York, New York, NY, for Department of Information Technology and Telecommunications.

### *MEMORANDUM OPINION AND ORDER*

HOLWELL, District Judge.

The New York City Department of Information Technology & Telecommunications ("DoITT") (hereinafter, "City") filed two proofs of claims in this confirmed Chapter 11 bankruptcy case, seeking fines in connection with the operation of public pay telephones by debtor Best Payphones, Inc. ("Best"). On October 6, 2005, Best moved to withdraw the reference of the part of its objection based on the federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 251 et seq., in particular 47 U.S.C. §§ 253(a) and (c). The City argues that withdrawal is inappropriate because the same questions are already pending before Judge Gleeson in the Eastern District of New York. For the reasons set forth below, the motion to withdraw is denied.

### BACKGROUND

The facts of this case have been extensively canvassed in several opinions by the Bankruptcy Court, familiarity with which is assumed. *See, e.g., In re Best Payphones, Inc.,* 279 B.R. 92 (Bankr.S.D.N.Y.2002); *In re Best Payphones, Inc.,* No. 01-15472(SMB), docket no. 466 (Bankr.S.D.N.Y. Nov. 29, 2005) (City Ex. 13). The Court will briefly highlight the facts relevant to the present matter.

In 1995 the City established the current regulatory

scheme governing public pay telephones. Under the new regulations, entities that had already installed such phones on City property were required to apply for a franchise; failure to do so would result in a Notice of Violation, which carried a $1,000 fine per phone. Best, which at the time operated more than 800 public pay telephones on City property, applied for a franchise. By resolution dated August 11, 1999, the New York City Franchise & Concession Review Committee approved the grant of a franchise to Best, contingent on Best executing and returning the Franchise Agreement. The approval required Best to execute and deliver the Franchise Agreement and other required closing documents as a condition to the award. Best did not execute and return the Franchise Agreement, however, and on January 13, 2000, the City sent Best a letter stating that, as a result of Best's failure to return the closing documents, the Franchise Committee "can therefore be deemed to have determined not to approve a franchise for [the debtor]." The City thereafter removed twenty-three*534 of Best's public pay telephones from City property between May 8 and May 10, 2000, and issued twenty-three Notices of Violations. Post-petition, the City issued an additional thirty-six Notices of Violation for operating thirty-six other public pay telephones without a permit.

Best filed this Chapter 11 case on October 23, 2001.[FN1] On February 1, 2002, the City filed a claim for pre-petition fines in the amount of $23,000, and on November 13, 2002, the City filed an administrative claim for post-petition fines in the amount of $36,000.[FN2] These claims correspond to the fifty-nine Notices of Violation issued to Best. Best filed a series of objections to these claims, arguing that the fines were unenforceable on a number of grounds. Of particular relevance to this motion, Best asserted that the Fines should be disallowed because the Franchise Agreement violated § 253(a) of the TCA.

> FN1. Best confirmed a 100% plan in late 2002 and subsequently sold all of its assets to a third-party.

> FN2. The City filed other claims at well, but these claims have been withdrawn or dismissed and are no longer disputed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 B.R. 532
370 B.R. 532
**(Cite as: 370 B.R. 532)**

At the same time, Best and its affiliate New Phone Company ("New")-an entity owned and controlled by Best's president, Michael Chaite-were "fil[ing] multiple lawsuits with overlapping claims and a shifting roster of defendants" in the Eastern District of New York. *New Phone Co. v. City of New York,* Nos. 00 Civ. 2007, 03 Civ. 3978, 01 Civ. 3934, 01 Civ. 8506, 03 Civ. 192, 04 Civ. 3541, 05 Civ. 1702, 2005 U.S. Dist. LEXIS 16224, 2005 WL 1902119, at *1 (E.D.N.Y. Aug.5, 2005). These lawsuits all argued that the City had discriminated against New and Best in its regulation of public pay telephones and had unlawfully favored Verizon New York, Inc. ("Verizon"). *See id.* Eventually, the three active Best cases in the Eastern District were consolidated before Judge Gleeson, and Magistrate Judge Matsumoto granted Best leave to file an amended complaint in the lead case, *Best Payphones, Inc. v. City of New York,* No. 03 Civ. 192. *See Best Payphones, Inc. v. City of New York,* No. 03 Civ. 192, 2006 WL 845506, 2006 U.S. Dist. LEXIS 22410 (E.D.N.Y. March 30, 2006). Best filed the Second Amended and Supplemental Consolidated Complaint in those actions on September 29, 2006, and the City filed a motion to dismiss the Second Amended and Supplemental Consolidated Complaint on April 16, 2007. That motion is currently pending before Judge Gleeson.

Meanwhile, in the bankruptcy proceeding, the City filed its response to Best's objections to its claim and moved for discretionary abstention, 28 U.S.C. § 1334(c)(1), arguing that all of issues surrounding Best's objections, other than the sufficiency of the City's proof of claim,[FN3] to the City's claims for fines were pending in other courts. Best responded by identifying four issues that it believed were not pending in any other proceeding.

> FN3. Specifically, Best argued that the City's claims should be dismissed because the City did not attach the Notices of Violation to its claims. (City Ex. 13, at 21.)

1. how DoITT filled in the "Detail of Violation" section of the NOV itself (the NOV is ambiguous and vague) 2. how the hearings at the Environmental Control Board ("ECB") are conducted (the ECB allowed DoITT to change its theory for the same NOV once DoITT realized its prior theory would be defeated) 3. the failure of DoITT to apply a policy to

Best that afforded other similarly situated public pay telephone ("PPT") providers an opportunity to avoid the NOVs *535 and 4. DoITT's lack of enforcement on Verizon for identical alleged infractions.
(Reply to the Response of the [DoITT] and the Department of Transportation to the Debtor's Objections to DoITT's and DOT's Proofs of Claim, April 5, 2005 ("Reply to the City's Response"), docket no. 394, 01-15472(SMB).) At oral argument on the City's motion, Best admitted that the first two issues were raised in another proceeding and rejected, so the Bankruptcy Court ruled from the bench that it would abstain from deciding those issues. The third and fourth issues implicate the provisions of several different laws, including the TCA. Notably, however, Best did not disagree with the City's assertion that the specific issue highlighted by Best as ripe for withdrawal in the instant motion-whether the Franchise Agreement violated the TCA-was pending in other proceedings, including the Eastern District. Nor did Best raise this issue at oral argument on the City's motion, which was held *after* the New York Court of Appeals and the Second Circuit ruled against Best in related proceedings.

While the City's motion for abstention was pending before the Bankruptcy Court, Best filed the present motion to withdraw the reference of the part of its objection based on the TCA. Judge Bernstein referred to the motion in its opinion granting the City's motion for abstention:

The question comes down to which federal court should decide the parties' disputes. At present, litigations are pending in this [Bankruptcy Court] and in the Eastern District of New York. In addition, the debtor has moved to withdraw the reference of the part of it objection based on the Telecommunications Act of 1996....

I do not presume to invade the territory of our own District Court where the debtor's motion to withdraw the reference is pending but remains undecided. Moreover, that motion centers on the provisions of the Telecommunications Act of 1996, and the debtor has understandably not argued that I should decide those issues. Nevertheless, the new allegations of selective enforcement raised by the debtor relate to the discrimination issues that form the crux of the Eastern District complaints.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 B.R. 532
370 B.R. 532
**(Cite as: 370 B.R. 532)**

(City Ex. 13, at 17-18.) Judge Bernstein went on to find that the third and fourth issues-Best's claims of selective enforcement-were specifically addressed in the complaints then pending in the Eastern District. Consequently, the Bankruptcy Court held that it would abstain from hearing *any* of the issues raised by the debtor's Amended Objection, with the exception of the sufficiency of the City's proof of claim.

With this background in mind, the Court now turns to Best's argument that the parts of its Objection based on the TCA must be withdrawn under 28 U.S.C. § 157(d).

### DISCUSSION

Pursuant to 28 U.S.C. § 157(a), all Chapter 11 cases are automatically referred to this district's bankruptcy judges. A party can move to withdraw the reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d), which states:

The district court *may withdraw,* in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, *for cause shown.* The district court *shall,* on timely motion of a party, *so withdraw* a proceeding *if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States* regulating organizations or activities affecting interstate commerce.

**\*536**28 U.S.C. § 157(d) (emphasis supplied). Best argues that the reference of those of its Objections that rely on the TCA should be withdrawn under either the mandatory or permissive standard of § 157(d).

[1][2] Mandatory withdrawal under § 157(d) is narrowly applied, and is appropriate only when "substantial and material potential conflicts exist between non-bankruptcy federal laws and Title 11." *In re Keene Corp.,* 182 B.R. 379, 382 (S.D.N.Y.1995) (citation omitted). Specifically, this provision of the statute has been interpreted to mandate withdrawal in situations where a bankruptcy judge would be called upon to "engage in significant interpretation, as opposed to simple application," of federal non-bankruptcy statutes. *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir.1991); *see*

*also In re Keene,* 182 B.R. at 382;*Enron Power Mktg. v. City of Santa Clara (In Re Enron Power Mktg.),* 2003 WL 68036, 2003 U.S. Dist. LEXIS 189 (S.D.N.Y.2003). In addition, mandatory withdrawal is "a fact specific determination, and thus necessarily involves analysis in light of the circumstances involved in each case." *In re Keene,* 182 B.R. at 382.

[3] Even where the requirements for mandatory withdrawal are not satisfied, a district court may withdraw a reference to the Bankruptcy Court, "in whole or in part, ... for cause shown." 28 U.S.C. § 157(d). Although § 157(d) does not define "cause," the Second Circuit has identified a number of relevant factors, including "whether the claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law." *Orion Pictures Corp. v. Showtime Networks, Inc.,* 4 F.3d 1095, 1101 (2d Cir.1993); *see also In re Burger Boys, Inc.,* 94 F.3d 755, 762 (2d Cir.1996).

[4] The City argues that, because the Bankruptcy Court granted the City's motion for abstention, there are no "proceedings" left to withdraw. This Court agrees. The Bankruptcy Court's opinion explicitly states that "the Court will abstain from hearing the issues raised by the debtor's Amended Objection with one exception. The debtor contends or implies that the DoITT claims should be dismissed because DoITT did not attach the NOVs to its claims. This is the only remaining issue that I must decide." (City Ex. 13, at 21.) As a result, so long as the abstention order remains in place, there is no reason to believe that the Bankruptcy Court will be called upon to "engage in significant interpretation" of the TCA. During the Bankruptcy Court's abstention, the consolidated cases in the Eastern District will proceed. The Second Amended and Supplemental Complaint specifically alleges that the text of the Franchise Agreement violates the TCA and seeks "an order declaring that the rules, regulations, and requirements that the City seeks and has sought to impose in the mandatory Franchise Agreement violate 47 U.S.C. §§ 253 and 276." *See* ¶¶ 290-93, 311; *see also* ¶¶ 7, 10-11, 14 (factual background related to the Franchise Agreement); ¶¶ 24-26, 311 (declaratory and injunctive relief and damages sought); ¶¶ 97-165 (detailed allegations regarding how the Franchise Agreement violates the TCA).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 B.R. 532
370 B.R. 532
**(Cite as: 370 B.R. 532)**

Accordingly, mandatory withdrawal pursuant to § 157(d) is not compelled.[FN4]

> FN4. The Court notes that even if the question of the Franchise Agreement's validity were to return undecided to the Bankruptcy Court from the Eastern District, the Bankruptcy Court may never have to "engage in significant interpretation, as opposed to simple application," of the TCA because the statute has already been interpreted by courts in similar cases, including the Second Circuit, *see TCG New York, Inc. v. City of White Plains,* 305 F.3d 67 (2d Cir.2002), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003), and at least one bankruptcy court, *see In re Metromedia Fiber Network, Inc.,* 313 B.R. 153 (Bankr.S.D.N.Y.2004), *aff'd,* 326 B.R. 483 (S.D.N.Y.2005).

**\*537**[5] Permissive withdrawal is likewise inappropriate. Neither judicial efficiency nor uniformity of bankruptcy administration would be materially advanced by a withdrawal of the reference in the instant case because, as explained, the same issues are pending, and indeed, are further advanced, in the Eastern District cases. Moreover, declining to withdraw the reference will not result in any additional delay or costs to the parties. As the Bankruptcy Court noted in its abstention order, "the resolution of the dispute will have little impact on the debtor and no impact on its creditors" (City Ex. 13, at 16) as Best has already reorganized and is presently resolving claims that, if allowed, will be paid from established reserves set out under the confirmed plan. Finally, Best has told the Court that it would not object to the withdrawal and transfer of its Objections to the Eastern District. (Reply 6.) However, as the Second Amended and Supplemental Consolidated Complaint, filed on September 29, 2006, contains the same arguments that Best has asked this Court to withdraw, no withdrawal is now necessary.

## CONCLUSION

For the foregoing reasons, the motion to withdraw the reference is denied.

SO ORDERED.

S.D.N.Y.,2007.
In re Best Payphones, Inc.
370 B.R. 532

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 2**

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1995 WL 479512 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 479512)**

**H**In re Kentile Floors, Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In re KENTILE FLOORS, INC., Debtor.
KENTILE FLOORS, INC., Plaintiff,
v.
CONGOLEUM CORPORATION, Defendant.
**Bankruptcy No. 92B46466 (BRL), Adv. No. 94-
8518A, No. 95 Civ. 2470 (LLS).**

Aug. 10, 1995.

MEMORANDUM AND ORDER

STANTON, District Judge.
*1 Congoleum Corporation ("Congoleum") moves
pursuant to 28 U.S.C. § 157(d) for an order
withdrawing the reference to the bankruptcy court of
an adversary proceeding brought against it by Kentile
Floors, Inc. ("Kentile") in Kentile's chapter 11 case.
Congoleum argues that the reference should be
withdrawn because the adversary proceeding is a
non-core proceeding in which Congoleum has the
right to a jury trial. Kentile contends that (1) the
bankruptcy court must determine in the first instance
whether the proceeding is core or non-core, (2)
Congoleum's motion is untimely, and (3) the
proceeding is core.

*BACKGROUND*

On November 30, 1992, Kentile filed a voluntary
petition pursuant to chapter 11 of title 11 of the
United States Code (the "Bankruptcy Code") in the
United States Bankruptcy Court for the Southern
District of New York. The Office of the United States
Trustee appointed an Official Unsecured Creditors'
Committee, which began investigating whether
Congoleum interfered with Kentile's relationships
with its distributors.

After obtaining discovery, Kentile filed a complaint
against Congoleum, asserting claims for tortious
interference with prospective economic advantage
and unfair competition. Kentile alleged that
beginning in early 1993 Congoleum threatened and

gave subsidies to Kentile's distributors as part of a
successful campaign to convince them to carry
Congoleum's rather than Kentile's products. Kentile
alleged that the action was a core proceeding.

Congoleum moved to dismiss the complaint for
failure to state a claim. The bankruptcy court granted
the motion in part, dismissing Kentile's unfair
competition claim but not the tortious interference
claim.

The bankruptcy court also referred the case to
mediation. The parties met several times and engaged
in additional discovery, but ultimately determined
that mediation would not likely resolve the dispute.
They agreed to return to the bankruptcy court and
notified the mediator of their decision.

Congoleum filed the instant motion and an answer
and jury demand.

*DISCUSSION*

A. Who May Make the Initial Core/Non-Core
Determination?

Kentile argues that Congoleum's motion is not ripe
because the bankruptcy judge must determine in the
first instance whether the proceeding is core or non-
core. Kentile relies on 28 U.S.C. § 157(b)(3), which
provides, "The bankruptcy judge shall determine, on
the judge's own motion or on timely motion of a
party, whether a proceeding is a core proceeding
under this subsection or is a proceeding that is
otherwise related to a case under title 11."Kentile
infers from the mandatory language of that section
that the bankruptcy judge has the exclusive power to
make the core/non-core determination.

However, section 157(d) provides that "the district
court may withdraw, in whole or in part, any cause or
proceeding referred under this section, on its own
motion or on timely motion of any party, for cause
shown."The Second Circuit has interpreted that
provision as authorizing district courts to make the
core/non-core determination in the first instance. *See
Orion Pictures Corp. v. Showtime Networks, Inc. (In*

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 479512 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 479512)

*re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2nd Cir. 1993), cert. dismissed,114 S. Ct. 1418 (1994)* ("A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn."); *see also Hassett v. Bancohio National Bank (In re CIS Corp.), 172 B.R. 748, 755 (S.D.N.Y. 1994)* ("While some courts have construed [section 157(b)(3)] as establishing a preference for initial determination of the issue by the bankruptcy court, nothing in this or any other statute vests that power exclusively in the bankruptcy court."); *Interconnect Telephone Svcs. v. Farren, 59 B.R. 397, 401 n.2 (S.D.N.Y. 1986)* (same).

**\*2** This court may determine whether the proceeding is core or non-core.

B. Timeliness

Kentile contends that Congoleum delayed too long in filing its motion to withdraw the reference. Kentile asserts that before filing the instant motion Congoleum moved to dismiss the complaint and participated in mediation, wasting judicial resources and those of the parties.

Although section 157(d) contains a threshold requirement of timeliness, there is no definition of "timely" in the Bankruptcy Code. Courts have defined it to mean "as soon as possible after the moving party has notice of the grounds for withdrawing the reference."*Central Illinois Sav. & Loan Ass'n v. Rittenberg Co. (In re IQ Telecommunications, Inc.), 70 B.R. 742, 746 (N.D. Ill. 1987)*; *see also Boyajian v. DeFusco (In re Giorgio), 50 B.R. 327, 328 (D.R.I. 1985)* ("the word 'timely' means 'at the first reasonable opportunity'").

Although nine months elapsed between the filing of the complaint and Congoleum's motion to withdraw the reference, the motion is timely. The several months during which the parties worked with a court-appointed mediator in an effort to settle the dispute do not count against Congoleum because filing a motion to withdraw the reference while mediation was underway would have defeated the purpose of mediation. Once the parties agreed to abandon the mediation and return to the bankruptcy court, Congoleum timely moved.

In addition, Congoleum did not have grounds for a motion to withdraw the reference until it filed an answer and jury demand. Congoleum bases the instant motion on the constitutional impermissibility of a bankruptcy judge holding a jury trial in a non-core proceeding. In the complaint, Kentile did not demand a jury trial and characterized the action as a core proceeding. (*See* Complaint, Burrick Aff. Ex. I.) Congoleum's answer, which denied that the action was a core proceeding and demanded a jury trial, thus provided the basis for the motion. (*See* Answer, Cohen Aff. Ex. E.)

Congoleum's motion to withdraw the reference is timely.

C. Withdrawal of the Reference

Section 157(d) permits withdrawal of the reference "for cause shown," but does not define the term "cause." Courts in this circuit have held that the fact that an adversary proceeding concerns non-core matters for which there is the right to a jury trial is sufficient cause to withdraw the reference.*Orion Pictures, 4 F.3d at 1101;Hassett, 172 B.R. at 755.* Thus, a district court considering whether to withdraw the reference should first determine whether the claim is core or non-core. *Orion Pictures, 4 F.3d at 1101.*

1. Core/non-core

A matter is a core proceeding if it invokes a substantive right provided by the Bankruptcy Code or if it could only arise in the context of a bankruptcy case. *McCrory Corp. v. 99 Cents Only Stores (In re McCrory Corp.), 160 B.R. 502, 506 (S.D.N.Y. 1993).* Put another way, a core proceeding has "as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment."*Acolyte Elec. Corp. v. City of New York, 69 B.R. 155, 173 (Bankr. E.D.N.Y. 1986), aff'd,1987 WL 47763 (E.D.N.Y. Mar. 27, 1987).*

**\*3**Section 157(b)(2) provides a non-exhaustive list of core matters. Kentile argues that the instant action falls under two of that subsection's categories: (1) matters concerning the administration of the estate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 479512 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 479512)

and (2) other proceedings affecting the liquidation of the estate or the adjustment of the debtor-creditor relationship or the equity security holder relationship. Specifically, Kentile claims that the proceeding is core because the allegedly tortious events occurred after it filed its bankruptcy petition and because Congoleum "utilized the fact of Kentile's status as a debtor-in-possession to dissuade Kentile's distributors from continuing to sell its products."(Kentile's Memorandum of Law at 18-19.)

Neither the Bankruptcy Code nor the case law supports the distinction Kentile draws between pre- and post-petition causes of action. Kentile cites *Ben Cooper, Inc. v. Insurance Company (In re Ben Cooper, Inc.), 896 F.2d 1394 (2nd Cir. 1990)* and *Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works), 815 F.2d 165 (2nd Cir. 1987)* as standing for the proposition that a debtor's state-law cause of action arising after the petition was filed is a core proceeding. In both cases, however, the courts concluded that the defendants, which contracted with debtors-in-possession, knew they were "dealing with an agent responsible to the bankruptcy court; that the bankruptcy court would resolve subsequent disputes should therefore come as no surprise."*Arnold Print Works, 815 F.2d at 170.* Here, in contrast, Congoleum did not contract with a debtor-in-possession and thereby consent to the bankruptcy court's jurisdiction.

Kentile also relies on several cases whose reasoning was discredited by the Second Circuit in *Orion Pictures.*The courts in *Germain v. Connecticut National Bank (In the Matter of O'Sullivan's Fuel Oil Co.), 88 B.R. 17, 20 (D. Conn. 1988), General American Communications Corp. v. Landsell (In re General American Communications Corp.), 130 B.R. 136, 157 (S.D.N.Y. 1991),* and *Umbreit v. Stump, Harvey & Cook, Inc. (In re Baltimore Motor Coach Co.), 103 B.R. 103, 106 (D. Md. 1989),* reasoned that the post-petition proceedings were core because no cause of action existed on the date the debtor filed its bankruptcy petition. The court of appeals in *Orion Pictures* implicitly rejected that approach and held that a proceeding against a defendant who was not a creditor of the debtor was non-core despite the benefit to the estate and the tangential relationship of the proceeding to estate administration.*Orion Pictures, 4 F.3d at 1102.*

Kentile's claims arise under state law and could have been brought regardless of whether it filed for bankruptcy protection. Congoleum has not filed a claim in Kentile's bankruptcy case. *See Keene Corp. v. Williams Bailey & Wesner (In re Keene Corp.), 182 B.R. 379, 384 (S.D.N.Y. 1995)* (action against a defendant which was neither a debtor nor a creditor of the debtor-in-possession was non-core). The instant action concerns the administration or liquidation of the estate only to the extent that any recovery may inure to the estate's benefit. That connection is too remote. *See Orion Pictures, 4 F.3d at 1101;Hassett, 172 B.R. at 757* ("Practically any claim brought by a trustee could be considered to have some connection to the estate's administration if the end result might be to bring property into the estate. But that does not mean that all such claims involve core matters.").

*4 Because there is no nexus between the instant proceeding and Kentile's bankruptcy case, the proceeding is non-core.

### 2. Other factors

Once a court has made the core/non-core determination, it should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping and other related factors in determining whether withdrawal of the reference is warranted. *Orion Pictures, 4 F.3d at 1101.*

Those factors favor withdrawal of the reference. Because Kentile's action is non-core, the bankruptcy court's determinations would be subject to *de novo* review by this court. *See28 U.S.C. § 157(c)(1).* Thus, a single proceeding in this court would avoid unnecessary costs.

Kentile does not dispute Congoleum's claim that it has the right to a jury trial on Kentile's claims. The bankruptcy court cannot, in keeping with the Constitution, hold a jury trial in a non-core matter. *Orion Pictures, 4 F.3d at 1101.* For those reasons, the reference to the bankruptcy court should be withdrawn.

### CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 479512 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 479512)**

Page 4

Congoleum's motion to withdraw the reference to the
bankruptcy court is granted.

S.D.N.Y.,1995.
In re Kentile Floors, Inc.
Not Reported in F.Supp., 1995 WL 479512
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2320113 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2320113)**

**H**In re Northwestern Corp.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: NORTHWESTERN CORPORATION, Debtor.
MAGTEN ASSET MANAGEMENT
CORPORATION and Law Debenture Trust
Company of New York, Plaintiffs,
v.
NORTHWESTERN CORPORATION, Defendant.
**No. 03-12872, 04-53324, 04-1494-JJF.**

Sept. 22, 2005.

Elio Battista, Jr., and Mark J. Packel, of Blank Rome
LLP, Wilmington, Delaware, Bonnie Steingart, and
Garry Kaplan, of Fried, Frank, Harris, Shriver &
Jacobson LLP, New York, New York, for Plaintiff
Magten Asset Management Corporation, of counsel.
Kathleen M. Miller, of Smith, Katzenstein & Furlow,
LLP, Wilmington, Delaware, Amanda D. Darwin,
John V. Snellings, and Lee Harrington of Nixon
Peabody LLP, Boston, Massachusetts, for Plaintiff
Law Debenture Trust Company of New York, of
counsel.
William E. Chipman, Jr. and Scott D. Cousins, of
Greenberg Traurig, LLP, Wilmington, Delaware,
Adam D. Cole, of Greenberg Traurig, LLP, New
York, New York, for Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Pending before the Court is the Motion Of Magten
Asset Management Corporation And Law Debenture
Trust Company Of New York To Withdraw The
Reference To Bankruptcy Court And For
Consolidation With Civil Action Number 04-1256
Pending In This District. (D.I.1.) For the reasons set
forth below, the Court will grant the Motion To
Withdraw The Reference and deny the Motion To
Consolidate with leave to renew at the status
conference to take place on Friday, October 21, 2005.

BACKGROUND

On September 14, 2003, NorthWestern Corporation

("NorthWestern") filed a voluntary petition for relief
under Chapter 11 of the Bankruptcy Code. On April
16, 2004, Plaintiffs brought this adversary action
alleging a fraudulent transfer of assets from
NorthWestern's wholly-owned subsidiary Clark Fork
and Blackfoot LLC ("Clark Fork") to NorthWestern.

On May 20, 2004, Plaintiff Magten Asset
Management Corporation ("Magten") filed a
complaint in Montana state court against Paul
Hastings Janofsky & Walker LLP ("Paul Hastings"),
the law firm that represented both NorthWestern and
Clark Fork in the allegedly fraudulent transfer. On
June 24, 2004, that case (the "Paul Hastings
proceeding") was removed to the Montana Federal
District Court. On September 8, 2004, the Montana
District Court transferred the Paul Hastings
proceeding to the Delaware District Court, noting,
among other considerations, that there was a
substantial overlap of issues between that case and
the adversary action that is the subject of the instant
motion. The Paul Hastings proceeding is now
pending before this Court as Civil Action No. 04-
1256-JJF. Magten has demanded a jury trial in that
case.

PARTIES' CONTENTIONS

By their Motion, Plaintiffs contend that discretionary
withdrawal of the reference is warranted because the
causes of action in the instant adversary action and
the Paul Hastings proceeding are inextricably
intertwined. Therefore, withdrawal of the reference
and consolidation of the two cases in this Court
would promote judicial efficiency and uniformity,
and foster economical use of the parties' resources.

In response, NorthWestern contends that Plaintiffs
have not demonstrated cause to withdraw the
reference. NorthWestern contends that withdrawal
would undermine the goal of providing uniformity in
bankruptcy administration, encourage forum
shopping, unnecessarily diminish the parties'
resources, and delay the bankruptcy process.

DISCUSSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pursuant to 28 U.S.C. § 1334(b), district courts "have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."Pursuant to 28 U.S.C. § 157(a), each district court may refer cases under title 11 to the Bankruptcy Court for disposition. Under Section 157(d), however, the referred proceeding can be withdrawn from the Bankruptcy Court and returned to the District Court. Section 157(d) provides for both mandatory withdrawal and discretionary withdrawal. In this case, Plaintiffs seek withdrawal only under the standards for discretionary withdrawal.

**\*2** In providing for discretionary withdrawal, Section 157(d) states: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."The requirement that cause be shown "creates a 'presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy.'" ' *Hatzel & Buehler, Inc. v. Central Hudson Gas & Elec.,* 106 B.R. 367, 371 (D.Del.1989) (citations omitted).

The Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for discretionary withdrawal. These factors include: (1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process; and (5) timing of the request for withdrawal. *In re Pruitt,* 910 F.2d 1160, 1168 (3d Cir.1990).

The Court concludes that Plaintiffs have shown sufficient cause to support discretionary withdrawal of the reference to the Bankruptcy Court. In reaching this determination, the Court concludes that the factors set forth in *In re Pruitt* weigh in favor of withdrawal. The claims in this case are based on the same underlying transaction and are virtually identical to the claims in the Paul Hastings proceeding currently pending before the Court. Resolving both of these proceedings in a single forum will ensure a uniform resolution of the issues and will promote the economical use of the parties' resources and the resources of this Court and the

Bankruptcy Court by reducing the possibility of duplicative proceedings.

In addition, the Court is satisfied that Plaintiff's Motion To Withdraw The Reference is not motivated by forum shopping. The Paul Hastings proceeding is before this Court because it was removed from Montana state court and transferred to this District upon the motion of Paul Hastings, the defendant in that case.

Finally, the Court concludes that the Motion To Withdraw The Reference is timely. It was made at a relatively early stage in the proceedings and significant discovery has not yet occurred in either case. Accordingly, the Court will grant Plaintiff's Motion for withdrawal.

Having withdrawn this matter, the Court will order a status conference to take place on Friday, October 21, at 9:30 a.m.. At that conference, the Court will address matters pending in this case and the Paul Hastings proceeding, including whether the cases will be consolidated for trial or only for pre-trial and discovery purposes.[FN1]

> FN1. The Court also intends to discuss at that status conference, all other related cases pending before this Court.

### CONCLUSION

For the reasons discussed, the Court will grant the Plaintiff's Motion To Withdraw The Reference To Bankruptcy Court (D.I.1) and deny the Plaintiff's Motion For Consolidation With Civil Action Number 04-1256 (D.I.1) with leave to renew at the October 21, 2005 status conference.

**\*3** An appropriate order will be entered.

### *ORDER*

At Wilmington, this 22nd day of September 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1. The Motion Of Magten Asset Management

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2320113 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2320113)**

Corporation And Law Debenture Trust Company Of New York To Withdraw The Reference To Bankruptcy Court (D.I.1) is *GRANTED.*

2. The Motion For Consolidation With Civil Action Number 04-1256-JJF (D.I.1) is *DENIED WITH LEAVE TO RENEW* at the October 21, 2005 status conference.

3. A status conference for both cases, Civil Action Nos. 04-1494-JJF and 04-1256-JJF, will take place on Friday, October 21, 2005 at 9:30 a.m. in Courtroom No. 4B on the 4th floor, Boggs Federal Building, Wilmington.

D.Del.,2005.
In re Northwestern Corp.
Not Reported in F.Supp.2d, 2005 WL 2320113 (D.Del.)

END OF DOCUMENT

**TAB 4**

Westlaw.

Not Reported in F.Supp.                                                          Page 1
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 489711)**

**C**Nemsa Establishment, S.A. v. Viral Testign
Systems Corp.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
NEMSA ESTABLISHMENT, S.A., Plaintiff,
v.
VIRAL TESTING SYSTEMS CORP., et al.,
Defendants.
**No. 95 Civ. 0277 (LAP).**

Aug. 15, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:
*1 Nemsa Establishment, S.A. ("Nemsa") has moved
to remand the instant case to the Supreme Court for
the State of New York, County of New York;
alternatively, for discretionary abstention; and for
costs and attorneys' fees in connection with this
motion. Nemsa's motions are denied. Defendants'
motion to transfer this case to the Southern District of
Texas pursuant to 28 U.S.C. § 1404(a) is granted.

*BACKGROUND*

Plaintiff Nemsa is an establishment formed and
functioning under the laws of Liechtenstein and is
domiciled in Vaduz, Liechtenstein. (Tackel Aff. ¶
3.FN1 ) Defendant Viral Testing Systems Corp.
("VTS" or "the Debtor") is a Delaware corporation
listed on the American Stock Exchange in New York
City.(Id. ¶ 4.) Defendant Lone Star Casino
Corporation ("Lone Star"), a Delaware corporation
with stock publicly traded on NASDAQ, was
originally formed as a wholly-owned subsidiary of
VTS in December 1992 and was later spun off to
VTS shareholders in May 1993. (Id.) Defendant
Travis Partners ("Travis"), a Delaware limited
partnership whose only general partners are
defendants Paul J. Montle ("Montle") and Paul V.
Culotta ("Culotta"), is a substantial minority
shareholder of VTS. (Culotta Aff. ¶ 2;FN2 Tackel Aff.
¶ 4.) In addition, Culotta is currently the President
and Chief Executive Officer of VTS. (Culotta Aff. ¶
2.) During the period of time covered by the

complaint, Montle and Culotta were the principal
executive officers of VTS: Montle was its President
and Chief Executive Officer, and Culotta was its Vice
President and Chief Financial Officer. (Id.) During
this time, Montle and Culotta were involved with
Lone Star as well: Montle was its Chairman and
Chief Executive Officer, and Culotta was its Chief
Financial Officer and a Director of Lone Star.(Id.)

Nemsa commenced this action in May 1994 in the
Supreme Court for the State of New York, County of
New York. (Tackel ¶ 5.) The action arises from
VTS's alleged breaches of an agreement (the
"Purchase Agreement") with Nemsa, pursuant to
which, it is alleged, VTS effectively assumed certain
debt obligations to Nemsa of a corporation known as
Thermascan, and became obligated to convey to
Nemsa cash and equity securities of VTS. (Id. ¶ 6;
Compl. ¶ 17.) Nemsa claims it has not received the
consideration to which it is entitled under the
Purchase Agreement despite performance of Nemsa's
obligations to VTS. (Tackel Aff. ¶ 6.) In its
complaint, Nemsa alleges various state law causes of
action against VTS, Lone Star, Travis, Montle, and
Culotta, including, *inter alia*, common law fraud and
deceit, fraudulent conveyance, aiding and abetting a
fraudulent conveyance, specific performance, breach
of contract, breach of fiduciary duty, usurpation of
corporate opportunity and tortious interference with
contract. (Id. ¶ 7.)

In November 1994, counsel for all parties
commenced settlement negotiations. By late
December 1994, a settlement dollar amount had been
agreed upon which was to be paid to Nemsa by a
promissory note of Travis, and other issues continued
to be discussed. However, settlement discussions
were halted by VTS and the remaining defendants
upon VTS's seeking the protection of the bankruptcy
laws. (Tackel Aff. ¶ 12.) On or about January 9,
1995, VTS filed its voluntary petition under Chapter
11 of the Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of Texas.
(Id. ¶ 2.) On or about January 13, 1995, VTS, along
with Lone Star, Travis, Montle, and Culotta
(collectively the "Non-Debtor Defendants") filed a
notice of removal of this action in the United States
District Court for the Southern District of New York.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

(*Id.*) A conference and argument were held on May 5, 1995.

### DISCUSSION

#### I. *"Related to" Subject Matter Jurisdiction is Proper*

**\*2** Nemsa has moved to have the instant action remanded to state court. In pertinent part, 28 U.S.C. § 1452(a) provides:

A party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a). Here, the jurisdictional basis for bankruptcy removal pursuant to this section is provided by 28 U.S.C. § 1334(b).*E.g., Drexel Burnham Lambert v. Vigilant Ins. Co.,* 130 B.R. 405, 407 (S.D.N.Y. 1991).Section 1334(b) provides for jurisdiction in cases involving proceedings "arising under title 11, or arising in or related to a case under title 11."28 U.S.C. § 1334(b). Thus, § 1334(b) provides for several different types of proceedings. First, actions that "arise under" title 11 of the Bankruptcy Code involve claims "predicated on a right created by a provision of title 11."*Drexel Burnham Lambert,* 130 B.R. at 407 (quoting *World Travel Vacation Brokers, Inc. v. The Bowery Savings Bank (In re Chargit Inc.),* 81 B.R. 243, 247 (Bankr. S.D.N.Y. 1987)). Second, "arising in" proceedings are "those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."*Id.* (quoting *In re Chargit,* 81 B.R. at 247). Third, although the statute does not provide a definition for "related to" actions, *e.g., Matter of Wood,* 825 F.2d 90, 93 (5th Cir. 1987), courts have held that an action is "related to" a case under title 11 if "the outcome of [the action] could *conceivably* have any effect on the estate being administered in bankruptcy."*Drexel Burnham Lambert,* 130 B.R. at 407 (quoting *In re Chargit,* 81 B.R. at 247) (emphasis in original).*See also Matter of Wood,* 825 F.2d at 93 (citing cases). In short, § 1334(b) was intended to "identify collectively a broad range of matters subject to the bankruptcy jurisdiction of federal courts."*Id.* at 92.As the Court of Appeals for the Fifth Circuit has explained:

Congress was concerned with the inefficiencies of piecemeal adjudication of matters affecting the administration of bankruptcies and intended to give federal courts the power to adjudicate all matters having an effect on the bankruptcy. Courts have recognized that the grant of jurisdiction under the 1978 Act was broad.

*Id.* (citations omitted).

Nemsa argues that the instant action does not fall within the purview of § 1334(b) and accordingly must be remanded. The defendants argue that removal of the instant action was proper because this case is "related to" VTS's bankruptcy proceeding. In *Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir. 1984), the Court of Appeals for the Third Circuit explained "related to" jurisdiction as follows:

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

**\*3***Id.* at 994 (citations omitted) (emphasis omitted). Courts in this circuit have cited with approval the standard enunciated by the Court of Appeals for the Third Circuit in *Pacor. E.g., Publicker Indus. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir. 1992) (stating that "[t]he test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether the outcome might have any 'conceivable effect' on the bankrupt estate" and that if such a connection were found, the litigation falls within "related to" jurisdiction); *Bond St. Assocs. v. Ames Dep't Stores,* 174 B.R. 28, 32 (S.D.N.Y. 1994); *Grillo v. Zurich Ins. Co.,* 170 B.R. 66, 68 (S.D.N.Y. 1994); *Neuman v. Goldberg,* 159 B.R. 681, 686-87 (S.D.N.Y. 1993); *Mihnlong Enters. v. New York Int'l Hostel, Inc. (In re New York Int'l Hostel, Inc.),* 157 B.R. 748, 751 (S.D.N.Y. 1993). Our Court of Appeals has cautioned that "related to" jurisdiction is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

not limitless,[FN3] of course, and also has found there was no jurisdiction in an action lacking any "significant connection" to the bankruptcy case. *Turner v. Ermiger (In re Turner), 724 F.2d 338, 341 (2d Cir. 1983).See also In re Cuyahoga, 980 F.2d at 114.* At least one court has questioned whether the "significant connection" language narrows -- or expands -- the *Pacor* standard in this circuit. *Weisman v. Southeast Hotel Properties,* No. 91 Civ. 6232 (MBM), 1992 WL 131080 at *3 (S.D.N.Y. June 1, 1992).But see Fietz v. Great Western Savings (In re Fietz), 852 F.2d 455, 457 (9th Cir. 1988); Widewaters Roseland Center Co. v. TJX Co., 135 B.R. 204, 206 (N.D.N.Y. 1991)* (stating that *Turner* narrows the standard set forth in *Pacor*).

In the instant action, the defendants rely in particular upon *Kelley v. Salem Mortgage Co., (In re Salem Mortgage), 783 F.2d 626 (6th Cir. 1986)* and *Ameritrust v. Opti-Gage, Inc. (In re Opti-Gage, Inc.), 128 B.R. 189 (Bankr. S.D. Ohio 1991)* in support of their argument that this action is "related to" the VTS bankruptcy. In *Opti-Gage,* it was held that:

[P]roceedings are "related to" bankruptcy cases not only where the outcome of the proceeding may conceivably have an effect upon the estate being administered, but also where parties are sufficiently intertwined with the debtor.

*128 B.R. at 195* (explaining *Salem Mortgage*). In *Salem Mortgage,* the Attorney General of Michigan filed suit against five related mortgage broker-debtors and eight other defendants. *783 F.2d at 629.* The parties negotiated a proposed consent order which had the effect, *inter alia,* of releasing all claims against the debtors from the mortgage transactions except for claims concerning their alleged misappropriation of escrow funds. *Id. at 634.*Although the bankruptcy court approved the order, the district court dismissed the action for lack of subject matter jurisdiction. *Id. at 630-31.*The Court of Appeals for the Sixth Circuit reversed and held that the action was not beyond "related to" jurisdiction. *Id. at 628-29.*The Court noted, first, that the parties in *Salem Mortgage* were "more intertwined" than those in earlier cases wherein the actions had been held beyond "related to" jurisdiction.[FN4]*Id.* at 635.Second, the Court rejected the argument that a finding of definite liability on the part of the estate was a requirement of "related to"

jurisdiction. *Id.*

*4 As mentioned *supra,* defendants also rely upon *Opti-Gage.*In *Opti-Gage,* Cavender was the sole owner of the debtor-corporation Opti-Gage. 128 B.R. at 191.* Cavender transferred control of Opti-Gage to two individuals, Lich and Auld, who thus became officers and directors of Opti-Gage. *Id. at 192.*As part of the transfer, plaintiff Ameritrust Co. loaned $1.5 million to Opti-Gage secured by, *inter alia,* the personal guaranties of Cavender, Lich, and their respective wives. *Id. at 191-92.*After Opti-Gage defaulted on the loan, plaintiff sued Opti-Gage, the Cavenders, and the Lichs in state court for various relief under the guaranties. *Id. at 191.*Subsequently, Opti-Gage filed a petition pursuant to chapter 11. *Id.* The Cavenders then asserted, *inter alia,* cross-claims against Opti-Gage and Lich, and joined Auld as a third-party defendant. *Id.* at 191-93.

After the action had been removed to bankruptcy court, Auld moved to dismiss the Cavenders' cross-claims against him on the grounds that the court lacked subject matter jurisdiction. *Id.* at 193.The Court denied Auld's motion. First, although it was possible that the cross-claims might "ultimately have no effect on Opti-Gage's bankruptcy", the Court declined to conclude that the cross-claims would "have no conceivable effect." *Id.* at 195.Second, the Court found that the Cavenders had "challenged the combined actions of both the debtor and nondebtors," and that the resolution of the dispute accordingly would "involve considerations of Auld's and Lich's involvement in those actions."*Id.* at 196.The factors the Court pointed to included the following:

In particular, because Lich and Auld owned the controlling interests of the debtor corporation, were officers and directors of that corporation, are alleged to have conspired to strip the corporation of its assets and to defraud the Cavenders, and it may be significant to distinguish Auld's and Lich's actions in their corporate capacities vis-a-vis their individual capacities, the court finds that Auld is sufficiently intertwined with the debtor to support a finding of bankruptcy jurisdiction.

*Id.* The Court pointed out that it was not finding the Cavenders' cross-claims related simply due to the common facts; "a factual nexus between a civil proceeding and a bankruptcy case is in and of itself

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 4
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

insufficient to confer bankruptcy jurisdiction upon a court."*Id.* As the Court explained:

With respect to the "intertwining" test, then, it is the degree to which the parties (Lich, Auld, and the debtor, Opti-Gage) are intertwined that supports a finding of jurisdiction. Unfortunately, it is impossible to precisely define when parties are sufficiently intertwined with the debtor to find bankruptcy jurisdiction, but the court believes that the factors listed in the preceding paragraph are sufficient to support jurisdiction for the cross-claims filed jointly against Auld, Lich, and Opti-Gage.

**\*5***Id.* The Court acknowledged that the facts presented in *Opti-Gage* were "probably very near the outer boundaries of bankruptcy jurisdiction," but concluded that:

[M]erely designating parties as nondebtors or third parties does not per se provide the answer to whether the requisite jurisdiction is present. Instead, a functional analysis of the relationship between the claim and the bankruptcy estate must be performed, *i.e.,* could resolution of the claim conceivably have any effect upon the estate being administered in bankruptcy?... [W]here parties are sufficiently intertwined with the debtor, claims involving the joint conduct of the debtor and nondebtor defendants will be "related to" the debtor's bankruptcy case.

*Id.* at 197-98.

I find the logic of *Salem Mortgage* and *Opti-Gage* persuasive.[FN5]The parties have not brought to my attention, nor has research uncovered, any cases in this circuit either expressly adopting or rejecting the reasoning of these cases. Given the unusual facts in this action, I find that VTS and the Non-Debtor Defendants are so intertwined that this action falls within "related to" jurisdiction, and that this action has a "significant connection" with the VTS bankruptcy proceeding. First, as the defendants point out, during the entire period covered by the complaint, Montle was VTS's President and Chief Executive Officer, and Culotta was VTS's Vice President and Chief Financial Officer. (Culotta Aff. ¶ 2.) Accordingly, during that time, VTS conducted its business through the instrumentality of Montle and Culotta as its principal executive officers. (*Id.*) Consequently, resolution of plaintiff's claims against VTS will involve consideration of the Non-Debtor Defendants' involvement in the acts underlying those

claims. *Opti-Gage,* 128 B.R. at 196 (noting that Lich and Auld were officers and directors of the debtor corporation, and that it could be "significant" to distinguish between the actions of Auld and Lich with respect to their individual and corporate capacities).

However, it is not merely from the fact that Culotta and Montle were officers of VTS that I find the instant action is "related to" the VTS chapter 11 proceeding. Rather, it is the fact that Nemsa apparently claims that the defendants *together* took actions which cannot be easily parsed out as attributable to VTS or to Non-Debtor Defendants. Given the allegations pleaded in Nemsa's complaint, it would be difficult -- if not impossible -- to distinguish at this juncture between actions taken by Culotta and Montle in their individual and corporate capacities, without considering VTS's and the Non-Debtor Defendants' joint conduct for each allegation. *Opti-Gage,* 128 B.R. at 196;*Matter of Wood,* 825 F.2d 90, 94 (5th Cir. 1987) (stating that "when the plaintiff alleges liability resulting from the joint conduct of the debtor and non-debtor defendants, bankruptcy jurisdiction exists over all claims under section 1334") (citations omitted).

**\*6** More specifically, in reviewing the complaint, it is apparent that the causes of action asserted against the Non-Debtor Defendants are intimately intertwined with those asserted against VTS. The first five causes of action asserted name only VTS; there can be no dispute that there is jurisdiction over these claims.[FN6]The sixth cause of action is asserted against VTS, Travis, Montle, and Culotta collectively. In this cause of action, Nemsa alleges that Montle and Culotta, as directors and officers of VTS and partners of Travis, and Travis itself controlled VTS. (Compl. ¶¶ 54-57.) Nemsa alleges that VTS, Travis, Montle, and Culotta made false and misleading misrepresentations and statements to Nemsa regarding the VTS-Thermascan merger in order to induce Nemsa to execute and deliver the Purchase Agreement and to vote its shares of Thermascan in favor of the merger. (*Id.* ¶¶ 60-63.)Even Nemsa does not distinguish between the actions of VTS and those of the Non-Debtor Defendants in its allegations.

Similarly, in its tenth and eleventh causes of action, Nemsa challenges the joint actions of VTS, Lone Star, Travis, Montle, and Culotta. (*Id.* ¶¶ 110-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 489711)**

21.)Specifically, in its tenth cause of action, Nemsa asserts that Travis, Montle, and Culotta caused VTS to assign to Lone Star VTS's right to purchase Papone's Palace, Ltd. Liability Co. without fair consideration at a time when VTS was insolvent (the "Casino").(*Id.* ¶¶ 69, 114.)According to Nemsa, Travis, Montle, and Culotta caused VTS to spend $1,665,000 for 166,456 shares of valueless Lone Star preferred stock. (*Id.* ¶ 116.)Nemsa claims these actions, plus VTS's spin-off of Lone Star in the form of a distribution and/or conveyance of 100% of the common stock of Lone Star to VTS stockholders, damaged Nemsa. (*Id.* ¶¶ 23, 117.)Nemsa asks to have set aside the conveyance of Lone Star common shares pursuant to the spin-off and the payment of $1,665,000 by VTS to Lone Star for Lone Star preferred shares; seeks declaratory judgment that these conveyances were fraudulent and void as against Nemsa; and seeks a judgment restraining the defendants from selling, disposing of, or encumbering their VTS common or Lone Star common shares. (*Id.* ¶ 119.)In its eleventh cause of action, Nemsa seeks monetary damages for the allegedly fraudulent conveyances described above. (*Id.* ¶ 121.)In the five remaining causes of action, Nemsa does not specifically name VTS as a defendant. However, in perusing these claims, it is apparent that Nemsa's allegations against the Non-Debtor Defendants reflect VTS's inseparable involvement in these events that Nemsa alleges.[FN7]

Thus, in analyzing Nemsa's allegations in the complaint, it is apparent that the actions of VTS and those of the Non-Debtor Defendants are inextricably intertwined. The defendants have argued that:

[T]he claims against all defendants are of a piece, and depend for their proof and evaluation of liability of the several defendants upon a weighing of the conduct of *all* defendants acting individually, in concert and possibly in multiple capacities.

*7 (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Remand ("Def. Opp.") at 12 n.8) (emphasis in original). The defendants are correct. Due to the nature of the factual allegations in the instant action, *i.e.,* the acts at issue involve the joint conduct of VTS and Non-Debtor Defendants, and the relationships and degree of interconnectedness among the parties, I find that the instant action is "related to" and has a significant

connection with the VTS bankruptcy proceeding and, thus, that jurisdiction is proper.[FN8]Accordingly, Nemsa's motion to remand to the state court must be denied.

II. *Equitable Remand and Discretionary Abstention*

Nemsa argues that even if the Court finds that it has subject matter jurisdiction to entertain this action, other grounds support remand. Specifically, Nemsa points to 28 U.S.C. § 1452(b), which authorizes a federal court to remand a case on any "equitable ground":

The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title.

28 U.S.C. § 1452(b).Section 1452(b) does not define the term "equitable ground"; however, among the factors taken into account by courts when deciding whether to remand are:
(1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; (7) prejudice to the involuntarily removed defendants.

*Drexel Burnham Lambert Group v. Vigilant Ins. Co.,* 130 B.R. 405, 407 (S.D.N.Y. 1991).*See also Phoenix Elec. Contracting v. Lovece,* No. 93 Civ. 4340 (LMM), 1993 WL 512917 at *3 (S.D.N.Y. Dec. 9, 1993) (referring to the factors set forth in *Drexel Burnham Lambert Group* and stating that courts have also considered the "duplicative and uneconomical use of judicial resources" and the "lessened possibility of inconsistent results"). Although the question of whether remand is appropriate is a close one, I find remand is inappropriate here.

Nemsa contends that the instant action involves questions of New York state law, thus favoring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 489711)**

remand to New York state courts. *E.g, Searcy v. Knostman,* 155 B.R. 699, 710 (Bankr. S.D. Miss. 1993) (remanding where case involved questions of state law); *Rednel Tower, Ltd. v. Riverside Nursing Home (In re Riverside Nursing Home),* 144 B.R. 951, 956 (Bankr. S.D.N.Y. 1992) (remanding where action involved a state law eviction of a chapter 11 debtor); *Bright v. Southern Technical College, Inc. (In re Southern Technical College, Inc.),* 144 B.R. 421, 422 (Bankr. E.D. Ark. 1992) (remanding where action was premised upon breach of contract, breach of warranty, and fraud, none of which were "arising under" or "arise in" the bankruptcy case). However, as defendants' counsel pointed out at the conference, it is not yet apparent that New York law applies to the claims in the instant action. Furthermore, even assuming New York state law applies, Nemsa, when questioned at the conference, was unable to explain in what way the New York law issues were either unsettled or complicated. Of course, this inability significantly undercuts the degree to which the state law factor weighs in favor of remand to New York courts. *E.g., Neuman v. Goldberg,* 159 B.R. 681, 688 (S.D.N.Y. 1993) (stating that "[t]he fact that a complaint is based on state law causes of action does not mandate equitable abstention or remand, particularly where the state law claims are not novel or complex"); *In re Riverside Nursing Home,* 144 B.R. at 956 (noting that "adjudication of the eviction proceeding require[d] the application of New York State's *complex* landlord and tenant law") (emphasis added); *Frazier v. Lawyers Title Ins. Corp. (In re Butcher),* 46 B.R. 109, 114 (Bankr. N.D. Ga. 1985) (denying motion to remand; although litigation involved question of state law, dispute did not involve unsettled questions of state law); *Ridgefield, Inc. v. Unity Foods, Inc. (In re Unity Foods, Inc.),* 35 B.R. 876, 879 (Bankr. N.D. Ga. 1983) (noting that case involved "application of state contract and commercial law which commonly arises in the Bankruptcy Court" and distinguishing an earlier case involved "unsettled questions of real property law").

**\*8** Nemsa argues that remand is warranted for another reason as well, that is, Nemsa's right to a jury trial might be compromised. The recently amended 28 U.S.C. § 157(e) provides:

If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury

trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties.

28 U.S.C. § 157(e). In other words, Nemsa would not have a jury trial as a matter of right. *E.g., Southern Technical College,* 144 B.R. at 422 (noting that "[a] right to jury trial is another factor which militates in favor of remand to the state court"). This factor thus favors remand.

Next, Nemsa argues that it would be prejudiced by having to prosecute its claims against the Non-Debtor Defendants in Bankruptcy Court in Texas. Nemsa's points concerning alleged prejudice if the action is transferred to Texas are discussed *infra* with respect to the proposed motion to transfer. At this juncture, it is sufficient to note that Nemsa's claim of prejudice is not persuasive.

Concerns for judicial economy and efficiency also suggest that remand is inappropriate.

[W]here a remand to the state court from whence the case was removed would only entail a duplication of effort and multiplicity of litigation, a retention of the case by the bankruptcy court would be appropriate. *In re Brothers Coal Co. Inc.,* 6 B.R. 567 (Bnkrtcy. W.D. Va. 1980).

*Matter of Wild Oaks Utils., Inc.,* 18 B.R. 959, 963 (Bankr. S.D.N.Y. 1982) (parallel citation omitted). To remand the case would result in "a duplication of effort and multiplicity of litigation" because of the strongly intertwined relationship between the Non-Debtor Defendants and VTS. Defendants have argued that most, if not all, of the paper discovery, deposition testimony, and trial testimony in this action would have to be redone were there a separate, subsequent proceeding against VTS. It is likely that the proof Nemsa will use to substantiate its claims against the Non-Debtor Defendants will be the same as that offered against VTS. Accordingly, concerns of efficiency and judicial economy do not favor remand here.

The degree of relatedness of the instant case to the proceeding in VTS's bankruptcy does not favor remand. As was explained *supra,* the Non-Debtor Defendants are inextricably intertwined with VTS and its bankruptcy case. As a result of the unusually

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

intertwined relationships, it would difficult for a finder of fact to determine whether any of the Non-Debtor Defendants' alleged acts were performed on their own behalf or on behalf of VTS without considering VTS's and the Non-Debtor Defendants' acts collectively. Thus, the relatedness between the VTS bankruptcy proceeding and this action favors denial of the remand motion.

In sum, although certain factors favor remanding this action, remand is, on balance, inappropriate, and Nemsa's motion for remand accordingly is denied.

\*9 In the alternative, Nemsa has requested that if I deny the motion to remand this action, then I abstain from hearing this action in accordance with the discretionary abstention provision codified at 28 U.S.C. § 1334(c)(1).Section 1334(c)(1) states:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). Courts have disagreed as to whether abstention under 28 U.S.C. § 1334(c) applies to a removed action. *E.g., Fedders North Am., Inc. v. Branded Prods., Inc. (In re Branded Products, Inc.),* 154 B.R. 936, 939 (Bankr. W.D. Tex. 1993) (stating that "[a]s a doctrine, abstention under § 1334(c), be it mandatory or discretionary, has no application in the context of a removed action"); *Paul v. Chemical Bank (In re 666 Assocs.),* 57 B.R. 8, 12 (Bankr. S.D.N.Y. 1985).*But see Anderson v. Hoechst Celanese Corp. (In re United States Brass Corp.),* 173 B.R. 1000, 1004 (Bankr. E.D. Tex. 1994) (stating that "it is the majority opinion that abstention does apply to cases removed under § 1452") (collecting cases); *Channel Bell Assocs. v. W.R. Grace & Co.,* No. 91 Civ. 5485 (PKL), 1992 WL 232085 at \*7-9 (S.D.N.Y. Aug. 31, 1992) (criticizing *In re 666 Assocs.*);*Chiodo v. NBC Bank-Brooks Field (In re Chiodo),* 88 B.R. 780, 785 (W.D. Tex. 1988).

Nemsa's request that I abstain should be denied regardless of whether the abstention doctrine technically applies to this action. That is, if abstention does not apply because this action was removed from state court, Nemsa's request would be denied. Alternatively, if abstention does apply, then I

must consider virtually the same factors as I did in connection with the motion to remand pursuant to § 1452(b).*E.g., Searcy v. Knostman,* 155 B.R. 699, 710 (S.D. Miss. 1993) (listing factors that a court should consider on the question of abstention "[u]nder § 1334(c)(1) and § 1452(b)"); *Aetna Life Ins. Co. v. Danbury Square Assocs. (In re Danbury Square Assocs.),* 150 B.R. 544, 547-48 (Bankr. S.D.N.Y. 1993) (stating that "[t]he courts have generally applied some of the same factors in determining motions for remand as ... with respect to abstention issues"); *In re Riverside Nursing Home,* 144 B.R. 951, 957 (Bankr. S.D.N.Y. 1992) (stating that "[t]he equitable grounds that warrant a decision to remand under 28 U.S.C. § 1452(b) are similar to the factors that authorize abstention under 28 U.S.C. § 1334(c)"). As discussed *supra,* remand is not warranted in the instant case; accordingly, neither is permissive abstention.

### III. *Transfer*

Defendants move pursuant to 28 U.S.C. § 1412 to transfer this action to the Southern District of Texas. Section 1412 provides that:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

\*10 28 U.S.C. § 1412. Courts in this circuit generally have held that § 1412 applies to "core" bankruptcy matters, not to "related proceedings." *M.D. Sass Re/Enterprise Partners v. Cargill Financial Servs. Corp.,* No. 93 Civ. 7414 (TPG), 1994 WL 97335 at \*1 (S.D.N.Y. Mar. 18, 1994); *Couri v. Fisher (In re JCC Capital Corp.),* 147 B.R. 349, 356 (Bankr. S.D.N.Y. 1992); *Luciano v. Maggio,* 139 B.R. 572, 576 (E.D.N.Y. 1992); *Kitto v. Thrash Oil & Gas Co.,* No. Civ-88-169E, 1992 WL 34126 at \*2 n.3 (W.D.N.Y. Feb. 13, 1992); *Chase Manhattan Bank v. Francini,* No. 91 Civ. 2515 (MBM), 1991 WL 161359 at \*1 (S.D.N.Y. Aug. 16, 1991); *In re Thomas McKinnon Secs., Inc. v. White,* 126 B.R. 833, 834-35 (Bankr. S.D.N.Y. 1991); *Goldberg Holding Corp. v. NEP Prods., Inc.,* 93 B.R. 33, 34 (S.D.N.Y. 1988).*But see Bricklayers Dist. Council Welfare Fund v. Furtunato Sons,* No. 92 Civ. 6329 (JFK), 1994 WL 471510 at \*2-3 (S.D.N.Y. Sept. 1, 1994) (transferring a related case pursuant to § 1412 but not

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

addressing whether the relevant transfer statute was § 1412 or § 1404(a); *Weisman v. Southeast Hotel Properties,* No. 91 Civ. 6232 (MBM), *1992 WL 131080* at *6 (S.D.N.Y. June 1, 1992) (stating that § 1412 applies to civil proceedings related to cases under Title 11). Because the instant action is related to the VTS chapter 11 proceeding, § 1412 is inapplicable, and the request to transfer pursuant to § 1412 is accordingly denied.

Defendants have moved for the transfer of the instant action pursuant to 28 U.S.C. § 1404(a).Section 1404(a) states:

For convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). The factors relevant to the consideration of a § 1404(a) transfer include:
(1) the place where the operative facts occurred; (2) the convenience to parties; (3) the convenience of witnesses; (4) the relative ease of access to sources of proof; (5) the availability of process to compel attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the forum's familiarity with the governing law; and (8) trial efficiency and the interest of justice.

*Associated Artists Entertainment, Inc. v. Walt Disney Pictures,* No. 93 Civ. 3934 (RJW), 1994 WL 708142 at *2 (S.D.N.Y. Dec. 19, 1994) (quoting *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F. Supp. 858, 867-68 (S.D.N.Y. 1991)).*See also Carrie Forbes, Inc. v. Gap, Inc.,* No. 94 Civ. 5337 (LLS), 1994 WL 693554 at *1 (S.D.N.Y. Dec. 9, 1994). In general, the plaintiff's choice of forum "will not be disturbed, except upon a clear-cut showing that convenience and justice for all parties demands that the litigation proceed elsewhere."*Doman v. Herman,* No. 95 Civ. 0260 (RWS), 1995 WL 347402 at *1 (S.D.N.Y. June 8, 1995) (quoting *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 668 F. Supp. 187 (S.D.N.Y. 1987), *aff'd,*848 F.2d 391 (2d Cir. 1988)). The burden is on the movant to establish that a transfer is appropriate. *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir. 1978), *cert. denied,*440 U.S. 908 (1979); *Carlton Int'l v. American Concord Techage, Inc.,* No. 94 Civ. 3750 (JFK), 1995 WL 450274 at *4 (S.D.N.Y. July 31, 1995); *Chase*

*Manhattan Bank v. Francini,* No. 91 Civ. 2515 (MBM), 1991 WL 161359 at *2 (S.D.N.Y. Aug. 16, 1991). I also note that "the purpose of § 1404(a) is not to shift the inconvenience from one party to the other."*Doman,* 1995 WL 347402 at *1 (quoting *Milgrim Thomajan & Lee, P.C. v. Nycal Corp.,* 775 F. Supp. 117, 122 (S.D.N.Y. 1991)).

*11 In the instant case, defendants have met their burden of showing that transfer to the Southern District of Texas is appropriate. The convenience of witnesses favors Texas. Where a party relies upon the convenience of witnesses, that party should provide a general statement of what the proposed testimony will address. *Factors, Etc.,* 579 F.2d at 218 (stating that "[w]hen a party seeks [a] transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover").[FN2] In the instant action, defendants state that all party witnesses from defendants' side are located in Houston. Defendants state that:

[T]he importance and materiality of the testimony of Mr. Culotta, Mr. Montle and other VTS and Lone Star personnel is patently obvious. These were the individuals who negotiated the agreements at issue and through whom, as officers of defendant corporations and partners of defendant partnership, all actions alleged by plaintiff to constitute breach of contract or tortious conduct were carried out. Their testimony will encompass all aspects of the alleged claims for relief, and will in large part, supplemented by supporting documentary evidence and the books and records of defendants, all of which is in Texas, constitute defendants' defense to such claims.

(Letter of Jonathan I. Price dated June 2, 1995 ("6/2/95 Price Ltr.") at 3 n.4). Nemsa, on the other hand, vaguely states that it expects to call:
(i) one or more former directors of VTS who, upon information and belief, reside in the Northeast, as well as (ii) the stock specialist for VTS and Lone Star who, upon information and belief, has its offices in New York, and (iii) an expert witness residing in New York.

(Letter of Martin S. Tackel dated May 25, 1995 ("Tackel Ltr.") at 6.) Nemsa has neglected to provide any greater specificity as to the identity of these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

witnesses or the necessity of their testimony. In addition, Nemsa has not claimed that the former directors may be found in New York; Nemsa states only that they are located in the Northeast. One may reasonably assume that if these witnesses were located in New York, then Nemsa would have so stated. Thus, one may also reasonably assume these witnesses -- not found in New York -- would have to travel whether the action is litigated in New York or in Texas. Finally, Nemsa is a domiciliary of Liechtenstein and receives mail care of a Swiss address. Nemsa has not offered anything contradicting defendants' contention that Nemsa's party witnesses will be required to travel from Europe to prosecute this action in any event. Thus, it seems that Nemsa's party witnesses will not be materially inconvenienced by having to pursue this action in Texas instead of New York. In short, the convenience of witnesses favors transfer.[FN10]

With respect to the convenience to the parties, I again note that all the principals from defendants' side are located in Houston. As stated above, Nemsa is a Liechtenstein domiciliary. Nemsa has done no more than conclusorily state that it would be inconvenienced by litigating the instant action in Texas.[FN11] Nemsa has not explained why it would be more convenient to litigate in New York than it would be in Texas.

**\*12** In terms of the location of the operative facts, certain facts took place in New York. For example, defendants acknowledge that aspects of the contract between plaintiff and VTS were negotiated physically or by telephone with persons in New York. However, the majority of the operative events appear to have taken place in Texas, not New York. Defendants state:

The conduct which is alleged actually to constitute the breach of the VTS-Nemsa contract and the VTS-Thermascan merger agreement took place in Texas, as did the conduct alleged to constitute the breaches of fiduciary duty, usurpation of corporate opportunity and tortious interference with contract by Travis, Montle and Culotta and fraudulent conveyances by all defendants.

(Letter of Jonathan I. Price dated May 12, 1995 ("5/12/95 Price Ltr.") at 7.) Thus, this factor weighs in favor of transfer to Texas.

The sources of proof also point in favor of Texas. VTS's headquarters is in the Houston area, as its present and most of its former officers, directors, and employees. VTS's files, books, and records are also located in the Houston area. The personal files of Montle and Culotta, as well as the personnel and business records of Lone Star and Travis, are also located in Texas. Plaintiff, however, is located in Europe and does not appear to have offices or other facilities in New York. Thus, this factor also points in favor of Texas.

Considerations of trial efficiency favor transfer for the reasons set forth in the context of the remand discussion *supra.*

In sum, the overwhelming majority of the relevant factors point toward Texas.[FN12] I find that, even taking into account the proper deference due a plaintiff's choice of forum, consideration of the factors pertinent to a § 1404(a) motion lead to the conclusion that this action should be transferred to the Southern District of Texas.

IV. *Miscellaneous*

Nemsa's request for costs and attorneys' fees pursuant to 28 U.S.C. § 1447(c) is denied because the instant action was not remanded. I also need not address defendants' argument that if there was no "related to" jurisdiction over the instant action, there was supplemental jurisdiction over the proceeding. I also need not address defendants' request that the instant proceeding be stayed pending the resolution of VTS's bankruptcy case.

*CONCLUSION*

Plaintiff's motion to remand the instant action to state court is denied. Plaintiff's request for abstention is denied. Defendants' motion to transfer pursuant to 28 U.S.C. § 1412 is denied. Defendants' motion to transfer the instant action pursuant to 28 U.S.C. § 1404(a) to the Southern District of Texas is granted. The Clerk of the Court shall mark this action closed.

> FN1. Reference is made to the affirmation of Martin S. Tackel annexed to Nemsa's Notice of Motion to Remand dated February 17,

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

Page 10

1995.

FN2. Reference is made to the affidavit of Paul V. Culotta dated March 23, 1995.

FN3. *See also Pacor,* 743 F.2d at 994.

FN4. The Court stated that:

The objectors to approval of the order of the bankruptcy court argue strongly that approval would be in conflict with the Third Circuit. However, we do not find the analysis in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir. 1984) to be compelling in this case. In *Pacor,* the plaintiff brought a state court action for work-related exposure to asbestos against the product's supplier. The supplier filed a third-party complaint impleading the original manufacturer. After the manufacturer entered chapter 11 bankruptcy proceedings, the supplier sought to remove the entire controversy to bankruptcy court. The Third Circuit held that the action between the supplier and manufacturer was removable, but that the original action against the supplier was not related to a case in bankruptcy and therefore could not be removed. As Judge Graves stated in a subsequent proceeding in this case, "*Pacor* would require the Debtor to be bound by *res judicata* or collateral estoppel, or, in the alternative, a finding that 'automatic liability against the debtor exist' in order to find a civil proceeding has an effect on the estate." *Matter of Salem Mortgage Co.,* 50 B.R. 34, 40 (Bankr. E.D. Mich. 1985). In distinguishing *Pacor,* we note that the parties in the mortgage transactions in this proceeding are more intertwined than the parties in *Pacor.* We also agree with Judge Graves that the statute does not require a finding of definite liability of the estate as a condition precedent to holding an action related to a bankruptcy proceeding. *Id.* at 41. As discussed above, Congress intended a grant of broad jurisdiction under the bankruptcy laws.

*Id.* at 634-35.

FN5. Nemsa's attempts to distinguish *Salem Mortgage* are not persuasive. For example, Nemsa argues that (i) the parties in *Salem Mortgage* were already engaged in an adversary proceeding before the bankruptcy court, (ii) the issue of subject matter jurisdiction had not been raised below by the parties or the bankruptcy court, and (iii) jurisdiction was addressed by the district court during its review of the proposed order of the bankruptcy court. However, Nemsa has not explained why these differences are significant. In addition, Nemsa argues that the Court of Appeals was "clearly ... [seeking] to resuscitate the result reached by consensus among the parties and, in large measure, [uphold] subject matter jurisdiction on that basis."(Plaintiff's Reply Memorandum of Law in Support of Plaintiff's Motion to Remand ("Pl. Reply") at 3.) While Nemsa's interpretation of *Salem Mortgage* might be interesting to a legal realist, Nemsa's argument, for the purposes of the instant motion, remains unsupported by the language of the case.

FN6. In its first cause of action, Nemsa seeks specific performance of the alleged agreement between VTS and Nemsa wherein VTS promised to pay Nemsa cash and VTS equity securities in exchange for assignment to VTS of all claims possessed by Nemsa against Thermascan. (Compl. ¶¶ 17, 30.) In its second cause of action, Nemsa asserts that VTS breached its contract with it. (*Id.* ¶¶ 32-33.)In its third cause of action, Nemsa, as a stockholder of Thermascan and an intended beneficiary of the merger agreement between VTS and Thermascan, claims that VTS failed to perform its obligations to Nemsa pursuant to the agreement, thereby breaching it.(*Id.* ¶¶ 15, 36-37, 42-43.)In its fourth cause of action, Nemsa seeks specific performance of the merger agreement. (*Id.* ¶ 47.)In its fifth cause of action, Nemsa asserts that VTS breached the merger agreement by failing to satisfy debt obligations to certain creditors, including Nemsa.(*Id.* ¶¶ 50-51.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 489711)

FN7. In the seventh cause of action asserted, Nemsa alleges that Travis, Montle and Culotta usurped a corporate opportunity belonging to VTS, *i.e.,* by causing VTS to acquire and subsequently assign to Lone Star the rights to purchase the casino alluded to earlier. (Compl. ¶¶ 68-84.) In its eighth claim, Nemsa asserts that Montle and Culotta breached their fiduciary duty to VTS by, *inter alia,* causing payment by VTS in connection with the purchase of the casino, assignment by VTS to Lone Star of the rights to purchase the casino and payment to Lone Star for illiquid, speculative preferred Lone Star shares at a time during VTS's insolvency.(*Id.* ¶¶ 85-105.)Nemsa asserts that Montle and Culotta failed to fulfill their fiduciary duties to Nemsa and other VTS creditors. (*Id.* ¶ 104.)In its ninth cause of action, Nemsa alludes to the same factual circumstances and alleges that Travis, Montle and Culotta breached their fiduciary duties to Nemsa as a minority stockholder in VTS. (*Id.* ¶¶ 107-08.)In the twelfth cause of action, Nemsa alleges that Lone Star, Travis, Montle and Culotta aided and abetted a fraudulent conveyance, *i.e.* the circumstances described above. (*Id.* ¶¶ 122-29.)In the thirteenth cause of action, Nemsa asserts a claim for tortious interference with contract against Travis, Montle and Culotta. Nemsa alleges that:

> Travis, Montle and Culotta, with due notice and knowledge of the aforesaid Purchase Agreement and Merger Agreement, did by virtue of the actions hereinabove set forth wrongfully, knowingly, intentionally and maliciously, and without reasonable justification or excuse, persuade and entice defendant VTS to, and VTS did, violate, repudiate and breach each of said contracts with plaintiff for the sole purpose of harming plaintiff.

(*Id.* ¶¶ 131.)

FN8. Even if the definition of "related to" prevailing in the Second Circuit is narrower

than that set forth in *Pacor,* I find that the instant action would fall within those narrower parameters.

FN9. Judge Keenan has recently stated:

> Where grounds for change of venue include the convenience of witnesses, movant should provide precise information, in affidavit form, about witnesses to be called and the anticipated areas of their testimony.

> *Carlton Int'l,* 1995 WL 450274 at *4. In this action, the fact that neither plaintiff nor defendants submitted affidavits is excusable because I instructed the parties to state their positions on transfer with letter-briefs -- in lieu of full-blown motions -- in order to minimize litigation expenses. However, to excuse the submission of a formal affidavit is not the same as overlooking the failure to bring specific facts to my attention.

FN10. Plaintiff appears to argue that defendants' failure to attempt to remove and transfer the instant action *earlier* is somehow relevant to the convenience to witnesses. Plaintiff cites no case in support of this puzzling proposition.

FN11. For example, plaintiff states simply that "a transfer of this action to the Texas Court will have a decisively negative impact on Nemsa's ability to continue the prosecution of this action."(Tackel Ltr. at 4.) I note also that plaintiff refers to the expense of seeking new counsel.(*Id.*)

FN12. The remaining factors are of little importance in the instant action. For example, the forum's familiarity with the governing law does not point strongly towards either New York or Texas. Neither party has established the applicability of the laws of a particular jurisdiction. Also, the question of compulsory process does not point strongly toward either New York or Texas. Defendants predict that there will be few, if any, non-party witnesses. Plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 489711)**

states that it plans to call witnesses located in the northeast; however, as stated *supra,* plaintiff has not identified those witnesses or explained their significance.

S.D.N.Y.,1995.

Nemsa Establishment, S.A. v. Viral Testing Systems Corp.

Not Reported in F.Supp., 1995 WL 489711 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 839079)**

CNorkin v. DLA Piper Rudnick Gray Cary, LLP
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
David NORKIN, Plaintiff,
v.
DLA PIPER RUDNICK GRAY CARY, LLP
Defendant.
**No. 05 Civ. 9137(DLC).**

March 31, 2006.

Richard Asche, Litman, Asche & Gioiella, LLP, New York, NY, for plaintiff.
Jeffrey Schreiber, Howard S. Koh, Meister Seelig & Fein LLP, New York, NY, for defendant.

*OPINION AND ORDER*

COTE, J.
*1 Plaintiff David Norkin ("Norkin") brought this action in New York State Supreme Court against DLA Piper Rudnick Gray Cary, LLP ("Piper"), the lawfirm that he claims represented both him and Britestarr Homes, Inc. ("Britestarr"), a company he owned and managed. Norkin alleges that Piper committed professional malpractice and breached its fiduciary duty to him and Britestarr when it (1) provided him with advice in connection with his personal bankruptcy proceeding, and (2) recommended that Britestarr file for bankruptcy and that Norkin resign as its president. Piper removed the action to this Court on the ground that it is related to Norkin's and Britestarr's bankruptcy proceedings.

Plaintiff now moves to remand the action to state court. Defendant opposes this motion and moves instead to transfer the matter to the United States District Court for the District of Connecticut. Defendant also moves to dismiss the complaint, or alternatively, for summary judgment. For the following reasons, plaintiff's motion to remand is denied; defendant's motion to transfer is granted; and defendant's motion to dismiss or alternatively, for summary judgment, is transferred to the District of Connecticut.

*Background*

The following facts are taken from the complaint or are undisputed, except where otherwise noted. From 1983 until May 2002, Norkin was the president of Britestarr. Norkin was initially Britestarr's sole beneficial shareholder. At some point after Britestarr's formation, but before the events that are the subject of this action, Norkin transferred record ownership of the Britestarr stock to his then wife, Friema Norkin.

In September 1988, Britestarr took out a loan from Lloyds Bank ("Lloyds"), which was secured by Friema Norkin's pledge of the Britestarr shares. Britestarr used the Lloyds loan to purchase a 28-acre property in Bronx, New York (the "property"), which Norkin describes as "ideally suited to serve as home to a large power plant."In or about 1990, the Norkins divorced, and Friema Norkin conveyed her interest in the Britestarr shares back to Norkin, pursuant to their separation agreement and divorce decree. Lloyds, however, retained possession of the share certificates. In 1997, Norkin filed for bankruptcy protection in United States Bankruptcy Court for the District of Connecticut and listed the Britestarr shares as an asset of his estate.

In 1998, ABB Equity Ventures ("ABB") began negotiations with Britestarr to purchase the property and develop a power plant on it. On December 31, 1998, ABB agreed to pay Britestarr $1.4 million for an exclusive three-year option to purchase the property. If ABB exercised the option, Britestarr could choose to receive $31.4 million in cash immediately, or payments of approximately $225 million over 30 years. In 1999, Norkin retained Piper to assist him and Britestarr in, among other things, "advancing the transaction" so that ABB would exercise its option.[FN1]

> FN1. Piper claims that it never represented Norkin personally in connection with the transactions at issue here. Instead, it claims it was retained only by Britestarr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 839079)

**\*2** Britestarr defaulted on the Lloyds loan, and in 2001, ABB purchased Lloyds's rights against Britestarr, including any claims to the Britestarr shares originally pledged by Friema Norkin. ABB filed suit in Norkin's personal bankruptcy proceedings, arguing that Friema Norkin still owned the Britestarr shares. Norkin claims that Piper provided him with advice in his personal capacity regarding the ownership of the shares.

In the spring of 2002, ABB informed Piper that it was willing pay over $1 million to extend the option period. According to Norkin, Piper never advised him or Britestarr of the offer. Between March and May 2002, Piper advised Britestarr to file for bankruptcy and recommended that Norkin resign as the company's president.[FN2] Piper expressed the view that filing for bankruptcy would remove impediments that would otherwise prevent Britestarr from selling the property. Norkin and Britestarr followed Piper's advice. Britestarr's bankruptcy proceeding, originally filed in New York, was transferred to the same Bankruptcy Judge in the District of Connecticut who was handling Norkin's bankruptcy. Britestarr subsequently filed an adversary proceeding against Piper, alleging that "the acts of Norkin along with Piper's assistance and counsel cost Britestarr to loose [sic] a tremendous business opportunity worth potentially hundreds of millions of dollars, and forced Britestarr into ... eventual bankruptcy."[FN3]

> FN2. Piper claims that Norkin could not have served as the corporate fiduciary of Britestarr in connection with its bankruptcy because he had previously pled guilty in this Court to bankruptcy fraud and conspiracy to bribe a federal judge. *United States v. Norkin,* No. 93 Cr. 837(LAP) (S.D.N.Y. filed Oct. 7, 1993).

> FN3. Although Britestarr's complaint alleges that Norkin engaged in inequitable conduct, Norkin is not named as a defendant. Instead, Britestarr and Norkin have entered into a joint prosecution agreement under which they will each share in the other's recovery, if any, against Piper. Britestarr's counsel is also providing Norkin with financial assistance in prosecuting this action. Piper describes this alleged agreement in its memorandum of law in support of its motion

to transfer. Norkin does not appear to contest any of the allegations mentioned here.

On May 23, 2002, on the motion of the Internal Revenue Service, the Bankruptcy Court converted Norkin's case from a Chapter 11 case to a Chapter 7 case. The court appointed a Chapter 7 trustee to exercise control over the property of Norkin's estate.

Norkin filed this action in New York State Supreme Court on May 9, 2005. On October 6, 2005, he served defendant with a complaint alleging that Piper breached its fiduciary duty to Norkin and committed professional malpractice in its representation of him. Norkin alleges that Piper was operating under a conflict of interest while it advised him and Britestarr, as it was also serving as counsel for TransGas, a competing power plant project. According to Norkin, Piper stood to earn more in legal fees from the TransGas project than it would from the ABB project.

Norkin requests "not less than" $10 million in compensatory damages and an additional $10 million in exemplary damages. Norkin does not explain how he arrives at the $10 million figure for the damages he allegedly suffered, but he does argue that if he had known of the $1 million offer to extend the option period, he would have (1) been able to settle ABB's claim in his personal bankruptcy over the ownership of the Britestarr shares and would have "remain[ed] as Britestarr's rightful owner and president"; (2) continued to serve as Britestarr's president and collected a salary and benefits; (3) acquired the necessary permits to facilitate ABB's purchase of the property; and (4) been able to keep Britestarr from filing for bankruptcy.

**\*3** On October 26, 2005, pursuant to 28 U.S.C. §§ 1334 and 1452 ("Section 1334" and "Section 1452," respectively), Piper removed the action to this Court on the ground that it "arises in or is related to" the federal bankruptcy cases of Norkin and Britestarr. Plaintiff now moves to remand the action to state court. Defendant moves instead to transfer it to the District of Connecticut. Defendant also moves to dismiss the complaint, or alternatively, for summary judgment.

*Discussion*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 839079)

## A. Plaintiff's Motion to Remand

Section 1334 confers original and exclusive jurisdiction on the district courts for "all cases arising under title 11," and original but *non*-exclusive jurisdiction for all cases "arising in or related to cases under title 11."28 U.S.C. § 1334(a)-(b). The law further allows a party to remove an action from state court to federal district court if the district court has jurisdiction under Section 1334. 28 U.S.C. § 1452. The district court is required, however, to abstain from hearing the action and remand it to state court if the proceeding is "based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11" and the proceeding "can be timely adjudicated [ ] in a State forum of appropriate jurisdiction."*Id.* at § 1334(c)(2). In all other cases, the district court *may* abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law."*Id.* at § 1334(c)(1). In other words, if the case is merely "related to" a bankruptcy proceeding, remand is generally required; if it "aris[es] under" Title 11 or "aris[es] in" a Title 11 case, remand is discretionary.

This Circuit has held that those cases "arising under" or "arising in" Title 11 proceedings are the same as those defined as "core proceedings" under 28 U.S.C. § 157(b).*Mt. McKinley Insurance Co. v. Corning Inc.,* 399 F.3d 436, 447-48 (2d Cir.2005). "Core proceedings" touch on issues at the heart of federal bankruptcy power, such as "the restructuring of debtor-creditor relations." *In re United States Lines, Inc.,* 197 F.3d 631, 636 (2d Cir.1999) (citation omitted). When the dispute sounds in contract, the determination of whether the lawsuit is core turns on "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization."*Mt. McKinley,* 399 F.3d at 448 (citation omitted). The court can also look to the nature of the proceeding and deem it to be core if "(1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function."*Id.* (citation omitted).

Here, these factors lead toward the conclusion that Norkin's claims are core. Norkin and/or Britestarr

retained Piper *after* Norkin filed for bankruptcy. The contract at issue therefore cannot be considered "antecedent" to the petition. As the Second Circuit has held, "[t]he bankruptcy court has core jurisdiction over claims arising from a contract formed post-petition with [28 U.S.C.] § 157(b)(2)(A)."*United States Lines,* 197 F.3d at 637-38. Further, because certain of the claims arise out of advice provided by Piper to Norkin *in his bankruptcy proceeding,* they cannot be considered independent of that petition.[FN4] Nor can this case be deemed independent of the Britestarr bankruptcy, given that one of Norkin's primary allegations is that Piper's faulty advice *led to* the Chapter 11 filing.

> FN4. The Fourth Circuit has held that "jurisdiction exists over a malpractice claim against a lawyer for providing negligent advice to a debtor in a bankruptcy case" because it "would have no practical existence but for the bankruptcy case."*Grausz v. Englander,* 321 F.3d 467, 471-72 (4th Cir.2003) (citation omitted). Although the *Grausz* decision turned partly on the Fourth Circuit's broad interpretation of "arising in" jurisdiction, which has not been adopted in our Circuit, the intuitive logic of the court's decision is no less applicable here.

*4 Moreover, the case directly affects the potential recoveries of creditors in the bankruptcy proceedings. First, the complaint clearly seeks to hold Piper liable for Norkin's apparent loss of the Britestarr shares. Norkin claims that Piper commited malpractice when it "failed to advise [him] of ABB's March 2002 settlement proposal that would have allowed Norkin to remain as Britestarr's rightful owner and President."Further, he alleges that Piper "reviewed documents related to the ownership, as between plaintiff and his former wife, of the Britestarr shares, and gave plaintiff advice in his personal capacity"-an allegation that would be wholly irrelevant if Norkin were not seeking recovery on that basis.

Norkin does not argue with Piper's contention that any claim to the Britestarr shares is property of Norkin's bankruptcy estate. Instead, he now disclaims all recovery based on the "ownership dispute" over the Britestarr shares, implicitly conceding that such a claim would effectively defeat his argument that his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 839079)

case is non-core. Norkin, however, cannot defeat federal court jurisdiction by disclaiming certain factual allegations after the matter has been removed. As this Court has previously held, "federal jurisdiction arising under Section 1334 is determined, like federal jurisdiction generally, on the basis of the facts at the time of removal."*In re Worldcom, Inc. Sec. Litig.*, 294 B.R. 553, 556 (S.D.N.Y.2003) (addressing changes in circumstances after the filing of the complaint).

Even if Norkin *could* effectively eliminate the portion of his claims that relate to the Britestarr shares, he admits that he has entered into an agreement with the trustee of his bankruptcy estate that the trustee will "receive a portion of any proceeds obtained by plaintiff in exchange for a release of possible claims by the estate against Mr. Norkin."Although "contract claims are not rendered core simply because they involve property of the estate,"*United States Lines,* 197 F.3d at 637, a proceeding is likely to be deemed core if it substantially impacts the potential recovery of creditors. Compare*United States Lines,* 197 F.3d at 638 (holding a proceeding to be core because the contracts at issue "may well be the most important asset of the debtor's estate" (citation omitted)) with*Mt. McKinley*, 399 F.2d at 449 (holding a proceeding to be non-core in part because the contracts at issue "are not the only or even the major assets available to pay asbestos claimants"). Here, the importance of the recovery to Norkin's estate is evidenced by the estate's willingness to release certain claims against Norkin in exchange for a portion of any recovery. Also, as noted above, Norkin has apparently entered into an agreement with Britestarr, which is in bankruptcy proceedings in the District of Connecticut and has also sued Piper, to share with Britestarr a portion of any recovery from this lawsuit. The mere recitation of the various connections between this case and the bankruptcy estates of Britestarr and Norkin demonstrates that this is not a run-of-the-mill contract dispute with minimal potential to impact a bankruptcy proceeding. Rather, the outcome promises to affect substantially creditors' rights in not one, but two, bankruptcies.

**\*5** The determination that the proceeding is core does not, of course, end the inquiry. The Court may still abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law."28 U.S.C. § 1334(c)(1).Section 1334(c)(1) is informed

by and interpreted according to "principles developed under the judicial abstention doctrines."*In re Pan American Corp.*, 950 F.2d 839, 846 (2d Cir.1991). According to those principles, federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them,"*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and may abstain only for a few "extraordinary and narrow exception[s]." *Id.* at 813 (citation omitted).

Courts in this district commonly consider twelve factors in addressing a motion based on Section 1334(c)(1):

(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden [on] the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*In re Worldcom Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y.2003). Here, these factors do not overcome the presumption in favor of maintaining federal jurisdiction-and, indeed, weigh heavily against abstention.

State law issues do not predominate here. Although plaintiff's causes of action are styled as New York State law claims, they turn largely on issues that are intertwined with the bankruptcies of Norkin and Britestarr, including the propriety of Piper's advice related to and leading to those proceedings. To the extent issues of New York law arise, they are in the well settled areas of professional malpractice,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 839079)

Page 5

negligence, and breach of fiduciary duty. Retention of federal jurisdiction would not hamper efficient administration of the estate, and, if anything, would promote it, as each of the related matters is proceeding in federal court. Therefore, the Court will not exercise discretionary abstention, and will instead retain jurisdiction over the present matter.

B. Defendant's Motion to Transfer to the District of Connecticut

Pursuant to 28 U.S.C. § 1412 ("Section 1412"), a case or proceeding under Title 11 may be transferred to another district "in the interest of justice or for the convenience of the parties."Section 1412 applies to the transfer of core proceedings, as well. *In re Enron Corp.,* 317 B.R. 629, 637 (Bankr.S.D.N.Y.2004). Transfer under Section 1412 requires consideration of substantially the same factors as transfer under 28 U.S.C. § 1404(a).*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman,* 306 B.R. 746, 749 (S.D.N.Y.2004). Those factors include:

*6 (1) the plaintiff's choice of forum; (2) the locus of the operative facts; (3) the convenience and relative means of the parties; (4) the convenience of witnesses; (5) the availability of process to compel the attendance of witnesses; (6) the location of physical evidence; (7) the relative familiarity of court with the applicable law; and (8) the interests of justice, including the interests of trial efficiency.

*Id.* at 749-50.In addition, "the district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy."*In re Manville Forest Prodcts Corp.,* 896 F.2d 1384, 1391 (2d Cir.1990).

Here, the factors militate in favor of transfer. The weight normally attached to the plaintiff's choice of forum is effectively "cancel[led] ... out" in this case by the presumption that the proceeding should be heard in the same district as the underlying bankruptcy. *Heyman,* 306 B.R. at 750. Further, Norkin's claims arise out of many of the same operative facts as Britestarr's case against Piper, which, along with both of the relevant bankruptcies, is proceeding in Connecticut.[FN5]And given that the courthouses for this District and the District of Connecticut are only 61 miles apart,[FN6] there is no

reason to believe that transfer would have a substantial adverse impact on either party's ability to prosecute or defend the case. Defendant's motion to transfer is accordingly granted.

> FN5. Any doubt about the close relationship between the two cases is eliminated by Norkin and Britestarr's apparent agreement to split the recoveries.

> FN6.*See* http://maps.yahoo.com/dd.

C. Defendant's Motion to Dismiss or Alternatively, for Summary Judgment

Because Piper's motion to transfer is granted, its motion to dismiss or alternatively, for summary judgment, is transferred to the District Court for the District of Connecticut.

*Conclusion*

For the foregoing reasons, plaintiff's motion to remand is denied; defendant's motion to transfer is granted; and defendant's motion to dismiss or alternatively, for summary judgment, is transferred to the District of Connecticut.

SO ORDERED:

S.D.N.Y.,2006.
Norkin v. DLA Piper Rudnick Gray Cary, LLP
Not Reported in F.Supp.2d, 2006 WL 839079 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 6**

**Westlaw.**

372 B.R. 107
372 B.R. 107, 41 Employee Benefits Cas. 2914
**(Cite as: 372 B.R. 107)**

**H**Oneida Ltd. v. Pension Ben. Guar. Corp.
S.D.N.Y.,2007.

United States District Court,S.D. New York.
ONEIDA LTD., Plaintiff,
v.
PENSION BENEFIT GUARANTY
CORPORATION, Defendant.
**No. 06 Civ. 15323(MGC).**

July 18, 2007.

**Background:** Chapter 11 debtor filed adversary proceeding, seeking declaration that payments owed to the Pension Benefit Guaranty Corporation (PBGC) were for prepetition claims discharged pursuant to debtor's reorganization plan. The PBGC moved to withdraw the reference.

**Holdings:** The District Court, Cedarbaum, J., held that:

(1) mandatory withdrawal of the reference was not warranted, and

(2) discretionary withdrawal was not warranted.

Motion denied.

West Headnotes

**[1] Bankruptcy 51 ⟜2103**

51 Bankruptcy
  51I In General
    51I(E) Reference
      51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
Mandatory withdrawal of the bankruptcy court reference is reserved for cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes. 28 U.S.C.A. § 157(d).

**[2] Bankruptcy 51 ⟜2103**

51 Bankruptcy

**[2]** The standard for withdrawal of the bankruptcy court reference is more easily satisfied when the non-bankruptcy law under consideration raises complicated issues of first impression which have not yet been considered by a federal court, or where a federal provision raises a sharp conflict with competing provisions of the Bankruptcy Code. 28 U.S.C.A. § 157(d).

**[3] Bankruptcy 51 ⟜2103**

51 Bankruptcy
  51I In General
    51I(E) Reference
      51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
The determination of when a claim arises and whether it may be discharged in bankruptcy is an inquiry which bankruptcy courts make as a matter of course and does not require intervention by the district court, for purpose of motion for withdrawal of the bankruptcy court reference. 28 U.S.C.A. § 157(d).

**[4] Bankruptcy 51 ⟜2103**

51 Bankruptcy
  51I In General
    51I(E) Reference
      51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
Mandatory withdrawal of the bankruptcy court reference was not warranted in Chapter 11 debtor's adversary proceeding, seeking declaration that payments owed to the Pension Benefit Guaranty Corporation (PBGC) were for prepetition claims discharged pursuant to debtor's reorganization plan; although issue required interpretation of ERISA amendment concerning payments owed to PBGC when pension plan was terminated by bankrupt debtor, the provision was not particularly complex, and the parties did not dispute the applicability of the ERISA amendment or the manner in which the payments to the PBGC should be calculated. 28

372 B.R. 107                                                                                     Page 2
372 B.R. 107, 41 Employee Benefits Cas. 2914
**(Cite as: 372 B.R. 107)**

U.S.C.A. § 157(d); Employee Retirement Income Security Act of 1974, § 4007, 29 U.S.C.A. § 1307.

**[5] Bankruptcy 51 ⟲2103**

51 Bankruptcy
 51I In General
  51I(E) Reference
   51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
Whether the proceeding is core or non-core to the bankruptcy is the most significant factor in determining if discretionary withdrawal of the bankruptcy court reference is warranted. 28 U.S.C.A. § 157(d).

**[6] Bankruptcy 51 ⟲2043(2)**

51 Bankruptcy
 51I In General
  51I(C) Jurisdiction
   51k2043 Core, Non-Core, or Related Proceedings in General; Nexus
    51k2043(2) k. Core or Non-Core Proceedings. Most Cited Cases

**Bankruptcy 51 ⟲2103**

51 Bankruptcy
 51I In General
  51I(E) Reference
   51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
"Core proceedings" in bankruptcy, for which discretionary withdrawal of the bankruptcy court reference is not warranted, must invoke a substantive right created by federal bankruptcy law that would not exist outside of a bankruptcy case. 28 U.S.C.A. § 157(b, d).

**[7] Bankruptcy 51 ⟲2103**

51 Bankruptcy
 51I In General
  51I(E) Reference
   51k2103 k. Withdrawal or Transfer to District Court. Most Cited Cases
Discretionary withdrawal of the bankruptcy court reference was not warranted in Chapter 11 debtor's adversary proceeding, seeking declaration that

payments owed to the Pension Benefit Guaranty Corporation (PBGC) were for prepetition claims discharged pursuant to debtor's reorganization plan; the proceeding was a "core" bankruptcy proceeding, in that the sole issue to be decided was whether the payments owed to PBGC were discharged under the reorganization plan, the ERISA provision upon with the court would rely in making the decision applied only to companies in bankruptcy reorganization, and the judicial efficiency and uniform administration of bankruptcy proceedings counseled against withdrawal. 28 U.S.C.A. § 157(b, d).

*108 Shearman & Sterling LLP, by: William J.F. Roll, III, Esq., Douglas P. Bartner, Esq., Lynette C. Kelly, Esq., Michael H. Torkin, Esq., New York, NY, for Plaintiff.
Steptoe & Johnson LLP, by: Greg R. Yates, Esq., Charles G. Cole, Esq., New York, NY, for Defendant.
Pension Benefit Guaranty Corporation, Office of the Chief Counsel, by: James L. Eggeman, Esq., Lawrence F. Landgraff, Esq., Washington, D.C., pro se.

*OPINION*

CEDARBAUM, District Judge.
This is a motion to withdraw the reference to the Bankruptcy Court (Gropper, J.) of an adversary proceeding brought by reorganized debtor Oneida Ltd. against Pension Benefit Guaranty Corporation ("PBGC"). Oneida seeks a declaration from the Bankruptcy Court that certain premiums payable to PBGC under the terms of a federal statute are pre-petition claims that were discharged upon Oneida's emergence from bankruptcy. PBGC moves, pursuant to 28 U.S.C. § 157(d), to withdraw the reference to the Bankruptcy Court, on the ground that the decision will require consideration of both Title 11 and other federal law. For the following reasons, PBGC's motion is denied.

BACKGROUND

PBGC is the federal agency established by the Employee Retirement Income Security Act ("ERISA") to administer the nation's pension termination insurance program. 29 U.S.C. § 1302. When a pension plan covered by ERISA is terminated without sufficient assets to pay all of its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

372 B.R. 107
372 B.R. 107, 41 Employee Benefits Cas. 2914
**(Cite as: 372 B.R. 107)**

promised benefits, PBGC typically becomes trustee of the plan and pays participants their benefits. PBGC funds these payments in part from annual premiums required by ERISA from sponsors of defined pension plans. 29 U.S.C. § 1307.

In 2006, facing a severe deficit in PBGC's funds, Congress passed the Deficit Reduction Act of 2005, which, among other things, amended ERISA to add a premium (the "DRA Premium") to be paid by companies that terminate covered pension plans (the "ERISA Amendment"). 29 U.S.C. § 1306(a)(7). The ERISA Amendment includes a provision that applies specifically to plans terminated by companies that have filed for bankruptcy. It reads, in relevant part:

(A) In general

If there is a termination of a single-employer plan under clause (ii) or (iii) of section 1341(c)(2)(B) of this title or section*109 1342 of this title, there shall be payable to [PBGC], with respect to each applicable 12-month period, a premium at a rate equal to $1,250 multiplied by the number of individuals who were participants in the plan immediately before the termination date. Such premium shall be in addition to any other premium under this section.

(B) Special rule for plans terminated in bankruptcy reorganization

In the case of a single-employer plan terminated under section 1341(c)(2)(B)(ii) of this title or under section 1342 of this title during pendency of any bankruptcy reorganization proceeding under chapter 11 of title 11, or under any similar law of a State or a political subdivision of a State (or a case described in section 1341(c)(2)(B)(i) of this title filed by or against such person has been converted, as of such date, to such a case in which reorganization is sought), subparagraph (A) shall not apply to such plan until the date of the discharge or dismissal of such person in such case.

(C) Applicable 12-month period

For purpose of subparagraph (A)-

(i) In general

The term "applicable 12-month period" means

(I) the 12-month period beginning with the first month following the month in which the termination date occurs, and

(II) each of the first two 12-month periods immediately following the period described in subclause (I).

(ii) Plans terminated in bankruptcy reorganization

In any case in which the requirements of subparagraph (B) are met in connection with the termination of the plan with respect to 1 or more persons described in such subparagraph, the 12-month period described in clause (i)(I) shall be the 12-month period beginning with the first month following the month which includes the earliest date as of which each such person is discharged or dismissed in the case described in such clause in connection with such person.

Oneida established a retirement plan for its employees effective January 1, 1997 (the "Pension Plan"). On March 19, 2006, Oneida filed for bankruptcy and moved for the Bankruptcy Court's approval to terminate the Pension Plan under the distress termination provisions of ERISA. 29 U.S.C. § 1341(c). On May 2, 2006, the Bankruptcy Court found that Oneida had satisfied the financial requirements for a distress termination of the Pension Plan. The following day, Oneida, its creditors' committee, and PBGC entered a settlement agreement which addressed the termination of Oneida's Pension Plan and provided, among other things, that nothing in Oneida's Plan of Reorganization would be deemed to "prejudice, preclude or otherwise affect any rights or obligations any of the Parties may have in connection with any premiums arising under [the ERISA Amendment]." (Torkin Decl., Ex. B, ¶ 4.)

On August 30, 2006, the Bankruptcy Court approved Oneida's Plan of Reorganization. The Plan provided that certain "Specified Unsecured Claims" would receive no recovery and be discharged. The term "Specified Unsecured Claims" was defined to include "Unsecured PBGC Claims," which in turn was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

372 B.R. 107                                                                                                    Page 4
372 B.R. 107, 41 Employee Benefits Cas. 2914
**(Cite as: 372 B.R. 107)**

defined as "the aggregate amount owed to the PBGC in connection with the distressed termination of the Pension Plans including pursuant to 29 U.S.C. §§ 1341(c)(2)(B)(ii), as amended ...." (Torkin Decl., Ex. A, pp. 7-8.) The Plan of Reorganization was confirmed on August 31, 2006 and became effective on September 15, 2006.

**\*110** Since the termination of the Pension Plan in May 2006, Oneida and PBGC have disputed the effect of the reorganization on Oneida's obligation to pay the DRA Premiums. Oneida alleges that the DRA Premium payments are pre-petition "claims," as defined in section 101(5) of the Bankruptcy Code, that were discharged upon confirmation of the Plan of Reorganization. PBGC disagrees. It argues that the ERISA Amendment provides for DRA Premiums to be paid after bankruptcy discharge, and that the Plan of Reorganization does not affect Oneida's obligation to pay the DRA Premiums.

On October 25, 2006, PBGC and Oneida entered into a stipulation preserving their respective rights to challenge or enforce Oneida's obligation to pay the DRA Premiums notwithstanding the language of the Plan of Reorganization. On November 13, 2006, the parties entered into an escrow agreement pursuant to which Oneida paid into escrow, pending the final resolution of the parties' dispute, the initial DRA Premium that would be due under the ERISA Amendment. On November 15, 2006, Oneida commenced an adversary proceeding seeking a declaration that the DRA Premiums were pre-petition bankruptcy claims that were discharged pursuant to Oneida's Plan of Reorganization.

### DISCUSSION

#### Mandatory Withdrawal

PBGC contends that withdrawal of the reference is mandatory under 28 U.S.C. § 157(d) because resolution of the adversary proceeding requires consideration of both Title 11 and the ERISA Amendment. 28 U.S.C. § 157(d) provides:

The district court may withdraw, in whole or in part, any case or proceeding referred under the section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the

court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

[1][2] In order to ensure that it "does not become an 'escape hatch' for matters properly before [the bankruptcy] court,"*In re Johns-Manville Corp.,* 63 B.R. 600, 603 (S.D.N.Y.1986), the Second Circuit has construed § 157(d) narrowly, reserving withdrawal of the reference for "cases or issues that would otherwise require a bankruptcy court judge to engage in *significant interpretation,* as opposed to *simple application,* of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir.1991) (emphases added). Thus, courts in this district have held that withdrawal is not mandatory where a case requires the "straightforward application of a federal statute to a particular set of facts." *In re Johns-Manville Corp.,* 63 B.R. at 602. The standard for withdrawal of the reference is more easily satisfied when the non-bankruptcy law under consideration raises complicated issues of first impression which have not yet been considered by a federal court, *In re Ionosphere Clubs, Inc.,* 103 B.R. 416, 419 (S.D.N.Y.1989), or where a federal provision raises a "sharp conflict with competing provisions of the [Bankruptcy] Code,"*In re Chateaugay Corp.,* 86 B.R. 33, 38-39 (S.D.N.Y.1987).

[3] The determination of when a claim arises and whether it may be discharged is "an inquiry which bankruptcy courts make as a matter of course and does not require intervention by the district court." *In re Revere Copper and Brass, Inc.,* 172 B.R. 192, 198 (S.D.N.Y.1994). To resolve the \*111 parties' dispute over the DRA Premiums, the Bankruptcy Court will be required to do what it does on a routine basis: determine whether the DRA Premiums are post-petition obligations that must be paid by Oneida upon reorganization, or pre-petition "claims" that may be discharged pursuant to the Plan of Reorganization. That the inquiry in this case may require the Bankruptcy Court to refer to the language of a recently drafted federal statute does not mandate withdrawal, as PBGC suggests. To construe section 157(d) so broadly would erode the purpose and function of the bankruptcy courts, and would be an inefficient use of judicial resources.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

372 B.R. 107                                                          Page 5
372 B.R. 107, 41 Employee Benefits Cas. 2914
**(Cite as: 372 B.R. 107)**

[4] Bankruptcy judges are well qualified to apply the language of a federal statute to the Bankruptcy Code's definition of a "claim," a definition which they interpret and apply in most bankruptcies. The federal provision at issue here is not particularly complex. Nor do the parties dispute the applicability of the ERISA Amendment itself or the manner in which the DRA Premiums should be calculated. *See In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 995 (2d Cir.1990) (holding that bankruptcy court had jurisdiction where application of federal law did "not require the bankruptcy court to engage itself in the intricacies of [a federal statute]."). Because the Bankruptcy Court's inquiry requires a "simple application" rather than a "significant interpretation" of the ERISA Amendment, mandatory withdrawal is not warranted.

Discretionary Withdrawal

Where withdrawal of the reference is not mandatory, a district court may exercise its discretion to withdraw a bankruptcy court reference "for cause shown." 28 U.S.C. § 157(d). The Second Circuit has instructed district courts to consider the following factors in exercising this discretion: (i) whether the proceeding is a "core" proceeding under 28 U.S.C. § 157(b); (ii) whether the action is legal or equitable; (iii) interests of judicial economy; (iv) interests of uniform bankruptcy administration; (v) reduction of forum shopping; (vi) economical use of debtors' and creditors' resources; (vii) interests of expediting the bankruptcy process; and (viii) the presence of a jury demand. *See In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir.1993).

[5][6] The first of these factors-whether the proceeding is "core" or "non-core"-is the most significant. Section 157(b)(2) sets out a non-exhaustive list of categories of core proceedings, including "matters concerning the administration of the estate" and the "allowance and disallowance of claims against the estate." More generally, "core proceedings must 'invoke a substantive right' created by federal law that would not exist outside of a bankruptcy case." *In re The VWE Group, Inc.,* 359 B.R. 441, 448 (S.D.N.Y.2007) (citations omitted). Non-core proceedings, on the other hand, " 'involve disputes over rights that ... have little or no relation to the Bankruptcy Code, do not arise under the federal bankruptcy law and would exist in the

absence of a bankruptcy case.' " *Id.* (citations omitted).

[7] Oneida's adversary proceeding is a core bankruptcy proceeding. The sole issue to be decided is whether the DRA Premiums are discharged pursuant to Oneida's Plan of Reorganization or remain obligations of Oneida after its discharge. The specific federal provision on which the Bankruptcy Court must rely to make that decision applies *only* to companies in bankruptcy reorganization. Thus, this adversary proceeding involves rights that "would not exist independent of a bankruptcy environment." *See* *112In re Refco, Inc.,* No. 06 Civ. 1888(GEL), 2006 WL 1379616, *1 (S.D.N.Y. May 16, 2006) (quotations and citations omitted).

Moreover, judicial efficiency and the uniform administration of bankruptcy court proceedings counsel against withdrawing the reference. Bankruptcy Judge Gropper has presided over this case for more than a year, and has carefully considered and confirmed Oneida's Plan of Reorganization as to all other claims. He is thoroughly familiar with the dispute between Oneida and PBGC and his view would assist the district court in reviewing the issue in case of an appeal.

Accordingly, discretionary withdrawal of the reference is not warranted.

CONCLUSION

For the foregoing reasons, defendant's motion to withdraw the reference is denied.

SO ORDERED.

S.D.N.Y.,2007.
Oneida Ltd. v. Pension Ben. Guar. Corp.
372 B.R. 107, 41 Employee Benefits Cas. 2914

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.