John D. Hughes (admitted *pro hac vice*)
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
JOSEPH MURPHY, et al.,                                 :
                                                       :
            Plaintiffs,                                :
                                                       :
v.                                                     :
                                                       :
ALLIED WORLD ASSURANCE                                 :
COMPANY (U.S.), INC. and ARCH                          :
INSURANCE COMPANY,                                     :      Case No. 1:08-cv-4196 (GEL)
                                                       :      *Electronically filed*
            Defendants.                                :
                                                       :
-------------------------------------------------------x

## DECLARATION OF ROBERT W. DIUBALDO IN SUPPORT OF ALLIED WORLD'S MOTION FOR SUMMARY JUDGMENT

I, ROBERT W. DIUBALDO, hereby declare as follows:

      1.     I a member of the bar of this Court and of the firm Edwards Angell Palmer & Dodge LLP, attorneys for defendant Allied World Assurance Company (U.S.), Inc. ("Allied World"). I respectfully submit this declaration in support of Allied World's motion for summary judgment.

      2.     Attached as Exhibit A is a true and correct copy of plaintiffs' first amended complaint filed in this action, without the annexed exhibits.

308033

3.      Attached as Exhibit B is a true and correct copy of the Court's decision in <u>Axis</u> <u>Reinsurance Co. v. Bennett, et al.</u>, No. 07 Civ. 7924 & 08 Civ. 3242 (GEL) (June 19, 2008).

4.      Attached as Exhibit C is a true and correct copy of the complaint filed by Axis Reinsurance Company in <u>Axis Reinsurance Co. v. Bennett, et al.</u>, No. 07 Civ. 7924 (GEL).

5.      Attached as Exhibit D is a true and correct copy of U.S. Specialty Insurance Company policy number 24-MGU-04-A4151 issued to Refco Group Ltd., LLC for the policy period of August 5, 2004-August 5, 2005.

6.      Attached as Exhibit E is a true and correct copy of a March 28, 2006 letter sent by counsel for Allied World, John D. Hughes, Esq., to Andrea Lieberman of Marsh USA denying coverage for plaintiffs' claims.

7.      Attached as Exhibit F is a true and correct copy of a February 29, 2008 letter sent by Mr. Hughes to Stuart I. Friedman, Esq., counsel for plaintiff-insured William M. Sexton, reaffirming Allied World's bases for denying coverage for plaintiffs' claims.

8.      Attached as Exhibit G is a true and correct copy of the April 21, 2008 order from Judge Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York requiring Allied World to advance defense costs to plaintiffs.

9.      Attached as Exhibit 1 to the Insurers' Joint Exhibits[1] ("IJX")is a true and correct copy of the second amended consolidated class action complaint in <u>In Re Refco, Inc. Securities</u> <u>Litigation</u>, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) dated December 3, 2007.

---

[1] As stated in the joint letter sent to the Court on July 8, 2008, Allied World, XL Specialty Insurance Company and Arch Insurance Company (the "Insurers") agreed, at the Court's suggestion, to serve and file a set of joint exhibits (the "Insurers' Joint Exhibits" or "IJX"). The joint exhibits are referenced herein and will be served and filed jointly on behalf of all Insurers by XL, though they will only be electronically filed under the docket number for the XL action before the Court (No. 08 Civ. 3821).

10.     Attached as Exhibit 2 to the IJX is a true and correct copy of the third amended class action complaint in American Financial International Group et al. v. Bennett et al., No. 05 Civ. 8988 (GEL) (S.D.N.Y.) dated January 8, 2008.

11.     Attached as Exhibit 3 to the IJX is a true and correct copy of the complaint in BAWAG v. Refco, et al., No. 05-03161 (Bankr. S.D.N.Y.) dated November 16, 2005.

12.     Attached as Exhibit 4 to the IJX is a true and correct copy of the complaint in Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.) dated October 9, 2007.

13.     Attached as Exhibit 5 to the IJX is a true and correct copy of the complaint in Fine v. Bennett, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) dated October 13, 2005.

14.     Attached as Exhibit 6 to the IJX is a true and correct copy of the second amended consolidated class action complaint in In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.) dated December 21, 2007.

15.     Attached as Exhibit 7 to the IJX is a true and correct copy of the complaint in Kirschner v. Agoglia, et al., No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) dated October 15, 2007.

16.     Attached as Exhibit 8 to the IJX is a true and correct copy of the complaint in Kirschner v. Bennett, et al., No. 07 Civ. 8165 (GEL) (S.D.N.Y) dated August 27, 2007.

17.     Attached as Exhibit 9 to the IJX is a true and correct copy of the complaint in Kirschner v. Grant Thornton LLP et al., No. 07 Civ. 11604 (GEL) (S.D.N.Y.) dated August 21, 2007.

18.     Attached as Exhibit 10 to the IJX is a true and correct copy of the complaint in Kirschner v. Hackl, et al., No. 07 Civ. 9238 (GEL) (S.D.N.Y.) dated October 15, 2007.

19.     Attached as Exhibit 11 to the IJX is a true and correct copy of the complaint in Kirschner v. Thomas H. Lee Partners, LP, et al., No. 07 Civ. 7074 (GEL) (S.D.N.Y.) dated November 20, 2007.

20.     Attached as Exhibit 12 to the IJX is a true and correct copy of the complaint in Krys, et al. v. Sugrue, et al., No. 08-3065 & No. 08-3086 (GEL) (S.D.N.Y.) dated March 5, 2008.

21.     Attached as Exhibit 13 to the IJX is a true and correct copy of the complaint in Mehta v. Bennett, No. 05 Civ. 8748 (GEL) (S.D.N.Y.) dated October 14, 2005.

22.     Attached as Exhibit 14 to the IJX is a true and correct copy of the complaint in Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al., No. 05-9608 (GEL) (S.D.N.Y.) dated November 14, 2005.

23.     Attached as Exhibit 15 to the IJX is a true and correct copy of the complaint in Unovalores Ltd. v. Bennett, NO. L1564-05 (Sup. Ct. N.J.) dated November 1, 2005.

24.     Attached as Exhibit 16 to the IJX is a true and correct copy of the complaint in V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y) dated October 9, 2007.

25.     Attached as Exhibit 17 to the IJX is a true and correct copy of the criminal information in United States of America v. Maggio, No. 07 Cr. 1196 (SHS) (S.D.N.Y.).

26.     Attached as Exhibit 18 to the IJX is a true and correct copy of the S3 indictment in United States of America v. Bennett, Trosten and Grant, No. 05 Cr. 1192 (NRB) (S.D.N.Y.).

27.     Attached as Exhibit 19 to the IJX is a true and correct copy of the S4 indictment in United States of America v. Grant, No. 05 Cr. 1192 (NRB) (S.D.N.Y.).

28.    Attached as Exhibit 20 to the IJX is a true and correct copy of the plea allocution transcript in United States of America v. Maggio dated December 19, 2007.

29.    Attached as Exhibit 21 to the IJX is a true and correct copy of the plea allocution transcript in United States of America v. Bennett, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) dated February 15, 2008.

30.    Attached as Exhibit 22 to the IJX is a true and correct copy of the plea allocution transcript in United States of America v. Trosten, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) dated February 20, 2008.

31.    Attached as Exhibit 23 to the IJX is a true and correct copy of the transcript of sentencing of Phillip Bennett in United States of America v. Bennett, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) dated July 3, 2008.

32.    Attached as Exhibit 24 to the IJX is a true and correct copy of pages 3095-3097 of the transcript of proceedings in United States of America v. Grant, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) dated April 17, 2008.

33.    A true and correct copy of Exhibit 25 to the IJX, the judgment of conviction of Phillip Bennett in United States of America v. Bennett, No. 05 Cr. 1192 (NRB) (S.D.N.Y.), will be filed as soon as it is made available. We have spoken with Judge Buchwald's clerk, who informed us that it will be available shortly.

34.    Attached as Exhibit 26 to the IJX is a true and correct copy of Policy No. 24-MGU-05-A10821 issued by U.S. Specialty Insurance Company to Refco Inc. for the period of August 11, 2005-August 11, 2006.

35.     Attached as Exhibit 27 to the IJX is a true and correct copy of Policy No. 1620924 issued by Lexington Insurance Company to Refco Inc. for the period of August 11, 2005-August 11, 2006.

36.     Attached as Exhibit 28 to the IJX is a true and correct copy of Policy No. RNN 506300 issued by Axis Reinsurance Company to Refco Inc. for the period of August 11, 2005-August 11, 2006.

37.     Attached as Exhibit 29 to the IJX is a true and correct copy of Policy No. AW0418197 issued by Allied World to Refco Inc. for the policy period of August 11, 2005-August 11, 2006.

38.     As of July 11th, Allied World will have advanced roughly $5.8 million of the $12.5 million limit of its policy to plaintiffs and will continue to advance at the rate of approximately $1 million every two weeks.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 11, 2008

Rex Direl

Robert W. DiUbaldo

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
In re:                                                   :     Chapter 11
REFCO, INC., et al.,                                     :     Case No. 05-60006 (RDD)
                                                         :     (Jointly Administered)
            Debtors.                                     :
                                                         :
                                                         :
-------------------------------------------------------- x
                                                         :
JOSEPH MURPHY, WILLIAM M. SEXTON,                        :
DENNIS A. KLEJNA, GERALD SHERER,                         :
PHILIP SILVERMAN, RICHARD N.                             :
OUTRIDGE, TONE GRANT, LEO R.                             :     Adv. Proc. No. 08-01133-rdd
BREITMAN, NATHAN GANTCHER,                               :
DAVID V. HARKINS, SCOTT L. JAECKEL,                      :
THOMAS H. LEE, RONALD L. O'KELLEY,                       :     **FIRST AMENDED**
and SCOTT A. SCHOEN,                                     :     **COMPLAINT**
                                                         :
                    Plaintiffs,                          :
                                                         :
            v.                                           :
                                                         :
ALLIED WORLD ASSURANCE COMPANY                           :
(U.S.), INC. and ARCH INSURANCE                          :
COMPANY,                                                 :
                                                         :
                    Defendants, and                      :
                                                         :
JOHN D. AGOGLIA, EDWIN L. COX,                           :
SUKHMEET DHILLON, THOMAS H.                              :
DITTMER, STEPHEN GRADY, THOMAS                           :
HACKL, ERIC G. LIPOFF, PETER                             :
MCCARTHY and FRANK MUTTERER,                             :
                                                         :
                    Nominal Defendants.                  :
-------------------------------------------------------- x

Plaintiffs Joseph Murphy, William M. Sexton, Dennis A. Klejna, Gerald Sherer, Philip

Silverman, Richard N. Outridge, Tone Grant, Leo R. Breitman, Nathan Gantcher, David V.

Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen

1

(collectively, "Plaintiffs"), by and through their undersigned counsel, allege as follows for their First Amended Complaint against defendants Allied World Assurance Company (U.S.), Inc. ("AWAC") and Arch Insurance Company ("Arch"):

## INTRODUCTION

1.      AWAC and Arch are the third and fourth excess insurers, respectively, in the "tower" of Direetors and Officers ("D&O") liability insurance obtained by Refco Inc. for the policy period August 11, 2005 to August 11, 2006 (the "Policy Period"). Plaintiffs are former officers and directors of Refco Inc., its predecessor Refco Group Ltd., LLC, and/or the subsidiaries of these entities. (Refco Inc., Refco Group Ltd., LLC and their subsidiaries are collectively referred to herein as "Refco.") Refco was a publicly traded company formed pursuant to an August 2005 initial public offering. Plaintiffs (collectively, the "Insureds") have been named as defendants in various civil proceedings, and in the case of Tone Grant a criminal proceeding, related to the collapse of Refco (collectively, the "Underlying Actions").

2.      The Insureds have requested coverage for such actions, including advancement of their defense costs incurred in connection with the Underlying Actions, from AWAC and Arch. Notwithstanding that the claims made against Plaintiffs in the Underlying Actions clearly constitute "claims" for "Wrongful Acts" under the "Excess Directors and Officers Insurance and Company Reimbursement Policy," policy number AW0418197, issued by AWAC to Refco (the "AWAC Policy," a true copy of which is attached as Exhibit A hereto), AWAC has denied coverage to the Insureds and refused to advance the defense costs of any of its Insureds. Likewise, Arch has also denied coverage to the Insureds under the Excess Insurance Policy, policy number DOX0009322-00, issued by Arch to Refco (the "Arch Policy," a true copy of which is attached as Exhibit B hereto).

2

3.     On October 19, 2007, this Court granted the Plaintiffs' motions for summary judgment in Axis Reinsurance Co. v. Bennett, et al., Adv. Proc. No. 07-1712-RDD (Bankr. S.D.N.Y.); Grant, et al. v. Axis Insurance Company, Adv. Proc. No. 07-2005-RDD (Bankr. S.D.N.Y.); and Breitman, et al. v. Axis Insurance Company, Adv. Proc. No. 07-2032-RDD (Bankr. S.D.N.Y.) on, *inter alia*, the issue of advancement of defense costs.[1] Specifically, this Court determined that, under the terms of the second excess D&O policy issued by Axis Reinsurance Company ("Axis") to Refco, Axis must advance defense costs to the Plaintiffs in connection with the Underlying Actions.

4.     Plaintiffs' defense costs exhausted Refco's primary and first excess D&O policies months ago, and recently exhausted the second excess D&O policy. On February 5, 2008, Plaintiffs received communication from counsel for Axis notifying Plaintiffs that Axis had received defense bills in excess of the policy issued by Axis and that all invoices received by Axis in excess of Axis' limit of liability would be forwarded to the next excess carrier (*i.e.*, AWAC). On March 6, 2008, Axis notified Plaintiffs by letter that it was in the process of making payments reaching the $10,000,000 total limit of liability under its policy. Since the March 6 letter, Axis has issued checks for such payment.

5.     Plaintiffs have submitted invoices for defense costs to AWAC. However, despite this Court's advancement ruling with respect to the policy issued by Axis, the relevant terms of which are identical to those of the AWAC Policy, AWAC continues to deny coverage and still refused to advance Plaintiffs' defense costs.

6.     On April 21, 2008, following a hearing held on April 11, 2008, this Court entered an order granting the Plaintiffs' motion for a preliminary injunction, and directing AWAC to

---

[1] Plaintiff Richard N. Outridge was not a party to the litigation with Axis.

advance the Plaintiffs' defense costs in the Underlying Actions pending a final determination as to coverage for the Plaintiffs under the AWAC Policy, or until further order of this Court.

7.      Arch also continues to deny coverage and cites as a ground for denial, *inter alia*, a provision in the AWAC Policy.

8.      An actual controversy exists between Plaintiffs, on the one hand, and AWAC and Arch, on the other. Plaintiffs seek a declaration from this Court that the AWAC and Arch Policies provide coverage for them for the Underlying Actions, require AWAC and Arch to advance their defense costs incurred in connection with the Underlying Actions, and preliminary and permanent injunctive relief directing AWAC and Arch to pay their losses, including defense costs, in accordance with the requirements of the AWAC and Arch Policies.

## JURISDICTION AND VENUE

9.      This adversary proceeding is brought pursuant to Rules 7001(1), (2), (7), and (9) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 105, et seq. and 28 U.S.C. § 2201.

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## PARTIES

### Plaintiffs

12.     Joseph Murphy is a former officer of Refco who, at times relevant to this action, served as Executive Vice President of Refco Inc. and President of Refco LLC. Murphy is a resident of the State of New Jersey.

13.     William M. Sexton is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Operating Officer of Refco. Sexton is a resident of the State of New York.

4

14.    Dennis A. Klejna is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and General Counsel of Refco. Klejna is a resident of the State of New York.

15.    Gerald Sherer is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and Chief Financial Officer of Refco. Sherer is a resident of the State of New York.

16.    Philip Silverman is a former officer at Refco who, at times relevant to this action, served as Secretary of Refco. Silverman is a resident of the State of New Jersey.

17.    Richard N. Outridge is a former officer of Refco Capital Markets, Ltd. who, at times relevant to this action, served as Chief Financial Officer and/or Controller of Refco Capital Markets, Ltd. Outridge is a resident of the State of Pennsylvania.

18.    Tone Grant is a former officer of Refco who served as President and Chief Executive Officer of Refco Group Ltd., LLC until 1998. Grant is a resident of the State of Illinois.

19.    Leo R. Breitman served, at times relevant to this action, as a director of Refco and member of the audit committee. Breitman is a resident of the State of Florida.

20.    Nathan Gantcher served, at times relevant to this action, as a director of Refco and a member of Refco's audit committee. Gantcher is a resident of the State of New York.

21.    David V. Harkins served, at times relevant to this action, as a director of Refco. Harkins is a resident of the State of Massachusetts.

22.    Scott L. Jaeckel served, at times relevant to this action, as a director of Refco. Jaeckel is a resident of the State of Massachusetts.

23.    Thomas H. Lee served, at times relevant to this action, as a director of Refco. Lee

5

is a resident of the State of New York.

24.    Ronald L. O'Kelley served, at times relevant to this action, as a director of Refco. O'Kelley is a resident of the State of Florida.

25.    Scott A. Schoen served, at times relevant to this action, as a director of Refco. Schoen is a resident of the State of Massachusetts.

**Defendants**

26.    Upon information and belief, AWAC is an insurance company that is organized and exists pursuant to the laws of the State of Delaware. Upon information and belief, AWAC has its principal place of business in Boston, Massachusetts.

27.    Upon information and belief, Arch is an insurance company that is organized and exists pursuant to the laws of the State of Missouri. Upon information and belief, Arch has its principal place of business in New York, New York.

28.    The AWAC Policy contains a "Service of Suit" Endorsement, which provides that "[i]n the event of failure of the Company [AWAC] to pay any amount claimed to be due hereunder, the Company [AWAC], at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States."

29.    Upon information and belief, John D. Agoglia, Edwin L. Cox, Sukhmeet Dhillon, Thomas H. Dittmer, Stephen Grady, Thomas Hackl, Eric G. Lipoff, Peter McCarthy and Frank Mutterer are nominal defendants who are potential insureds under the AWAC Policy and Arch Policy whose contractual rights may be affected by this litigation.

## GENERAL ALLEGATIONS

### A.    THE UNDERLYING ACTIONS

30.    On October 17, 2005, Refco Inc., and many of its direct and indirect subsidiaries filed voluntary petitions for relief in this Court under Chapter 11 of the United States Bankruptcy

6

Code.

31.     Thereafter, Plaintiffs were named as defendants in various civil actions (the "Civil Actions"). Plaintiff Grant was also a defendant in one criminal action, in which trial began on March 24, 2008 and concluded on April 17, 2008.

32.     The Civil Actions include: In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988 (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Agoglia, et al., Adv. Proc. No. 07-3060 (RDD) (Bankr. S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07-7074 (GEL) (S.D.N.Y.); and Kirschner v. Grant Thornton LLP, et al., No. 2007-1-008818 (Ill. Cir. Ct.).

33.     The Plaintiffs properly gave notice of the Underlying Actions (including the Civil Actions) to the insurers in the Refco "tower" of D&O liability insurance, including AWAC and Arch, and requested, among other things, that such insurers advance their defense costs incurred in connection with the Underlying Actions under the policies described below.

## B.     THE REFCO "TOWER" OF D&O INSURANCE

34.     As indicated above, Refco procured a "tower" of D&O liability insurance coverage. Such coverage consists of a primary policy and five excess policies for the Policy Period.

### The U.S. Specialty Policy

35.     U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy, Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, for the Policy Period with a $10 million limit of liability (the "U.S. Specialty Policy," or "Primary

7

Policy," a true copy of which is attached as Exhibit C).

36.     The U.S. Specialty Policy names as "Insured Persons" under the Policy "any past,

present or future director or officer of the Company." (Exhibit C at Definition (F)). The U.S.

Specialty Policy provides those directors and officers with coverage for "Loss arising from

Claims . . . against the Insured Persons for Wrongful Acts." (*Id.* at Insuring Agreement (A)).

37.     The Underlying Actions are Claims for "Wrongful Acts," as defined in the U.S.

Specialty Policy. (*Id.* at Definition (P)).

38.     "Loss" is defined by the U.S. Specialty Policy so as to include defense costs. (*Id.*

at Definition (G) and Endorsement No. 4).

39.     The U.S. Specialty Policy further requires the Insurer to advance defense costs

incurred during the pendency of Claims:

> **The Insurer will pay covered Defense Costs on an as-incurred
> basis. If it is finally determined that any Defense Costs paid by
> the Insurer are not covered under this Policy, the Insureds agree
> to repay such non-covered Defense Costs to the Insurer.**

(*Id.* at Condition (D)(2)) (emphasis added).

40.     The U.S. Specialty Policy also includes a "Full Severability" Endorsement, which

provides that "[n]o knowledge or information possessed by any Insured will be imputed to any

other Insured." (*Id.* at Endorsement No. 10).

41.     The U.S. Specialty Policy also provides that for purposes of determining the

application of exclusions, "no Wrongful Act of any Insured Person will be imputed to any other

Insured Person who did not have actual knowledge of, or directly participate in the commission

of, such Wrongful Act . . . ." (*Id.* at Exclusions).

42.     The U.S. Specialty Policy further provides that "notwithstanding anything in this
•
Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the

8

coverage provided under Insuring Agreement (A) of this Policy." (*Id.* at Endorsement No. 13).

43.    U.S. Specialty recognized its coverage obligations to Plaintiffs as well as other Insureds. After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to the Insureds, U.S. Specialty paid the defense costs of the Insureds until the limits of the U.S. Specialty Policy were exhausted last year.

**The Lexington Policy**

44.    Lexington Insurance Company ("Lexington") issued the first excess policy above the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924, for the Policy Period with a $7.5 million limit of liability in excess of $10 million (the "Lexington Policy," or "First Excess Policy").

45.    The Lexington Policy "follows form" to the U.S. Specialty Policy. This means that the Lexington Policy "indemnify[ies] the Insured named in the Declarations . . . in accordance with the applicable insuring agreements, terms, conditions and exclusions . . . of the Underlying Policy."

46.    After obtaining approval from this Court to comply with the terms of its policy and advance defense costs to Insureds, Lexington paid the defense costs of the Insureds in connection with the Underlying Actions, including Plaintiffs, until the limits of the Lexington Policy were exhausted in July 2007.

**The Axis Policy**

47.    Axis is the second excess insurer on the Refco "tower" of D&O liability insurance. Axis issued the second excess policy above the Lexington Policy, SecurExcess Policy No. RNN 506300, for the Policy Period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy," or "Second Excess Policy").

9

48.     Like the Lexington Policy, the Axis Policy also "follows form" to the U.S.

Specialty Policy. Accordingly, the Axis Policy states that it provides coverage "in conformance

with the provisions of" the U.S. Specialty Policy.

**The Axis Adversary Proceeding**

49.     On or about May 23, 2007, Axis commenced an adversary proceeding in the U.S.

Bankruptcy Court for the Southern District of New York, Axis Reinsurance Company v. Bennett

et al., Adv. Proc. No. 07-0712 (Bankr. S.D.N.Y.) (the "Axis Adversary Proceeding"), seeking a

declaration that it had no obligations to its Insureds under the Axis Policy. The Axis Complaint

named the Plaintiffs in this action, among others, as defendants.[2]  All defendants were former

Refco officers or directors.

50.     In response to the Axis Complaint in the Axis Adversary Proceeding, Plaintiffs

herein filed various pleadings seeking advancement and the Plaintiffs herein made motions for

preliminary injunctive relief to compel Axis to advance defense costs under the Axis Policy,

which this Court granted.

51.     Plaintiffs subsequently moved for summary judgment against Axis, seeking, *inter

alia*, summary judgment and a permanent injunction compelling Axis to pay the defense costs as

incurred, pending a final determination of coverage under the Axis Policy or until the Axis

Policy is exhausted.

52.     Following a hearing on the motions, by Order dated October 19, 2007, as

amended on October 22, 2007, the Bankruptcy Court granted the motions for summary

judgment.

53.     Following the October 19 decision granting summary judgment, Axis advanced

---

[2]  For purpose of this section describing the "Axis Adversary Proceeding," use of the term "Plaintiffs" includes all
Plaintiffs herein, except for plaintiff Richard N. Outridge, who was not a party to the Axis Adversary Proceeding.

10

Plaintiffs' defense costs in connection with the Underlying Actions.

54.     At present, as indicated above, the Axis Policy has been exhausted by reason of advancement.

**The AWAC Policy**

55.     AWAC is the third excess insurer in the Refco "tower" of D&O liability insurance.

56.     The AWAC Policy was issued to Refco for the Policy Period with a $12.5 million limit of liability in excess of $27.5 million.

57.     Upon information and belief, Refco paid the premium of $339,449 that is set forth in the AWAC Policy and thereby obtained coverage from AWAC. (*See* Ex. A at Declarations, Item 7).

58.     Like the Lexington Policy and the Axis Policy, the AWAC Policy "follows form" to the U.S. Specialty Policy. Specifically, the AWAC Policy states that it "shall provide the Insured(s) with . . . coverage . . . pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the [U.S. Specialty Policy] . . . ." (Ex. A at (I) Insuring Agreement. *See also id.* at Definition (II)(a) and Declarations, Item 2).

59.     The AWAC Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy. (*Id.* at Definition (II)(d)).

60.     The AWAC Policy further provides that terms not defined therein "shall have the same meaning in this policy as is attributed to them in the [U.S. Specialty Policy]." (Ex. A at (II) Definitions).

61.     The terms "Claim" and "Wrongful Act(s)" are not specifically defined in the AWAC Policy. Accordingly, any "Claim" for a "Wrongful Act" brought against Plaintiffs that

11

falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the AWAC Policy. (*See id.*)

62.     Each of the Underlying Actions is a "Claim" against Plaintiffs (and other Insureds) for "Wrongful Acts" covered by Insuring Agreement (A) in the U.S. Specialty Policy and by the Insuring Agreement in the AWAC Policy.

63.     The AWAC Policy specifically states that when the policies underlying it are exhausted, it will "continue in force as primary insurance." (Ex. A at (IV) Limit of Liability). Specifically, the Policy provides that "[i]n the event. . . of the . . . exhaustion of the Underlying Aggregate Limit by reason of the Underlying Insurers . . . paying . . . Loss or Damages otherwise covered hereunder, this policy shall . . . continue in force as primary insurance . . . ." (*Id.*).

64.     The AWAC Policy clearly provides coverage for defense costs. The AWAC Policy specifically provides that the term "Loss" shall have the same meaning as attributed to it in the U.S. Specialty Policy. (*See* Ex. A at Definition (II)(c)). "Loss" is defined by the U.S. Specialty Policy to include defense costs. (*See* Ex. C at Definition (G) and Endorsement No. 4).

65.     The Declarations Page of the AWAC Policy further acknowledges, in bold, capital letters, that it covers defense costs:

> **THE LIMIT OF LIABILITY AVAILABLE TO PAY
> JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED
> BY AMOUNTS INCURRED FOR LEGAL DEFENSE.
> AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL
> BE APPLIED AGAINST THE RETENTION AMOUNT.**

(Ex. A at Declarations Page).

## The Arch Policy

66.     Arch is the fourth excess insurer in the Refco "tower" of D&O liability insurance.

67.     The Arch Policy was issued to Refco for the Policy Period with a $10 million

12

limit of liability in excess of $40 million.

68.     Upon information and belief, Refco paid the premium of $241,693.00 that is set forth in the Arch Policy and thereby obtained coverage from Arch. *(See* Ex. B at Item 6).

69.     Like the Lexington Policy, Axis Policy and the AWAC Policy, the Arch Policy "follows form" to the U.S. Specialty Policy. Specifically, the Arch Policy states that it "shall apply in conformance with the terms and conditions of the [U.S. Specialty Policy] and in conformance with any terms and conditions further limiting or restricting coverage in this Policy or in any other Underlying Insurance . . . ." (Ex. B at Insuring Agreement § I(C); *see also id.* at Definitions §§ (II)(C) and (D) and Declarations, Items 4 and 5).

70.     The Arch Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the U.S. Specialty Policy. *(Id.* at Definitions § (II)(B)).

71.     The term "Claim" is defined as having "the same meaning" in the Arch Policy "as given to it in the [U.S. Specialty Policy]." *(Id.* at II(A) Definitions). Accordingly, any "Claim" brought against Plaintiffs that falls within Insuring Agreement (A) of the U.S. Specialty Policy also falls within the "Insuring Agreement" of the Arch Policy. *(See id.)*

72.     Each of the Underlying Actions is a "Claim" against Plaintiffs (and other Insureds) for "Wrongful Acts" covered by Insuring Agreement (A) in the U.S. Specialty Policy and by the Insuring Agreement in the Arch Policy.

73.     The Arch Policy specifically states that Arch "shall provide the Insureds coverage for Claims in excess of the Underlying Insurance." (Ex. B at I(A) Insuring Agreement). The Arch Policy further provides that "the insurance coverage afforded by [the Arch] Policy shall apply" "after exhaustion of the Underlying Limit..." (Ex. B at (I)(B) Insuring Agreement).

74.     The Declarations Page of the Arch Policy further acknowledges, in bold, capital

13

letters, that it covers defense costs:

> **THE LIMITS OF LIABILITY SHALL BE REDUCED**
> **BY AMOUNTS INCURRED AS DEFENSE COSTS AND EXPENSES.**

(Ex. B at Declarations Page).

### Other Excess Insurance

75.     There is one additional excess policy above (*i.e.*, in excess of) the Arch Policy in

the Refco D&O liability insurance "tower."

### C.     ATTEMPTS BY AWAC TO AVOID ITS
### ADVANCEMENT OBLIGATIONS UNDER THE AWAC POLICY

76.     By letter dated March 28, 2006 and in subsequent correspondence, AWAC has

denied coverage for Plaintiffs under the AWAC Policy.

77.     In the letter of March 28, 2006, AWAC denied coverage based upon (1)

Endorsement No. 3 to the AWAC Policy, described as the "AWAC Prior Knowledge

Exclusion," (2) the purported Knowledge Exclusion Endorsement of the Axis Policy, (3) a

purported "warranty letter" from Refco Group Ltd. LLC dated January 15, 2005 (the "Axis

Warranty Letter"), and (4) the failure to answer Question 12 in Refco's application for the

Primary Policy.

78.     The March 28, 2006 letter from AWAC asserts that Phillip "Bennett's knowledge

prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable

person or persons would suppose might afford valid grounds for a claim which would fall within

the scope of the coverage afforded by the Policy," is grounds for denial on each of the bases

described above.

79.     AWAC reiterated its denial of coverage, as initially outlined in its March 28, 2006

letter, by subsequent letters dated September 11, 2007 and November 12, 2007. For example,

the letter dated September 11, 2007 states that "because the Refco matters all arise from and are

14

premised upon Mr. Bennett's knowledge, prior to the inception of the [AWAC] Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by this Policy, coverage for these Claims is excluded under the Policy for all Insureds."

80.     Bennett's knowledge of any facts or circumstances that might afford grounds for a claim within the scope of the AWAC Policy does not provide a basis for AWAC to deny coverage as to Plaintiffs.

81.     Based upon its denials of coverage, as set forth above, AWAC has refused to advance Plaintiffs' defense costs.

## D.    ATTEMPTS BY ARCH TO AVOID ITS OBLIGATIONS UNDER THE ARCH POLICY

82.     By letter dated March 9, 2006 and in subsequent correspondence, Arch has denied coverage for Plaintiffs under the Arch Policy.

83.     In the letter of March 9, 2006, Arch denied coverage based upon (1) the "Prior Knowledge Exclusion Endorsement" that Arch understood would be contained in the AWAC Policy, "when issued," (2) the purported "Inverted Representation Endorsement" that Arch understood would be contained in the AWAC Policy, (3) Endorsement No. 4 to the Arch Policy, described as the "Arch Prior Knowledge or Information Exclusion," (4) the Lexington Policy's definition of "Loss," which Arch construed as precluding coverage for defense costs, and (5) the Axis Warranty Letter.

84.     The March 9, 2006 letter from Arch asserts that Phillip "Bennett, at the time of the inception of the [Arch] Policy, had knowledge of or information concerning any act, error, omission, fact, matter or circumstance that might give rise to a Claim," which knowledge is grounds for denial on each of the bases described above.

15

85.     Arch reiterated its denial of coverage, as initially outlined in its March 9, 2006 letter, by subsequent letter dated May 22, 2006.

86.     Bennett's knowledge of any facts or circumstances that might afford grounds for a claim within the scope of the Arch Policy does not provide a basis for Arch to deny coverage as to Plaintiffs.

87.     Based upon its denials of coverage, as set forth above, Arch has asserted that it has no obligation to advance Plaintiffs' defense costs.

## COUNT I

### (Declaratory Relief Against AWAC)

88.     Plaintiffs repeat and reallege paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     Pursuant to the terms of the AWAC Policy, AWAC is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions, including but not limited to defense costs, upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, Lexington Policy and Axis Policy.

90.     The U.S. Specialty Policy, the Lexington Policy and the Axis Policy have been fully exhausted.

91.     AWAC has denied and continues to deny its contractual obligations, has denied coverage under the AWAC Policy, and has refused and continues to refuse to advance defense costs.

92.     None of the grounds asserted by AWAC for the denial of coverage under the AWAC Policy provides a valid basis for denying coverage to the Plaintiffs.

93.     Upon information and belief, Refco paid all premiums for the AWAC Policy and

16

had and has performed all of the terms and conditions of the AWAC Policy on its part to be performed with respect to the relief here sought, unless otherwise excused.

94.   Plaintiffs, as Insureds under the AWAC Policy, and therefore, parties to the insurance contract, have performed all the terms and conditions of the AWAC Policy on their part(s) to be performed with respect to the relief here sought, unless otherwise excused.

95.   At all relevant times mentioned herein, the AWAC Policy was, and is, in full force and effect.

96.   An actual controversy exists between AWAC and Plaintiffs as to whether the Plaintiffs are entitled to coverage under the AWAC Policy in the form of advancement of their defense costs in the Underlying Actions, and judicial resolution of the parties' rights and obligations is necessary.

97.   This Court should issue a judgment declaring that the Plaintiffs are entitled to coverage under the AWAC Policy for Loss arising out of the Underlying Actions, including but not limited to defense costs as they are incurred.

## COUNT II

### (Preliminary Injunctive Relief Against AWAC)

98.   Plaintiffs repeat and reallege paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.   Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for defense costs in the Underlying Actions.

100.   AWAC has expressed its refusal to make such payments, notwithstanding that Plaintiffs' defense costs are mounting as the Underlying Actions proceed.

101.   Absent preliminary injunctive relief, Plaintiffs face an imminent risk of irreparable

17

harm, including, but not limited to, the risk of an adverse outcome in the Underlying Actions caused by their inability to mount an adequate defense.

102. Plaintiffs are entitled to preliminary injunctive relief requiring AWAC to advance their defense costs in the Underlying Actions in accordance with AWAC's contractual obligations.

## COUNT III

### (Permanent Injunctive Relief Against AWAC)

103. Plaintiffs repeat and reallege paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104. Upon the exhaustion of the Axis Policy, AWAC became obligated to make payments to the Plaintiffs for Losses, including defense costs in the Underlying Actions.

105. AWAC has expressed its refusal to make such payments.

106. Plaintiffs are entitled to permanent injunctive relief requiring AWAC to make payments for Losses, including defense costs, in the Underlying Actions in accordance with AWAC's contractual obligations.

## COUNT IV

### (Breach of Contract Against AWAC)

107. Plaintiffs repeat and reallege paragraphs 1 through 106 of this Complaint as if fully set forth herein

108. Pursuant to the terms of the AWAC Policy, AWAC is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy and the Axis Policy.

18

109.    As of the present date, AWAC has denied its contractual obligations and has denied coverage under the AWAC Policy.

110.    Upon information and belief, Refco paid all premiums for the AWAC Policy and has performed all of the terms and conditions of the AWAC Policy on its part to be performed, unless otherwise excused.

111.    Plaintiffs, as Insureds under the AWAC Policy, have performed all the terms and conditions of the AWAC Policy on their part to be performed, unless otherwise excused.

112.    At all relevant times mentioned herein, the AWAC Policy was, and is, in full force and effect.

113.    None of the grounds asserted by AWAC for the denial of coverage under the AWAC Policy provides a valid basis for denying coverage to Plaintiffs.

114.    By denying coverage to Plaintiffs for the Underlying Actions, AWAC has breached the AWAC Policy.

115.    Plaintiffs have suffered and will continue to suffer damages as a direct and consequential result of AWAC's breach of its contractual duties and obligations under the AWAC Policy.

116.    Plaintiffs are entitled to recover their damages from AWAC under the terms of the AWAC Policy in an amount to be determined at trial.

## COUNT V

### (Declaratory Relief Against Arch)

117. Plaintiffs repeat and reallege paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118. Pursuant to the terms of the Arch Policy, Arch is contractually obligated to provide

19

coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions, including but not limited to defense costs, upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy, the Axis Policy and the AWAC Policy.

119. Arch has denied and continues to deny its contractual obligations.

120. None of the grounds asserted by Arch for the denial of coverage under the Arch Policy provides a valid basis for denying coverage to Plaintiffs.

121. Upon information and belief, Refco paid all premiums for the Arch Policy and has performed all of the terms and conditions of the Arch Policy on its part to be performed, unless otherwise excused.

122. Plaintiffs, as Insureds under the Arch Policy, have performed all the terms and conditions of the Arch Policy on their part to be performed, unless otherwise excused.

123. At all relevant times mentioned herein, the Arch Policy was, and is, in full force and effect.

124. An actual controversy exists between Arch and the Plaintiffs as to whether the Plaintiffs are entitled to coverage under the Arch Policy for the Underlying Actions, and judicial resolution of the parties' rights and obligations is necessary.

125. This Court should issue a judgment declaring that Plaintiffs are entitled to coverage under the Arch Policy for Loss arising out of the Underlying Actions, including, but not limited to, defense costs as they are incurred.

## COUNT VI

### (Permanent Injunctive Relief Against Arch)

126. Plaintiffs repeat and reallege paragraphs 1 through 125 of this Complaint as if fully

20

set forth herein.

127. Upon the exhaustion of the AWAC Policy, Arch will become obligated to make payments to the Plaintiffs for Losses, including defense costs in the Underlying Actions.

128. Arch has expressed its refusal to make such payments.

129. Plaintiffs are entitled to permanent injunctive relief requiring Arch to make payments for Losses, including defense costs, in the Underlying Actions in accordance with Arch's contractual obligations.

## COUNT VII

### (Breach of Contract Against Arch)

130. Plaintiffs repeat and reallege paragraphs 1 through 129 of this Complaint as if fully set forth herein

131. Pursuant to the terms of the Arch Policy, Arch is contractually obligated to provide coverage to Plaintiffs for all Loss (as defined in the U.S. Specialty Policy) arising from the Underlying Actions upon exhaustion of the limits of liability of the underlying U.S. Specialty Policy, the Lexington Policy, the Axis Policy and the AWAC Policy.

132. As of the present date, Arch has denied its contractual obligations and has denied coverage under the Arch Policy.

133. Upon information and belief, Refco paid all premiums for the Arch Policy and has performed all of the terms and conditions of the Arch Policy on its part to be performed, unless otherwise excused.

134. Plaintiffs, as Insureds under the Arch Policy, have performed all the terms and conditions of the Arch Policy on their part to be performed, unless otherwise excused.

135. At all relevant times mentioned herein, the Arch Policy was, and is, in full force

21

and effect.

136.    None of the grounds asserted by Arch for the denial of coverage under the Arch Policy provides a valid basis for denying coverage to Plaintiffs.

137.    By denying coverage to Plaintiffs for the Underlying Actions, Arch has breached the Arch Policy.

138.    Plaintiffs have suffered and will continue to suffer damages as a direct and consequential result of Arch's breach of its contractual duties and obligations under the Arch Policy.

139.    Plaintiffs are entitled to recover their damages from Arch under the terms of the Arch Policy in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request entry of judgment in their favor as follows:

140.  On Count I, declaring that Plaintiffs are entitled to  coverage under the AWAC Policy for Loss arising out of the Underlying Actions, including but not limited to defense costs;

141.  On Count II, requiring AWAC to advance Plaintiffs' defense costs in the Underlying Actions pending a final determination of coverage under the AWAC Policy;

142.  On Count III, requiring AWAC to make payments to Plaintiffs for Losses, including defense costs, in the Underlying Actions, in accordance with the AWAC Policy;

143.  On Count IV, awarding Plaintiffs damages against AWAC for its breach of the AWAC Policy;

144.  On Count V, declaring that Plaintiffs are entitled to coverage under the Arch Policy for Loss arising out of the Underlying Actions, including but not limited to defense costs;

145. On Count VI, requiring Arch to make payments to Plaintiffs for Losses, including

defense costs, in the Underlying Actions, in accordance with the Arch Policy;

146. On Count VII, awarding Plaintiffs damages against Arch for its breach of the Arch

Policy;

147. Awarding Plaintiffs their attorneys' fees and costs and disbursements of this action;

and

148. Granting such other and further relief as the Court may deem proper.

Dated: April 24, 2008

HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation

/s/ Helen B. Kim
Helen B. Kim
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4525
Facsimile: (310) 788-4471

/s/ Ivan Kline
Ivan Kline
600 Lexington Avenue
New York, NY 10022
Telephone:    (212) 750-8700
Facsimile:    (212) 223-8391

PHILIP A. NEMECEK (PN-3319)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8834
Facsimile:   (212) 940-8776

*Attorneys for Plaintiffs William M. Sexton
and Gerald M. Sherer*

*Attorneys for Plaintiff Dennis A. Klejna*

23

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP

/s/ Richard Cashman
Richard Cashman
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:    (212) 832-8300
Facsimile:    (212) 763-7600

*Attorneys for Plaintiff Philip Silverman*

JOHN J. JEROME (JJ-2413)
SAUL EWING LLP

/s/ John J. Jerome
John J. Jerome
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone:    (212) 672-1996
Facsimile:    (212) 672-1920

*Attorneys for Plaintiff Joseph Murphy*
CLARE P. GUTEKUNST (CG-0117)
PROSKAUER ROSE LLP

/s/ Claire P. Gutekunst
Claire P. Gutekunst
1585 Broadway
New York, NY 10036-8299
Telephone:    (212) 969-3421
Facsimile:    (212) 969-2900

*Attorneys for Plaintiff Richard N. Outridge*

NORMAN L. EISEN (NE 1198)
LAURA E. NEISH (LN-0040)
ZUCKERMAN SPAEDER LLP

/s/ Norman L. Eisen
Norman L. Eisen
1540 Broadway, Suite 1604
New York, NY 10036
Telephone:    (212) 704-9600
Facsimile:    (212) 740-4256

And

BLAKE T. HANNAFAN (BH-7054)
HANNAFAN & HANNAFAN

/s/ Blake T. Hannafan
One East Wacker Dr.
Suite 2800
Chicago, IL 60601
Telephone:    (312) 527-0055
Facsimile:    (312) 527-0220

*Attorneys for Plaintiff Tone N. Grant*

GREG A. DANILOW (GD-1621)
MICHAEL F. WALSH (MW-8000)
WEIL, GOTSHAL & MANGES LLP

/s/ Michael F. Walsh
Michael F. Walsh
767 Fifth Avenue
New York, NY 10153-0119
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Attorneys for Plaintiffs Leo R. Breitman, Nathan
Grantcher, David V. Harkins, Scott L. Jaeckel,
Thomas H. Lee, Ronald L. O'Kelley, and Scott
A. Schoen*

24

# Exhibit B



Axis Reinsurance Co. v. Bennett
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
AXIS REINSURANCE COMPANY, Plaintiff,
v.
Phillip R. BENNETT et al., Defendants.
Nos. 07 Civ. 7924(GEL), 08 Civ. 3242(GEL).

June 19, 2008.

Wayne E. Borgeest, Joan M. Gilbride, Robert A. Benjamin, Kaufman Borgeest & Ryan LLP, Valhalla, NY, for Plaintiff.

Helen B. Kim, Philip A. Nemecek, Katten Muchin Rosenman LLP, Los Angeles, CA, and New York, NY, for Defendant and Counterclaim Plaintiff Dennis A. Klejna.

Stuart I. Friedman, Ivan Kline, Friedman & Wittenstein, New York, NY, for Defendants and Counterclaim Plaintiffs William M. Sexton and Gerald M. Sherer.

Greg A. Danilow, Michael F. Walsh, Weil, Gotshal & Manges LLP, New York, NY, for Defendants Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen.

Richard Cashman, Haller Ehrman LLP, New York, NY, for Defendant and Counterclaim Plaintiff Philip Silverman.

John J. Jerome, Saul Ewing LLP, New York, NY, for Defendant and Counterclaim Plaintiff Joseph Murphy.

Norman L. Eisen, Thomas G. Macauley, Laura E. Neish, Zuckerman Spaeder LLP, New York, NY, and Michael T. Hannafan, Blake T. Hannafan, Hannafan & Hannafan, Ltd., Chicago, IL, for Defendant Tone N. Grant.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

*1 Certain former officers and directors of Refco (collectively, the "insureds") [FN1] move for summary judgment dismissing the complaint against them in *Axis Reinsurance Company v. Bennett et al.,* No. 07 Civ. 7924(GEL) (S.D.N.Y.) (the "district court action"), which seeks a declaration that plaintiff Axis

Reinsurance Company ("Axis") has no obligation to the insureds under the terms of a 2005-2006 Directors and Officers ("D & O") liability insurance policy it issued to Refco. Five of the insureds (the "counterclaim plaintiffs") [FN2] also move for summary judgment on their counterclaims in *Axis Reinsurance Company v. Bennett et al.,* 08 Civ. 3242(GEL) (S.D.N.Y.) (the "Axis adversary proceeding"), which was originally commenced by Axis in the bankruptcy court, *see* Adv. Proc. No. 07-1712(RDD), before this Court withdrew the bankruptcy reference. (Doc. # 5, No. 07 Civ. 7924.)The counterclaim plaintiffs in the Axis adversary proceeding seek the mirror image of the relief sought by Axis in the district court action-*i.e.,* a declaration that Axis's 2005-2006 D & O policy covers them for losses arising out of various proceedings related to the collapse of Refco. Axis contends that both motions are premature because no discovery has occurred in either the district court action or the Axis adversary proceeding and that, in any event, numerous issues of material fact exist that preclude summary judgment. For the reasons stated below, the motions will be granted in part, and denied in part. [FN3]

> FN1. The defendant insureds are Dennis A. Klejna, William M. Sexton, Gerald Sherer, Joseph Murphy, Philip Silverman, Tone Grant, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen.

> FN2. The counterclaim plaintiffs are Klejna, Sexton, Sherer, Murphy, and Silverman.

> FN3. Klejna, who is both an insured and a counterclaim plaintiff, has reached a settlement with lead plaintiffs in *In re Refco, Inc. Securities Litigation,* No. 05 Civ. 8626(GEL) (S.D.N.Y.), which the Court preliminary approved in January 2008. (See Doc. # 459, No. 05 Civ. 8626.)Although Klejna tendered the settlement to Axis in July 2007, Axis has "consistently refused to consent to or to fund the settlement."(Klejna Mem. 8.) Accordingly, Klejna moved for summary judgment in both the district court

action and in the Axis adversary proceeding. Following Klejna's lead, the other insureds subsequently filed their own motions for summary judgment. In response to Axis's opposition to their motions, Klejna and the other insureds (with the exception of defendant Grant) filed a joint reply brief. (Grant filed his own reply brief.) Because the arguments advanced by Klejna and the other insureds in their moving papers are largely identical, and because Klejna joined the other insureds (with the exception of Grant) in filing a single reply brief, this Opinion and Order discusses the motions filed by Klejna and the other insureds in tandem and, unless otherwise noted, makes no distinction between them.

## BACKGROUND

### I. Refco's Collapse and Bankruptcy

Prior to its implosion in the fall of 2005, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. *See In re Refco, Inc. Secs. Litig.*, No. 07 Civ. 11604, 2008 WL 1827644, at *1 (S.D.N.Y. April 21, 2008). On October 10, 2005, two months after its initial public offering ("IPO"), Refco announced that it had discovered an undisclosed $430 million receivable due from an entity controlled by Refco's CEO, Phillip R. Bennett. (Adv.Pro.Compl.¶¶ 56-57, 59.[FN4]) As a result, the company announced that its financial statements for the preceding four years could no longer be relied upon. (*Id.* ¶ 57.)Following these disclosures, Refco's stock plummeted and was de-listed by the New York Stock Exchange, leading to over $1 billion in lost market capitalization. *See In re Refco*, 2008 WL 1827644, at *1.

> FN4. References to "Adv. Pro. Compl." refer to the complaint originally filed in the bankruptcy court in the Axis adversary proceeding. (Kim Decl. Ex. 8.) References to "D. Ct. Compl." refer to the complaint filed in the district court action. (*Id.* Ex. 20.)

On or about October 17, 2005, Refco Inc. and many of its subsidiaries (collectively, "Refco") filed for protection under Chapter 11 of Title 11 of the United

States Code. (Adv.Pro.Compl.¶ 61.)

### II. The Underlying Actions

The collapse and ensuing bankruptcy of Refco in October 2005 triggered an onslaught of litigation against certain Refco officers and directors (the "Underlying Actions"). Many of the Underlying Actions remain pending before this Court, including *In re Refco, Inc. Securities Litigation,* No. 05 Civ. 8626(GEL) (S.D.N.Y.); *American Financial International Group et al. v. Bennett et al.,* No. 05 Civ. 8988(GEL) (S.D.N.Y); *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation,* No. 06 Civ. 643(GEL) (S.D.N.Y.); *V.R. Global Partners, L.P. v. Bennett et al.,* No. 07 Civ. 8686(GEL) (S.D.N.Y.); *Capital Management Select Fund Ltd. v. Bennett et al.,* No. 07 Civ. 8688(GEL) (S.D.N.Y.); *Kirschner v. Thomas H. Lee Partners, L.P. et al.,* No. 07 Civ. 7074(GEL) (S.D.N .Y.); *Kirschner v. Bennett et al.,* No. 07 Civ. 8165(GEL) (S.D.N.Y.); and *Kirschner v. Grant Thornton LLP et al.,* No. 07 Civ. 11604(GEL) (S.D.N.Y.). The government has also initiated criminal proceedings against several Refco officers, securing three guilty pleas and a conviction following a criminal trial.[FN5]

> FN5. Specifically, defendants Bennett, Robert C. Trosten, and Santo Maggio, each pleaded guilty to criminal charges arising out of the fraud at Refco. Defendant Tone E. Grant was convicted by a jury at his criminal trial. (Axis Mem. 1.) Only Grant is a movant on the insureds' pending summary judgment motions.

### III. Refco's D & O Liability Insurance

#### A. *The 2004-2005 Policy Period*

*2 For the period from August 5, 2004, to August 11, 2005 (the "2004-2005 Policy Period"), Refco Group Ltd. ("RGL"), then Refco's parent company, obtained a "tower" of D & O liability insurance consisting of a primary policy and two excess policies totaling $30 million of coverage (the "2004-2005 Program"). Specifically, U.S. Specialty Insurance Company ("U.S.Specialty") provided $10 million of primary coverage (the "2004-2005 Primary Policy"); Greenwich Insurance Company provided the first excess layer of $10 million in excess of $10 million;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Axis provided the second excess layer of $10 million in excess of $20 million (the "2004-2005 Axis Policy"). (Sylwestrzak Decl. ¶ 3.)

### 1. *The 2004-2005 Primary Policy*

In connection with the 2004-2005 Primary Policy and pursuant to U .S. Specialty's August 5, 2004, policy binder (*id.*Ex. A), RGL submitted a "long form" application to U.S. Specialty that was executed by Bennett on behalf of RGL (the "Application").[FN6](*Id.* ¶ 6 and Ex. C.) U.S. Specialty issued the 2004-2005 Primary Policy to RGL on or about October 23, 2004. (*Id.* ¶ 5.)

> FN6. An "insurance binder is a temporary or interim policy until a formal policy is issued."*Springer v. Allstate Life Ins. Co of New York,* 94 N.Y.2d 645, 649 (N.Y.2000). U.S. Specialty's August 5, 2004, policy binder was contingent upon the "receipt, review, and acceptance" of the Application from Refco. (Sylwestrzak Decl. Ex. A.)

### 2. *The 2004-2005 Axis Policy*

As noted above, Axis provided the second excess layer of coverage to RGL. In issuing the 2004-2005 Axis Policy, Axis did not require an application of its own, relying instead on the Application that RGL had submitted to U.S. Specialty. (*Id.* ¶ 9.) The Axis policy binder issued to Refco, dated August 5, 2004, expressly conditioned the validity of the binder on the receipt of, *inter alia,* a "[s]igned Axis warranty." (*Id.* Ex. D; *see id.* ¶ 8). According to the insureds, a "Warranty Letter" executed by Bennett and submitted to Axis on or about January 21, 2005, "on behalf of all Insureds under the Policy" served to satisfy this condition. (*Id.* ¶ 10 and Ex. E; *see* Brooks Decl. ¶ 3.) The Warranty Letter stated:

> No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance .... [I]f such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

(Sylwestrzak Decl. Ex. E.) Refco did not submit the Warranty Letter to U.S. Specialty, nor was it ever made a part of the Application. (*Id.* ¶ 11.)

On or about April 25, 2005, Axis issued the 2004-2005 Axis Policy to RGL. (*Id.* ¶ 12 and Ex. F.) None of the insureds has requested coverage under the 2004-2005 Axis Policy.

### B. *The 2005-2006 Policy Period*

In advance of its August 2005 IPO, Refco obtained D & O insurance for the period from August 11, 2005, to August 11, 2006 (the "2005-2006 Policy Period"). Refco's insurance was again structured as a tower, consisting of a primary policy and five excess policies totaling $70 million in coverage (the "2005-2006 Program").(*Id.* ¶ 14.)U.S. Specialty again provided $10 million of primary coverage (the "2005-2006 Primary Policy"); Lexington Insurance Company ("Lexington") provided the first excess layer of $7.5 million in excess of $10 million (the "Lexington Policy"); Axis provided the second excess layer of $10 million in excess of $17.5 million (the "2005-2006 Axis Policy"); Allied World Assurance Company provided the third excess layer of $12.5 million in excess of $27.5 million; Arch Insurance Company provided the fourth excess layer of $10 million in excess of $40 million; and XL Specialty Insurance Company provided the fifth excess layer of $20 million in excess of $50 million. (*Id.*)

### 1. *The 2005-2006 Primary Policy*

*3 In issuing the 2005-2006 Primary Policy, U.S. Specialty did not require a new application from Refco, but instead relied upon the Application submitted by RGL for the 2004-2005 Policy Period. (*Id* . ¶ 16.)The 2005-2006 Primary Policy defines an "Insured Person" as "any past, present or future director or officer" of Refco Inc. "and any Subsidiary thereof." (*Id.* Ex. G, at Definitions (C), (F).) The Policy provides Insured Persons with coverage for "Loss arising from Claims ... against the Insured Persons for Wrongful Acts."(*Id.* Ex. G, at Insuring Agreement (A)). "Loss" is defined under the Policy to include, *inter alia,*"[d]efense [c]osts and any damages, settlements, judgments or other amounts" that "an Insured Person is legally obligated to pay as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a result of any Claim."(*Id.* Ex. G, at Definition (G).) Axis concedes that "most" of the Underlying Actions are "Claims" for "Wrongful Acts" as defined in the 2005-2006 Primary Policy. (P. Rule 56.1 Stmt. ¶ 24.)

The 2005-2006 Primary Policy also contains two severability provisions. With regard to exclusions, the Policy states, in relevant part:

For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act ....

(Sylwcstrzak Decl. Ex. G, at 5.) The 2005-2006 Primary Policy also contains a "Full Severability" Endorsement, which provides:

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

(*Id.* Ex. G, at Endorsement No. 10.)

Following the initiation of the Underlying Actions following Refco's collapse, the insureds requested coverage from U.S. Specialty under the 2005-2006 Primary Policy. U.S. Specialty agreed to advance their defense costs, subject to full repayment should it be determined that no coverage exists under the 2005-2006 Primary Policy. (*See* Adv. Pro. Compl. ¶ 8; Gilbride Decl. Ex. D.) The $10 million liability limit of the 2005-2006 Primary Policy was exhausted in 2007. (*See* Adv. Pro. Compl. ¶ 9.)

### 2. *The Lexington Policy*

After the 2005-2006 Primary Policy was exhausted, Lexington, the first excess insurer, also agreed to advance the defense costs of the insureds, subject to repayment if appropriate after a final determination

of coverage. (*See* Gilbride Decl. Ex. D.) The $7.5 million limit in the Lexington Policy was exhausted in July 2007. (*See* Kim Decl. Ex. 3.)

### 3. *The 2005-2006 Axis Policy*

*4 As with the 2004-2005 Axis Policy, Axis did not require its own application for the 2005-2006 Axis Policy, but instead relied on the Application that RGL had previously submitted to U.S. Specialty in connection with the 2004-2005 Primary Policy. (Sylwestrzak Decl. Ex. J at Endorsement 5.) Axis provided Refco with a policy binder on August 11, 2005, pursuant to which Axis agreed to provide $10 million in coverage in excess of the liability limits in the 2005-2006 Primary Policy and the Lexington Policy. (Sylwestrzak Dec. ¶ 18 and Ex. I.) Axis subscquently issued the 2005-2006 Axis Policy on March 1, 2006. (*Id.* ¶¶ 19-20.)

The 2005-2006 Axis Policy "follows the form" of the underlying insurance policies (*i.e.*, the 2005-2006 Primary Policy and the Lexington Policy), meaning that it provides coverage "in conformance with the provisions of" the underlying insurance, except to the extent that the 2005-2006 Axis Policy contains limitations or restrictions on coverage beyond the underlying insurance. (*Id.* Ex. J, at (I) (Insuring Agreement).) The 2005-2006 Axis Policy specifically defines "Insureds" as the same persons who may be entitled to insurance under the 2005-2006 Primary Policy and defines "Claim(s)" as "event(s) which take place during the Policy Period and which trigger(s) coverage under the insuring agreement(s) of the Underlying Insurance."(*Id.* Ex. J at (II), Definitions (A) and (C).) Accordingly, a "Claim" for a "Wrongful Act" brought against the insureds that falls within the 2005-2006 Primary Policy also falls within the 2005-2006 Axis policy.

The 2005-2006 Axis Policy (as issued in March 2006) added as a final endorsement a "Knowledge Exclusion," which provides:

In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge

and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

(*Id.* Ex. J, at Endorsement No. 6.) Axis's August 11, 2005, policy binder did not make reference to the inclusion of the Knowledge Exclusion in the 2005-2006 Axis Policy. (*Id.* Decl. Ex. I.)

## IV. Axis's Initial Denial of Coverage

By letter dated March 6, 2006 (the "Denial Letter"), Axis denied coverage to the insureds for "Claims" made against them for "Wrongful Acts" as defined in the 2005-2006 Primary Policy. (*Id.* Ex. L.) The Denial Letter asserted several grounds for denying coverage.

First, Axis relied upon the Warranty Letter that was signed by Bennett and submitted to Axis "on behalf of all Insureds under the Policy."(Sylwestrzak Deck Ex. E.) According to Axis, the Warranty Letter was submitted, not in connection with the 2004-2005 Axis Policy (as the insureds contend), but rather, in conjunction with the 2005-2006 Axis Policy. Given Bennett's guilty plea to charges arising out of the fraud at Refco, Axis contended that Bennett's false representations in the Warranty Letter entitled Axis to deny coverage to all insureds under the 2005-2006 Axis Policy.

*5 Second, Axis relied upon Bennett's failure to answer a question in the Application to U.S. Specialty. (*Id.* Ex. L, at 9-10.) Specifically, Question 12(b) of the Application asked whether any proposed insured was "aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he has reason to believe might result in a claim being made."(*Id.* Ex. C, at 3.) Immediately following Question 12(b) was a disclaimer stating:

[I]t is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to question[ ] ... 12(b).

(*Id.*) The Denial Letter asserted that Bennett's failure to disclose the alleged fraud at Refco in the answer to Question 12(b) resulted in the Underlying Actions being excluded from coverage. (*Id.* Ex L., at 10.)

Axis also cited the Knowledge Exclusion included in the 2005-2006 Axis Policy. (*Id.* Ex. L, at 9.) The Denial Letter asserted that, pursuant to that Exclusion, Bennett's knowledge, when the 2005-2006 Axis Policy was issued, of facts that might give rise to claims under the Policy barred coverage not only for Bennett, but also for all other insureds. (*Id.* Ex. L, at 9, 11.) $^{FN7}$

> FN7. The Denial Letter also advanced a fourth ground for denying coverage based on the purported relationship between the Underlying Actions and an action filed by the Bankruptcy Trust of Gerard Sillam (the "Sillam Action") (Sylwestrzak Deck Ex. L, at 10-11), but Axis's complaints in both the adversary proceeding and the district court action do not cite the Sillam Action as a ground for denying coverage.

## V. The Axis Adversary Proceeding

On or about May 24, 2007, Axis commenced an adversary proceeding in the bankruptcy court for the Southern District of New York seeking a declaration that the 2005-2006 Axis Policy does not provide coverage for the insureds for losses arising out of the Underlying Actions. (Kim Decl. ¶ 10 and Ex. 8.) Counts I, II, and III of Axis's complaint in the adversary proceeding largely track the Denial Letter, relying upon the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, and the purported Knowledge Exclusion, respectively, to deny coverage. Count IV of the adversary proceeding complaint cites Clause XI of the 2005-2006 Axis Policy (the "Prior Acts Exclusion"), which excludes coverage for "any claim arising out of the same circumstances as those underlying any action or proceeding against any Insured that was pending on or prior to June 4, 2004."(Klejna Mem. 8; *see* Sylwestrzak Decl. Ex. J, at (XI) Exclusions.) Axis asserts that wrongful acts alleged in a 1994 enforcement action brought against Refco by the Commodities Futures Trading Commission ("CFTC") are also alleged in the Underlying Actions,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and thus pursuant to the Prior Acts Exclusion, the 2005-2006 Axis Policy does not provide coverage for those Actions.

On or about July 12, 2007, five of the insureds answered the complaint in the Axis adversary proceeding and filed counterclaims seeking a declaration of coverage (Count I) under the 2005-2006 Axis Policy and an injunction (Count II) to compel Axis to pay losses, including defense costs, in the Underlying Actions. *(See* Kim Decl. ¶ 14.) The counterclaim plaintiffs also moved for a preliminary injunction to compel Axis to advance defense costs under the Policy. *(See* Kim Decl. Ex. 9; Kline Decl. ¶ 4 and Exs. 1, 2.) The other insureds subsequently moved to dismiss the Axis adversary proceeding. *(See* Kline Decl. ¶ 8.)

*6 On August 30, 2007, the bankruptcy court both granted the counterclaim plaintiffs' motion for a preliminary injunction and dismissed the complaint (but not the counterclaims) without prejudice on the ground that the factual issues raised in the adversary proceeding overlapped with the underlying tort and criminal proceedings pending in this Court. *(See* Kim Decl. Ex. 13; Gilbride Decl. Ex. S.)

On or about September 25, 2007, the insureds moved for summary judgment and a permanent injunction compelling Axis to pay defense costs as incurred, pending a final determination of coverage under the 2005-2006 Axis Policy, or until that policy was exhausted.[FN8] In an Order dated October 19, 2007, as amended on October 22, 2007, the bankruptcy court granted the motions for summary judgment in their entirety. (Kim Decl. ¶ 20 and Ex. 15.) Axis filed an appeal from the bankruptcy court's October 19, 2007, Order requiring the advancement of defense costs, which is currently pending before this Court.*(Id.* ¶ 20.)

> FN8. The insureds (other than the counterclaim plaintiffs) had commenced two separate adversary proceedings-*Grant v. Axis Reinsurance Co.,* Adv. Proc. No. 07-2005(RDD) (Bankr.S.D.N.Y.) and *Breitman v. Axis Reinsurance Co.,* Adv. Proc. No. 07-2032(RDD) (Bankr.S.D.N.Y.)-seeking advancement of defense costs under the 2005-2006 Axis Policy. The bankruptcy court subsequently consolidated these

proceedings with the Axis adversary proceeding. This Court withdrew the bankruptcy reference for the consolidated adversary proceedings in November 2007. *(See* Doc. # 5, No. 07 Civ. 7924.)

Following the summary judgment order, Axis advanced the insureds' defense costs in connection with the Underlying Actions until the 2005-2006 Axis Policy was exhausted. Axis has steadfastly maintained its right to recoup defense payments made to the insureds. *(See* Kim Decl. ¶ 26; Kline Decl. ¶ 10.)

## VI. The District Court Action and Withdrawal of the Bankruptcy Reference

On September 10, 2007, shortly after the dismissal of its complaint in the Axis adversary proceeding, Axis filed a nearly identical complaint in this Court. Counts I, II, III, and IV of the district court complaint again rely, respectively, on the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, the purported Knowledge Exclusion, and the Prior Acts Exclusion. The complaint seeks a determination that no coverage exists for any of Refco's former officers or directors in connection with the Underlying Actions.

By agreement of the parties and pursuant to this Court's Order of November 13, 2007 (Doc. # 5, No. 07 Civ. 7924), the Court withdrew the bankruptcy reference for the consolidated adversary proceedings so that all coverage issues could be determined in this Court. (Kim Decl. ¶ 21 and Ex. 16.)

The insureds now move for summary judgment dismissing Axis's complaint against them in the district court action.[FN9] The counterclaim plaintiffs also move for summary judgment on Count I of their counterclaims in the Axis adversary proceeding, seeking a declaration that they are covered by the 2005-2006 Axis Policy for losses arising out of the Underlying Actions.

> FN9. On November 13, 2007, this Court imposed a stay in the district court action "until 30 days have elapsed from this Court's decision regarding" Axis's appeals from various orders of the bankruptcy court, which are currently pending before this

Court. (*See* Doc. # 5, No. 07 Civ. 7924.)The
insureds request that the Court lift the stay to
allow them to proceed with their summary
judgment motion. (Ins. Mem. 1 n. 1.) Axis
contends that the insureds filed their motion
"in violation of the litigation stay," but
t    requests that the Court lift the stay to permit
it to file its opposition to the insureds'
motion. (P. Mem. 32 n. 15.) Because the
parties' arguments regarding coverage (or
lack thereof) in the district court action are
virtually identical to those advanced in the
Axis adversary proceeding, and because a
lifting of the stay will allow the eight
defendant insureds who (unlike the
counterclaim plaintiffs) have no
counterclaims pending in the Axis adversary
proceeding to also move for summary
judgment regarding coverage, the insureds'
request to lift the stay in the district court
action is granted for the limited purpose of
resolving the pending motions for summary
judgment.

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment is appropriate "if the pleadings,
the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as
to any material fact and that the movant is entitled to
judgment as a matter of law."Fed.R.Civ.P. 56(c). The
Court's responsibility is to determine if there is a
genuine issue to be tried, and not to resolve disputed
issues of fact. *See Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 249 (1986). The Court must draw all
reasonable inferences and resolve all ambiguities in
the nonmoving party's favor, and construe the facts in
the light most favorable to the nonmoving party. *Id.*
at 254-55.However, summary judgment may be
granted "[i]f the evidence is merely colorable, or is
not significantly probative."*Id.* at 249 (citations
omitted).

\*7 The party seeking summary judgment bears the
burden of showing that no genuine factual dispute
exists. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196,
202 (2d Cir.1995). Once the moving party has made a
showing that there are no genuine issues of material
fact, the burden shifts to the nonmoving party to raise

triable issues of fact. *Anderson,* 477 U.S. at 250. A
genuine issue for trial exists if, based on the record as
a whole, a reasonable jury could find in favor of the
nonmoving party. *Id.* at 248.

While Rule 56 permits a party to move for summary
judgment "at any time," Fed.R.Civ.P. 56(b), pre-
discovery summary judgment is the exception rather
than the rule and will be granted "only in the clearest
of cases."*Wells Fargo Bank Northwest, N.A. v. Taca
Int'l Airlines, S.A.,* 247 F.Supp.2d 352, 360
(S.D.N.Y.2002) (internal quotation marks omitted);
*see Hellstrom v. United States Dep't of Veterans
Affairs,* 201 F.3d 94, 97 (2d Cir.2000) ("Only in the
rarest of cases may summary judgment be granted
against a [party] who has not been afforded the
opportunity to conduct discovery.")."The nonmoving
party must have ... the opportunity to discover
information that is essential to his opposition to the
motion for summary judgment."*Trebor Sportswear
Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d
Cir.1989) (internal quotation marks omitted).
However, where it is clear that the nonmoving party
cannot defeat the motion by showing facts sufficient
to require a trial for resolution, summary judgment
may be granted notwithstanding the absence of
discovery. *See Gottlieb v. County of Orange,* 84 F.3d
511, 519 (2d Cir.1996).

Rule 56(f) gives the court discretion to deny or defer
an otherwise supported motion for summary
judgment to allow for further discovery if the
nonmoving party "shows by affidavit that, for
specified reasons, it cannot present facts essential to
justify its opposition" to the motion for summary
judgment. Fed.R.Civ.P. 56(f). Under the rule, the
affidavit must explain: "(1) what facts are sought and
how they are to be obtained, (2) how those facts are
reasonably expected to create a genuine issue of
material fact, (3) what effort ... has [been] made to
obtain them, and (4) why [those efforts have been]
unsuccessful."*Gurary v. Winehouse,* 190 F.3d 37, 43
(2d Cir.1999) (internal quotation marks omitted); *see
Paddington Partners v. Bouchard,* 34 F.3d 1132,
1138 (2d Cir.1994). In addition, a court deciding
whether to grant summary judgment in the absence of
discovery must also consider whether the lack of
discovery was in any way due to fault or delay on the
part of the nonmovant, and whether the nonmovant
has provided any basis for its belief that further
discovery would alter the outcome of the summary

judgment motion. *See Berger v. United States, 87 F.3d 60, 65 (2d Cir.1996); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir.1995).*

## II. The Summary Judgment Motions

**\*8** The insureds seek summary judgment dismissing the complaint in the district court action and in favor of Count I of their counterclaims in the Axis adversary proceeding. The insureds' requested relief in both proceedings is essentially identical-*i.e* ., a determination that the 2005-2006 Axis policy provides coverage to the insureds for any losses, including defense costs, arising out of the Underlying Actions. In both proceedings, Axis has advanced four grounds to deny coverage: the Warranty Letter, Bennett's failure to answer Question 12(b) of the Application, the purported Knowledge Exclusion, and the Prior Acts Exclusion. The insureds contend that all of Axis's grounds for denying coverage should be rejected as a matter of law. Each of these grounds will be examined below.

### A. *The Warranty Letter*

### 1. *Inclusion in 2005-2006 Axis Policy*

The insureds contend that Axis cannot rely upon the Warranty Letter to deny coverage under the 2005-2006 Axis Policy because the Letter was executed by Bennett in connection with the 2004-2005 Axis Policy, and the Warranty Letter is "simply not part of the 2005-2006 Axis Policy."(Ins.Mem.14.) The insureds cite a memorandum contemporaneous to the Warranty Letter in which Refco employee Ellen Brooks advised Bennett that "Axis ... is one of three insurance carriers for our *present D & O coverage that was placed August 5, 2004....* They are requiring you to sign a warranty letter confirming that we do not currently have a claim against our **D & O** policy."(Brooks Decl. Ex. A (emphasis added).) The insureds also attach a declaration from Pamela Sylwestrzak, Senior Vice President at Marsh USA, Inc. ("Marsh"), Refco's insurance broker, stating that the validity of the 2004-2005 Axis policy hinder "was subject to receipt by Axis of,"*inter alia,* "a warranty letter to Axis," and that the Warranty Letter satisfied this condition. (Sylwestrzak Decl. ¶¶ 8, 10.) [FN10]The insureds further point to a merger clause in the 2005-2006 Primary Policy,[FN11] contending that since the Warranty Letter was never attached to the

Application or otherwise submitted to U.S. Specialty, Axis is precluded from treating the Warranty Letter as part of the 2005-2006 Primary Policy.

> [FN10]. In her reply declaration, Sylwestrzak reiterates that the Warranty Letter "was explicitly requested by Axis, and was supplied by [RGL], solely in connection with the Axis 2004-2005 Policy."(Sylwestrzak Reply Decl. ¶ 2.)

> [FN11]. The merger clause provided: "By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute *the entire agreement* between the parties with respect to this insurance."(Sylwestrzak Decl. Ex. G, at Condition (O) (emphasis added).)

Axis vigorously disputes the insureds' contentions and asserts that the Warranty Letter is properly part of the 2005-2006 Axis Policy. According to an affidavit by Stephen Kane, Axis's underwriter, "Axis relied upon the January 21, 2005 Warranty Letter at all times while making underwriting decisions concerning the [2005-2006 Axis] policy, which was to commence at the same time the IPO went forward."(Kane Aff. ¶ 7.) Kane's affidavit explains that,

[a]lthough Axis had received a warranty letter signed by Phillip Bennett on behalf of all insureds on January 21, 2005, Axis was told by Marsh that Refco would not be updating the warranty statement in connection with the underwriting for the August 11, 2005 IPO. I understood from this statement by Marsh that *the January 21, 2005 Warranty Letter still applied to the post-IPO Policy* [*i.e.,* the 2005-2006 Axis Policy], but that Refco would not execute a new warranty statement to warrant new things that management learned of from January 21, 2005 through the IPO.

**\*9** (*Id.* ¶ 4 (emphasis added).) Based on Kane's affidavit, Axis contends that Refco, through Marsh, represented that the Warranty Letter would "still appl[y]" to the 2005-2006 Axis Policy to the extent that it barred claims arising from any insured's knowledge, prior to January 21, 2005, of any fact or

Slip Copy
Slip Copy, 2008 WL 2485388 (S.D.N.Y.)
(Cite as: 2008 WL 2485388 (S.D.N.Y.))

circumstance of which any insured had reason to suppose might afford grounds for such a claim. (*Id.*)

Axis also points to the express language of the Warranty Letter, which repeatedly references the *"proposed* insurance." (Sylvestrzak Decl. Ex. E (emphasis added).) Although the insureds claim that Refco did not even begin the process of seeking insurance for the 2005-2006 Policy Period until after the April 2005 announcement that Refco planned an IPO for later that year (Brooks Decl. ¶ 4; Sylwestrzak Decl. ¶ 13), Axis asserts that the 2005-2006 Axis Policy had already been proposed by the time Refco executed the Warranty Letter in January 2005. (*See* Axis Mem. 9). According to Axis, the reference to "proposed insurance" in the Warranty Letter thus refers, not to the 2004-2005 Axis Policy, but rather, to the 2005-2006 Axis Policy. *See* Axis Add'l Rule 56.1 Stmt. ¶ 21 ("[T]he Warranty Letter was provided to Axis as part of the underwriting of the '2005-2006 Policy Period,' " citing Kane Aff. ¶ 7). Furthermore, Axis cites the language in the preamble of the 2005-2006 Axis Policy stating that the Policy is issued "in reliance on ...*all information* provided to [Axis]." (Sylwestrzak Decl. Ex. J (emphasis added).) Axis contends that "all information" includes the Warranty Letter, and that, accordingly, notwithstanding the merger clause in the 2005-2006 Primary Policy, the Warranty Letter is a valid ground upon which to deny coverage to the insureds.

As the parties' competing arguments make clear, genuine issues of material fact abound as to whether the Warranty Letter is properly part of the 2005-2006 Axis Policy. Given that the insureds' motions were made prior to discovery, Axis needs only to provide some basis for its belief that further discovery would alter the outcome of the motions in order to survive summary judgment. *See Berger,* 87 F.3d at 65. Axis has clearly met this minimal burden. Kane's statements regarding his reliance on Marsh's representations concerning the Warranty Letter, coupled with the "proposed insurance" language in the Warranty Letter itself and Axis's purported reliance on the Letter in issuing the 2005-2006 Axis Policy, together provide a sufficient basis to believe that additional discovery would yield material facts regarding whether the parties intended the Warranty Letter to be part of the 2005-2006 Axis Policy.

None of the insureds, moreover, suggests that the

lack of discovery up to this point is due to any fault or delay on the part of Axis. On the contrary, in its Rule 56(f) affidavit, Axis explains that despite numerous requests for information both prior and subsequent to the start of litigation, "[n]one of the [i]nsureds [has] responded to any of Axis's ... requests."(Gilbride Decl. ¶ 26.) Indeed, the affidavit notes that the insureds "rely heavily on the factual Declarations of Ellen Brooks [and] Pamela Sylwestrzak," and yet neither declarant "has been subject to cross-examination by Axis," nor "produced a single document for Axis's review."(*Id.* ¶ 31.)Because the insureds' position depends critically on these declarants, Axis "must have ... the opportunity" to depose and obtain relevant documents from them "to discover information that is essential to [its] opposition."*Trebor Sportswear,* 865 F.2d at 511 (internal quotation marks omitted) (noting that summary judgment is inappropriate where the nonmoving party shows that it "cannot at the time present facts essential to justify [its] opposition" (internal quotation marks omitted)).

## 2. *Applicability of Severability Provision*

**\*10** Even if the Warranty Letter is properly part of the 2005-2006 Axis Policy, however, the insureds contend that the severability provision contained in Endorsement No. 10 of the 2005-2006 Primary Policy nevertheless prevents Axis from relying on the Warranty Letter to bar coverage for the insureds. Specifically, the insureds assert that the severability provision operates as a general non-imputation clause that bars Axis from imputing Bennett's knowledge of the alleged Refco fraud to the other insureds and using the Warranty Letter to deny them coverage on that basis.

Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."*Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 275 (2d Cir.2000) (internal quotation marks omitted). For the purposes of a summary judgment motion, the Court must decide "whether significant contractual ambiguity exists." *Echelon Int'l Corp. v. America West Airlines,* 85 F.Supp.2d 313, 317 (S.D.N.Y.2000). If the language of the contract is "unambiguous and conveys a definite meaning," then the interpretation of the contract is a question of law for the court. *Bourne v.*

Slip Copy
Slip Copy, 2008 WL 2485388 (S.D.N.Y.)
(Cite as: 2008 WL 2485388 (S.D.N.Y.))

*Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995) (citations omitted). If the terms are not clear, the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent is admissible. *Id.*

As noted above, Endorsement No. 10 provides:

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. *No knowledge or information possessed by any Insured will be imputed to any other Insured.* If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth.

((Sylwestrzak Decl. Ex. G, at Endorsement No. 10 (emphasis added).) The insureds assert that the severability provision is comprised of the italicized language, and that the provision operates as a general non-imputation clause applicable without restriction. As Axis persuasively argues, however, when the severability provision is read, "not as if isolated from the context, but in the light of the [Endorsement] as a whole," *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir.2002), it is clear that the scope of the provision is limited to the statements Refco made in the Application it submitted to U.S. Specialty. Indeed, the opening clauses of Endorsement No. 10 specifically limit the scope of the representations made by the insureds, and the insurer's reliance upon those representations, to the "particulars and statements contained in the Application."(*Id.*) Similarly, the clause immediately following the severability provision voids the 2005-2006 Primary Policy only "with respect to any Insured" who knows of any "untruth[s]" in the "particulars or statements in the Application."(*Id.*) Accordingly, even though the severability provision itself contains no restrictive language, when read in context with the surrounding clauses, the provision "admits of only one reasonable interpretation"-*i.e.,* that it extends only to the statements Refco made in the Application.[FN12]*American Home Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984). The severability provision thus has no bearing on whether Axis may rely on the Warranty

Letter to deny coverage to the insureds.[FN13]

FN12. Because the severability provision is unambiguous, "the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning."*American Home*, 748 F.2d at 765.

FN13. The Warranty Letter itself, moreover, bars coverage for "any claim" arising from any fact or circumstance of which any insured had reason to suppose might afford grounds for such a claim. (Sylwestrzak Decl. Ex. E.) *See American Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94 Civ. 2727, 1997 WL 906427, at *1, n. 3, 9-10 (S.D.N.Y. Sept. 12, 1997) (interpreting "any claim" language to exclude coverage for innocent co-insureds). Accordingly, even if the severability provision extends beyond the "particulars or statements in the Application" to function as a general non-imputation clause, the express terms of the Warranty Letter, assuming that the Letter is properly part of the 2005-2006 Axis Policy, would override that provision. (*See* Sylwestrzak Ex. J, at (I) (Insuring Agreement) (noting that the 2005-2006 Axis Policy provides coverage "in conformance with the provisions of" the underlying insurance policies *"[e]xcept as specifically set forth in the provisions of this Policy"* ) (emphasis added).)

*11 In sum, because genuine issues of material fact clearly exist as to whether the Warranty Letter is part of the 2005-2006 Axis Policy, and because the severability provision at Endorsement No. 10 does not preclude Axis from denying coverage based on the Warranty Letter, summary judgment must be denied as to Count I of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

**B. *Bennett's Failure to Answer Question 12(b) on the Application***

As noted above, Question 12(b) of the Application to U.S. Specialty inquired as to whether any proposed

Slip Copy
Slip Copy, 2008 WL 2485388 (S.D.N.Y.)
(Cite as: 2008 WL 2485388 (S.D.N.Y.))

Page 11

insured was "aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he has reason to believe might result in a claim being made."(Sylwestrzak Decl. Ex. C, at 3.) Immediately following Question 12(b) was a disclaimer stating:

[I]t is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to question[ ] ... 12(b).

(*Id.*) Bennett failed to check either the "yes" or "no" box in the answer to Question 12(b).

Axis concedes that no factual dispute exists regarding the omission of an answer to Question 12(b), and that the parties' sole disagreement concerns the legal consequences of Bennett's failure to answer. (*See* Axis Mem. 16.) Axis contends that the insureds owe a duty of candor when applying for insurance, and that Bennett's failure to answer constitutes a material misrepresentation barring coverage for any claim by any insured that was "required to be disclosed" in response to Question 12(b). (Sylwestrzak Decl. Ex. C, at 3; *see* Axis Mem. 15.)

As the insureds correctly contend, however, "[i]t is well-settled that 'where upon the face of [an insurance] application, a question appears to be *not answered at all*, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they *waive the want or imperfection in the answer*, and render the omission to answer more fully immaterial.' " *Philadelphia Indem. Ins. Co. v. Horowitz, Greener & Stengel, LLP*, 379 F.Supp.2d 442, 453 (S.D.N.Y.2005) (emphasis added), quoting *Phoenix Mut. Life Ins. Co. v. Raddin*, 120 U.S. 183, 190 (1887); [FN14]*see Justofin v. Metro. Life Ins. Co.* 372 F.3d 517, 525 (3d Cir.2004) (noting that under Pennsylvania law, "when a policy is issued on an application containing an ambiguous, unresponsive or incomplete answer[,] the insurer waives the right to assert the falseness and materiality of the question and answer" (internal quotation marks omitted) (alteration in original)); *see also*Am.Jur.2d Insurance § 1603 ("An insurer's issuance of a policy in the face

of what appears to be a lack of sufficient information to allow the insurer to determine its risks ... estops the insurer from, or waives the insurer's right to, cite that lack of information as a ground for avoiding coverage.").

> FN14. Axis contends that the holding of *Raddin*"has been distinguished in instances, such as here, where the application asks for disclosure of a pre-existing condition and the lack of an answer constitutes non-disclosure of that condition."(Axis Mem. 15.) However, the two cases Axis cites for this proposition, *Moriarty v. Metropolitan Life Insurance Co.,* 202 S.W. 630, 631 (Ky.App.1918), and *Home Life Insurance Co. v. Myers,* 112 F. 846, 852 (D.Kan.1901), are entirely inapposite. Indeed, *Moriarty* expressly recognized that,

> where the application asks a question in regard to a material fact, but no answer by the insured appears in the application, the courts generally hold that no case of fraudulent representation is presented, because the insured neither admitted nor denied the existence of the fact concerning which the inquiry was made.

> 202 S.W. at 631, citing *Raddin,* 120 U.S. 183. The principle established in *Raddin* was held inapplicable to the facts of *Moriarty* because the insurance application in that case expressly set forth declarations that "were true without exception ... unless the insured desired to qualify the declaration."*Id.* The insured's failure in *Moriarty* to provide any answer or response following a declaration that he had never suffered from consumption (when, in fact, he had) thus constituted a material misrepresentation entitling the insurer to deny coverage on that ground. *Id.* Similarly, *Home Life* distinguished *Raddin* on the ground that the insured in that case gave "neither a truthful nor an imperfect answer," but rather, "a *false* answer which, by the terms of the contract, avoids the policy."112 F. at 852 (emphasis added).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*12** In light of this longstanding legal principle, Axis's decision to issue its 2005-2006 Policy without challenging the omission of an answer to Question 12(b) constituted a waiver of any objection to coverage based upon Bennett's failure to answer. Accordingly, summary judgment must be granted to the insureds as to Count II of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

## C. *The Knowledge Exclusion*

### 1. *Inclusion in 2005-2006 Axis Policy*

As with the Warranty Letter, the insureds contend that Axis cannot rely upon the Knowledge Exclusion to deny coverage because the Exclusion is not properly a part of the 2005-2006 Axis Policy. According to the insureds, between August 11, 2005, the date the Axis policy binder was issued to Refco, and March 1, 2006, the date the 2005-2006 Axis Policy was formally issued, the Axis policy binder served as the operative insurance contract. That binder, however, did not list the Knowledge Exclusion as an endorsement to be added to the 2005-2006 Axis Policy, and the insureds contend that Marsh never authorized Axis to add the Knowledge Exclusion to the 2005-2006 Axis Policy. (Sylwestrzak Decl. ¶ 21.) Because Axis did not issue the 2005-2006 Axis Policy until March 1, 2006, "months after the alleged fraud was revealed at Refco in October 2005 and months after claims were made on the basis of the Axis [policy binder]," the insureds claim that "Axis unilaterally changed the terms of the 2005-2006 Axis Policy after learning of events that would give rise to a claim under the Policy so as to provide grounds for denying coverage."(*Id.* at 19-20.)The insureds thus contend that Axis's attempt to deny coverage on the basis of the Knowledge Exclusion should be rejected as a matter of law.

Although acknowledging that the Knowledge Exclusion was not included in the policy binder it issued to Refco in August 2005, Axis contends that the Exclusion was properly added to the 2005-2006 Axis Policy because "it was agreed by Refco's agent (Marsh) that one of the terms of the Axis policy would be a Knowledge Exclusion."(Kane Aff. ¶ 48.) To support this contention, Axis relies heavily on Kane's affidavit, which describes the events leading

up to Axis's inclusion of the Knowledge Exclusion in its 2005-2006 Policy in considerable detail.

Kane's affidavit states that prior to Axis's issuance of the policy binder for the 2005-2006 Policy, Marsh informed Axis that Refco "would not be updating the [Warranty Letter] in connection with the underwriting for the August 11, 2005 IPO"(*id.* ¶ 24), and that if Axis needed a warranty to bind the Policy, it should "include an inverted warranty endorsement on [its] revised quote"(*id.*Ex. A). According to Kane, an "inverted warranty" is simply another name for a "knowledge exclusion." (*Id.* ¶ 26.)On August 10, 2005, Axis issued a policy binder to Refco that included, *inter alia,* a list of items that Axis must receive, review, and accept as pre-conditions to the effectiveness of the binder (the "subjectivities"), as well as a list of endorsements. (*Id.* ¶ 32.)One of the endorsements was a "Reliance endorsement (e.g. on the primary carrier's application)," which, according to Kane, was included because Axis expected that Refco would be submitting a new application to U.S. Specialty for the 2005-2006 Policy Period, and "Axis wanted to incorporate and adopt that application directly as an application for the Axis [2005-2006] policy."(*Id.* ¶ 33.)In conjunction with the "Reliance endorsement," the August 10, 2005, policy binder also required Refco to submit a "Copy of the primary carrier's application" as a subjectivity to the policy binder. (*Id.* ¶ 34.)Kane's affidavit explains that Axis expected the new application to "contain essentially the same questions contained" in the prior Application submitted to U.S. Specialty, including the warranty language at Question 12(b).(*Id.* ¶ 30.)

**\*13** On August 11, 2005, Axis received an email from Kenny Li, an employee at Marsh, forwarding an email that Vice President Sylwestrzak had sent to Li earlier that day.[FN15](*Id.* ¶ 36.)Sylwestrzak's email to Li stated:

> FN15. Li's email simply stated: "Please see below and confirm that this will satisfy the application subjectivities."(Kane Aff. Ex. C.)

With respect to the open subjectivities, here is a copy of the [U.S. Specialty] long form application submitted for the 8/4/04 placement. [U.S. Specialty] did not require a new application for the 8/11/05 binding of the IPO. You will note the

warranty is not signed. *It was agreed by [U.S. Specialty] to accept the app as is and to add on the inverted warranty statement to the policy.*

(*Id.* Ex. C (emphasis added).) In light of Marsh's earlier representation that an "inverted warranty endorsement" could be part of the 2005-2006 Axis Policy, Kane interpreted the final sentence in Sylwestrzak's email to mean that U.S. Specialty had agreed to add an inverted warranty to the 2005-2006 Primary Policy in lieu of a new application containing a new warranty statement.(*Id.* ¶¶ 25, 39-40.)

Based on this purported representation by Marsh that the 2005-2006 Primary Policy would include an inverted warranty, and the fact that Axis's 2005-2006 Policy would "follow the form" of the 2005-2006 Primary Policy, Axis issued a revised policy binder on August 11, 2005, which removed the subjectivity regarding receipt of the primary carrier's application, but did not include the Knowledge Exclusion. (*Id.* ¶ 42-43.)According to Kane,

[b]eeause Axis expected the Knowledge Exclusion to be included in the Primary Policy, there was absolutely no reason to include reference to the Knowledge Exclusion in the August 11, 2005 binder. To do so would be contrary to established underwriting practices. Excess insurers do not list the terms and conditions of underlying policies in their own binders.

(*Id.* ¶ 45.)When the 2005-2006 Primary Policy was subsequently issued without the inclusion of the inverted warranty, however, Axis proceeded to add the Knowledge Exclusion to the 2005-2006 Axis Policy, which it issued on March 1, 2006. According to Axis, it was justified in adding the Knowledge Exclusion because Refco's agent (Marsh) had agreed that one of the terms of the 2005-2006 Primary Policy would be an inverted warranty, and the addition of the Knowledge Exclusion to the Axis 2005-2006 Policy, after the 2005-2006 Primary Policy failed to include an inverted warranty, simply effectuated the parties' intent. (Axis Mem. 21.)

In their reply brief, the insureds argue that Axis fundamentally misconstrues the final sentence of Sylwestrzak's August 11, 2005, email to Li. According to the insureds, Sylwestrzak's email merely transmitted the 2004-2005 Application to

U.S. Specialty and explained that, with regard to that Application, the warranty had not been signed. As a result, the insureds contend that rather than representing that U.S. Specialty had agreed to "add on the inverted warranty statement to the [2005-2006 Primary P]olicy" (Kane Aff. Ex. C), the final sentence of Sylwestrzak's email simply clarifies that U.S. Specialty had added an inverted warranty endorsement to the *2004-2005* Primary Policy (Sylwestrzak Decl. Ex. B, at Endorsement 7), a fact that Axis knew or should have known since it was also an excess carrier for the 2004-2005 Program. (Ins. Reply Mem. 12.)

**\*14** Although the insureds may ultimately prevail on their interpretation of Sylwestrzak's email, the extensive recitation of events in Kane's affidavit nevertheless suffices to raise genuine issues of material fact regarding whether the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy. Indeed, at the very least, Kane's affidavit demonstrates that the final sentence of Sylwestrzak's email to Li is ambiguous on its face as to whether it constituted a representation by Marsh that an inverted warranty would be added to the 2005-2006 Primary Policy, or whether it merely explained that an inverted warranty had been added to the 2004-2005 Primary Policy. Kane's affidavit provides a sufficient basis to believe that further discovery would yield material facts shedding light on Sylwestrzak's email, which is critical to Axis's contention that the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy. Axis should thus be afforded the opportunity to gather extrinsic evidence and depose witnesses to clarify the parties' intent concerning the Knowledge Exclusion.[FN15]*See Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir.1983) ("[S]ummary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information.").

> FN16. Although the insureds note that Axis had already received U.S. Specialty's final policy binder (dated August 10, 2005) by the time Axis issued its revised August 11, 2005, policy binder to Refco (Sylwerstrzak Reply Decl. ¶¶ 4-5), this fact is not dispositive as Axis contends that Li's August 11, 2005, email (forwarding Sylwestrzak's email) was a representation by Marsh that an inverted warranty would subsequently be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

added to the 2005-2006 Primary Policy, which was not issued until months later (*see id.* Ex. G.) The insureds' argument that Axis violated the automatic stay of the Bankruptcy Code, 11 U.S.C. § 362(a), by making a "unilateral" post-petition change to debtor's insurance is similarly unavailing because it is unclear at this stage of the litigation whether Axis's addition of the Knowledge Exclusion was a unilateral act. (Ins. Mem. 20 n. 11; Klejna Mem. 19.)

### 2. *Applicability of Severability Provision*

The insureds additionally contend that even if the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy, two severability provisions in the 2005-2006 Primary Policy prevent Axis from relying on the Knowledge Exclusion to bar coverage for all insureds based on Bennett's knowledge of the alleged fraud at Refco. As explained above, however, the first of these provisions, contained at Endorsement No. 10, is limited to statements contained in the Application submitted to U.S. Specialty. *See supra* at 21-22.Accordingly, that provision has no bearing on Axis's ability to impute Bennett's knowledge to all insureds and deny coverage through the Knowledge Exclusion.<sup>FN17</sup>Similarly, the express terms of the second severability provision, located at the end of the "Exclusions" section in the 2005-2006 Primary Policy, limit its application to "the above EXCLUSIONS." <sup>FN18</sup>(Sylwestrzak Decl. Ex. G, at 5.) The Knowledge Exclusion, which was added by Axis to its own 2005-2006 Policy, is not one of "the above EXCLUSIONS" contained in the 2005-2006 Primary Policy. Accordingly, that severability provision also does not preclude Axis from relying on Bennett's knowledge of the Refco fraud to bar coverage for all insureds pursuant to the Knowledge Exclusion.

> FN17. As explained below, moreover, the Knowledge Exclusion specifically excludes coverage for any claims of which *"any Insured"* had knowledge." (Sylwestrzak Ex. J, at Endorsement No. 6 (emphasis added).) *See State Farm Fire & Cas. Co. v. Wolford,* 498 N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any insured" exclusion to bar coverage for innocent insured). Accordingly, even if the severability provision in Endorsement No. 10 extends beyond the

"particulars or statements in the Application" to operate as a general non-imputation clause (Sylwestrzak Decl. Ex. G, Endorsement No. 10), the express terms of the Knowledge Exclusion, assuming that the Exclusion is properly part of the 2005-2006 Axis Policy, would override that provision. *See supra* note 13.

> FN18. The second severability provision provides, in relevant part:

> For purposes of determining the application of the above EXCLUSIONS, no Wrongful Act of any Insured Person will be imputed to any other Insured Person who did not have actual knowledge of, or directly participate in the commission of, such Wrongful Act ....

> (Sylwestrzak Decl. Ex. G, at 5.)

### 3. *Interpretation of Knowledge Exclusion*

The insureds further contend that even if the Knowledge Exclusion is fully applicable, the reference to "any Insured" in the Knowledge Exclusion should "be read as an exclusion of coverage for 'any insured' who had the relevant knowledge," rather than, "as Axis suggests, an exclusion of coverage for any *other insured.*"(Klejna Mem. 21 (emphasis added); *see* Ins. Mem. 22-23.) As described above, the "Knowledge Exclusion" provides, in its entirety:

> **\*15** In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, *any Insured* had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

(Sylwestrzak Decl. Ex. J, at Endorsement No. 6 (emphasis added).)

As Axis correctly contends, it is well established that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"[t]he language 'any insured' has been consistently interpreted as expressing a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured."*McCauley Enters., Inc. v. New Hampshire Ins. Co.,* 716 F.Supp. 718, 721 (D.Conn.1989) (collecting cases). Indeed, "unlike the phrase 'the insured,' the phrase 'any insured' unambiguously expresses a contractual intent to create joint obligations and to prohibit recovery by an innocent co-insured."*Sales v. State Farm Fire and Cas. Co.,* 849 F.2d 1383, 1385 (11th Cir.1988); *see State Farm Fire & Cas. Co. v. Wolford,* 498 N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any insured" exclusion to bar coverage for innocent insured); *see also Allstate Ins. Co. v. Mugavero,* 79 N.Y.2d 153, 164 (1992) (contrasting exclusionary clauses barring coverage for *"an* insured" versus *"the* insured"). By its express terms, the Knowledge Exclusion specifically excludes coverage for any "Claims" of which *"any Insured* had knowledge ." (Sylwestrzak Decl. Ex. J, at Endorsement No. 6 (emphasis added).) Accordingly, if the Knowledge Exclusion is part of the 2005-2006 Axis Policy, Axis may properly impute Bennett's knowledge of the fraud at Refco to all insureds and use the Knowledge Exclusion to deny coverage to them.

In sum, because genuine issues of material fact exist as to whether the Knowledge Exclusion is properly part of the 2005-2006 Axis Policy, and because neither the severability provisions in the 2005-2006 Primary Policy nor the Knowledge Exclusion itself precludes Axis from imputing Bennett's knowledge of the fraud to Refco to all insureds and denying coverage to them pursuant to the Exclusion, summary judgment must be denied as to Count III of Axis's complaint in the district court action, and on the corresponding portion of the counterclaims in the Axis adversary proceeding.

### D. *The Prior Acts Exclusion*

Axis's final ground for denying coverage to the insureds is based on the Prior Acts Exclusion in the 2005-2006 Axis Policy, which excludes coverage for any claim arising out of:

A. Any demand, suit or other proceeding, pending, or order, degree or judgment entered, against any insured on or prior to [June 4, 2004] ...; or

B. Any other wrongful act, fact, circumstances or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

**\*16** (Sylwestrzak Decl. Ex. J, at (XI) Exclusions.) Axis asserts that a 1994 enforcement action brought against Refco by the CFTC (the "1994 CFTC action") constitutes a prior claim that is "causally or logically interrelated by a common nexus" with the "wrongful act, fact, or circumstance or situation" alleged in each of the Underlying Actions. (D.Ct.Compl.¶¶ 138-39, 155-58.) Accordingly, Axis contends that the Prior Acts Exclusion precludes coverage for the insureds for losses arising from those Actions.

The insureds fiercely deny any "common nexus" between the 1994 CFTC action and the Underlying Actions, asserting that (1) the CFTC action alleged violations of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.,* whereas none of the Underlying Actions allege any violations of that statute or any other statute that the CFTC has authority to enforce; (2) the events alleged in the CFTC complaint occurred in 1990 and 1991, while the conduct at issue in the Underlying Actions is alleged to have begun no earlier than 1997; and (3) the "Refco Inc." named in the CFTC proceeding is not the same "Refco Inc." formed in 2005 that is involved in the Underlying Actions. (Ins. Reply Mem. 16.)

Although the limited evidentiary record at this stage of the proceedings appears to tilt significantly in favor of the insureds' position, Axis has nevertheless alleged in its district court complaint that the 1994 CFTC action "involv[ed] the same scheme of improperly shifting client funds between related party accounts-the same type of transactions that Refco allegedly used to hide the fraud alleged" in the Underlying Actions. (D.Ct.Compl.¶ 138.) Indeed, Axis has set forth specific allegations that "Refco improperly availed itself of as much as $123 million in client funds on an almost daily basis in order to pay off debts owed by Refco Capital."(D. Ct. Compl. ¶ 139 (internal quotation marks omitted).) Although a district court may deny a request for additional discovery if the request is "based on speculation as to what potentially could be discovered,"*National Union Fire Ins. Co. v. Stroh Cos., Inc.,* 265 F.3d 97,

117 (2d Cir.2001) (internal quotation marks omitted),
Axis's allegations regarding the 1994 CFTC action
are sufficiently specific to justify further targeted
discovery into whether the claims asserted in the
CFTC action are "causally or logically" related to the
Underlying Actions. (Sylwestrzak Decl. Ex. J, at (XI)
Exclusions.) Summary judgment must therefore be
denied as to Count III of Axis's complaint in the
district court action, and on the corresponding portion
of the counterclaims in the Axis adversary
proceeding.

## CONCLUSION

In sum, the insureds have largely failed to
demonstrate that this case falls within the ambit of
the "rarest of cases" in which "summary judgment
[may] be granted against a plaintiff who has not been
afforded     the     opportunity     to     conduct
discovery."*Hellstrom,* 201 F.3d at 97. Accordingly,
for the reasons stated above, the insureds' and
counterclaim plaintiffs' motions for summary
judgment are granted with respect to Count II of
Axis's complaint in *Axis Reinsurance Company v.
Bennett et al.,* No. 07 Civ. 7924(GEL) (S.D.N.Y.),
and on the corresponding portion of Count I of the
counterclaims in *Axis Reinsurance Company v.
Bennett et al.,* 08 Civ. 3242(GEL) (S.D.N.Y.), and
denied in all other respects.

\*17 SO ORDERED.

S.D.N.Y.,2008.
Axis Reinsurance Co. v. Bennett
Slip Copy, 2008 WL 2485388 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

AXIS REINSURANCE COMPANY,                    :

               Plaintiff,                          :

               v.                                  :

PHILLIP R. BENNETT, LEO R. BREITMAN,          :
NATHAN GANTCHER, TONE GRANT,                  :
DAVID V. HARKINS, SCOTT L. JAECKEL,           :
DENNIS A. KLEJNA, THOMAS H. LEE,              :
SANTO C. MAGGIO, JOSEPH MURPHY,               :
RONALD L. O'KELLEY,                           :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,           :
GERALD SHERER, PHILIP SILVERMAN,              :
ROBERT C. TROSTEN, AND DOES 1 TO 10,          :

             Defendants.                         :

-----------------------------------------------------------x

**07 CIV 7924**

Index. No. _____

FILED
U.S. DISTRICT COURT
S.D. OF N.Y.
2007 SEP 10 AM 10: 41

## COMPLAINT

    I.     Axis Reinsurance Company ("Axis"), by and through its undersigned counsel, as and for its Complaint against defendants Phillip R. Bennett, Leo R. Breitman,

Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively "Insureds"), allege as follows upon personal knowledge as to its own acts and status, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

2.    This action concerns an actual controversy between Axis and the Insureds, regarding a contract of excess directors, officers and corporate liability insurance between Axis and the Insureds.

3.    Refco, Inc. ("Refco"),[1] and at least some of its directors and officers, engaged in a massive fraud involving hundreds of millions of dollars. Refco's insurers were also victims of this fraud. The representations and documents Axis relied upon when evaluating the risk and deciding whether or not to insure Refco's directors and officers, turned out to be false.

4.    Axis bound coverage for an excess directors, officers and corporate liability insurance policy issued to Refco for claims made during the period from August 11, 2005 to August 11, 2006 (the "Axis Policy"). The Axis Policy follows the terms and conditions of the primary policy, or more restrictive underlying excess policy. The Axis Policy also contains its own terms and conditions which further restrict coverage otherwise provided by the primary or first excess policies.

---

[1] The name "Refco," as used throughout this complaint, refers to Refco, Inc., the publicly traded company formed pursuant to the August 2005 initial public offering, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO. "Refco" also refers to subsidiaries of Refco, Inc. and Refco Group Ltd., LLC.

5.    Since October 11, 2005, various lawsuits, criminal, governmental and/or regulatory investigations (the "Noticed Matters") involving certain individuals insured under the Axis Policy have been instituted and those individuals have sought coverage for the Noticed Matters under the Axis Policy.

6.    Axis denied coverage for the Noticed Matters on March 6, 2006, based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.  For over a year, none of the Insureds responded to Axis's declination of coverage.

7.    Since March 6, 2006, Axis has received notice from certain of the Insureds of several other matters related to the Noticed Matters, and Axis has denied coverage for these other matters (the "Related Matters") based on various terms and conditions of the Axis Policy, including a warranty received during the underwriting of the Axis Policy.

8.    Axis is the third layer of directors, officers and corporate liability insurance coverage.  The two layers below Axis have reserved rights, but not declined coverage.

9.    The primary layer has now exhausted its $10 million limit of liability, subject to its reservation of rights, through the payment of Insureds' defense costs.  The $7.5 million first excess insurer has also exhausted its limit of liability, subject to its reservation of rights, through payment of Insureds' defense costs.

10.    The Insureds now seek reimbursement of their defense costs and settlements from Axis.  However, Axis has denied coverage based, in part, on specific

terms and conditions present in the Axis Policy (including a warranty received during the underwriting of the Axis Policy) not present in the primary or first excess policy.

11.    Axis seeks a declaration that the Axis Policy does not provide coverage to Insureds for the Noticed Matters or the Related Matters.  An actual controversy exists between Plaintiff and Defendants, and Plaintiff seeks a declaratory judgment or other relief from the Court resolving this dispute in its favor.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1334(a).  Axis filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)).   Certain Insureds subsequently filed an adversary proceeding at *In re Refco*, Bankr. S.D.N.Y. (07-2005 (RDD)).  Axis has moved by order to show cause to withdraw the reference for Axis's adversary complaint and the Insureds' adversary complaint pursuant to 28 U.S.C. §157(d).

13.    This Court also has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. §1367(a).  The instant complaint is related to and supplemental to *In re Refco, Inc. Securities Litigation*, S.D.N.Y. (05-8626 (GEL)).

14.    Finally, this Court has jurisdiction over the parties and the subject matter of this complaint pursuant to 28 U.S.C. § 1367(a). Certain defendants filed counterclaims to Axis's adversary complaint, filed at *In re Refco*, Bankr. S.D.N.Y (07-1712 (RDD)).  Axis has moved by order to show cause to withdraw the reference for the counterclaims to Axis's adversary complaint pursuant to 28 U.S.C. §157(d).  The instant complaint is related to and supplemental to those counterclaims.

631120_1.DOC                                      4

15. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### PARTIES

16. Axis is an insurance company that is organized and exists pursuant to the laws of the state of New York. Axis has its principal place of business in New York.

17. Defendant Phillip R. Bennett ("Bennett") served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

18. Defendant Leo R. Breitman ("Breitman") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Breitman is a citizen of Florida.

19. Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco and member of the Audit Committee at times relevant to this action. Upon information and belief, Gantcher is a citizen of New York.

20. Defendant Tone Grant ("Grant") served as President and Chief Executive Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Grant is a citizen of Illinois.

21. Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action. Upon information and belief, Harkins is a citizen of Massachusetts.

22.    Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.    Upon information and belief, Jaeckel is a citizen of Massachusetts.

23.    Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Klejna is a citizen of Washington D.C..

24.    Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action. Upon information and belief, Lee is a citizen of New York.

25.    Defendant Santo C. Maggio ("Maggio") served as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action. Upon information and belief, Maggio is a citizen of Florida.

26.    Defendant Joseph Murphy ("Murphy") served as Executive Vice President of Refco Group and was responsible for global marketing since 1999. Murphy was also President of various Refco subsidiaries, including Refco Futures and Westminster Refco at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

27.    Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

28.    Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

29.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Sexton also briefly served as Chief Executive Officer of Refco. Upon information and belief, Sexton is a citizen of Iowa.

30.    Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action. Upon information and belief, Sherer is a citizen of New York.

31.    Defendant Philip Silverman ("Silverman") served as Secretary of Refco Group Holdings, Inc. at times relevant to this action. Silverman also served as Secretary of various Refco subsidiaries and Controller of Refco Group. Upon information and belief, Silverman is a citizen of New Jersey.

32.    Defendant Robert C. Trosten ("Trosten") served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action. Upon information and belief, Trosten is a citizen of New Jersey.

33.    The true names and capacities of DOES 1 to 10 are currently unknown to Plaintiff, and therefore, Plaintiff sues those Defendants by such fictitious names. Upon information and belief, each fictitiously named Defendant is an Insured which may seek coverage under the Axis Policy. Plaintiff is entitled to the relief sought herein against the fictitious Defendants, and therefore, sues these Defendants by such fictitious names. Plaintiff will seek leave to insert the true names and capacities of these fictitiously named Defendants, together with charging allegations, when obtained, if not already set forth herein.

## THE D&O INSURANCE POLICIES

34.    The Axis Policy is an excess directors, officers and corporate liability policy.  It has a policy period of August 11, 2005 to August 11, 2006 and a limit of liability of $10 million excess of $17.5 million in underlying insurance.  A true, complete and accurate copy of the Axis Policy is attached as Exhibit A.

35.    Various other insurers issued underlying insurance policies to Refco.  U.S. Specialty Insurance Company (the "Primary Insurer") issued a primary policy with a limit of liability of $10 million excess of applicable self insured retentions (the "Primary Policy").  A true, complete and accurate copy of the Primary Policy is attached as Exhibit B.  Lexington Insurance Company (the "First Excess Insurer") issued a first excess policy with a limit of liability of $7.5 million excess of $10 million (the "First Excess Policy").  A true, complete and accurate copy of the First Excess Policy is attached as Exhibit C.

36.    Axis is aware of other policies issued to Refco which are excess of the Axis Policy.  However, the terms and conditions of these policies are not relevant to this action.

37.    In general, the Axis Policy applies "in conformance with the provisions of the applicable Primary Policy and, to the extent coverage is further limited or restricted thereby, to [the First Excess Policy]." Axis Policy, Section I.  However, the Axis Policy also contains its own provisions which further limit or restrict coverage otherwise provided by the Primary Policy or the First Excess Policy.  The Axis Policy provides that "[i]n no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable Underlying Insurance." *Id.*

38.    Subject to all of the terms and conditions, the Axis Policy affords five types of specified coverage. First, the Axis Policy insures covered loss incurred by the directors and officers of Refco and its subsidiaries for claims made against them if such loss is not indemnified by Refco. *See* Primary Policy, Insuring Agreement A. Coverage under Insuring Agreement A, and only coverage under Insuring Agreement A, is deemed non-rescindable. *See* Primary Policy, Endorsement 13.

39.    Second, the Axis Policy insures Refco and its subsidiaries to the extent they indemnify any directors or officers for covered loss in connection with claims made against the officers or directors. *See* Primary Policy Insuring Agreement B(1).

40.    Third, the Axis Policy insures Refco and its subsidiaries for covered loss in connection with "Securities Claims" (as defined in the Primary Policy) asserted against them. *See* Primary Policy, Insuring Agreement B(2).

41.    Fourth, the Axis Policy recognizes depletion of the Primary Policy's limit of liability as a result of the Primary Policy's $250,000 sub-limit for "Derivative Demand Investigative Costs" (as defined in the Primary Policy) incurred in connection with any derivative demand received by Refco's Board of Directors. *See* Primary Policy Endorsement No. 11.

42.    Fifth, the Axis Policy insures the "Controlling Shareholder" (defined as Bennett in the Primary Policy) for covered loss incurred in connection with "Securities Claims" (as defined in the Primary Policy) asserted against him, provided one or more other individual insureds and/or Refco are, and remain, co-defendants in such "Securities

Claim" along with the "Controlling Shareholder." *See* Primary Policy Endorsement No. 15.

43.    The Axis Policy (and the Primary and First Excess Policies) does not provide a duty to defend the insureds against claims made against them. Instead, the Primary Policy provides that the "Insureds must defend any Claim made against them." Primary Policy Condition D(1). The Primary Policy provides that the Primary Insurer will advance **covered** defense costs on an as-incurred basis in excess of the retention amount. Primary Policy, Condition (D)(2).

44.    Pursuant to the Bankruptcy Court's March 27, 2006 Order in *In re Refco Inc.*, Case No. 05-60006 (Doc. No. 1567, Bankr. S.D.N.Y.), the Primary Insurer has been advancing defense costs to the insureds on an as-incurred basis. The First Excess Insurer has taken the position that the First Excess Policy does not provide coverage for defense costs in connection with claims otherwise covered under the Primary Policy. Nevertheless, the First Excess Insurer has now agreed to advance defense costs, upon exhaustion of the Primary Policy's limit of liability, provided the insureds provide an undertaking – in the event it is determined that the First Excess Policy does not provide coverage for defense costs, each of the insureds must agree to repay defense costs advanced by the First Excess Insurer. *See* July 26, 2006 letter on behalf of Lexington Insurance Company, attached as Exhibit D.

45.    In connection with the underwriting of the Axis Policy, Axis requested and received a warranty letter (the "Warranty") which provides as follows:

> (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose

might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005. A true, accurate, and complete copy of the Warranty is attached as Exhibit E.

46.    The Axis Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

47.    The February 8, 2005 application (the "Application") submitted to Axis asks at Question 12:

(a)    Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? ___ Yes    ___ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b)    Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?

__ Yes  __ No

If yes, please provide complete details (use a separate sheet of paper, if necessary):

> Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Neither box was checked for Questions 12(a) and 12(b). A true and accurate copy of the

February 8, 2005 application (without attachments) is attached as Exhibit F.

48.    The Application was signed by Phillip Bennett on February 8, 2005.

Under Bennett's signature, the following words appear, "Note: This Application must be

signed by the President and/or CEO of the Applicant **acting as the authorized agent of**

**the persons and entity(ies) proposed for this insurance.**" (emphasis added).

49.    The Axis Policy also contains a Knowledge Exclusion Endorsement at

Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

50.    The Axis Policy provides, at Clause XI:

> The Insurer shall not be liable for any amount in any Claim taking place during the Policy Period and arising under any Insurance Product, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:
>
> A.    Any demand, suit or other proceeding pending, or order, decree of judgment entered, against any Insured on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations [June 4, 2004] or any wrongful act, fact, circumstance or situation underlying or alleged therein; or
>
> B.    Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

51.    On March 6, 2006, Axis disclaimed coverage for the Noticed Matters based on: (1) the Warranty; (2) the Manuscript Application Endorsement and question 12 of the Application; (3) the Knowledge Exclusion Endorsement; and (4) the claim made date. A true, accurate, and complete copy of the March 6, 2006 letter denying coverage is attached as Exhibit G.

52.    At various times after March 6, 2006, Insureds provided Axis with notices of the Related Matters and Axis responded that each was related to the Noticed Matters for which Axis denied coverage. Axis's response to each of the Related Matters was to incorporate the March 6, 2006 letter.

### THE REFCO SCANDAL

53.    The Axis Policy incepted on August 11, 2005. On the same day, Refco conducted its initial public offering.

54.    Two months later, on October 10, 2005, Refco issued a press release. The press release announced that Refco had been carrying an undisclosed receivable of $430 million from an entity controlled by Bennett. Refco stated that "[b]ased on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." Moreover, Refco stated that although the receivable "was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet", the receivable "was not shown as a related party transaction in any such financials. For that

reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

55.     Many of these financial statements were part of the application Axis expressly relied upon when deciding whether or not to enter into the insurance contract.

56.     On October 11, 2005, Refco issued a second press release. The press release announced that Bennett had repaid the $430 million receivable in full. The press release also provided further information on the nature of the receivable: "Based on the results of the internal investigation to date, the Company believes that the receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties to the Company, that arose as far back as at least 1998. These obligations were transferred periodically to the entity controlled by Mr. Bennett, and the Company's books and records then reflected a receivable from that entity, rather than a receivable from the originating accounts. The fact that the receivable was from a company controlled by Mr. Bennett was hidden at the end of quarterly and annual reporting periods by reason of transfers to a third party customer account that we currently believe is unaffiliated with Mr. Bennett or anyone else at the Company."

57.     On October 11, 2005, Refco filed the October 10, 2005 and October 11, 2005 press releases with the U.S. Securities and Exchange Commission (the "SEC").

58.    On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code.

59.    On November 10, 2005, Bennett was indicted on charges of securities fraud, conspiracy to commit securities fraud, false filings to the SEC, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Bennett Indictment") is attached as Exhibit H.

60.    According to the Bennett Indictment, Bennett "sought to hide from, among others, Refco's auditors and investors, losses sustained by Refco through its own and its customers' trading in the financial markets. To that end, Bennett transferred losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the [SEC]." Bennett Indictment, at ¶ 4.

61.    The Bennett Indictment alleges that, as part of its brokerage business, Refco extended credit to customers for their securities and commodities trading. When certain customers were unable to repay that credit, rather than noting the losses on Refco's balance sheet, Bennett directed the transfer of those losses to an entity called Refco Group Holdings, Inc. ("RGHI"), which he controlled. As a result, Refco's balance sheet showed a receivable from RGHI.

62.    According to the Bennett Indictment, beginning in or around 1999, Bennett took steps to hide the RGHI receivable from Refco's auditors. Specifically,

Bennett arranged transactions with third parties to temporarily pay down the RGHI receivable at quarter- or year-end and mask the related-party nature of the RGHI debt.

63.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2004 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2004 Transactions"). On or about February 20, 2004, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $720 million to a Refco customer.  On the same day, the customer loaned $720 million to RGHI.  RGHI then used the $720 million to pay down its debt to Refco.  These loans were unwound on or about March 4, 2004, after Refco's fiscal year-end.

64.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI.  In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, ltd. would repay the customer $720 million if RGHI defaulted.

65.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal year ending February 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "February 2005 Transactions)". On or about February 23, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $345 million to a Refco customer.  On the same day, the customer loaned $345 million to RGHI.  RGHI then used the $345 million to pay down its debt to Refco.  These loans were unwound on or about March 8, 2005, after Refco's fiscal year-end.

66.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $345 million if RGHI defaulted.

67.    According to the Bennett Indictment, Bennett caused Refco to enter into certain transactions at the close of Refco's fiscal first quarter end for 2005 that had the effect of temporarily hiding RGHI's debt to Refco (the "May 2005 Transactions"). On or about May 25, 2005, Bennett allegedly caused Refco Capital Markets, Ltd. to loan approximately $450 million to a Refco customer. On the same day, the customer loaned $450 million to RGHI. RGHI then used the $450 million pay down its debt to Refco. These loans were unwound on or about June 6, 2005, after Refco's fiscal first quarter-end.

68.    According to the Bennett Indictment, Bennett executed the loan agreement between the Refco customer and RGHI. In addition, Bennett allegedly signed a letter of guaranty stating that Refco Group, Ltd. would repay the customer $450 million if RGHI defaulted.

69.    On October 24, 2006, Trosten was indicted on charges of conspiracy, securities fraud, and wire fraud. A true, accurate and complete copy of the publicly available indictment (the "Trosten Indictment") is attached as Exhibit I.

70.    According to the Trosten Indictment, Trosten "lied to Refco's auditors about the existence and size of related party debts and transactions between RGHI and Refco."

71.    According to the Trosten Indictment, Trosten "concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers."

72.    According to the Trosten Indictment, on or about April 27, 2004, Trosten "signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors." Nevertheless, on or about August 5, 2004, Bennett transferred approximately $48 million from RGHI to Trosten.

73.    In addition to the foregoing, Bennett and Trosten were not the only people at Refco who knew of the ongoing fraud. On January 16, 2007, Grant was indicted on charges of conspiracy, securities fraud, wire fraud, bank fraud, and money laundering. A true, accurate, and complete copy of the publicly available indictment (the "Grant Indictment") is attached as Exhibit J.

74.    On March 30, 2007, the government filed a memorandum of law detailing some of the evidence the government expected to introduce against Grant at trial. A true, accurate, and complete copy of the government's memorandum of law (the "Grant Memo") is attached as Exhibit K.

75.    According to the Grant Memo, "by February 1999, prior to the close of Refco's fiscal year, Grant was fully briefed, in Refco's offices on the core issues of the fraud: the round-trip loan transactions set forth in the Indictment; that Refco had covered up several of the large losses set forth in the Indictment; and that Refco had been moving

expenses (including a large portion of its computer expenses) off of Refco's books and on to the parent company's books."

76.     According to the Grant Memo, "[d]urring the interval between 1999 and 2004, the evidence will show that Grant continued to discuss with Sandy Maggio, a Refco executive, the continuing financial problems at Refco, including continued rolling fails, where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors."

77.     According to the Grant Memo, "in May 2004, prior to the LBO, Bennett met with Grant for the purpose of fully discussing with him the structure of the LBO and how, through the LBO, Bennett and Grant were going to deal with the more than $1 billion debt that they (as owners of RGHI) owed to Refco."

78.     According to the Grant Memo, "Grant was a knowing and active participant from as early as 1997, had full knowledge of the means used to hide Refco's losses as of at least February 1999, and stood to reap a 50% share of the rewards of the fraud if it were successful. Between 1999 and 2004, while Grant had no day-to-day role in running Refco, he was intermittently briefed by Bennett and Santo Maggio, another Refco executive, on the status of Refco's ongoing economic troubles, including on the status of the massive debt from RGHI to Refco."

79.     The Grant Memo further notes that Grant "was not on the periphery of the fraud, he was a founding member and had full knowledge of its methods by 1999."

80.     According to the Grant Memo, the government expects Maggio to testify that "on several occasions prior to the May 2004 meeting between Grant and Bennett,

Maggio expressed concern to Bennett about the increasingly dire financial circumstances at Refco. In response, Bennett told Maggio, in substance and in part, that he was keeping Grant abreast of ths [sic] situation at Refco (including that the company's situation was not as reflected on its books), and that Maggio was not alone in that he, Grant and Bennet [sic] were /in [sic] it together.6 [sic] Bennett further stated, in substance, that if the fraud were to be discovered, Bennett told Grant that Bennett was not going to be alone (e.g., Grant would be responsible as well)."

81.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the May 2005 Transactions, the allegations in the Trosten Indictment and the allegations in the Grant Memo, as of August 11, 2005, Bennett possessed knowledge of facts, circumstances, situations, transactions, or events, which he had reason to suppose might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall within the scope of the insurance afforded by the Axis Policy.

82.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the allegations in the Trosten Indictment, and the allegations in the Grant Memo, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

83.    Based on his knowledge of the RGHI receivables to Refco, the February 2004 Transactions, the February 2005 Transactions, the allegations in the Trosten

Indictment, and the allegations in the Grant Memo, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

### THE NOTICED MATTERS

84.     Beginning on October 11, 2005, various lawsuits were filed against the Defendants.

85.     On October 13, 2005, Axis received notice of Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

86.     On October 13, 2005, Axis received notice of Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

87.     On October 13, 2005, Axis received notice of Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank

Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

88.    On October 13, 2005, Axis received notice of United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

89.    On October 27, 2005, Axis received notice of Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

90.    On October 18, 2005, Axis received notice of Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

91.    On October 18, 2005, Axis received notice of Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blaire &

Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

92.     On October 28, 2005, Axis received notice of Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

93.     On October 28, 2005, Axis received notice of Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

94.     On October 28, 2005, Axis received notice of Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

95.     On October 21, 2005, Axis received notice of Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

96.     On October 21, 2005, Axis received notice of Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

97. On October 21, 2005, Axis received notice of <u>Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc.</u>, No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

98. On October 25, 2005, Axis received notice of <u>American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al.</u>, No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

99. On October 25, 2005, Axis received notice of <u>Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc.</u>, No. 05-cv-09048, (S.D.N.Y. 10/24/05).

100. On October 27, 2005, Axis received notice of <u>Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer</u>, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

101.   On November 21, 2005, Axis received notice of <u>Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al.,</u> No. 05603931 (Supreme Court of New York 11/04/05).

102.   On November 21, 2005, Axis received notice of <u>Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P.,</u>

Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

103.    On November 30, 2005, Axis received notice of Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holidings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

104.    On November 30, 2005, Axis received notice of Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

105.    On November 30, 2005, Axis received notice of Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

106.    On November 30, 2005, Axis received notice of <u>BAC International Banks, Inc. v. Refco Capital Markets, Ltd.</u>, No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

107.    On November 30, 2005, Axis received notice of <u>Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis</u>, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

108.    On November 30, 2005, Axis received notice of <u>City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP</u>, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

109.    Axis responded to each of the notices received in paragraphs 85 to 108 (the "Noticed Matters") by letter from Axis's counsel on March 6, 2006. A true, accurate and complete copy of this letter was previously attached as Exhibit G.

110.    The March 6, 2006 letter noted that the Noticed Matters were interrelated, as that term is defined in Condition (C) of the Primary Policy, because all of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise

financial losses. Accordingly, the Noticed Matters constitute a single "claim," as that term is defined in the Primary Policy.

111. The March 6, 2006 letter denied coverage for the Noticed Matters based on the January 14, 2005 Warranty.

112. The March 6, 2006 letter denied coverage for the Noticed Matters based on the Manuscript Application Endorsement and question 12 of the Application.

113. The March 6, 2006 letter denied coverage for the Noticed Matters based on the Knowledge Exclusion Endorsement in the Axis Policy.

114. The March 6, 2006 letter denied coverage for the Noticed Matters based on the claim made date.

115. The March 6, 2006 letter reserved the right to rescind the Axis Policy and an earlier D&O policy issued by Axis to Refco.

116. The March 6, 2006 letter reserved the right to deny coverage based on various other terms and conditions of the Axis Policy.

117. After denying coverage for the Noticed Matters on March 6, 2006, Axis continued to receive notice of additional matters related to the Noticed Matters.

## THE RELATED MATTERS

118. On March 14, 2006, Axis received notice of <u>Klaus Gensheimer, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Credit</u>

Suisse First Boston LLC, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Grant Thornton LLP, Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC, Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co. Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital Strategies LLC, and Refco Group Holdings, Inc., No. 05-cv-10318 (S.D.N.Y. 12/8/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

119.    On March 14, 2006, Axis received notice of Teachers' Retirement System of the State of Illinois, Bumper Fund L.P., Irwin Geduld IRA, as Trustee and as Partner of Geduld Capital Management, Brookstreet Securities Corp., and City of Pontiac General Employees' Retirement System, On Behalf of Themselves and All Others Similarly Situated v. Thomas H. Lee, Scott A. Schoen, David V. Harkins, Ronald L. O'Kelley, Scott L. Jaeckel, Thomas H. Lee Partners, L.P., Phillip R. Bennett, Refco Group Holdings, Inc., Gerald M. Sherer, Dennis A. Klejna, Robert Trosten, Nathan Gantcher, Leo R. Breitman, William M. Sexton, Santo Maggio, Liberty Corner Advisors, Liberty Corner Capital, Liberty Corner Capital Strategies, Terry Pigott, Grant Thornton

LLP, Mark A. Ramler, Banc of America Securities LLC, Bank of America Corp., eutsche Bank Securities Inc., Deutsche Bank AG, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, Joseph P. Collins, and Mayer Brown, Rowe & Maw, LLP., No. 05-cv-10403 (S.D.N.Y. 12/12/05). On March 27, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

120.    On May 10, 2006, Axis received notice of Global Management Worldwide Limited, Individually and on Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Thomas H. Lee Partners, L.P., Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Joseph J. Murphy, William M. Sexton, Santo C. Maggio, Dennis Klejna, Perry Rotkowitz, Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Credit Suisse Group, Credit Suisse First Boston, Goldman Sachs & Co., Goldman Sachs Group Inc., Banc of America Securities LLC, Bank of America Corp., Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc., Grant Thornton LLP, J.P. Morgan Securities Inc., J.P. Morgan Chase & Co., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc, William Blair & Company LLC,

Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., and Refco Securities LLC, No. 06-cv-00643, (S.D.N.Y. 1/26/06). On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

121.    On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Leo A. Breitman Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

122.    On May 10, 2006, Axis received notice of In re Refco Inc., et. al. - David V. Harkins Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

123.    On May 10, 2006, Axis received notice of In re Refco Inc., et al. - Ronald O'Kelley Subpoena, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

124.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Nathan Gatcher Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

125.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott L. Jaeckel Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

126.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Scott A. Schoen Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

127.    On May 10, 2006, Axis received notice of <u>In re Refco Inc., et. al. - Thomas H. Lee Partners, L.P. Subpoena</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05). On May 16, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

128.    On May 10, 2006, Axis received notice of <u>In the Matter of Refco Inc. -</u>
<u>Subpoena of Thomas H. Lee Partners, L.P. for Production of Documents Pursuant to</u>
<u>Rule 8</u>, No. 05-60006 (Bankr. S.D.N.Y. 12/5/05).    On May 16, 2006, Axis denied
coverage for this matter noting that it was interrelated, as that term is defined in
Condition (C) of the Primary Policy, with the Noticed Matters.    Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

129.    On May 10, 2006, Axis received notice of <u>Global Management</u>
<u>Worldwide Limited v. Refco Capital Markets, Ltd.</u>, No. 05-03144 (Bankr. S.D.N.Y
11/11/05).  On May 15, 2006, Axis denied coverage for this matter noting that it was
interrelated, as that term is defined in Condition (C) of the Primary Policy, with the
Noticed Matters.    Axis incorporated by reference the March 6, 2006 letter denying
coverage for the Noticed Matters.

130.    On June 16, 2006, Axis received notice of the amended complaint in <u>In re</u>
<u>Refco, Inc. Securities Litigation</u>, No. 05-cv8626 (S.D.N.Y. 5/5/06).    On June 5, 2006,
Axis denied coverage for this matter noting that it was interrelated, as that term is defined
in Condition (C) of the Primary Policy, with the Noticed Matters.    Axis incorporated by
reference the March 6, 2006 letter denying coverage for the Noticed Matters.

131.    On June 26, 2006, Axis received notice of <u>Gary L. Franzen v. IDS Futures</u>
<u>Corporation, Refco Commodity Management, Inc.</u>, No. 06-cv-03012 (N.D.Ill. 6/1/06).
On July 10, 2006, Axis denied coverage for this matter noting that it was interrelated, as
that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.

Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

132.    On March 9, 2006, Axis received notice of <u>Arch Insurance Company v. Phillip R. Bennett, Leo R. Breitman, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Santo C. Maggio, Joseph Murphy, Ronald L. O'Kelley, Perry Rotkowitz, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman and Robert C. Trosten,</u> No. 600805/06 (N.Y. Supp. 3/9/06). On October 12, 2006, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

133.    On November 3, 2006, Axis received notice of an SEC inquiry into Refco, Inc. On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

134.    On November 3, 2006, Axis received notice of <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation,</u> No. 06-cv-0643 (S.D.N.Y. 1/26/06). On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters. Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

135.   On November 3, 2006, Axis received notice of <u>Thomas H. Lee Equity</u> <u>Fund V, LP et al</u>, No. 05-cv-09608 (S.D.N.Y. 11/14/05).   On January 8, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.   Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

136.   On January 27, 2007, Axis received notice of <u>United States of America v.</u> <u>Phillip R. Bennett, Robert C. Trosten and Tone N. Grant</u>, No. S3 05-cr-1192 (S.D.N.Y. 1/16/07).   On February 20, 2007, Axis denied coverage for this matter noting that it was interrelated, as that term is defined in Condition (C) of the Primary Policy, with the Noticed Matters.   Axis incorporated by reference the March 6, 2006 letter denying coverage for the Noticed Matters.

137.   Each of the matters identified in paragraphs 118 through 136 (the "Related Matters") is interrelated, as that term is defined in the Primary Policy, with each of the other Related Matters and with the Noticed Matters.   Axis has denied coverage for each of the Related Matters based on the same reasons enumerated in the March 6, 2006 letter.

### PRIOR LITIGATION

138.   Refco was previously involved in litigation involving the same scheme of improperly shifting client funds between related party accounts – the same type of transactions that Refco allegedly used to hide the fraud alleged in the Noticed Matters and the Related Matters.

139.   Refco was involved in a CFTC enforcement action which alleged that Refco used funds in client accounts to pay off its own debts (the "1994 CFTC Action").

commingling funds. As discussed in an October 13, 2005 article available from Bloomberg Newswires, according to the CFTC at the time, Refco improperly availed itself of as much as $123 million in client funds on an "almost daily basis" in order to pay off debts owed by Refco Capital.

## COUNT I

### DECLARATORY JUDGMENT THAT THE AXIS WARRANTY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

140.   Axis incorporates by reference each of the allegations contained in paragraphs 1 through 139 above.

141.   As alleged herein, as of January 14, 2005, Bennett possessed knowledge of facts, circumstances, situations, acts, errors or omissions which he had reason to suppose might afford grounds for a "claim" (as that term is defined in the Primary Policy) such as would fall within the scope of the Axis Policy.

142.   The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arise therefrom.

143.   The Warranty provides that "It is agreed by the undersigned **on behalf of all Insureds under the Policy,** that with respect to the above statements, that if such knowledge exists, **any claim arising therefrom is excluded** from the proposed insurance." (emphasis added). Accordingly, Bennett's knowledge excludes coverage for all Insureds.

144.   Axis seeks a declaration that as a result of the Axis Warranty, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### COUNT II

### DECLARATORY JUDGMENT THAT THE AXIS MANUSCRIPT APPLICATION ENDORSEMENT AND QUESTION 12 OF THE APPLICATION BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

145.   Axis incorporates by reference each of the allegations contained in paragraphs 1 through 144 above.

146.   As alleged herein, as of February 8, 2005, Bennett was aware of facts, circumstances or situations involving Refco which Bennett had reason to believe might result in a "claim" (as that term is defined in the Primary Policy) being made.

147.   The Noticed Matters and the Related Matters constitute a "claim" (as that term is defined in the Primary Policy) arising out of, based upon or attributable to such facts, circumstances or situations.

148.   The Application notes that it "must be signed by the President and/or CEO of the Applicant **acting as authorized agent** of the persons and entity(ies) proposed for this insurance." (emphasis added).   Accordingly, Bennett's knowledge, and failure to make the necessary disclosures pursuant to Question 12 of the Application, exclude coverage for all Insureds.

Endorsement and question 12 of the Application, the Axis Policy does not provide

coverage for any loss arising out of the Noticed Matters or the Related Matters.

## COUNT III

### DECLARATORY JUDGMENT THAT THE AXIS KNOWLEDGE EXCLUSION ENDORSEMENT BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

150.    Axis incorporates by reference each of the allegations contained in

paragraphs 1 through 149 above.

151.    As alleged herein, as of August 11, 2005, Bennett possessed knowledge of

facts, circumstances, situations, transactions, or events, which he had reason to suppose

might give rise to a "claim" (as that term is defined in the Primary Policy) that would fall

within the scope of the insurance afforded by the Axis Policy.

152.    The Noticed Matters and the Related Matters consist of "claims" (as that

term is defined in the Primary Policy) based upon, arising out of, directly or indirectly

resulting from, in consequence of, or in any way involving such facts, circumstances,

situations, transactions or events.

153.    The Knowledge Exclusion excludes coverage for "claims" (as that term is

defined in the Primary Policy) based upon, etc. "which as of the inception date of the

Policy Period, **any Insured** had knowledge and had reason to suppose might give rise to

a Claim that would fall within the scope of the insurance afforded by this Policy."

(emphasis added). Accordingly, Bennett's knowledge, or the knowledge of *any* insured,

excludes coverage for all insureds.

154.    Axis seeks a declaration that as a result of the Axis Knowledge Exclusion Endorsement, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### COUNT IV

### DECLARATORY JUDGMENT THAT CLAUSE XI OF THE AXIS POLICY BARS COVERAGE FOR THE NOTICED MATTERS AND THE RELATED MATTERS

155.    Axis incorporates by reference each of the allegations contained in paragraphs 1 thorough 154 above.

156.    As alleged herein, Clause XI of the Axis Policy excludes coverage for any "claim" (as that term is defined in the Primary Policy) based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving, any demand, suit or other proceeding, on or prior to June 4, 2004, or any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation occurring on or prior to June 4, 2004, are causally or logically interrelated by a common nexus.

157.    The Noticed Matters and the Related Matters allege many of the same wrongful acts previously alleged in the 1994 CFTC Action.

158.    Axis seeks a declaration that, as a result of Clause XI, the Axis Policy does not provide coverage for any loss arising out of the Noticed Matters or the Related Matters.

### OTHER COVERAGE DEFENSES/RESCISSION

159.    Other Axis Policy terms, conditions and endorsements may ultimately be implicated. Axis has reserved the right to disclaim coverage for the Noticed Matters and the Related Matters based on various terms, conditions and endorsements of the Axis Policy. Nothing in this Adversary Complaint is intended to waive any rights Axis may have in the Axis Policy, at law or in equity, including the right to rescind the Axis Policy and prior policies issued by Axis to Refco, its subsidiaries or predecessors, based on material misrepresentations in the applications for such other policies. Axis reserves the right to raise such other coverage defenses as appropriate and/or to seek rescission.

WHEREFORE, Axis requests that the Court enter a declaration and final judgment in its favor:

(A)    Declaring that, for the reasons set forth in Count I, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(B)    Declaring that, for the reasons set forth in Count II, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(C)    Declaring that, for the reasons set forth in Count III, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(D)    Declaring that, for the reasons set forth in Count IV, the Axis Policy does not provide coverage to any Defendant for any loss incurred in connection with the Noticed Matters or the Related Matters;

(E)    Awarding Axis such other and additional relief as shall be found to be reasonable; and

(F)    Awarding Axis its fees and costs incurred in prosecuting this action.

Respectfully submitted,

KAUFMAN BORGEEST & RYAN LLP

By: _____
    Wayne E. Borgeest
    Joan M. Gilbride
    Ann Marie Collins
    Robert A. Benjamin

200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
wborgeest@kbrlaw.com
jgilbride@kbrlaw.com
acollins@kbrlaw.com
rbenjamin@kbrlaw.com

*Attorneys for Plaintiff*
*Axis Reinsurance Company*

631120_1.DOC

# Exhibit D

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

**DIRECTORS, OFFICERS AND ORGANIZATION LIABILITY INSURANCE POLICY**

POLICY NUMBER: 24-MGU-04-A4151     RENEWAL OF: N/A

ITEM 1.    NAMED ORGANIZATION:    Refco Group Ltd., LLC
550 W. Jackson Blvd. Suite 1300
Chicago, IL 60661

**RECEIVED**

**OCT 2 3 2004**

**MARSH**
CHICAGO, ILLINOIS

ITEM 2.    POLICY PERIOD:
(a)  Inception Date: 8/5/2004
(b)  Expiration Date: 8/5/2005
at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.    LIMIT OF LIABILITY (inclusive of Defense Costs):
$10,000,000 maximum aggregate limit of liability for all Insuring Agreements combined.

ITEM 4.    RETENTIONS: $500,000
(Provided, the retention is $0, per Claim, for Loss under INSURING AGREEMENT A as to which indemnification by the Insured Organization is not legally permissible.)

ITEM 5.    PREMIUM: $150,000.00

ITEM 6.    DISCOVERY PERIOD:
One or two years after the end of the Policy Period, at the election of the Named Organization.

ITEM 7.    ADDITIONAL PREMIUM FOR DISCOVERY PERIOD:
(a)  one-year Discovery Period:    100% of the Annual Premium.
(b)  two-year Discovery Period:    200% of the Annual Premium.

ITEM 8.    NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:
HCC GLOBAL FINANCIAL PRODUCTS
P.O. Box 4018
Farmington, CT 06034
Attention: Claims Manager

ITEM 9.    ENDORSEMENTS ATTACHED AT ISSUANCE:
1055-400 / 1055-418 / 1055-428 / 1055-1052 / 80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary                         President                         Authorized Representative

Date: November 1, 2004                                   USSIC 1055 (04/2002)

# U.S. SPECIALTY INSURANCE COMPANY

# THE MAG

Directors, Officers and
Organization Liability Insurance
Policy



**HCC Global Financial Products**

8 Forest Park Drive
P.O. Box 4018
Farmington, CT 06034

# U.S. SPECIALTY INSURANCE COMPANY

## THE MAG
### DIRECTORS, OFFICERS AND PRIVATE ORGANIZATION LIABILITY INSURANCE POLICY

**This is a claims made policy. Please read it carefully.**

In consideration of the payment of the premium, and in reliance upon the statements made in the **Application**, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this policy, the Insurer and the **Insureds** agree as follows:

### INSURING AGREEMENTS

(A)  The Insurer will pay to or on behalf of the **Insured Persons Loss** arising from **Claims** first made against them during the **Policy Period** or **Discovery Period** (if applicable) for **Wrongful Acts**.

(B)  The Insurer will pay to or on behalf of the **Insured Organization Loss** arising from **Claims** first made against it during the **Policy Period** or **Discovery Period** (if applicable) for **Wrongful Acts**.

### DEFINITIONS

(A)  **Application** means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)  **Claim** means:

   (1)  any written demand, oral demand or demands for non-monetary relief

   (2)  any civil proceeding commenced by service of a complaint or similar pleading,

   (3)  any arbitration, mediation or other similar dispute resolution proceeding, or

   (4)  any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

U.S. SPECIALTY INSURANCE COMPANY

provided, that any such demand or proceeding will be a **Claim** only if and to the extent that it seeks monetary relief. **Claim** also means any criminal proceeding commenced by the return of an indictment, and any appeal from any proceeding referred to in this DEFINITION (B).

(C)  **Defense Costs** means reasonable legal fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured**, but excluding salaries, wages, benefits or overhead expenses of any **Insured Person**.

(D)  **Discrimination** means:

(1)  any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

(2)  any limitation, segregation or classification of any **Employee** or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an **Employee**;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

(E)  **Employee** means any individual whom the **Insured Organization** compensates by salary, wages and/or commissions and whose labor or service is engaged by and directed by the **Insured Organization**, including seasonal, volunteer and part-time employees.

(F)  **Employment Practices Wrongful Act** means any actual or alleged:

(1)  **Discrimination,**

(2)  **Retaliation,**

(3)  **Sexual Harassment,**

(4)  **Workplace Harassment,**

(5)  **Workplace Tort, or**

(6)  **Wrongful Termination.**

(G)  **Insured** means the **Insured Persons** and the **Insured Organization.**

U.S. SPECIALTY INSURANCE COMPANY

(H)     Insured Organization means the Named Organization and any Subsidiary thereof.

(I)     Insured Person means any past, present or future director, officer, managing member, manager or Employee of the Insured Organization, including any person in a position which is the functional equivalent thereof with respect to any entity included within the definition of Insured Organization located outside the United States.

(J)     Loss means Defense Costs and any damages, settlements, judgments, back pay awards and front pay awards or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that an Insured is legally obligated to pay as a result of any Claim; provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

(K)     Named Organization means the entity designated as such in Item 1 of the Declarations.

(L)     Outside Capacity means service by an Insured Person as a director, officer, member, manager or trustee of, or in another equivalent executive position with respect to, an Outside Entity, during such time that such service is at the request of the Insured Organization.

(M)     Outside Entity means any corporation or organization other than the Insured Organization which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code of 1986, as the same may be amended from time to time.

(N)     Policy Period means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(O)     Pollutants means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(P)     Retaliation means retaliatory treatment against an Employee of the Insured Organization on account of such Employee's exercise or attempted exercise of his or her rights under law.

U.S. SPECIALTY INSURANCE COMPANY

(Q)   **Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Insured Organization**, is used as a basis for employment decisions by the **Insured Organization**, creates a work environment with the **Insured Organization** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

(R)   **Subsidiary** means any entity:

   (1)   during any time on or before the inception of the **Policy Period** in which the **Named Organization** has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers; or

   (2)   subject to CONDITION (F)(3), created or acquired during the **Policy Period** during any time in which, as a result of such creation or acquisition, the **Named Organization** has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers.

   An entity ceases to be a **Subsidiary** when the **Named Organization** no longer has or controls, either directly or indirectly through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors or managers. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**.

(S)   **Workplace Harassment** means conduct which creates a work environment with the **Insured Organization** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

(T)   **Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Insured Organization**.

(U)   **Wrongful Act** means:

   (1)   any **Employment Practices Wrongful Act** (a) by the **Insured Organization**, or (b) by an **Insured Person** in his or her capacity as a

U.S. SPECIALTY INSURANCE COMPANY

director, officer, member, manager or Employee of the Insured Organization;

(2)    any other actual or alleged act, error, misstatement, misleading statement, omission or breach of duty (a) by the Insured Organization, or (b) by an Insured Person in his or her capacity as a director, officer, member, manager or Employee of the Insured Organization or in an Outside Capacity; or

(3)    any matter claimed against an Insured Person solely by reason of his or her service (a) as a director, officer, member, manager or Employee of the Insured Organization, or (b) in an Outside Capacity.

(V)    **Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any Employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(A)    arising out of, based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply to an Insured only if there has been a final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply to an Insured only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted;

(C)    for any actual or alleged:

(1)    bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof; or

(2)    mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C)(2) will not apply to any Claim for an Employment Practices Wrongful Act;

U.S. SPECIALTY INSURANCE COMPANY

(D) for the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants;

(E) for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulations or any other actual or alleged Wrongful Act in the administration of employee benefits;

(F) brought by or on behalf of, or in the name or right of, the Insured Organization, whether directly or derivatively, or any Insured Person, unless such Claim is:

    (1) brought and maintained independently of, and without the solicitation, assistance or active participation of, the Insured Organization or any Insured Person,

    (2) brought or maintained by an Insured Person for contribution or indemnity and directly results from another Claim covered under this Policy, or

    (3) for an actual or alleged Employment Practices Wrongful Act;

(G) by or on behalf of, or in the name or right of, any Outside Entity, whether directly or derivatively, against an Insured Person for a Wrongful Act in his or her Outside Capacity with respect to such Outside Entity, unless such Claim is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Outside Entity, the Insured Organization or any Insured Person;

(H) arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time;

(I) arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation;

(J) as a result of any portion of a Claim seeking relief or redress in any form other than money damages; or

(K) brought about or contributed to by any willful violation of any law, statute, rule or regulation by any Insured; provided, that this EXCLUSION (K) will not apply to any Claim for an Employment Practices Wrongful Act;

U.S. SPECIALTY INSURANCE COMPANY

(L)  for any actual or alleged violation of any provision of the Fair Labor Standards Act other than the Equal Pay Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, any workers' compensation, unemployment insurance, social security or disability benefits law or any amendments thereto, or any other similar provisions of any federal, state or local statutory or common law or any rules and regulations promulgated under any of the foregoing; provided, that this EXCLUSION (L) shall not apply to any Claim for any actual or alleged Retaliation;

(M)  for the actual, alleged or threatened discharge, dispersal, release or escape of nuclear reaction, nuclear radiation, radioactive contamination or any radioactive substance;

(N)  for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, any rule or regulation promulgated under any of the foregoing, or any other provision of federal, state or common law imposing liability in connection with the registration, offer, sale or purchase of securities; provided, that this EXCLUSION (N) shall not apply to any Claim arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933; and provided, further, that if at least thirty (30) days prior to any initial public offering of stock of the Named Organization or any Subsidiary or any purchase or sale, or any offer to purchase or sell, any debt securities of the Named Organization or any Subsidiary, the Insured Organization gives the Insurer written notice thereof together with any information with respect thereto as the Insurer may request, the Insurer will offer a proposal to provide coverage with respect to such event, subject to such additional terms, conditions and limitations of coverage and such additional premium as the Insurer may require;

(O)  for any actual or alleged:

(1)  infringement of any patent, copyright or trademark, or

(2)  unauthorized taking or use of any trade name, service mark, service name, mask work, title, slogan, trade secret, know-how or confidential or proprietary business information or other material or information in violation of any right under any patent, copyright or trademark registration, license, lease, franchise, permit, authorization or agreement (including secrecy and non-disclosure agreements);

including any actual or alleged violation of any law, statute, rule or regulation or any provision of the common law imposing liability in connection therewith;

U.S. SPECIALTY INSURANCE COMPANY

      provided, that this EXCLUSION (O) will apply only to Claims against the
      **Insured Organization**; or

(P)    arising out of any actual or alleged breach of contract or agreement; provided, that
      this EXCLUSION (P) will not apply to otherwise covered Defense Costs incurred
      in connection with any such Claim and provided, further, that this EXCLUSION
      (P) will not apply to any Claim for an **Employment Practices Wrongful Act**.

No conduct of any **Insured** will be imputed to any other **Insured** to determine the
application of any of the above EXCLUSIONS.

DISCOVERY PERIOD

If the Insurer or the Named **Organization** fails or refuses to renew this Policy or if the
Named **Organization** cancels this Policy, any **Insured** will have the right, upon payment
of the respective Discovery Period Premium set forth in Item 7 of the Declarations, to an
extension of the coverage granted by this Policy for the period set forth in Item 6 of the
Declarations following the effective date of such cancellation or non-renewal (the
"Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly
taking place before the date of such cancellation or non-renewal. A written request for
this extension, together with payment of the Discovery Period Premium, must be made
within thirty (30) days after the effective date of cancellation or non-renewal of the
Policy. Such Discovery Period Premium will be deemed to be fully earned as of the
inception of the Discovery Period. This clause and the right contained within will not
apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

EXTENSIONS

(A)    Subject to its terms and conditions, this Policy will afford coverage for Claims for
      **Wrongful Acts** of an **Insured Person** if such Claims are made against the
      estates, heirs, legal representatives or assigns of an **Insured Person** who is
      deceased or against the legal representatives or assigns of an **Insured Person** who
      is incompetent, insolvent or bankrupt, to the extent that such Claims would have
      been covered by this Policy in the absence of such death, incompetence,
      insolvency or bankruptcy.

(B)    Subject to its terms and conditions, this Policy will afford coverage for Claims for
      **Wrongful Acts** of an **Insured Person** if such Claims are made against the
      **Insured Person's** lawful spouse solely by reason of such spouse's legal status as
      a spouse of the **Insured Person** or such spouse's ownership interest in property
      which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured**
      **Persons**. For purposes of the Policy, amounts which such spouse becomes legally
      obligated to pay by reason of such Claim will be treated as Loss which the
      **Insured Person** is legally obligated to pay on account of the claim made against
      the **Insured Person**. This coverage extension does not apply, however, to the

U.S. SPECIALTY INSURANCE COMPANY

extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

## CONDITIONS

(A)   Limit of Liability and Retention

    (1)   The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

    (2)   Defense Costs will be part of and not in addition to the Limit of Liability, and payment of Defense Costs will reduce the Limit of Liability. Defense Costs, as incurred, will also be applied against the retention.

    (3)   The retention stated in Item 4 of the Declarations will apply to **Loss**, including **Defense Costs**:

        (a)   which the **Insured Organization** is obligated to pay as a result of **Claims** against it, or

        (b)   which the **Insured Organization** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons** as a result of **Claims** against them, whether or not such **Loss** is actually paid, unless the **Insured Organization** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency.

    For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the **Named Organization** and each **Subsidiary**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

    (4)   The Insurer will be liable only for the amount of **Loss** in connection with any **Claim** which is in excess of the retention stated in Item 4 of the Declarations, if applicable. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

    (5)   One retention amount will apply to the covered portion of each and every single **Claim**.

U.S. SPECIALTY INSURANCE COMPANY

(B)  Notice of Claims and Reporting Provisions

    (1)  The Insureds must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any Claim as soon as practicable after it is made.

    (2)  If written notice of a Claim has been given to the Insurer pursuant to CONDITION (B)(1) above, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, will be considered to have been made at the time such notice was given.

    (3)  If, during the Policy Period or the Discovery Period (if applicable), the Insureds become aware of any circumstances which may reasonably be expected to give rise to a Claim against the Insureds and if, before the end of the Policy Period or the Discovery Period (if applicable), the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such Wrongful Act, then any Claim subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act described in such notice will be considered to have been made at the time such notice of circumstances was given.

    (4)  All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 8 of the Declarations.

(C)  Interrelationship of Claims

All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

U.S. SPECIALTY INSURANCE COMPANY

(D)    Defense Costs. Settlements. Allocation

    (1)    The Insurer will have no duty under this Policy to defend any Claim. The Insureds must defend any Claim against them. The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent, which consent may not be unreasonably withheld. Only those settlements, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under the Policy. The Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

    (2)    The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

    (3)    If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insureds and against others not included within the definition of Insured, the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the Claim and the relative benefits to be obtained by the resolution of the Claim. The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters claimed against Insureds. If the Insureds and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.

    (4)    The Insurer will have no obligation to pay Loss, including Defense Costs, after the Insurer's maximum aggregate limit of liability, as set forth in Item 3 of the Declarations, has been exhausted by the payment of Loss, including Defense Costs. If the Insurer's maximum aggregate limit of liability, as set forth in Item 3 of the Declarations, is exhausted by the payment of Loss, including Defense Costs, the premium will be fully earned.

U.S. SPECIALTY INSURANCE COMPANY

(E)   Cancellation or Nonrenewal

   (1)   The Insurer may cancel this Policy for non-payment of premium by
         sending not less than ten (10) days' notice to the Named Organization at
         its last known address. The Insurer may not otherwise cancel this Policy.

   (2)   The Named Organization may cancel this Policy by mailing the Insurer
         written notice stating when such cancellation will be effective; provided,
         that the Named Organization may not cancel this Policy after the
         effective date of any acquisition of the Named Organization as described
         in CONDITION (F)(1) below. If the Named Organization cancels this
         Policy, the Insurer will retain the customary short rate premium. Premium
         adjustment may be made either at the time cancellation is effective or as
         soon as practicable after cancellation becomes effective, but payment of
         unearned premium is not a condition of cancellation.

   (3)   If the Insurer elects not to renew this Policy, the Insurer must give the
         Named Organization notice of non-renewal no less than sixty (60) days
         before the end of the Policy Period.

   (4)   If the period of limitation relating to the giving of notice is prohibited or
         made void by any law controlling the construction thereof, such period
         will be deemed to be amended so as to be equal to the minimum period of
         limitation permitted by such law.

(F)   Changes in Exposure

   (1)   If, during the Policy Period, any of the following transactions or events
         (each a "Change in Control") occurs with respect to the Named
         Organization:

         (a)   the Named Organization merges into or consolidates with another
               entity such that the Named Organization is not the surviving
               entity, or

         (b)   another entity, person or group of entities and/or persons acting in
               concert acquires the right to elect, appoint or designate more than
               50% of the directors or managers of the Named Organization, or

         (c)   a trustee in bankruptcy, receiver, conservator, rehabilitator,
               liquidator or other similar official is duly appointed with respect to
               the Named Organization;

         then coverage under this Policy will continue in full force and effect until
         the end of the Policy Period with respect to Claims for Wrongful Acts

                                             USSIC 1055 (04/2002)
                                             Page 13 of 17

U.S. SPECIALTY INSURANCE COMPANY

committed or allegedly committed before the effective date of such
Change in Control, but coverage will cease with respect to Claims for
Wrongful Acts committed or allegedly committed thereafter and the
premium will be considered fully earned in consideration of the coverage
extended.

(2)   If, during the Policy Period, any of the following transactions or events
(each a "Change in Control") occurs with respect to a Subsidiary:

(a)   the Subsidiary ceases to be a Subsidiary, or

(b)   a trustee in bankruptcy, receiver, conservator, rehabilitator,
liquidator or other similar office is duly appointed with respect to
the Subsidiary;

then coverage under this Policy with respect to Claims against such
Subsidiary or any Insured Person thereof will continue in full force and
effect until the end of the Policy Period with respect to Claims for
Wrongful Acts committed or allegedly committed before the effective
date of such Change in Control, but coverage under this Policy with
respect to Claims against such Subsidiary or any Insured Person thereof
will cease with respect to Claims for Wrongful Acts committed or
allegedly committed thereafter.

(3)   If, during the Policy Period, the Insured Organization acquires any
assets and/or liabilities, acquires a Subsidiary or acquires any entity by
merger and, at the time of such transaction, the assets and/or liabilities so
acquired or the assets and/or liabilities of the entity so acquired exceed
twenty-five (25%) of the total assets of the Insured Organization as
reflected in the Insured Organization's most recent audited consolidated
financial statements, such entity will be included with the term
"Subsidiary" for a period of ninety (90) days after the date of such
transaction. There will be no coverage under this Policy in respect of any
Claim against the Insureds which is first made more than ninety (90) days
after the effective date of the transaction described in this CONDITION
(F)(3) unless the Insurer has received written notice containing full details
of such transaction and the Insurer has agreed to provide such coverage.
No coverage will be available under this policy for Loss, including
Defense Expenses, from any Claim against any entity, or the Insured
Persons of any entity, included with the term "Subsidiary" by reason of
this CONDITION (F)(3) for any Wrongful Act committed or allegedly
committed before the date of such transaction.

U.S. SPECIALTY INSURANCE COMPANY

(G)  Other Insurance and Other Indemnification

  (1)  Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

  (2)  All coverage for Loss from Claims against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with, any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and any indemnification available to such **Insured Persons** in connection with their service in **Outside Capacities** from any source other than the **Insured Organization**, including but not limited to **Outside Entities**.

(H)  Cooperation and Subrogation

  (1)  In the event of any notice under CONDITION (B) of a **Claim** or of circumstances which may reasonably be expected to give rise to a **Claim**, the **Insureds** will give the **Insurer** all information, assistance and cooperation that the **Insurer** may reasonably request with respect thereto.

  (2)  In the event of any payment under this Policy, the **Insurer** will be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation the **Insured Persons'** rights to indemnification or advancement from the **Insured Organization**. The **Insureds** must execute all papers required and do everything necessary to secure such rights and to enable the **Insurer** to bring suit in their name.

(I)  No Action against the Insurer

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**. No person or organization will have any right under this Policy to join the **Insurer** as a party to any action against the **Insureds** to determine the **Insurer's** liability; nor may the **Insurer** be impleaded by the **Insureds** or their legal representatives in any such action.

(J)  Notices and Authority

By acceptance of this Policy, the **Insureds** agree that the **Named Organization** may act on behalf of all **Insureds** with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the

U.S. SPECIALTY INSURANCE COMPANY

cancellation or renewal of this Policy and the acceptance of any amendments thereto.

**(K)**     Assignment

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

**(L)**     Titles and Headings

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

**(M)**     Representations and Severability

The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person or persons who signed the Application. If any of the particulars or statements in the Application is untrue, this Policy will be void with respect to any Insured who knew of such untruth or to whom such knowledge is imputed.

**(N)**     Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

**(O)**     Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement the parties with respect to this insurance.

USSIC 1055 (04/2002)
Page 16 of 17

U.S. SPECIALTY INSURANCE COMPANY

(P)    Territory

This Policy applies to Wrongful Acts actually or allegedly taking place or Claims
made anywhere in the world.

(Q)    Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable
laws construing this Policy, including any endorsement to this Policy which is
required by any state Department of Insurance (or equivalent authority) ("State
Amendatory Endorsement"), are hereby amended to conform to such laws.
Nothing herein will be construed to restrict the terms of any State Amendatory
Endorsement.  In addition, to the extent permissible by law, nothing in any State
Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the Insurer has caused this Policy to be executed by its authorized
officers, but this Policy will not be valid unless countersigned on the Declarations Page
by a duly authorized representative of the Insurer.

Secretary                              President

ENDORSEMENT NUMBER: 1

**SCHEDULED ERRORS AND OMISSIONS EXCLUSION
(BROAD FORM)**

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged rendering of or failure to render any professional services in connection with any of the businesses or operations of the **Insured Organization** set forth below:

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
        Attorney-in-Fact

1055-400
(Ed 11/99)

ENDORSEMENT NUMBER: 2

### DELETE EMPLOYMENT PRACTICES COVERAGE

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)    The Insurer will not be liable to make any payment for Loss in connection with any Claim for an **Employment Practices Wrongful Act.**

(2)    DEFINITION (U) is amended to read as follows:

    (U)    **Wrongful Act** means:

        (1)    any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty (a) by the **Insured Organization,** or (b) by an **Insured Person** in his or her capacity as a director, officer, member, manager or **Employee** of the **Insured Organization** or in an **Outside Capacity,** or

        (2)    any matter claimed against an **Insured Person** solely by reason of his or her service (a) as a director, officer, member, manager or **Employee** of the **Insured Organization,** or (b) in an **Outside Capacity;**

    provided, however, that **Wrongful Act** will not include any **Employment Practices Wrongful Act.**

(3)    EXCLUSION (C)(2) is amended by deleting the words "provided, that this EXCLUSION (C)(2) will not apply to any **Claim** for an **Employment Practices Wrongful Act."**

(4)    EXCLUSION (F)(3) is deleted in its entirety.

(5)    EXCLUSION (K) is amended by deleting the words "provided, that this EXCLUSION (K) will not apply to any **Claim** for an **Employment Practices Wrongful Act."**

(6)    EXCLUSION (L) is amended by deleting the words "provided, that this EXCLUSION (L) shall not apply to any **Claim** for any actual or alleged **Retaliation."**

1055-418
Ed (02/00)

(7)  EXCLUSION (P) is amended by deleting the words "and provided, further, that this EXCLUSION (P) will not apply to any **Claim** for an **Employment Practices Wrongful Act**."


All other terms, conditions and limitations of this Policy will remain unchanged.


Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:  _____
                    Attorney-in-Fact

1055-418
Ed (02/00)

ENDORSEMENT NUMBER: 3

**PRIOR ACTS EXCLUSION**

      To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any **Wrongful Act** committed or allegedly committed prior to 6/4/04.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

          By: _____
                           Attorney-in-Fact

1055-428
Ed (08/00)

Page 1 of 1

ENDORSEMENT NUMBER: 4

### AMEND SECURITIES EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (N) is amended to read as follows:

(N)    for any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, any rule or regulation promulgated under any of the foregoing, or any other provision of federal, state or common law imposing liability in connection with the registration, offer, sale or purchase of securities; provided, however, that this EXCLUSION (N) shall not apply to any **Claim** arising out of:

(1)    any private placement of any debt or equity securities;

(2)    any placement of the **Insured Organization's** securities exempted from registration under the Securities Act of 1933; or

(3)    any **Wrongful Act** relating to the **Insured Organization's** preparation for any public offering of the **Insured Organization's** securities, including but not limited to any "road show," if such public offering does not occur;

provided, further, that if at least thirty (30) days prior to any initial public offering of stock of the **Insured Organization** or any purchase or sale, or any offer to purchase or sell, any debt securities of the **Insured Organization**, the **Insured Organization** gives the Insurer written notice thereof together with any information with respect thereto as the Insurer may request, the Insurer will offer a proposal to provide coverage with respect to such event, subject to such additional terms, conditions and limitations of coverage and such additional premium as the Insurer may require;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                Attorney-in-Fact

1055-1052                   Page 1 of 1
Ed (11/04)

ENDORSEMENT NUMBER: 5

**POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE**

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to Refco Group Ltd., LLC by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States — (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

80016
Ed (04/03)

Page 1 of 1

ENDORSEMENT NUMBER: 7

**INVERTED WARRANTY**

To be attached to and made a part of Policy No. 24-MGU-04-A4151, issued to
Refco Group, Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, the Insurer shall not be liable to make any
payment of **Loss** in connection with any **Claim** arising out of, based upon or attributable
to any actual or alleged fact, circumstance, situation or **Wrongful Act** that occurred prior
to 8/5/2004, if as of that date, any **Insured** knew or could have reasonably foreseen that
such fact, circumstance, situation or **Wrongful Act** could give rise to a **Claim** against an
**Insured** for a **Wrongful Act**.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is
not to be effective with the policy.

Effective Date of this endorsement: 8/5/2004

By: _____
    Attorney-in-Fact

80001                    Page 1 of 1
Ed (05/00)

# Exhibit E

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue  Boston, MA  02199  617.239.0100  fax 617.227.4420  eapdlaw.com

John D. Hughes

617.951.3373
fax 617.227.4420
jhughes@eapdlaw.com

March 28, 2006

Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, IL 60661

Re:  **Insured:**          Refco, Inc.
     **Excess Policy No.:** 418197
     **Policy Period:**     8/11/05 – 8/11/06
     **Claim No.:**         648-010578
     **Matters:**           See attached list.

Dear Ms. Lieberman:

As you know, this firm represents Allied World Assurance Company ("Allied World") in connection with Excess Directors and Officers and Company Reimbursement Policy No. AW0418197 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds, including the individual Insured Persons, under the Policy. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

By our October 25, 2005 letter, Allied World acknowledged receipt of and generally reserved its rights with respect to the complaints filed in the following seven lawsuits: (1) *Glaubach v. Refco, Inc., et al.*, No. 05 CV 8692 (S.D.N.Y.); (2) *FrontPoint Financial Services, Inc. v. Refco, Inc., et al.*, No. 05 CV 8663 (S.D.N.Y.); (3) *Lieber v. Refco, Inc., et al.*, No. 05 CV 8667 (S.D.N.Y.); (4) *Sandra Weiss v. Refco, Inc., et al.*, No. 05 CV 8691 (S.D.N.Y.); (5) *Mehta v. Bennett, et al.*, No. 05 CV 8748 (S.D.N.Y.); (6) *Wakefield v. Refco, Inc., et al.*, No. 05 CV 8742 (S.D.N.Y.); and (7) *United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.); Following our October 25, 2005 letter, Allied World received and, by our letter of November 1, 2005, acknowledged and generally reserved its rights with respect to the following six lawsuits: (1) *American Financial International Group -Asia, LLC v. Refco, Inc., et al.*, No. 05 CV 8988 (S.D.N.Y.); (2) *Mettupatti v. Bennett, et al.*, No. 05 CV 9048 (S.D.N.Y.); (3) *Todd Weiss v. Bennett, et al.*, No. 05 CV 9126 (S.D.N.Y.); (4) *Banesco Holding C.A., et al. v. Refco, Inc., et al.*, No. 05-603681 (Supreme Court of N.Y.); (5) *Miura Financial Services v. Refco, Inc., et al.*, No.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 2

05-603682 (Supreme Court of N.Y.); and *(6) Multiplicas Casa De Bolsa v. Refco, Inc., et al.*, No. 05-603683 (Supreme Court of N.Y.).

Following our November 1, 2005 letter, Allied World received and, by our letter of November 30, 2005, acknowledged and generally reserved its rights with respect to the following three lawsuits: (1) *Baker v. Bennett, et al.*, No. 05 CV 8923 (S.D.N.Y.); (2) *Becker v. Refco, Inc., et al.*, No. 05 CV 8929 (S.D.N.Y.); and (3) *Nathanson v. Bennett, et al.*, No. 05 CV 8926 (S.D.N.Y.). By our letter of February 9, 2006, Allied World acknowledged receipt of and generally reserved rights with respect to the following two lawsuits: (1) *Klaus Gensheimer v. Phillip R. Bennett, et al.*, No. 05 CV 10318 (S.D.N.Y.); and (2) *Teachers' Retirement System of the State of Illinois, et al. v. Thomas H. Lee, et al.*, (S.D.N.Y.).

Finally, by this letter Allied World acknowledges receipt of: (1) *Thomas H. Lee Equity Fund V, L.P. et al. v. Phillip R. Bennett, et al.*, (S.D.N.Y.); (2) *Bawag P.S.K. v. Refco, Inc. et al.*, No. 05-03161 (Bankr. S.D.N.Y.), (3) *Univalores Ltd. v. Bennett*, No. L15464-05 (N.J. Sup. Ct., Somerset County), (4) the November 11, 2005 Indictment in the *U.S. v. Bennett* matter referenced above; (5) the CFTC Subpoena; and (6) the SEC Investigation.

These are the matters for which Allied World has received notice in connection with the above-referenced policy. If your records indicate that any other matters have been sent to Allied World, please advise immediately. On Allied World's behalf, this will set forth Allied World's position on coverage for these matters under the Policy. For the reasons set forth below, Allied World denies coverage for each of these matters.

I.    The Litigation

Please note that Allied World's review of these matters necessarily is based on the unsubstantiated allegations in the complaints, and that Allied World is not expressing any view on the truth of such allegations.

A.    The Securities Class Action Lawsuits

Twelve of the suits listed above *(Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Mettupatti, Todd Weiss, Gensheimer* and *Teachers' Retirement)* are purported shareholder class actions alleging violations of the securities laws. All of these suits were filed in the federal district court for the Southern District of New York, with all but *Gensheimer* and *Teachers' Retirement* being filed in October 2005, the latter two being filed in December 2005.

Several of the shareholder class action complaints purport to sue on behalf of the class of all purchasers of Refco's publicly traded common stock, while other complaints seek to sue on behalf of the purchasers of all of Refco's securities. *Gensheimer* and *Teachers' Retirement* further sue on behalf of those purchasing Refco bonds pursuant to Refco's August 5, 2004 bond

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 3

offering or April 13, 2005 prospectus and exchange offer. The alleged class periods in the complaints differ somewhat, with all alleging a beginning of August 11, 2005 (except *Gensheimer* and *Teachers' Retirement*, which start August 5, 2004), and an ending varying between October 7 and October 18, 2005.

Refco, Inc. is named as a defendant in several of the complaints. One or more of the following individuals, who are identified as Refco directors and/or officers, also are named in some or all of the lawsuits: Phillip Bennett, Gerald Sherer, Lee Brietman, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, Nathan Gantcher and Scott Schoen. Various other defendants are named in some of the complaints, including: Grant Thornton, Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, Merrill Lynch Pierce Fenner & Smith, Deutsche Bank Securities, J.P. Morgan Securities, Liberty Corner Capital, Sandler O'Neill & Partners, HSBC Securities (USA) Inc., William Blair & Co., Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert & Co., The Williams Capital Group, Utendahl Capital Group, Refco Group Holdings Inc. and Refco F/X Associates, LLC.

The securities class action complaints generally allege that on August 11, 2005, Refco completed its IPO, selling 26.5 million shares of common stock at $22/share for proceeds totaling $583 million. At that time, Mr. Bennett and other Refco insiders allegedly sold 5.375 shares, and received $145 million in personal gross proceeds. Mr. Bennett also allegedly gained from a provision that allowed him and other insiders to divide up the proceeds when the underwriters exercised options to purchase additional shares.

The securities class action complaints further allege that in connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005. Plaintiffs allege that Refco's Registration Statement and Prospectus were materially false and misleading. The complaints allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer and that Refco's financial statements issued since 2002 could no longer be relied on. The *Gensheimer* and *Teachers' Retirement* complaints further allege that statements made in connection with the sale of Refco bonds were misleading for failing to disclose the debt owed by the entity controlled by Mr. Bennett.

Plaintiffs allege that by the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. The common stock fell further on October 11, 2005, after a five hour trading halt on the New York Stock Exchange was lifted, following the additional disclosure that the $430 million receivable was largely comprised of uncollectible debts dating back to 1998. Refco's shares closed at $13.85/share on October 11, 2005.

The securities class action complaints further allege that on October 12, 2005, *The Wall Street Journal* reported that an investment firm controlled by Mr. Bennett had paid Liberty Corner Capital to help him hide his debt to Refco of hundreds of millions of dollars, and that the Securities Exchange Commission ("SEC") had launched an investigation. That same day, the

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 4

United States Attorney announced that Mr. Bennett had been arrested and indicted for securities fraud in connection with the IPO.

Plaintiffs allege that on October 12, 2005, the stock fell further to close at $10.85/share. On October 13, 2005, trading in Refco's stock was delayed at the opening of the market. Later that morning, Refco announced that it had hired advisors and imposed a 15-day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE again halted trading, Refco's stock was trading at $7.90/share. Then, on October 18, 2005, Refco filed for Chapter 11 bankruptcy protection.

The securities class action complaints allege violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages, attorneys' fees and costs.

    B.    The Shareholder Derivative Action

The *Mehta* lawsuit is a shareholder derivative action filed on October 14, 2005 in federal court in New York. The *Mehta* complaint names as defendants eleven individuals identified as directors and/or officers of Refco: Phillip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. The *Mehta* complaint also names as defendants Credit Suisse First Boston, Goldman Sachs, Banc of America Securities, Deutsche Bank, J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, HSBC and Thomas H. Lee Partners.

The *Mehta* complaint is based generally on the same allegations contained in the securities class action complaints. It alleges that demand on Refco's board to file suit against the defendants on behalf of the company would be futile.

The complaint contains six counts: (1) breach of fiduciary duty against the individual defendants and Thomas H. Lee Partners; (2) abuse of control against the individual defendants and Thomas H. Lee Partners; (3) gross mismanagement against the individual defendants and Thomas H. Lee Partners; (4) waste of corporate assets against the individual defendants and Thomas H. Lee Partners; (5) unjust enrichment against the individual defendants and Thomas H. Lee Partners; and (6) aiding and abetting against the IPO Underwriter Defendants.

The complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, corporate reforms, enhanced shareholder representation on the board of directors, attorneys' fees and costs.

## EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 5

### C.    The Criminal Proceedings

On October 12, 2005, the United States of America filed a criminal complaint against Mr. Bennett in federal court in New York, alleging one count for violation of the federal securities laws, 15 U.S.C. §78j(b). *See United States of America v Bennett*, No. 05 MAG 1720 (S.D.N.Y.).

The six page complaint alleges that from at least in or about 2004 up to October 2005, Mr. Bennett hid from investors in the August 2005 IPO the existence of hundreds of millions of dollars of related party transactions between Refco and Refco Group Holdings, Inc. ("RGHI"), a company controlled by Mr. Bennett. The complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005 in connection with the IPO. Specifically, the S-1, which contained Refco's audited financial statements as of February 28, 2005 and unaudited financial statements as of May 31, 2005, did not disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI.

The complaint asserts that Refco's books show a "multi-hundred million dollar receivable" from RGHI throughout 2005, including in late February 2005, except for quarter-end periods. In this regard, in February 2005, Mr. Bennett allegedly caused Refco to engage in a series of transactions designed to disguise the related-party nature of this $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett. The complaint alleges that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 fiscal-year end.

More particularly, the complaint alleges that on February 23, 2005, Refco Capital Markets, a subsidiary of Refco, loaned $335 million to a Refco customer unrelated to Mr. Bennett, to be repaid on March 8, 2005. On the same day, the Refco customer loaned $335 million to RGHI, with a March 8, 2005 repayment date. The loan agreement allegedly was executed by Mr. Bennett on behalf of RGHI, and the interest rate was 75 basis points higher than the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit. Also on February 23, 2005, Mr. Bennett allegedly signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., providing assurance that should RGHI default, Refco Group Ltd. would make the customer whole.

The $335 million loan to RGHI allegedly was used to pay down a portion of the existing RGHI debt to Refco. The result of these transactions allegedly was to substitute a $335 million debt to Refco by the customer for a $335 million debt by RGHI. The transactions allegedly then were unwound on March 8, 2005, after the end of Refco's fiscal year on February 28, 2005. The complaint further alleges that similar transactions took place at the close of the quarters ended May 31, 2005, November 30, 2004, and August 31, 2004.

EDWARDS ANGELL PALMER & DODGE llp

March 28, 2006
Page 6

Finally, the government's complaint asserts that on October 10, 2005, Refco issued a press
release announcing that it had discovered a $430 million debt owed by an entity controlled by
Mr. Bennett, and that Mr. Bennett had repaid the entire sum to Refco that day. Following this
announcement, the market price of Refco's common stock plummeted from its October 7, 2005
closing price of $28.56/share to $13.85/share, its closing price on October 11, 2005, allegedly
resulting in a market capitalization loss of over $1 billion.

On November 10, 2005, the Grand Jury for the Southern District of New York indicted Mr.
Bennett on charges of securities fraud, conspiracy to commit securities fraud, false filings to the
SEC, and wire fraud. The indictment is based upon the same financial fraud orchestrated by Mr.
Bennett as is alleged in the criminal complaint.

### D.    The Customer Actions

The complaints in the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa*
lawsuits all were filed on October 17, 2005 in New York Supreme Court. Refco, Inc. and Refco
Capital Markets, Ltd. - referred to collectively in the complaints as "Refco" - are the only two
named defendants in each of the three lawsuits. The plaintiffs in each of the lawsuits identify
themselves as owners of brokerage accounts with Refco.

The three complaints, which are substantially similar to each other, allege that pursuant to
separate brokerage agreements between plaintiffs and Refco, Refco was obligated to invest,
transfer and return funds and investments in plaintiffs' accounts as instructed by plaintiffs. Each
of the complaints alleges that on or about October 12, 2005, plaintiffs instructed Refco to
transfer the funds in their accounts to other institutions, but that Refco failed and/or refused to do
so, and instead announced a "moratorium" on account withdrawals.

Each of the complaints contains four causes of action: (1) breach of contract; (2) conversion; (3)
imposition of a constructive trust; and (4) unjust enrichment. Plaintiffs each seek compensatory
damages in excess of the amounts in their respective Refco accounts (which vary from $2.5
million to $50 million), the imposition of a constructive trust over the funds in the accounts,
punitive damages in excess of $100 million, attorneys' fees, costs and pre-judgment interest.

### E.    American Financial

*American Financial* was filed in the Southern District of New York on or about October 21,
2005. The plaintiff identifies itself as a Delaware LLC that trades currencies through an account
at Refco F/X Associates, LLC ("RefcoFX"). The suit is a purported class action brought on
behalf of all persons who traded currencies through, or had currency trading accounts with,
RefcoFX from August 11, 2005 through the date the complaint was filed, and who have been
damaged. The complaint names as defendants Refco, RefcoFX, and Mr. Bennett; it also names a
number of John Doe defendants.

BOS_528356_2.DOC//HUGHES

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 7

The complaint generally alleges the same conduct that is the subject of the Criminal Proceedings and the other civil lawsuits. It further alleges that Refco, Refco FX, and various Refco affiliates filed a voluntary petition for bankruptcy protection on October 17, 2005, and that, on the same day, RefcoFX notified its customers that they could no longer make withdrawals from or deposits to their currency trading accounts. As a result, plaintiffs were prevented from depositing funds to maintain appropriate account balances and were forced to sell currency positions to avoid having RefcoFX close leveraged positions automatically. This and other alleged consequences of RefcoFX's actions allegedly caused plaintiffs transactional costs and other losses.

Based on this alleged conduct, the complaint asserts causes of action for (1) fraud and misrepresentation, (2) negligence and negligent misrepresentation, (3) unjust enrichment and restitution, (4) quantum meruit, (5) breach of contract, (6) breach of warranty, and (7) unfair competition.

### F.    Bawag

*Bawag*, an adversary proceeding instituted in connection with Refco's bankruptcy proceedings, was filed on November 16, 2005. The plaintiff identifies itself as a bank located in Austria. Among the defendants named in the complaint are Refco, numerous Refco affiliates and Mr. Bennett.

The complaint alleges that plaintiff was fraudulently induced to loan approximately $420 million to Mr. Bennett on October 10, 2005. The complaint alleges that Mr. Bennett failed to disclose that he sought the loan to pay off RGHI's receivable to Refco, a "related-party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." Complaint, § 17. The complaint alleges that Mr. Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." Complaint, § 30. It also alleges that the Refco defendants had knowledge of the related-party receivable but nonetheless assisted Mr. Bennett in his effort to obtain the loan to repay the receivable.

The complaint asserts seven causes of action: (1) Constructive Trust, (2) Fraud in the Inducement, (3) Fraud, (4) Civil Conspiracy, (5) Unjust Enrichment, (6) Breach of Contract, and (7) Conversion.

### G.    Thomas H. Lee

*Thomas H. Lee* was filed in the Southern District of New York on November 11, 2005. Plaintiffs are the Thomas H. Lee Equity Fund V, L.P., the Thomas H. Lee Parallel Fund V, L.P., and the Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds"). Defendants are Mr. Bennett, Tone Grant, Santo Maggio, and Refco Group Holdings, Inc. and John Does 1-10.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 8

The complaint in *Thomas H. Lee* alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." Complaint, § 4. Specifically, the complaint alleges that Mr. Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [sic] of customer losses and obligations that would never be repaid to the Company." Complaint, § 30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

Based on these and other allegations, the complaint asserts causes of action for (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (2) fraud, (3) negligent misrepresentation, (4) breach of contract, and (5) contribution and indemnification.

### H.   SEC Investigation

Allied World is in receipt of a letter dated January 24, 2006 from Mr. Bennett's counsel, Debora K. Grobman, to the primary carrier, that provides notice of a purported claim filed against Mr. Bennett. Specifically, the letter states that pursuant to a formal Order Directing Private Investigation And Designating Officers To Take Testimony dated October 12, 2005, entitled the Matter of Refco, Inc. HO-1-337, the SEC is conducting an investigation into whether "Refco, certain of its present and former officers, directors or employees" (and others), "have committed substantially the same Wrongful Acts set out against Mr. Bennett in the Complaint and the various civil suits filed against him." Ms. Grobman's letter states that her firm, Kramer Levin, cannot provide a copy of the order due to use restrictions imposed by the SEC.

### I.   CFTC Subpoena

Allied World has received a copy of a subpoena issued by the U.S. Commodity Futures Trading Commission to Mr. Bennett and dated October 19, 2005 (the "CFTC Subpoena"). The subpoena indicates that it was issued in the matter of "Refco, Inc., Refco LLC, Refco FX, LLC, Refco Capital Markets, Ltd., Refco Group, Ltd., Liberty Corner Asset Management, LLC, Liberty Corner Capital Strategies, LLC and Phillip R. Bennett," and seeks production of documents relating to various Refco affiliated entities as well as documents related to Mr. Bennett's financial assets and holdings.

In a letter to the primary carrier dated January 9, 2006, Ms. Grobman represented that the CFTC subpoena was issued pursuant to a formal investigative order. The letter stated that the CFTC would not provide Kramer Levin with a copy of the order, but had permitted the firm to review the order at the CFTC's offices. According to the letter, the order was dated

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 9

October 13, 2005 – days after Refco's public announcements regarding the receivables owed to Refco by an entity controlled by Mr. Bennett and the related party transactions designed to conceal those receivables. The letter stated that the order is to determine whether, in or in connection with the transfer of funds by and between various Refco entities and/or various hedge funds, or the reporting of or representations made about such transfers, Refco, Inc., Refco LLC, Refco FX, Refco Capital Markets, Refco Group, Liberty Corner Asset Management, Liberty Corner Capital Strategies, Mr. Bennett or any other persons or entities, have engaged, are engaging or are about to engage in acts and practices in violation of Sections 9(a)(3) or 9(a)(4) or Commission Regulations 1.14 and 1.15.

**J.    Unovalores**

The complaint in *Unovalores* was filed in New Jersey state court on or about November 1, 2005. The plaintiff, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett. Based on the above, the complaint asserts causes of action for (1) fraud, (2) New Jersey RICO, (3) RICO conspiracy, (4) breach of fiduciary duty, (5) tortious interference with contract, and (6) writ of attachment.

**II.    Coverage Analysis**

**A.    The Policy**

The Policy has a Limit of Liability, per claim and in the aggregate, of $12,500,000, which is excess of a total underlying limit, per claim and in the aggregate, of $27,500,000. There are three Underlying Policies: U.S. Specialty Insurance Company ("U.S. Specialty") Primary Policy No. 24-MGU-05-A10821 (the "Followed Policy"), with limits of $10,000,000; Lexington Insurance Company ("Lexington") First Excess Policy No. 162-0924, with a limit of $7,500,000; and AXIS Reinsurance Company ("Axis") Second Excess Policy No. RNN 506300 (the "Axis Excess Policy"), with a limit of $10,000,000.

We call your attention to the following terms in the Policy. The Policy, § I ("INSURING AGREEMENT") states:

> This policy shall provide the Insured(s) with Excess Directors and Officers Insurance and Company Reimbursement coverage for Loss or Damages resulting from any claim or claims first made against the Insured(s) and reported to the Insurer pursuant to the terms of this policy in accordance with the same

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 10

warranties, terms, conditions, exclusions and limitations of the Followed Policy
identified in Item 2 of the Declarations as they were in existence on the inception
date of this policy subject to the premium, limits of liability, Policy Period,
warranties, exclusions, limitations and other terms and conditions of this policy
including any and all endorsements attached hereto; provided always that this
policy shall, in no event and notwithstanding any other provision, provide
coverage broader than that provided by any Underlying Policy unless such
broader coverage is specifically agreed to by the Insurer herein or in a written
endorsement attached hereto.[1]

(Emphasis added.)

As indicated by the words "subject to," although the Policy provides coverage in accordance with
the Followed Policy, that coverage is then limited by the warranties, exclusions, limitations and
other terms and conditions of the Policy. Further, § IV of the Policy ("LIMITS") states, among
other terms:

In the event any Underlying Policy contains terms and conditions more restrictive
than the Followed Policy, then the Insurer's coverage shall under no
circumstances be broader than the most restrictive terms and conditions contained
in the Followed Policy or any Underlying Policy.

It is agreed that if any warranty signed by or on behalf of any Insured, whether or
not contained in any Underlying Insurer's application or warranty statement,
applies to the Limit of Liability covered by the Insurer or any Underlying Insurer,
then any representations or warranties made in said application or warranty,
whether or not it is assigned to the Insurer, will be deemed to be treated as though
it was assigned to the Insurer.

Thus, not only is the coverage offered under the Policy limited by the Policy's own terms and
conditions, the coverage is also limited by any restrictive terms or conditions in any Underlying
Policy, as well as by any warranty letter applying to any of those policies.

In addition, we call your attention to Endorsement No. 3 to the Policy ("Prior Knowledge
Exclusion"), which states as follows:

It is hereby understood and agreed that the Insurer shall not be liable for Loss in
connection with any claim or claims made against the Insureds: (a) alleging,
arising out of, based upon, in consequence of, or attributable to facts or

---

[1] With regard to the coverage afforded by the Followed Policy to the Securities Class Action Lawsuits, we direct
your attention to the November 10, 2005 letter to you by Ross, Dixon & Bell, LLP on behalf of U.S. Specialty,
which is incorporated herein by reference.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 11

circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a Claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

B.    The Axis Policy

The Axis Second Excess Policy (the "Axis Policy") insures $10 million excess of $17.5 million in underlying limits. The Axis Policy contains a Manuscript Application Endorsement (Endorsement No. 5), which states:

> In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal signed February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. In the application, Mr. Bennett did not answer the questions posed as Question 12: (a) "Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as director, officer or trustee of any corporation or organization?"; or (b) "Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made?"

The Axis Policy also contains a Knowledge Exclusion Endorsement (Endorsement 6), which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

EDWARDS ANGELL PALMER&DODGE LLP

March 28, 2006
Page 12

### C.    The Axis Warranty Letter

Axis received a warranty letter from Refco Group Ltd. LLC (Refco's operating entity prior to the formation of Refco, Inc.), signed by Phillip Bennett, dated January 14, 2005 (the "Axis Warranty Letter"). It states, among other things:

> With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:  (a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT [unrelated matter described]. . . .

> It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

> This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Based upon the language in § IV ("LIMITS") of the Policy, this warranty letter was assigned to Allied World.

### D.    The Securities Class Actions, Derivative Action, Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the American Financial Action, the Bawag Action, the Thomas H. Lee Action and the Unavalores Action

The *Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Mettupatti, Todd Weiss, Mehta, Gensheimer* and *Teachers' Retirement* lawsuits, the Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the *American Financial* action, the *Bawag* action, the *Thomas H. Lee* action and the *Unavalores* action all arise from a common nucleus of alleged facts. The plaintiffs in these matters contend that during the time period prior to and leading up to the inception of the Policy on August 11, 2005, at least Mr. Bennett knew, but concealed, the outstanding debt of hundreds of millions of dollars that he, through an entity he controlled, owed to Refco, Inc. The existence of this debt, its concealment and nondisclosure in annual and quarterly filings that were made prior to the inception of the Policy Period, have been admitted by Refco, Inc. in public statements and filings since October 10, 2005.

Mr. Bennett, as Chief Executive Officer of Refco Group, LLC, signed the public filings and the prospectus for the public offering on which the cases of the plaintiffs and the government are based. Each of the actions referenced above is premised upon the knowledge of Mr. Bennett –

EDWARDS ANGELL PALMER&DODGE LLP

March 28, 2006
Page 13

and possibly other Insureds – of the existence of his debt and its concealment from the existing
and prospective shareholders of the company.  Indisputably, Mr. Bennett knew that the
concealment of a debt of hundreds of millions that he owed to the company would afford
grounds for a claim that would fall within the scope of coverage afforded by the Policy.  Mr.
Bennett personally signed a number of documents in connection with obtaining coverage under
the Policy, including, but not limited to, an application signed February 8, 2005.

Mr. Bennett clearly is an Insured as the term is defined in the Followed Policy, and, by
incorporation, in the Policy.  The Prior Knowledge Exclusion eliminates coverage under the
Policy "for Loss in connection with any Claim or Claims made against the Insureds: . . .alleging,
arising out of, based upon, in consequence of, or attributable to facts or circumstances of which
any Insured had knowledge as of inception and . . . which a reasonable person would suppose
might afford valid grounds for a Claim which would fall within the scope of the coverage
hereunder. . . ." (emphasis added).

Because the *Glaubach, FrontPoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson,
American Financial, Mettupatti, Todd Weiss, Mehta, Gensheimer* and *Teachers' Retirement*
lawsuits, the Criminal Proceedings, the CFTC Subpoena, the SEC Investigation, the *American
Financial* Action, the *Bawag* Action, the *Thomas H. Lee* Action and the *Unavalores* Action all
arise from and are premised upon Mr. Bennett's knowledge, prior to the inception of the Policy,
of facts or circumstances which a reasonable person or persons would suppose might afford valid
grounds for a claim which would fall within the scope of the coverage afforded by this Policy,
coverage for these Claims is excluded under the Policy for all Insureds.

Likewise, because the coverage under the Policy is limited by any restrictive terms or conditions
in any Underlying Policy, as well as by any warranty letter applying to any of those policies, Mr.
Bennett's knowledge, prior to the inception of the Policy, of facts or circumstances which a
reasonable person or persons would suppose might afford valid grounds for a claim which would
fall within the scope of the coverage afforded by the Policy, is also grounds for denial on the
basis of the terms and conditions of the Axis Policy, the Axis Warranty and the application.
Allied World incorporates herein by reference Axis' March 6, 2006 coverage declination letter,
which sets forth the grounds for denying coverage to all Insureds under the Axis Policy for
matters brought in connection with the alleged financial fraud orchestrated by Mr. Bennett,
among others.[2]

---

[2]  Some of the matters noticed to Allied World do not appear to have been noticed to Axis, including, the
*Gensheimer* and *Teachers' Retirement* lawsuits, the CFTC Subpoena, the SEC Investigation, the *Thomas H. Lee*
action and the *Unavalores* action.  However, these matters all appear to arise from the same facts alleged in the
matters that were specifically addressed by Axis in its letter.  Therefore, Allied World adopts the positions taken by
Axis in its letter as applying to the matters noticed to Allied World and referenced herein, but apparently not noticed
to Axis.  Note, however, that to the extent the Axis March 6, 2006 letter takes any position relating exclusively to
any matter not noticed to Allied World and referenced herein, Allied World does not adopt such position at this
time, but reserves the right to do so in the future.

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 14

There is also no coverage under the Policy for any Defense Costs incurred by Insureds in connection with these Claims for an additional reason. Subject to all of its terms and conditions, the Policy affords specified coverage for certain Loss, as that term is defined in the Primary Policy, and as that definition is restricted by other Underlying Insurance. The Lexington Policy's definition of Loss excludes legal expenses and costs:

> The word "Loss" shall be understood to mean the sums paid or payable in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, whether recoverable or not) and shall exclude all expenses and costs.

Lexington Policy § XII (emphasis added). This section of the Lexington Policy further provides that the word "Costs" includes "interest on judgments, investigations, adjustments and legal expenses." Further, the Lexington Policy, § I, notes that it does not incorporate Primary Policy provisions regarding costs and expenses incident to defense of claims. Because the Allied World Policy does not provide broader coverage than that provided by the most restrictive policy included in the Underlying Insurance, there is no coverage for Defense Costs under the Allied World Policy.

Without prejudice to its denial of coverage for these Claims, Allied World reserves its right to raise other terms and conditions from the Policy, the Followed Policy or any Underlying Policy as either a defense to coverage or as a basis for rescission of the Policy.

E.    **The Customer Actions**

By a letter dated November 10, 2005, Ross, Dixon & Bell, LLP on behalf of U.S. Specialty denied coverage for the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits. Allied World hereby expressly adopts and fully incorporates herein the positions stated in that letter on the basis thereof, and denies coverage with respect to the *Banseco Holding, Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits.

Furthermore, coverage for the Customer Actions is not available under the Policy by virtue of:

- the Prior Knowledge Exclusion, which applies to the extent that the "moratorium" on customer account withdrawals that is the basis for these complaints arose from facts known by Mr. Bennett prior to the inception of the Policy; and,

- the provisions of the Axis Policy, the Axis Warranty and the application, as set forth in the March 6 Axis coverage declination letter.

On behalf of Allied World, we reserve all of its rights and defenses under the Policy, the Followed Policy, the Underlying Policies and available at law and in equity, including, but not

EDWARDS ANGELL PALMER & DODGE LLP

March 28, 2006
Page 15

limited to, the right to rescind the Policy as to any and all Insureds. Likewise, we recognize that the Insureds reserve their rights as well.

Should you or the insureds have any questions or concerns regarding the above, please do not hesitate to contact me.

Very truly yours,

John D. Hughes (aa)

John D. Hughes

cc:     R. Damian Brew, Marsh USA

EDWARDS ANGELL PALMER&DODGE LLP

March 28, 2006
Page 16

## LIST OF MATTERS

Glaubach v. Refco, Inc., et al.
FrontPoint Financial Services, Inc. v. Refco, Inc., et al.
Lieber v. Refco, Inc., et al.
Sandra Weiss v. Refco, Inc., et al.
Mehta v. Bennett, et al.
Wakefield v. Refco, Inc., et al.
United States of America v. Bennett
American Financial International Group -Asia, LLC v. Refco, Inc., et al.
Mettupatti v. Bennett, et al.
Todd Weiss v. Bennett, et al.
Banesco Holding C.A., et al. v. Refco, Inc., et al.
Miura Financial Services v. Refco, Inc., et al.
Multiplicas Casa De Bolsa v. Refco, Inc., et al.
Baker v. Bennett, et al.
Becker v. Refco, Inc., et al.
Nathanson v. Bennett, et al.
Klaus Gensheimer v. Phillip R. Bennett, et al.
Teachers' Retirement System of the State of Illinois, et al. v. Thomas H. Lee, et al.
Thomas H. Lee Equity Fund V, L.P. et al. v. Phillip R. Bennett, et al.
Bawag P.S.K. v. Refco, Inc. et al.
Unovalores Ltd. v. Bennett
The November 11, 2005 Indictment in the U.S. v. Bennett matter referenced above
The CFTC Subpoena
The SEC Investigation.

BOS_528856_2.DOC/JHUGHES

# Exhibit F

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue  Boston, MA 02199  617.239.0100  *fax* 617.227.4420  eapdlaw.com

John D. Hughes
617.951.3373
*fax* 617.227.4420
jhughes@eapdlaw.com

February 29, 2008

**VIA E-MAIL AND FIRST CLASS MAIL**

Stuart I. Friedman, Esq.
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022

Re:  **Insured: Refco Group Ltd, LLC**
     **Excess Policy No.: 418197 (the "Policy")**
     **Policy Period: 8/11/05 – 8/11/06**
     **Claim No.: 648-010578**
     **Matters:**   *In re Refco, Inc. Securities Litigation*
                 *American Financial International Group – Asia LLC v. Bennett, et al.*
                 *VR Global Partners, L.P., et al. v. Philip R. Bennett, et al.*
                 *Capital Management Select Fund Ltd., et al. v. Bennett, et al.*
                 *Kirschner v. John D. Agoglia, et al.*
                 *Civil Forfeiture Action[1]*

Dear Mr. Friedman:

On behalf of Allied World Assurance Co. (U.S.), Inc. ("Allied World"), we hereby acknowledge receipt of your letter dated February 22, 2008 enclosing various invoices for services rendered by your firm to William Sexton in connection with the above captioned matters for January 2008.[2] We note that a significant portion of these invoices includes amounts that relate to previous invoices issued by your firm. Please forward us these invoices as well.

As set forth in our letters dated March 28, 2006, September 11, 2007, November 12, 2007 and other correspondence incorporated by reference therein,[3] Allied World has denied coverage for all matters noticed to it concerning the demise of Refco, including the above-captioned matters.[4]

As discussed more fully in those letters, Allied World originally set forth three primary bases for denying coverage, including, among others: on the basis of the Prior Knowledge Exclusion in the Policy (Endorsement No. 003); on the basis of the Knowledge Exclusion Endorsement

---

[1] We presume the "Civil Forfeiture Action" relates to the anticipated civil forfeiture action referenced in our January 4, 2008 letter to your firm.

[2] To the extent the invoices do not relate to the matters listed above, please let us know immediately.

[3] All prior correspondence to you regarding the above referenced matters is incorporated by reference herein.

[4] Abbreviated terms, unless otherwise defined herein, bear the same meaning as those defined in the March 28, 2006 letter.

EDWARDS ANGELL PALMER & DODGE LLP

February 29, 2008
Page 2

(Endorsement 6) to the Axis Excess Policy; and on the basis of the Axis Warranty Letter dated January 14, 2005 and signed by Phillip Bennett.

While worded somewhat differently, these three provisions exclude coverage for all matters based upon, arising out of or in consequence of facts or circumstances of which **any** Insured had knowledge as of the inception of the Policy, which such person would have reason to suppose might give rise to a claim that would fall within the scope of the Policy's coverage.

The denial was specifically based upon the knowledge of the Insured Phillip Bennett. Because the Refco matters all arise from and are premised upon Mr. Bennett's knowledge prior to the inception of the Policy, of facts or circumstances which a reasonable person or persons would suppose might afford valid grounds for a claim which would fall within the scope of the coverage afforded by the Policy, coverage for these Claims is excluded under the Policy for all Insureds. Pursuant to Endorsement No. 5 of the Axis Policy, there is also no coverage due to Mr. Bennett's failure to answer the question posed in Question 12 of the application completed and signed by him on February 8, 2005 in conjunction with the Followed Policy.

The information that has become available to Allied World since its original letter of March 28, 2006 has only served to confirm the basis of its position on coverage as stated in that letter. For example, on February 15, 2008, Mr. Bennett pled guilty to all 20 counts in the federal indictment he was facing for his actions related to Refco's collapse, including securities and wire fraud, conspiracy, money laundering and bank fraud.

Not only has subsequent information confirmed Mr. Bennett's knowledge, it also has made clear that other Insureds were also in possession of knowledge prior to the inception of the Policy that they (or a reasonable person in their position) would have supposed might afford grounds for a claim, or would indicate the probability of any such claim. Indeed, the recent criminal plea accepted by the Insured, Santo Maggio, and the judicial admissions made in support of that plea further support this conclusion. Similarly, on February 20, 2008, Robert C. Trosten pled guilty to five counts of the criminal indictment he was facing for his actions related to Refco's collapse, including securities fraud, wire fraud, bank fraud, money laundering and conspiracy to commit those crimes. Under the express terms of the Policy, Bennett's, Maggio's and Trosten's prior knowledge and guilty pleas can be imputed to all other Insureds, relieving Allied World from any liability for claims arising from the demise of Refco and any obligation to advance defense costs.

Not only is the coverage offered under the Policy limited by the Policy's own terms and conditions, the coverage is also limited by any restrictive terms or conditions in any Underlying Policy. On May 23, 2007, Axis filed an adversary proceeding in the Refco bankruptcy seeking a declaration that there was no coverage under the Axis Excess Policy for the Refco matters noticed to Axis. See Complaint, *AXIS Reinsurance Co. v. Phillip R. Bennett, et al.* Adversary

- 2 -

# EDWARDS ANGELL PALMER&DODGE LLP

February 29, 2008
Page 3

Proceeding No. 07-01712-RDD filed *In re Refco, Inc., et al.* (U.S. Bkcy Ct., S.D.N.Y. Case No. 05-60006) ("Axis Adversary Proceeding"). In the Complaint, at Count IV Axis seeks a declaration that the provisions in the Axis Policy exclude coverage for prior related matters.

Thus, in addition to the bases for denying coverage as stated in the March 28, 2006 letter, Allied World may independently deny coverage on the same basis asserted by Axis in the Axis Adversary Proceeding (i.e., under Exclusion III(A) and III(B) of the Axis Excess Policy).

Furthermore, as noted previously (and as alleged in the Axis Adversary Proceeding), the scheme of Mr. Bennett and other Refco insiders to present Refco for sale, first to the THL Entities and then to the public, by hiding debts and financial irregularities included the conversion of client funds for Refco's use. Because the acts involved in the current claims are "the same, similar, related or repeated" wrongful acts to those involved in the 1994 CFTC action (as described in the Axis Adversary Proceeding), they are based upon "Interrelated Wrongful Acts" falling within Exclusion III.2 of the Policy. Therefore, Exclusion III.2 serves as an independent basis for denying coverage under the Policy.

Moreover, our prior letters to you also specifically denied coverage for the *VR Global Partners, L.P., et al. v. Bennett, et al.*, *Capital Management Select Fund Ltd., et al. v. Bennett, et al.*, *Kirschner v. John D. Agoglia, et al.* and *American Financial International — Asia, LLC v. Bennett, et al.* matters because, among other things, they are interrelated with the Refco matters for which coverage has previously been denied in the correspondence referred to above.

Additionally, our prior January 4, 2008 letter to you requested additional information related to the anticipated civil forfeiture action. You have yet to send us further information.

Allied World recently filed a motion in the United States Bankruptcy Court for the Southern District of New York to seek leave to pursue its contractual right of arbitration under the Policy, as previously agreed by the parties. Attached is a copy of that motion.

On behalf of Allied World, we reserve all of its rights and defenses available pursuant to the Policy, at law and in equity, including, but not limited to, the right to rescind the Policy as to any and all Insureds. Likewise, we recognize that Mr. Sexton reserves his rights available pursuant to the Policy, at law and in equity as well.

Very truly yours,

John D. Hughes
JDH:ak
Enclosure

-3-

# Exhibit G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------- x   Chapter 11
                                                               :
-                                                              :
In re                                                          :   Case No. 05-60006 (RDD)
REFCO INC., et al.,                                            :
                                                               :   Jointly Administered
                        Debtors.                               :
---------------------------------------------------------------- x
JOSEPH MURPHY, WILLIAM M. SEXTON, DENNIS :
A. KLEJNA, GERALD SHERER, PHILIP                               :   Adv. Proc. No. 08-01133 (RDD)
SILVERMAN, RICHARD N. OUTRIDGE, TONE                           :
GRANT, LEO R. BREITMAN, NATHAN GANTCHER, :
DAVID V. HARKINS, SCOTT L. JAECKEL, THOMAS :
H. LEE, RONALD L. O'KELLEY, AND SCOTT A.                       :
SCHOEN,                                                        :
                                                               :
                        Plaintiffs,                            :
                                                               :
            v.                                                 :
                                                               :
ALLIED WORLD ASSURANCE COMPANY (U.S.),                         :
INC.,                                                          :
                                                               :
                        Defendant.                             :
                                                               :
---------------------------------------------------------------- x
```

**ORDER GRANTING PRELIMINARY INJUNCTION MOTION TO REQUIRE ALLIED
WORLD ASSURANCE COMPANY (U.S.), INC. TO PAY OFFICER AND DIRECTOR
DEFENSE COSTS IN UNDERLYING LITIGATIONS AND FOR RELIEF FROM THE
PLAN INJUNCTION OR AUTOMATIC STAY, TO THE EXTENT APPLICABLE, FOR
THE ADVANCEMENT OF SUCH DEFENSE COSTS AND TO PERMIT MOVANTS TO
PROSECUTE CLAIMS AGAINST ALLIED WORLD ASSURANCE COMPANY**

Upon the motion (the "Motion") dated March 13, 2008, as amended, of Dennis A.

Klejna, William M. Sexton, Gerald Sherer, Philip Silverman, Richard N. Outridge, Joseph

Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H.

Lee, Ronald L. O'Kelley, Scott A. Schoen and Tone N. Grant (the "Movants") for a preliminary

injunction to require Allied World Assurance Company (U.S.), Inc. ("Allied World") to pay

defense costs in underlying litigations and for relief from the Plan Injunction, to the extent

applicable, to permit Allied World to pay such defense costs and to permit Movants to prosecute claims against Allied World, pursuant to 11 U.S.C. § 362(d), and Rules 4001(a) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Court having reviewed the Motion and the objections and other pleadings related thereto; and upon the record of the hearing thereon (the "Hearing"); and the Court having found that (i) the Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) adequate and sufficient notice of the Motion and the Hearing were given to all parties in interest and no other or further notice is necessary or required, and (iii) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court in its bench ruling attached as Exhibit A hereto, which modifies and supercedes the Court's bench ruling issued at the close of the Hearing.

Therefore, it is hereby ORDERED that:

1.      The Motion is granted.

2.      All capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Allied World Policy, as may be the case.

3.      Allied World is directed, upon the exhaustion of the Axis Policy, to advance, subject to the terms of, and a complete reservation of rights, privileges and defenses of the parties under, the Allied World Policy, the payment of the Defense Costs of Movants in the Underlying Actions, pending a final determination as to coverage for the Movants under the Allied World Policy, or until further order of this Court.

4.      The injunction imposed by Section 10.5 of the Modified Joint Chapter 11 Plan of Refco, Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Refco Plan") and issued by

2

paragraphs 20 and 34(c) of the Confirmation Order (together, the "Plan Injunction") and the automatic stay imposed by 11 U.S.C. § 362(a), to the extent applicable, is hereby modified (a) to permit the foregoing advancement of Defense Costs and (b) to permit the Movants to bring actions seeking declaratory judgments or monetary or equitable relief against Allied World relating to Side A of the Allied World Policy and matters related thereto.

5.      Allied World shall notify counsel to the Plan Administrators under the Refco Plan (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $1,000,000 in the aggregate, and in increments of $1,000,000 thereafter.

6.      Entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the reimposition of the Plan Injunction or automatic stay, to the extent they apply, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to Movants and Allied World.

7.      Nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in paragraph 4 hereof.

8.      Nothing in this Order shall constitute a determination of or affect the priority of payments to which insureds are entitled under the Allied World Policy.

Dated: April 21, 2008
        New York, New York

                                /s/ Robert D. Drain
                                UNITED STATES BANKRUPTCY JUDGE

3

31423424v5