John D. Hughes (admitted *pro hac vice*)
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                         :

JOSEPH MURPHY, et al.,              :
                                          :
          Plaintiffs,           :
v.                                    :
                                          :
ALLIED WORLD ASSURANCE     :
COMPANY (U.S.), INC. and ARCH   :
INSURANCE COMPANY,        :     Case No. 1:08-cv-4196 (GEL)
                                          :     *Electronically filed*
          Defendants.        :
                                          :
------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALLIED WORLD ASSURANCE COMPANY (U.S.), INC.'S MOTION FOR SUMMARY JUDGMENT

305864

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 2

   I.    Refco's Collapse and Bankruptcy ............................................................................2

   II.   Refco's 2004-2005 Insurance Tower .......................................................................2

   III.   Refco's 2005-2006 Insurance Tower .......................................................................3

   IV.   The Issuance of the Allied World Policy ..................................................................4

   V.   The Terms of the Allied World Policy .....................................................................4

   VI.   The Claims Asserted Against the Insureds Precipitated by Refco's Demise .................5

   VII.   Allied World Denies Coverage for the Claims Asserted Against the Insureds ..............7

   VIII.   Bennett's Prior Knowledge .......................................................................................8

   IX.   The Bankruptcy Court Orders Allied World to Advance Defense Costs ......................9

ARGUMENT ......................................................................................................................... 10

   I.    Summary Judgment Standards .................................................................................10

   II.   The Prior Knowledge Exclusion in the Policy Bars Coverage for the Claims
        Asserted Against the Insureds .................................................................................10

     A.   The Operation of the Prior Knowledge Exclusion. ...................................................10

     B.   Bennett's Conviction on the Federal Felonies Proves That the Prior Knowledge
        Exclusion Applies. ..................................................................................................13

     C.   The Severability Provision in the Primary Policy Does Not Trump the Clear
        Language of the Prior Knowledge Exclusion. ..........................................................19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988 (GEL)
(S.D.N.Y) .......................................................................................................... 15, 16

American Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp., 1997 WL 906427
(S.D.N.Y. Sept. 12, 1997) ........................................................................................... 13

Axis Reinsurance Co. v. Bennett, 2008 WL 2485388 (S.D.N.Y. June 19, 2008) (Ex. B to
DiUbaldo Decl.) ............................................................................................ 10, 11, 19, 20

BAWAG v. Refco Inc., et al., No. 05-03161 (Bankr. S.D.N.Y) .................................... 19

Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688 (GEL)
(S.D.N.Y.) .......................................................................................................... 16

Cement & Concrete Workers District Council Pension Fund v. Ulico Cas. Co., 387 F.
Supp. 2d 175 (E.D.N.Y. 2005) ................................................................................. 13

Coregis Ins. Co. v. Lewis Johs Avallone Avilies & Kaufman LLP, 2006 WL 2135782
(E.D.N.Y. July 28, 2006) ................................................................................. 11, 12

Coregis Ins. Co. v. Lyford, 21 F. Supp. 2d 695 (S.D. Tex. 1998) ........................................ 11, 12

Fine v. Bennett, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) ......................................... 7

Gottlieb v. County of Orange, 84 F.3d 511 (2d Cir. 1996) ......................................... 10

Home Ins. Co. v. Am. Home Products Corp., 902 F.2d 1111 (2d Cir. 1990) ............................ 20

In re Enron Corp., 491 F. Supp. 2d 690 (S.D. Tex. 2007) ......................................... 13

In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ.
643 (GEL ) (S.D.N.Y.) ................................................................................. 16

In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y) ................................ 15

Kirschner v. Agoglia, et al., No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) .............. 18

Kirschner v. Grant Thornton LLP, et al., No. 07 Civ. 11604 (GEL) (S.D.N.Y.) ........................ 17

Kirschner v. Hackl, et al., No. 07 Civ. 9238 (GEL) (S.D.N.Y.) ......................................... 19

Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07 Civ. 7074 (GEL ) (S.D.N.Y.) ...... 16, 17

Krys, et al. v. Sugrue, et al., No. 08-3065 (GEL) & No. 083086 (GEL) (S.D.N.Y.) ............. 18, 19

Maroney v. New York Cent. Mut. Fire Ins. Co., 5 N.Y. 3d 467 (2005)................................. 12, 13

McCauley Enters., Inc. v. New Hampshire Ins. Co., 716 F. Supp. 718 (D. Conn. 1989) ............ 11

Mehta v. Bennett, et al., No. 05 Civ. 8748 (GEL) (S.D.N.Y.) ........................................................ 7

S.E.C. v. Sekhri, et al., 2002 WL 31100823 (S.D.N.Y. July 22, 2002)......................................... 13

State Farm Fire & Cas. Co. v. Wolford, 498 N.Y.S.2d 631 (4th Dep't 1986) ............................... 11

Thomas H. Lee Equity Fund, L.P. v. Bennett, et al., No. 05 Civ. 9608 (GEL) (S.D.N.Y .... 17, 18

U.S. v. Grant, 05 Cr. 1192 (S4) (NRB) (S.D.N.Y) ....................................................................... 19

U.S. v. Weismann, 1997 WL 334966  (S.D.N.Y. 1997).................................................................. 14

United States Fire Ins. Co. v. New York Marine and General Ins. Co., 268 A.D.2d 19,
       706 N.Y.S.2d 377 (App. Div. 2000)................................................................................... 12

V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.) ..................... 16

Westport Resources Investment Serv. Inc. v. Chubb Customer Ins. Co., 2003 WL
       22966305 (S.D.N.Y. Dec. 16, 2003) ........................................................................... 13, 14

**Statutes**

Fed. R. Civ. P. 56(c) .................................................................................................................... 10

Fed. R. Evid. 803(22)................................................................................................................... 13

Fed. R. Evid. 807 ......................................................................................................................... 14

# INTRODUCTION

Defendant Allied World Assurance Company (U.S.), Inc. ("Allied World") moves the Court for summary judgment dismissing the first amended complaint filed by plaintiffs, certain insureds (collectively, the "Insureds").  In their Complaint, the Insureds seek coverage and advancement of defense costs under an excess directors and officers liability insurance policy that Allied World issued to Refco Inc. ("Refco") for the period of August 11, 2005 through August 11, 2006.  The Insureds have been named as defendants in several lawsuits which were brought following the disclosure of a $430 million receivable owed to Refco by a related party which had been fraudulently concealed.

Allied World's policy unambiguously excludes coverage for all claims that arise out of or are attributable to facts or circumstances known by any Insured prior to the inception of the policy which a reasonable person might have known would give rise to a claim or which indicate the probability of a claim.  This Court recently examined a nearly identical exclusion contained in an insurance policy issued to the Insureds by Axis Reinsurance Corporation.  This Court held that such an exclusion precludes coverage for all Insureds if any Insured had such knowledge.

An Insured under Allied World's policy, Phillip R. Bennett ("Bennett"), the former Chief Executive Officer of Refco, has pled guilty to and been sentenced on various federal felonies involving the fraudulent concealment of the $430 million receivable which occurred prior to the inception of Allied World's policy.  The claims for which the Insureds seek coverage under the policy all arise from the fraudulent concealment of the $430 million receivable that Bennett has admitted to having knowledge of in his plea allocution.  These facts and circumstances known by Bennett prior to the inception of the policy likewise have been established by his conviction of the federal felonies.  Bennett's knowledge is imputed to all the other Insureds under the terms of

Allied World's policy.  Therefore, coverage for all the claims which have been asserted against the  Insureds is precluded as a matter of law.

## FACTUAL BACKGROUND

I.    Refco's Collapse and Bankruptcy

Refco Inc. ("Refco") became a publicly traded company pursuant to an August 2005 initial public offering.  See Declaration of Robert W. DiUbaldo ("DiUbaldo Decl."), Ex. A, at ¶1; Ex. C, at ¶53.  On October 10, 2005, two months after its initial public offering, Refco announced that it had discovered an undisclosed $430 million receivable (the "Refco Receivable") due from an entity controlled by its former CEO, Bennett.  Id., Ex. B, at *1; Ex. C, at ¶54.  As a result of the Refco Receivable, the company declared that its financial statements could not be relied upon.  Id., Ex. B, at *1; Ex. C, at ¶54.  On October 17, 2005, Refco and many of its subsidiaries (collectively, also "Refco") filed for protection under Chapter 11 of Title 11 of the United States Bankruptcy Code.  Id., Ex. A, at ¶30, Ex. C, at ¶53.

II.    Refco's 2004-2005 Insurance Tower

Prior to Refco's August 2005 initial public offering, Refco Group Ltd., then Refco's parent company, obtained a "tower" of D&O liability insurance coverage for the policy period of August 5, 2004 to August 11, 2005, consisting of a primary policy and two excess policies.  Id., Ex. B, at *2.  Specifically, U.S. Specialty Insurance Company ("U.S. Specialty") provided $10 million of primary coverage; Greenwich Insurance Company provided the first excess layer of coverage with $10 million in limits excess of $10 million; and Axis Reinsurance Company ("Axis") provided the second excess layer of coverage with $10 million in limits in excess of $20 million.  Id.

The policy issued by U.S. Specialty contained an Inverted Warranty exclusion that

provided, as follows:

> In consideration of the premium charged, the Insurer shall not be liable to make any payment of Loss in connection with any Claim <u>arising out of, based upon or attributable to any actual or alleged fact, circumstance, situation or Wrongful Act that occurred prior to 8/5/2004, if as of that date, any Insured knew or could have reasonably foreseen that such fact, circumstance, situation or Wrongful Act could give rise to a Claim against an Insured for a Wrongful Act.</u>

<u>Id.</u>, Ex. D, End. No. 7 (emphasis added).

> III.    Refco's 2005-2006 Insurance Tower

In advance of its August, 2005 initial public offering, Refco obtained another "tower" of D & O insurance for the policy period of August 11, 2005 to August 11, 2006.  <u>See</u> Insurers' Joint Exhibits ("IJX"), at 26-29;[1] DiUbaldo Decl., Ex. A, at ¶¶35, 44, 47, 56.  U.S. Specialty Insurance Company ("U.S. Specialty") again issued a primary policy to Refco with a limit of $10 million, excess applicable retentions (the "Primary Policy").  <u>See</u> IJX at 26; DiUbaldo Decl., Ex. A, at ¶35.  Lexington Insurance Company issued the first excess policy (the layer above the Primary Policy) with a limit of $7.5 million excess of $10 million.  <u>See</u> IJX at 27; DiUbaldo Decl., Ex. A, at ¶44.  Axis again provided a second excess layer of coverage for this policy period, with a limit of $10 million in excess of $17.5 million (the "Axis Policy").  <u>See</u> IJX at 28; DiUbaldo Decl., Ex. A, at ¶47.  Allied World provided the third excess layer of insurance coverage to Refco pursuant to its Excess Directors and Officers Insurance Company Reimbursement Policy No. AW0418197 (the "Allied World Policy" or the "Policy").  The Allied

---

[1] As stated in the joint letter sent to the Court on July 8, 2008, Allied World, XL Specialty Insurance Company ("XL") and Arch Insurance Company (the "Insurers") agreed, at the Court's suggestion, to serve and file a set of joint exhibits ("Insurers' Joint Exhibits" or "IJX").  The joint exhibits are referenced in the DiUbaldo Declaration in support of Allied World's motion for summary judgment and will be served and filed jointly on behalf of all the Insurers by XL, though they will only be electronically filed under the docket number for the XL action before the Court (No. 08 Civ. 3821).

World Policy provided a limit of liability of $12.5 million in excess of $27.5 million. <u>See</u> IJX at 29; DiUbaldo Decl., Ex. A, at ¶¶1, 56.

IV.    The Issuance of the Allied World Policy

On August 9, 2005, prior to the inception of the Allied World Policy, Allied World's underwriter, Jerome Brendle, sent a Quote Confirmation to Refco's broker, Marsh USA, Inc. ("Marsh") concerning the proposed insurance. <u>See</u> Declaration of Jerome W. Brendle in Support of Allied World's Motion for Summary Judgment ("Brendle Decl."), Ex. A and ¶2. The Quote Confirmation contained a draft of a "Prior Knowledge Exclusion." <u>Id.</u>, Ex. A, End. No. 1 and ¶3. <u>See also</u> IJX 29, at End. No. 3. In defining the scope of coverage, the Quote Confirmation noted in the "Applicable Endorsements" section that a "Warranty exclusion" would be included in the Policy as of the date it incepted. <u>See</u> Brendle Decl., Ex. A, at 2 and ¶¶3-4.

On the following day, August 10, 2005, Mr. Brendle sent a "Binder Confirmation" to Marsh, which set forth the terms and conditions of the coverage to be afforded by the Policy. <u>See id.,</u> Ex. B and ¶5. The terms and conditions set forth in the Binder Confirmation were derived from Allied World's August 9, 2005 Quote Confirmation. They stated that the Policy would include an "Inverted Warranty Exclusion" as of its inception. <u>Id.,</u> Ex. B, at 2 and ¶6.

V.    The Terms of the Allied World Policy

The Allied World Policy incepted on August 11, 2005. <u>See</u> IJX at 29. Section I of the Policy, the Insuring Agreement, provided, in relevant part:

> This policy shall provide the Insured(s) with Excess Directors and Officers Insurance and Company Reimbursement coverage for Loss or Damages resulting from any claim or claims first made against the Insured(s) and reported to the Insurer pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the Followed Policy... <u>subject to the…, exclusions,… of this policy including any and all endorsements attached hereto</u>….

Id.  The Policy also contained a Prior Knowledge Exclusion, referenced at Item 11 of the

Policy's Declarations page and Endorsement No. 3, which provided, as follows:

> It is hereby understood and agreed that the Insurer shall not be
> liable for Loss in connection with any claim or claims made
> against the Insureds:
>
> alleging, arising out of, based upon, in consequence of, or
> attributable to facts or circumstances of which any Insured had
> knowledge as of inception and (i) which a reasonable person would
> suppose might afford valid grounds for a claim which would fall
> within the scope of the coverage hereunder, or (ii) which indicate
> the probability of any such claim.

Id. (emphasis added), Declarations page, Item 11 and End. No. 3.   The Prior Knowledge

Exclusion excludes coverage for all Insureds if "any Insured" had knowledge prior to the

inception of the Policy of a fact or circumstance that might result in a claim arising under the

Policy or would indicate the probability of such claim.  Id., End. No. 3.

VI.    The Claims Asserted Against the Insureds Precipitated by Refco's Demise

The collapse of Refco in October 2005 triggered an onslaught of lawsuits and regulatory

investigations (collectively, the "Underlying Actions") against certain Refco officers and

directors (referred to herein as the "Insureds").  See DiUbaldo Decl., Ex. C, at ¶¶84-108, 118-36;

Ex. B, at *1; Ex. A, at ¶32.

The Insureds sought coverage under the Policy for most of the Underlying Actions, many

of which are pending before this Court, including In re Refco, Inc. Securities Litigation, No. 05

Civ. 8626 (GEL) (S.D.N.Y.); American Financial International Group et al. v. Bennett et al., No.

05 Civ. 8988 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer

Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett et

al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett et al.,

No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, LP. et al., No. 07

Civ. 7074 (GEL) (S.D.N.Y.); <u>Kirschner v. Grant Thornton LLP et al.</u>, No. 07 Civ. 11604[2] (GEL)

(S.D.N.Y.); <u>Thomas H. Lee Equity Fund V, L.P. v. Bennett</u>, et al., No. 05 Civ. 9608 (GEL)

(S.D.N.Y.); <u>Krys, et al. v. Sugrue, et al.</u>, No. 08-3065 (GEL) & No. 08-3086 (GEL).[3]  <u>See</u> IJX at

1, 2, 4, 6, 9, 11, 12, 14, 16.  <u>See also</u> DiUbaldo Decl., Ex. B, at *1; Ex. A, at ¶32.

<u>Kirschner v. Agoglia, et al.</u>, No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) is

an Underlying Action not before this Court. <u>See</u> IJX at 7.

Criminal proceedings were also initiated against several Refco officers who are Insureds

under Allied World's policy—Bennett, Santo C. Maggio, Robert C. Trosten and Tone N.

Grant—resulting in three guilty pleas (Bennett, Maggio and Trosten) and a conviction (Grant).

<u>See</u>  IJX at 17-24[4]; DiUbaldo Decl., Ex. B, at *1.

The Underlying Actions, as well as the criminal proceedings, arose from and are

attributable to a common set of facts and circumstances—namely, that Bennett engaged in a

scheme to conceal the existence of the Refco Receivable by engaging in certain fraudulent and

criminal acts to deceive Refco's investors, lenders, the public and regulators.  <u>See</u> IJX 1 at ¶¶1,

3-7, 9-10, 12, 428-587; IJX 2 at ¶¶4-7, 9-10, 14-15, 25, 72-92; IJX 6 at ¶¶2-5, 7, 25, 28-29, 72-

73, 109, 366-371, 375, 380; IJX 16 at ¶¶2-8, 13, 15-19, 23, 30-35, 111-115, 126-149, 181-182,

185-190, 236-43, 541-42, 544, 547-49; IJX 4 at ¶¶2-3, 6, 8-10, 14, 25-26, 62-63, 116-119, 155-

162, 364-65, 369-71; IJX 11 at ¶¶1-3, 13, 57-61, 83, 192-200, 271, 288-89; IJX 9 at ¶¶ intro, 1-5,

---

[2] The operative pleading in this action was filed in <u>Kirschner v. Grant Thornton LLP</u>, et al., No. 2007-1-008818 (Cook Cty., Ill.), which was removed to Illinois federal court and then subsequently transferred to this Court.

[3] <u>Kirschner v. Bennett et al.</u>, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) and <u>Kirschner v. Hackl, et al.</u>, No. 07 Civ. 9238 are also before the Court, though none of the plaintiffs-Insureds in this action are seeking coverage for that matter. <u>See</u> IJX at 8, 10.  <u>BAWAG v. Refco Inc., et al.</u>, No. 05-03161 (RDD) is before the U.S. Bankruptcy Court for the Southern District of New York, though no Insured is seeking coverage for this matter. <u>See</u> IJX at 3. Another action for which the Insureds are not seeking coverage is <u>Unovalores, Ltd. v. Bennett</u>, No. L1564-05 (Sup. Ct. N.J.).  <u>See</u> IJX at 15.

[4] The S4 indictment is the operative indictment for the insured Grant, although it contains similar and/or identical allegations to the S3 indictment which Bennett pled guilty to.  A copy of the S4 indictment is attached as Exhibit 19 to the IJX.

13, 59-93; IJX 14 at ¶¶1-6, 8, 30-37, 45, 47, 51; IJX 7 at ¶¶1-5, 56-81; IJX 12 at ¶¶1, 6-8, 151,

193-99, 212-243; IJX 18 at ¶¶7-18, 21-27, 33, 38, 41, 46, 49, 56-59; IJX 19 at ¶¶6-8, 13, 15, 17,

20-26, 32, 34-37, 41, 52, 54, 59-60.[5]

VII.    Allied World Denies Coverage for the Claims Asserted Against the Insureds

By letter dated March 28, 2006, Allied World initially denied coverage for all the

Underlying Actions, criminal proceedings and regulatory investigations then noticed to it arising

from the collapse of Refco based on, among other grounds, the Prior Knowledge Exclusion

contained in the Policy.  See DiUbaldo Decl., Ex. E.  Allied World thereafter reaffirmed its

coverage denial based on subsequent developments, including Bennett's plea of guilty on

February 15, 2008 to a 20-count indictment filed against him.  Id., Ex. F.  The 20-count

indictment to which Bennett pled guilty alleged, in part:

> From at least as early as in or about the late 1990s, Bennett,
> together with others at Refco, sought to hide from, among others,
> Refco's auditors, customers and investors, losses sustained by Refco
> through its own and its customers' trading in the financial
> markets in order to sell the company for their own benefit
> and that of Refco's owners and senior management.  See
> IJX 18 at ¶¶7, 10-17, 21, 25, 33, 41.
>
> In furtherance of this scheme, Bennett and others caused Refco to
> file on its behalf false and fraudulent statements to Refco's banks,
> counterparties, customers, auditors and investors, and to create
> false audited financial statements and false public filings with the
> SEC.  Id., ¶¶8, 13, 21, 26-27, 38, 41, 49.
>
> In furtherance of this scheme, Bennett and others at Refco engaged
> in a series of transactions to transfer losses from Refco to a
> company controlled by Bennett, directed a repeated series of
> transactions designed to conceal those losses at year- and quarter-
> end from Refco's auditors and others, and caused Refco to make false
> and fraudulent public filings with the SEC.  This fraudulent scheme

---

[5] Fine v. Bennett, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) and Mehta v. Bennett, et al., No. 05 Civ. 8748 (GEL)
(S.D.N.Y.) were dismissed.  Nonetheless, the allegations in those complaints arise from and are attributable to the
fraudulent concealment of the Refco Receivable and related scheme.  See IJX 5 at ¶¶11-12, 15, 43, 46-48, 52, 55,
68; IJX 13 at ¶¶11-12, 15, 43, 45-49, 52, 55, 59, 66.

(begun at least as early as in or about the late 1990's) culminated in the August 2005 initial public offering of stock ("IPO") in Refco in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement. Id., ¶¶7-9. See also id., ¶¶10-18, 22-26, 33, 46.

After the fraudulent scheme was uncovered in October 2005, Refco filed for bankruptcy and was subsequently de-listed by the New York Stock Exchange. Id., ¶¶56-59.

Based on these allegations and others, the indictment accused Bennett of committing the following felonies in violation of federal law: conspiracy to commit securities fraud, wire fraud, bank fraud, money laundering, and to make false filings to the SEC; securities fraud; false filings with the SEC; wire fraud; material misstatements to auditors; and money laundering (collectively, "the Federal Felonies"). Id.

VIII.   Bennett's Prior Knowledge

During his plea allocution on February 15, 2008, Bennett admitted the following, under oath:

> Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from... a related party, was instead due from an independent third-party customer.
>
> The [hidden] receivable was composed of, among other things, historical customer losses, bad depts., and expenses that [another Refco entity] had incurred on behalf of Refco.
>
> I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the [hidden] receivable. We concealed the receivable from, amongst others, Refco's auditors...various lenders...and also investors in Refco's common stock.
>
> The [hidden] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believe that I would be able to pay the [hidden] receivable down over time, and did, in fact,

> ultimately pay off the receivable balance in its entirety, I knew that
> failing to disclose the receivable was wrong; I knew that obtaining
> funds from Refco's investors and lenders based on misleading
> financial statements was also wrong.
>
> I also caused Refco to file documents with the SEC, namely S1,
> S4, and 10-K that did not disclose the full extent of the [hidden]
> receivable or the transactions used to conceal it; and, thus, were
> false and misleading with respect to material facts. I knew that
> failing to disclose these facts in public filings and in connection
> with Refco's sale and registration of Refco's notes and common
> stock was wrong, and I deeply regret having done so.

See IJX 21, at pp. 17:5-19:3. Bennett was CEO of Refco at all times relevant to the indictment.

See IJX 18 at ¶2; IJX 1 at ¶32 (noting that Bennett was CEO of Refco from 1998 until he was

forced to resign in October 2005). On July 3, 2008, Bennett was sentenced to sixteen years in

prison as a result of his conviction on the Federal Felonies. See IJX 23.

The Underlying Actions all arose out of or are attributable to the very same fraudulent

and criminal acts for which Bennett was indicted and convicted. See citations on pp. 6-8 and pp.

14-19. Furthermore, Bennett admitted in his plea allocution that he knew about (and participated

in) these fraudulent and criminal acts involving hundreds of millions of dollars for approximately

seven years prior to the inception of the Policy. Compare id. IJX 21, at pp. 17:5-19:3 with

IJX 18 at ¶¶7-18, 22-26. Bennett's knowledge is imputed to all Insureds under the terms of the

Policy. See IJX 29, at End. No. 3. Moreover, but for the fraudulent scheme of Bennett to

conceal and manipulate the Refco Receivable, the Insureds would not be subject to the various

claims alleged in the Underlying Actions. See IJX 18 at ¶¶7-18, 21-27, 41, 46, 49, 56-59. See

also citations on pp. 7-8, 14-19.

IX.    The Bankruptcy Court Orders Allied World to Advance Defense Costs

Prior to Bennett's conviction on the Federal Felonies, on March 13, 2008, the Insureds

moved the United States Bankruptcy Court for the Southern District of New York for a

preliminary injunction requiring Allied World to advance defense costs in the Underlying

Actions. DiUbaldo Decl., Ex. G. The Bankruptcy Court granted the Insureds' motion and

ordered Allied World to advance defense costs pending a determination that the Insureds' claims

were not covered under the Policy. Id. at 3.

Allied World has advanced roughly $5.8 million of its $12,500,000 limit, and continues

to advance at the rate of approximately $1,000,000 every two weeks.

## ARGUMENT

### I.    Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and an affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56

permits a party to move for summary judgment at any time. Once the moving party shows that

there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise

triable issues of fact. See DiUbaldo Decl., Ex. B, at *7. Where it is clear that the nonmoving

party cannot defeat a summary judgment motion by showing facts sufficient to require a trial for

resolution, summary judgment may be granted notwithstanding the absence of or minimal

discovery. Gottlieb v. County of Orange, 84 F.3d 511, 519 (2d Cir. 1996).

### II.    The Prior Knowledge Exclusion in the Policy Bars Coverage for the Claims Asserted Against the Insureds

#### A.    The Operation of the Prior Knowledge Exclusion.

The Prior Knowledge Exclusion in the Allied World Policy provides that there is no

coverage for any claims made against the Insureds if:

> (1)    Such claims allege, arise out of, are based upon, or are attributable to facts or circumstances which any Insured had knowledge of prior to the Policy's inception; and

(2)      A reasonable person with knowledge would believe that such
facts and circumstances might provide grounds for a claim that
would fall within the scope of coverage provided by the Policy
or would indicate the probability of such claim.

See IJX 29 at End. No. 3.

This Court has already recognized the broad scope of this exclusion.    In Axis
Reinsurance Co. the Court held that a nearly identical prior knowledge exclusion unambiguously
precluded coverage for all insureds if "any Insured" had knowledge prior to the inception of the
policy of a fact or circumstance that might result in a claim arising under that policy.    See
DiUbaldo Decl., Ex. B, at **14-15 (finding that such language clearly "expresses a contractual
intent to create joint obligations and to prohibit recovery by an innocent co-insured.")    See also
Coregis Ins. Co. v. Lewis Johs Avallone Aviles & Kaufman LLP, 2006 WL 2135782, at **10-
11 (E.D.N.Y. July 28, 2006) (holding that a prior knowledge exclusion with nearly identical
language was "clear and unambiguous" under New York law and precluded coverage for all
insureds if any insured had knowledge); McCauley Enters., Inc. v. New Hampshire Ins. Co., 716
F. Supp. 718, 721 (D. Conn. 1989) (interpreting "any insured" language to the same effect); State
Farm Fire & Cas. Co. v. Wolford, 498 N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any
insured" exclusion to bar coverage for innocent insured).[6]    This exclusion operates to bar
coverage under the Policy even as to so-called "innocent insureds" who allegedly did not have
the relevant knowledge. See cases cited above in this paragraph.

The various claims asserted in the Underlying Actions and criminal proceeding for which
the Insureds seek coverage are before the Court and/or included as part of the Insurers' Joint
Exhibits.  Under New York law, there need only be some casual relationship between the claims

---

[6] See also Coregis Ins. Co. v. Lyford, 21 F. Supp. 2d 695, 698 (S.D. Tex. 1998) (citing to case law in numerous other jurisdictions to support this proposition).

asserted in the Underlying Actions and Bennett's prior knowledge of facts and circumstance related to such claims in order for the Prior Knowledge Exclusion to be triggered. See, e.g., Maroney v. New York Cent. Mut. Fire Ins. Co., 5 N.Y. 3d 467, 472 (2005) (interpreting "arising out of" language in policy exclusions to mean "originating from, incident to, or having connection with" such that there only has to be a casual relationship between the alleged injury and the coverage provided); United States Fire Ins. Co. v. New York Marine and General Ins. Co., 268 A.D.2d 19, 21-22, 706 N.Y.S.2d 377, 378-79 (App. Div. 2000) (to the same effect). See also Coregis Ins. Co. v. Lyford, 21 F. Supp. 2d 695, 699 (S.D. Tex. 1998) (to the same effect).

Where, as here, the Allied World Policy excludes coverage for claims "arising out of" an insured's prior knowledge of facts or circumstances that might reasonably be grounds for a claim, the proper focus is on the nexus between the insured's prior knowledge and the possibility of the assertion of the claims that gave rise to the Underlying Actions. See, e.g., Coregis Ins. Co., 2006 WL 2135782, at **10-11 (in examining the application of a prior knowledge exclusion with nearly identical language, the fact that the insured knew of the mere "possibility" that claims might arise under the policy was sufficient to bar coverage for all insureds); Lyford, 21 F. Supp. 2d at 699 (to the same effect).

Thus, it is irrelevant whether Bennett could have predicted every single claim that has been asserted against the Insureds in the Underlying Actions. Lyford, 21 F. Supp. 2d at 699 ("the possibility that the plaintiff in the underlying suit might assert different claims than those [the insured] appears to have anticipated is irrelevant. In policy exclusion cases, the nature of the injury, rather than the 'nomenclature' of the underlying claim, is the relevant issue."). So long as "any insured" knew, from an objective standpoint, of facts or circumstances that might give rise

to the types of claims asserted against the Insureds, coverage for such claims is barred by the Prior Knowledge Exclusion as a matter of law.

In light of Bennett's prior knowledge, there is no legal basis upon which Allied World is obligated to provide coverage to the Insureds. See, e.g., Cement & Concrete Workers District Council Pension Fund v. Ulico Cas. Co., 387 F. Supp. 2d 175, 190-91 (E.D.N.Y. 2005) (there is no duty to defend or indemnify where a policy provision excludes coverage); Maroney, 5 N.Y.3d at 471 ("[I]n policies of insurance...if any one exclusion applies there can be no coverage."). For this reason, Allied World's summary judgment motion should be granted.

      B.   Bennett's Conviction on the Federal Felonies Proves That the Prior Knowledge Exclusion Applies.

Bennett's conviction on the Federal Felonies is evidence admissible to prove the existence of the facts upon which that conviction was based under Fed. R. Evid. 803(22). See, e.g., S.E.C. v. Sekhri, et al., 2002 WL 31100823, **10, 12 (S.D.N.Y. July 22, 2002) (guilty plea and allocution admissible after sentencing under Rule 803(22) as probative evidence of certain facts against other defendants in related actions to prove the truth of the matters asserted); American Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp., 1997 WL 906427, at *4 n.7 (S.D.N.Y. Sept. 12, 1997) (plea allocutions of certain officers and directors admissible against another director pursuant to Rule 803(22)). See also In re Enron Corp., 491 F. Supp. 2d 690, 703 (S.D. Tex. 2007) (guilty pleas of former Enron employees constitute admissions of material facts alleged in the complaint or indictment against them and admissible against non-Enron employees); Westport Resources Investment Serv. Inc. v. Chubb Customer Ins. Co., 2003 WL

22966305, at **1, 4-5 (S.D.N.Y. Dec. 16, 2003), aff'd, 110 Fed. Appx. 172 (2d Cir. Sept. 23, 2004) (criminal conviction of one insured triggered fraud exclusion against another insured).[7]

Accordingly, Bennett's conviction[8] on the Federal Felonies is admissible against the Insureds to prove the truth of the facts alleged in the indictment. These facts are:

> From at least as early as in or about the late 1990s, Bennett, together with others at Refco, sought to hide from, among others, Refco's auditors, customers and investors, losses sustained by Refco through its own and its customers' trading in the financial markets in order to sell the company for their own benefit and that of Refco's owners and senior management. See IJX 18 at ¶¶7-17, 21, 25, 33, 41.

> In furtherance of this scheme, Bennett and others caused Refco to file on its behalf false and fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to create false audited financial statements and false public filings with the SEC. Id., ¶¶8, 13, 21, 26-27, 38, 41, 49.

> In furtherance of this scheme, Bennett and others at Refco engaged in a series of transactions to transfer losses from Refco to a company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the SEC. This fraudulent scheme (begun at least as early as in or about the late 1990's) culminated in the August 2005 initial public offering of stock ("IPO") in Refco in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement. Id., ¶¶7-9, 10-18, 22-26, 33, 46.

> After the fraudulent scheme was uncovered in October 2005, Refco filed for bankruptcy and was subsequently de-listed by the New York Stock Exchange. Id., ¶¶56-59.

Here, the Underlying Actions and criminal proceeding for which the Insureds seek coverage indisputably arise out of or are attributable to the very same facts or circumstances that

---

[7] Though not discussed at length herein, Bennett's plea is also admissible under other exceptions to the hearsay rule, including Fed. R. Evid. 807.

[8] Bennett's conviction on the Federal Felonies became final upon his sentencing. See U.S. v. Weismann, 1997 WL 334966, at **10-11 (S.D.N.Y. 1997) ("Final judgment in a criminal case means sentence.").

Bennett knew about prior to the inception of the Policy.  A brief summary of the allegations set forth in the Underlying Actions and criminal proceeding illustrates that the fraudulent concealment of the Refco Receivable is the lynchpin of the claims that have been asserted against the Insureds:

- In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626:  Plaintiffs allege that the defendants (including Bennett) schemed to conceal the Refco Receivable resulted in materially false SEC filings.  See IJX 1 at ¶¶1, 3-7, 9-10, 12, 428-587.  Specifically, the complaint alleges "a little more than two months after completing a highly lucrative initial public offering, Refco admitted its financial statements 'should no longer be relied upon' because [it] had concealed hundreds of millions of dollars of uncollectible receivables owed to [it] by an off-balance sheet entity owned by [Bennett].  While the admission only partially revealed the true extent of the problems at [Refco], it set into motion a chain of events and subsequent disclosures that—over the span of just a few days—led to Refco's abrupt collapse and bankruptcy."  Id., ¶1.  The complaint further states that there are two sets of claims emanating from the fraudulent scheme to conceal the Refco Receivable:  (1) A series of strict liability and negligence claims against defendants who "statutorily responsible for untrue statements in the prospectuses and registration statements pursuant to which Refco issued securities to the public" (due to Refco's failure to disclose the hidden receivable) and (2) claims against defendants who "directly participated in the fraudulent scheme and those who knew about or were reckless with respect to discovering the fraud."  Id., ¶12.

- American Financial International Group, et al. v. Bennett, et al., No. 05 Civ. 8988:  Plaintiffs are customers who maintained accounts at a Refco entity (Refco FX) and allege they were victims of "a fraudulent scheme perpetrated by Defendants [including Bennett and certain Insureds] to fleece [the customers] of the funds and currencies held in their accounts."  See IJX 2 at ¶4.  The plaintiffs allege that they opened accounts at RefcoFX based on defendants' representations that Refco and RefcoFX were financially sound (and also based on Refco's financial statements), Id., ¶¶5-6, 9-10, but that defendants withdrew millions of dollars from RefcoFX (and other affiliates) in order to fund their fraudulent scheme, conceal the Refco Receivable and create the appearance that Refco and RefcoFX were financially stable.  Id., ¶¶7,9.  After Refco went into bankruptcy (as a result of the hidden Refco Receivable), plaintiffs' accounts were frozen.  Id., ¶¶14-15.

The damages alleged by plaintiff emanate from the concealment of the Refco Receivable, which is described by plaintiffs as "one massive scheme," in which the "defendants manipulated Refco reported financial results by engaging in a series of transactions with entities controlled by Bennett in order to hide large losses and avoid charges, which would have negatively affected Refco's financial results had they properly been recorded."  Id., ¶77; Id., ¶¶72-86 (describing the Refco Receivable and its centrality to the complaint).  Plaintiffs' allege that defendants' concealed the existence of the Refco

Receivable so that plaintiffs would entrust money and assets to RefcoFX, which defendants in turn used to fund their cover-up of the Refco Receivable. Id., ¶¶72-92.

- In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643: Plaintiffs were securities brokerage customers of Refco Capital Markets ("RCM") and allege that the defendants named in the complaint [including Bennett and certain Insureds] "perpetrated a fraudulent and deceptive scheme through which they converted for their own benefit customer securities owned by plaintiffs and entrusted to RCM for safekeeping." See IJX 6 at ¶¶3, 7. Plaintiffs further allege that the purpose behind the conversion of the plaintiffs' securities was to fund Refco's trading losses and portray Refco as a financially strong and healthy company by concealing the Refco Receivable from RCM's customers, the public, creditors and regulators so that defendants could take Refco public as soon as possible and reap a huge financial windfall. Id., ¶¶2-7, 25, 72-73, 109, 366-71, 375, 380. Conversion of the customers assets was also necessary to fund the round-trip transactions related to the Refco Receivable. Id. Plaintiffs allege that, because of the fraudulent scheme to cover-up the Refco Receivable, Refco went bankrupt, leaving plaintiffs with massive losses. Id., ¶¶28-29.

- V.R. Global Partners, L.P. v. Bennett, et al., No. 07 Civ. 8686: Plaintiffs were customers at RCM. Plaintiffs allege that defendants (including Bennett) perpetrated a fraudulent and deceptive scheme through which they concealed the Refco Receivable and created a false appearance as to Refco's financial condition in order to induce plaintiffs to entrust their securities with RCM. See IJX 16 at ¶¶2, 15, 30-35, 113, 126-49, 181, 185-90, 541-42. By inducing plaintiffs to entrust their assets with RCM, the defendants were able to convert for their own benefit customer securities owned by plaintiffs in order to fund fraudulent transactions related to the Refco Receivable and create the appearance that Refco was finally strong in order to secure a "substantial payday" by taking the company public as quickly as possible. Id., ¶¶30-35, 111-115, 149, 181-82, 185-90, 544. Plaintiffs allege that, as a result of the Refco Receivable, RCM became insolvent and was left in a position where it could not return to plaintiffs the securities entrusted to RCM. Id., ¶¶236-43; 547-49.

- Capital Management Select Fund Ltd. v. Bennett, et al., No. 07 Civ. 8688: Like VR Global Partners, plaintiffs were customers at RCM. Plaintiffs allege that defendants (including Bennett) perpetrated a fraudulent and deceptive scheme through which they concealed the Refco Receivable and created a false appearance as to Refco's financial condition in order to induce plaintiffs to entrust their securities with RCM and ultimately enrich the defendants. See IJX 4 at ¶¶2-3, 6, 14, 62-63, 116-119. Central to this scheme was Bennett's use of funds from RCM to engage in a series of transactions designed to conceal the Refco Receivable. Id., ¶¶62-63. Plaintiffs allege that as a result of defendants' fraudulent scheme related to the Refco Receivable, plaintiffs suffered massive losses due to the conversion of their securities. Id., ¶¶25-26, 155-62.

- Kirschner v. Thomas H. Lee Partners, L.P., et al., No. 07 Civ. 7074: This complaint revolves around the defendants' (certain Insureds) breach of fiduciary duties for their failure to uncover the fraudulent concealment of the Refco Receivable. See IJX 11 at

¶¶1-3, 57-61, 83, 192-200, 271, 288-89.  The complaint alleges that the defendants ignored and/or disregarded the Refco Receivable and fraudulent transactions designed to conceal such in order to reap the benefits of the August 2005 initial public offering, among other things.  Id., ¶¶57-61.  Specifically, the complaint asserts that had the defendants sought out information regarding the related-party receivables they "would have uncovered the fraud within Refco and would not have allowed Refco to incur hundreds of millions of dollars in additional liabilities it could not afford" and that defendants breached their fiduciary duties after they learned that in the 1990s, Refco was "trading losses into a Refco subsidiary" but did nothing Id., ¶¶61, 83.

The "massive fraudulent scheme" at the heart of the complaint is described as involving (a) the creation of the Refco Receivable "to create a false picture of Refco's financial success", (b) concealment of the Refco Receivable from the public through certain transactions that had no legitimate business purpose and (c) causing Refco to rely upon the fraudulent conversion of billions of dollars of assets of RCM customers in order to aid the failure to disclose the Refco Receivable.  Id., ¶¶195-197, 199.

- Kirschner v. Grant Thornton LLP, et al., No. 07 Civ. 11604:  This complaint alleges that certain Insured defendants, including Bennett and Grant, devised an elaborate scheme through which they maintained the illusion that Refco was financially stable by "concealing Refco's trading losses and operating expenses from its financial statements, recording them as receivables owed by [a related party company owned and controlled by Bennett]…and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables" (the Refco Receivable).  See IJX 9 at ¶¶5, 1-4.  The defendants then "designed and implemented a series of fraudulent transactions" whose "sole purpose was to prevent the [Refco Receivable] from being disclosed."  Id., ¶6.  As a result of the scheme to conceal the Refco Receivable, the defendants "received significant fees and other payments, some amounting to millions of dollars, in return for their support and participation in the [defendants] fraudulent scheme."  Id., ¶¶13.  To that end, it is alleged that, beginning in late 1997, "Refco Insiders decided to engineer a lucrative cashing-out of their interests in Refco for far more than these interests were worth…[and] engaged in a three-part scheme through which they concealed Refco's trading losses [the Refco Receivable] and operating expenses, inflated Refco's revenues, and hid their manipulation of Refco's financial statements through fraudulent round trip loans, all the while funding Refco's operations with customer assets looted from RCM."  Id., ¶59.  The trustee alleges that this massive scheme resulted in one of the swiftest corporate meltdowns in U.S. history and caused Refco over $2 billion in damages.  Id., ¶ intro.

- Thomas H. Lee Equity Fund, L.P. v. Bennett, et al., No. 05 Civ. 9608:  Plaintiffs allege that they suffered hundreds of millions of dollars in financial losses due to the "secretive and willful scheme" designed by, among others, Bennett and Grant, "to misrepresent Refco's true financial picture by falsifying its books and record" in order to conceal the true nature of "a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the [Refco's] financial statements, would have materially reduced Refco's value."  See IJX 14 at ¶4.  See generally ¶¶1-6.  Specifically,

it is alleged that Bennett failed to disclose to plaintiffs "what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of millions of dollars of customer losses and obligations that would never be repaid to [Refco]." Id., ¶30.

Plaintiffs allege that, "by hiding material customer losses assumed by [Refco]", defendants made Refco appear more valuable than it was during the plaintiffs' 2004 leveraged buyout of Refco. Id., ¶6. After the discovery of the "$430 million receivable owed to Refco by RGHI, Refco's stock price dropped precipitously, losing over $1 billion in market capitalization....the impact on [Refco] has been catastrophic." Id., ¶8.

- Kirschner v. Agoglia, et al., No. 05-60006, Adv. Pro. No. 07-3060: In this action, the trustee alleges that "on October 17, 2005 [Refco] and a number of its wholly owned subsidiaries were propelled into bankruptcy and eventual liquidation following a massive financial fraud perpetrated for more than eight years" by Bennett and others. See IJX 7 at ¶1. Central to the "massive financial fraud" was the fraudulent concealment of the Refco Receivable, which defendants used to "inflate Refco's financial position artificially until such time as it could be sold." Id., ¶59. Pursuant to the Refco Receivable scheme, the defendants moved "hundreds of millions of dollars in trading losses as well as operating expenses of Refco's books and transferring them to RGHI's accounts, creating the appearance that Refco had a receivable from RGHI." Id. By doing this, the defendants were able to create a "false appearance of financial stability" and "artificial perception among Refco's customers, creditors and potential investors that Refco was very profitable...and risk averse". Id., ¶2. The trustee asserts that, in fact, Refco was "none of those things" and "suffered huge financial losses that had to be, and were, fraudulently concealed from Refco's customers, creditors and potential investors." Id., ¶3. Less than two months after the August 2005 IPO, the Refco Receivable was discovered, which led to Refco's collapse. Id., ¶¶56-60.

- Krys, et al. v. Sugrue, et al., No. 08-3065 (GEL) & No. 08-3086 (GEL) (S.D.N.Y.): This action was brought by certain hedge funds and related entities to recover damages arising from the conversion of hundreds of millions of dollars of assets held in customer accounts at Refco. See IJX 12 at ¶¶1, 6-7. The plaintiffs allege that their money was unknowingly transferred from one Refco entity to RCM and used by defendants "in fraudulent activities designed to conceal Refco losses [the Refco Receivable], bolster Refco's financial statements, and enrich individuals." Id., ¶7. Beginning in the late 1990s, "Bennett caused hundreds of millions of dollars in uncollectible customer accounts to be transferred to [RGHI], an entity owned and controlled by Bennett, to remove those losses from Refco's financial statements. A corresponding receivable of several hundred million dollars from RGHI was recorded on Refco's books." Id., ¶7. It is further alleged that "to conceal the [Refco Receivable] and bolster Refco's financials, Bennett diverted customer assets held at RCM, including [plaintiffs] cash" to fund a series of sham loans and transactions at the end of each of Refco's financial reporting periods. Id., ¶¶8, 193. In addition to the improper use of customer funds, the plaintiffs allege that Refco and its directors and officers breached their fiduciary duties to plaintiffs by their "failure to disclose to [plaintiffs] the existence, nature and extent of the massive

intercompany transfers [i.e., the Refco Receivable and related transactions]" alleged in the complaint. Id., ¶151. As a result, plaintiffs seek damages resulting from the discovery of the fraudulent scheme to conceal the Refco Receivable and related events, which led to Refco's collapse. Id., ¶1.

- U.S. v. Grant, 05 Cr. 1192 (S4): The criminal action asserted against Mr. Grant revolves around the failure to disclose and/or conceal the Refco Receivable, as well as the fraudulent scheme undertaken at Refco to ensure concealment. See IJX 19 at ¶¶6-8, 13, 15, 17, 20-26, 32, 34-37, 41, 52, 54, 59-60. The S4 indictment alleges that from the early to mid 1990s, Grant and Bennett "schemed to hide the true financial health of Refco" by making "false and fraudulent statements to" Refco's banks, investors and auditors and filing false statements with the SEC in order to conceal the Refco Receivable. Id., ¶¶6-8, 32, 34-37. The indictment also details certain fraudulent transactions that were used to hide the Refco Receivable and Refco's unlawful use of customer funds to conceal its losses. Id., ¶¶15, 17, 19-26, 41. Following the announcement of the discovery of the Refco Receivable, "the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization." Id., ¶52.[9]

As set forth in each of the underlying proceedings, but for the fraudulent scheme of Bennett to conceal the existence of the Refco Receivable, the Insureds would not be subject to any of the claims alleged in the Underlying Actions and the criminal proceedings.

C. The Severability Provision in the Primary Policy Does Not Trump the Clear Language of the Prior Knowledge Exclusion.

This Court held in Axis Reinsurance Co. that the severability provisions contained in Primary Policy are limited in effect and do not preclude the imputation of Bennett's knowledge to the other Insureds under the terms of the Prior Knowledge Exclusion. See DiUbaldo Decl., Ex. B, at **10-11 (noting that Endorsement No. 10 to the Primary Policy is limited to statements made by Refco in the application it submitted to U.S. Specialty); Id. at *14 (finding that the severability provision located in the Exclusions section of the U.S. Specialty Policy is limited in its application to only the Exclusions of that policy). Further, as noted by the Court in that

---

[9] See also footnote 5 (citing two underlying complaints against the Insureds which have been dismissed and illustrate that the fraudulent concealment of the Refco Receivable is the factual centerpiece upon which the underlying claims have arisen). Actions for which the Insureds are not seeking coverage also arose from the fraudulent scheme to conceal the Refco Receivable and related transactions. See, e.g., BAWAG v. Refco Inc., et al., No. 05-03161 (IJX 3 at ¶¶2-4, 17, 23, 30, 37, 40, 42) and Kirschner v. Hackl, et al., No. 07 Civ. 9238 (IJX 10 at ¶¶1-4, 27, 30-39, 44).

decision, even if the severability provisions in the Primary Policy were not expressly limited in their application, the express terms and conditions of the Allied World Policy (specifically its Prior Knowledge Exclusion) supercede these provisions of the Primary Policy such that the express language of the Prior Knowledge Exclusion controls. Id. at *10, n. 13, *14, n. 17; See also Home Ins. Co. v. Am. Home Products Corp., 902 F.2d 1111, 1113 (2d Cir. 1990) (the excess policy controls the excess insurer's obligations if there is any conflict between the coverage afforded by the primary policy and the excess policy). Thus, the severability provisions contained in Endorsement No. 10 and the Exclusions section of the Primary Policy do not prevent, in any way, the imputation of Bennett's knowledge to all Insureds pursuant to the Prior Knowledge Exclusion in the Allied World Policy.

## CONCLUSION

The claims for which the Insureds seek coverage under the Policy arise out of and are attributable to facts and circumstances which another Insured, Bennett, had knowledge of prior to the inception of the Policy. Any reasonable person would have known that those facts and circumstances, namely, the fraudulent concealment of a $430 million receivable owed to a related party, might lead to the claims that have been asserted against the Insureds. Thus, the Prior Knowledge Exclusion in the Policy bars coverage for the claims asserted against the Insureds as a matter of law. Consequently, Allied World has no duty to defend or indemnify the Insureds. Allied World's motion for summary judgment should be granted and the Insureds' first amended complaint dismissed.

Dated: July 11, 2008

Respectfully submitted,

_____/s/ John D. Hughes_____
John D. Hughes (admitted *pro hac vice*)
Robert W. DiUbaldo (RD 4484)
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022
(212) 308-4411

Attorneys for Defendant
Allied World Assurance Company (U.S.), Inc.

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                    :
                                    :
JOSEPH MURPHY, et al.,              :
                                    :
Plaintiffs,                         :
v.                                  :
                                    :   Case No. 1:08-cv-4196 (GEL)
ALLIED WORLD ASSURANCE              :
COMPANY (U.S.), INC. and ARCH       :
INSURANCE COMPANY,                  :
                                    :
Defendants.                         :
                                    :
                                    :
-------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2008, I caused a copy of Allied World's

motion for summary judgment, Rule 56.1 statement of undisputed material facts, memorandum

of law, declaration of Robert W. DiUbaldo and declaration of Jerome W. Brendle dated July 11,

2008 to be sent by electronic mail to the following:

Michael Francis Walsh, Esq.
Weil Gotshal & Manges LLP
767 Fifth Avenue New York, NY 10153
(212) 310-8372
*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaekel,
Thomas H. Lee, Ronald L. O Kelley, and Scott A. Schoen*

William A. Schreiner, Jr., Esq.

Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1858
*Attorneys for Plaintiff Tone Grant*

Laura L. Neish, Esq.
Zuckerman Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600
*Attorneys for Plaintiff Tone Grant*

Helen Kim, Esq.
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
(310) 788-4525
*Attorneys for Plaintiff Dennis Klejna*

John R. Jerome, Esq.
Timothy Hoeffner, Esq.
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY 10167
*Attorneys for Plaintiff Joseph Murphy*

Claire P. Gutekunst, Esq.
Proskauer Rose, LLP
1585 Broadway
New York, NY 10036
(212) 969-3421
*Attorneys for Plaintiff Richard N. Outridge*

Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022
(212) 750-8700
*Attorneys for Plaintiffs William M. Sexton and Gerald Sherer*

Richard Cashman, Esq.
Heller Ehrman, LLP
Times Square Tower
7 Times Square

New York, NY 10036 (212) 847-8796
*Attorneys for Plaintiff Philip Silverman*

John H. Eickemeyer, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
*Attorneys for Defendant Arch Insurance Company*

Marc E. Rindner, Esq.
1776 K Street NW
Wiley Rein LLP
Washington, DC 20006
(202) 719-7486
*Attorneys for Defendant Arch Insurance Company*

William Fleming, Esq.
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900


Robert W. DiUbaldo