John D. Hughes (admitted *pro hac vice*)
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                                  :

JOSEPH MURPHY, et al.,           :

                                                  :

               Plaintiffs,           :

v.                                          :

                                                  :

ALLIED WORLD ASSURANCE       :
COMPANY (U.S.), INC. and ARCH    :
INSURANCE COMPANY,         :     Case No. 1:08-cv-4196 (GEL)
                                                  :     *Electronically filed*

              Defendants.        :

                                                    :

-----------------------------------------------------x

## RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ALLIED WORLD'S MOTION FOR SUMMARY JUDGMENT

       Pursuant to Local Rule 56.1 for the Southern District of New York, Defendant Allied World Assurance Company (U.S.) Inc. ("Allied World") submits the following statement of undisputed material facts:

       1.    Refco Inc. ("Refco") became a publicly traded company pursuant to an August 2005 initial public offering.  See Declaration of Robert W. DiUbaldo ("DiUbaldo Decl.") dated July 11, 2008, Ex. A, at ¶1; Ex. C, at ¶53.

       2.    On October 10, 2005, two months after its initial public offering, Refco announced that it had discovered an undisclosed $430 million receivable (the "Refco

305950

Receivable") due from an entity controlled by its former Chief Executive Officer, Phillip Bennett ("Bennett"). Id., Ex. B, at *1; Ex. C, at ¶54.

3.    As a result of the Refco Receivable, the company declared that its financial statements could not be relied upon. Id., Ex. B, at *1; Ex. C, at ¶54.

4.    On October 17, 2005, Refco and many of its subsidiaries (collectively, also "Refco") filed for protection under Chapter 11 of Title 11 of the United States Bankruptcy Code. Id., Ex. A, at ¶30, Ex. C, at ¶53.

Refco's 2004-2005 Insurance Tower

5.    Prior to Refco's August 2005 initial public offering, Refco Group Ltd., then Refco's parent company, obtained a "tower" of D&O liability insurance coverage for the policy period of August 5, 2004 to August 11, 2005, consisting of a primary policy and two excess policies. Id., Ex. B, at *2.

6.    Specifically, U.S. Specialty Insurance Company ("U.S. Specialty") provided $10 million of primary coverage; Greenwich Insurance Company provided the first excess layer of coverage with $10 million in limits excess of $10 million; and Axis Reinsurance Company ("Axis") provided the second excess layer of coverage with $10 million in limits in excess of $20 million. Id.

7.    The policy issued by U.S. Specialty for the 2004-2005 period contained an Inverted Warranty exclusion that provided, as follows:

> In consideration of the premium charged, the Insurer shall not be liable to make any payment of Loss in connection with any Claim arising out of, based upon or attributable to any actual or alleged fact, circumstance, situation or Wrongful Act that occurred prior to 8/5/2004, if as of that date, any Insured knew or could have reasonably foreseen that such fact, circumstance, situation or Wrongful Act could give rise to a Claim against an Insured for a Wrongful Act.

Id., Ex. D, End. No. 7 (emphasis added).

Refco's 2005-2006 Insurance Tower

8.    In advance of its August 2005 initial public offering, Refco obtained another "tower" of D & O insurance for the policy period of August 11, 2005 to August 11, 2006.  See Insurers' Joint Exhibits ("IJX"), at 26-29[1]; Ex. A, at ¶¶35, 44, 47, 56.

9.    U.S. Specialty Insurance Company ("U.S. Specialty") again issued a primary policy to Refco with a limit of $10 million, excess applicable retentions (the "Primary Policy"). See IJX at 26; DiUbaldo Decl., Ex. A, at ¶35.

10.    For this policy year, Lexington Insurance Company issued the first excess policy (the layer above the Primary Policy) with a limit of $7.5 million excess of $10 million.  See IJX at 27; DiUbaldo Decl., Ex. A, at ¶44.

11.    Axis again provided a second excess layer of coverage for this policy year, with a limit of $10 million in excess of $17.5 million (the "Axis Policy").  See IJX at 28; DiUbaldo Decl., Ex. A, at ¶47.

12.    Allied World provided the third excess layer of insurance coverage to Refco pursuant to its Excess Directors and Officers Insurance Company Reimbursement Policy No. AW0418197 (the "Allied World Policy" or the "Policy").  The Allied World Policy provided a limit of liability of $12.5 million in excess of $27.5 million.  See IJX at 29; DiUbaldo Decl.; Ex. A, at ¶¶1, 56.

The Issuance of the Allied World Policy

13.    On August 9, 2005, prior to the inception of the Allied World Policy, Allied World's underwriter, Jerome Brendle, sent a Quote Confirmation to Refco's broker, Marsh USA,

---

[1] As stated in the joint letter sent to the Court on July 8, 2008, Allied World, XL Specialty Insurance Company ("XL") and Arch Insurance Company (the "Insurers") agreed, at the Court's suggestion, to serve and file a set of joint exhibits ("Insurers' Joint Exhibits" or "IJX").  The joint exhibits are referenced in the DiUbaldo Declaration in support of Allied World's motion for summary judgment and will be served and filed jointly on behalf of all the Insurers by XL, though they will only be electronically filed under the docket number for the XL action before the Court (No. 08 Civ. 3821).

Inc. ("Marsh") concerning the proposed insurance. <u>See</u> Declaration of Jerome W. Brendle in Support of Allied World's Motion for Summary Judgment ("Brendle Decl.") dated July 11, 2008, Ex. A and ¶2.

14.     The Quote Confirmation contained a draft of a "Prior Knowledge Exclusion." <u>Id.</u>, Ex. A, End. No. 1 and ¶3. <u>See also</u> IJX 29, at End. No. 3.

15.     In defining the scope of coverage, the Quote Confirmation noted in the "Applicable Endorsements" section that a "Warranty exclusion" would be included in the Policy as of the date it incepted. <u>See</u> Brendle Decl., Ex. 1, at 2 and ¶¶3-4.

16.     On the following day, August 10, 2005, Mr. Brendle sent a "Binder Confirmation" to Marsh, which set forth the terms and conditions of the coverage to be afforded by the Policy. <u>See id.</u>, Ex. B and ¶5.

17.     The terms and conditions set forth in the Binder Confirmation were derived from Allied World's August 9, 2005 Quote Confirmation. They stated that the Policy would include an "Inverted Warranty Exclusion" as of its inception. <u>Id.</u>, Ex. B, at 2 and ¶6.

The Terms of the Allied World Policy

18.     The Allied World Policy incepted on August 11, 2005. <u>See</u> IJX at 29.

19.     Section I of the Policy, the Insuring Agreement, provided, in relevant part:

> This policy shall provide the Insured(s) with Excess Directors and Officers Insurance and Company Reimbursement coverage for Loss or Damages resulting from any claim or claims first made against the Insured(s) and reported to the Insurer pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the Followed Policy... <u>subject to the…, exclusions,… of this policy including any and all endorsements attached hereto</u>....

<u>Id.</u>

20.     The Policy also contained a Prior Knowledge Exclusion, referenced at Item 11 of the Policy's Declarations page and Endorsement No. 3, which provided, as follows:

It is hereby understood and agreed that the Insurer shall not be liable for Loss in connection with any claim or claims made against the Insureds:

alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which any Insured had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

Id. (emphasis added), Declarations page, Item 11 and End. No. 3.

21.    The Prior Knowledge Exclusion excludes coverage for all Insureds if "any Insured" had knowledge prior to the inception of the Policy of a fact or circumstance that might result in a claim arising under the Policy or would indicate the probability of such claim.  Id., End. No. 3.

<u>The Claims Asserted Against the Insureds Precipitated by Refco's Demise</u>

22.    The collapse of Refco in October 2005 triggered an onslaught of lawsuits and regulatory investigations (collectively, the "Underlying Actions") against certain Refco officers and directors (referred to herein as the "Insureds").  See DiUbaldo Decl., Ex. C, at ¶¶84-108, 118-36; Ex. B, at *1; Ex. A, at ¶32.

23.    The Insureds sought coverage under the Policy for most of the Underlying Actions, many of which are pending before this Court, including In re Refco, Inc. Securities Litigation, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); American Financial International Group et al. v. Bennett et al., No. 05 Civ. 8988 (GEL) (S.D.N.Y.); In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, No. 06 Civ. 643 (GEL) (S.D.N.Y.); V.R. Global Partners, L.P. v. Bennett et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y.); Capital Management Select Fund Ltd. v. Bennett et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y.); Kirschner v. Thomas H. Lee Partners, LP. et al., No. 07 Civ. 7074 (GEL) (S.D.N.Y.); Kirschner v. Grant Thornton LLP et al., No. 07 Civ.

11604[2] (GEL) (S.D.N.Y.); <u>Thomas H. Lee Equity Fund V, L.P. v. Bennett</u>, et al., No. 05 Civ.

9608 (GEL) (S.D.N.Y.); <u>Krys, et al. v. Sugrue, et al.</u>, No. 08-3065 (GEL) & No. 08-3086

(GEL).[3] <u>See</u> IJX at 1, 2, 4, 6, 9, 11, 12, 14, 16. <u>See also</u> DiUbaldo Decl., Ex. B, at *1; Ex. A, at

¶32.

24.    <u>Kirschner v. Agoglia, et al.</u>, No. 05-60006, Adv. Pro. No. 07-3060 (Bankr.

S.D.N.Y.) is an Underlying Action not before this Court. <u>See</u> IJX at 7.

25.    Criminal proceedings were also initiated against several Refco officers who are

Insureds under Allied World's policy—Bennett, Santo C. Maggio, Robert C. Trosten and Tone

N. Grant—resulting in three guilty pleas (Bennett, Maggio and Trosten) and a conviction

(Grant). <u>See</u> IJX at 17-23[4]; DiUbaldo Decl., Ex. B, at *1.

26.    The Underlying Actions, as well as the criminal proceedings, arose from and are

attributable to a common set of facts and circumstances—namely, that Bennett engaged in a

scheme to conceal the existence of the Refco Receivable by engaging in certain fraudulent and

criminal acts to deceive Refco's investors, lenders, the public and regulators. <u>See</u> IJX 1 at ¶¶1,

3-7, 9-10, 12, 428-587; IJX 2 at ¶¶4-7, 9-10, 14-15, 25, 72-92; IJX 6 at ¶¶2-5, 7, 25, 28-29, 72-

73, 109, 366-371, 375, 380; IJX 16 at ¶¶2-8, 13, 15-19, 23, 30-35, 111-115, 126-149, 181-182,

185-190, 236-43, 541-42, 544, 547-49; IJX 4 at ¶¶2-3, 6, 8-10, 14, 25-26, 62-63, 116-119, 155-

162, 364-65, 369-71; IJX 11 at ¶¶1-3, 13, 57-61, 83, 192-200, 271, 288-89; IJX 9 at ¶¶ intro, 1-5,

---

[2] The operative pleading in this action was filed in <u>Kirschner v. Grant Thornton LLP</u>, et al., No. 2007-1-008818 (Cook Cty., Ill.), which was removed to Illinois federal court and then subsequently transferred to this Court.

[3] <u>Kirschner v. Bennett et al.</u>, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) and <u>Kirschner v. Hackl, et al.</u>, No. 07 Civ. 9238 are also before the Court, though none of the plaintiffs-Insureds in this action are seeking coverage for that matter. <u>See</u> IJX at 8, 10. <u>BAWAG v. Refco Inc., et al.</u>, No. 05-03161 (RDD) is before the U.S. Bankruptcy Court for the Southern District of New York, though no Insured is seeking coverage for this matter. <u>See</u> IJX at 3. Another action for which the Insureds are not seeking coverage is <u>Unovalores, Ltd. v. Bennett</u>, No. L1564-05 (Sup. Ct. N.J.). <u>See</u> IJX at 15.

[4] The S4 indictment is the operative indictment for the insured Grant, although it contains similar and/or identical allegations to the S3 indictment which Bennett pled guilty to. A copy of the S4 indictment is attached as Exhibit 19 to the IJX.

13, 59-93; IJX 14 at ¶¶1-6, 8, 30-37, 45, 47, 51; IJX 7 at ¶¶1-5, 56-81; IJX 12 at ¶¶1, 6-8, 151,

193-99, 212-243; IJX 18 at ¶¶7-18, 21-27, 33, 38, 41, 46, 49, 56-59; IJX 19 at ¶¶6-8, 13, 15, 17,

20-26, 32, 34-37, 41, 52, 54, 59-60.[5]

### Allied World Denies Coverage for the Claims Against the Insureds

27.    By letter dated March 28, 2006, Allied World initially denied coverage for all the

Underlying Actions, criminal proceedings and regulatory investigations then noticed to it arising

from the collapse of Refco based on, among other grounds, the Prior Knowledge Exclusion

contained in the Policy.  See DiUbaldo Decl., Ex. E.

28.    Allied World thereafter reaffirmed its coverage denial based on subsequent

developments, including Bennett's plea of guilty on February 15, 2008 to a 20-count indictment

filed against him.  Id., Ex. F.

29.    The 20-count indictment to which Bennett pled guilty alleged, in part:

> From at least as early as in or about the late 1990s, Bennett,
> together with others at Refco, sought to hide from, among others,
> Refco's auditors, customers and investors, losses sustained by
> Refco through its own and its customers' trading in the financial
> markets in order to sell the company for their own benefit and that
> of Refco's owners and senior management. See IJX 18 at ¶¶7, 10-
> 17, 21, 25, 33, 41.

> In furtherance of this scheme, Bennett and others caused Refco to
> file on its behalf false and fraudulent statements to Refco's banks,
> counterparties, customers, auditors and investors, and to create
> false audited financial statements and false public filings with the
> SEC. Id., ¶8, 13, 21, 26-27, 38, 41, 49.

> In furtherance of this scheme, Bennett and others at Refco engaged
> in a series of transactions to transfer losses from Refco to a
> company controlled by Bennett, directed a repeated series of

---

[5] Fine v. Bennett, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) and Mehta v. Bennett, et al., No. 05 Civ. 8748 (GEL)
(S.D.N.Y.) were dismissed.  Nonetheless, the allegations in those complaints arise from and are attributable to the
fraudulent concealment of the Refco Receivable and related scheme.  See IJX 5 at ¶¶11-12, 15, 43, 46-48, 52, 55,
68; IJX 13 at ¶¶11-12, 15, 43, 45-49, 52, 55, 59, 66.  Similarly, actions for which the Insureds are not seeking
coverage also arose from the fraudulent scheme to conceal the Refco Receivable and related transactions. See, e.g.,
BAWAG v. Refco Inc., et al., No. 05-03161 (IJX 3 at ¶¶2-4, 17, 23, 30, 37, 40, 42) and Kirschner v. Hackl, et al.,
No. 07 Civ. 9238 (IJX 10 at ¶¶1-4, 27, 30-39, 44).

transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the SEC. This fraudulent scheme (begun at least as early as in or about the late 1990's) culminated in the August 2005 initial public offering of stock ("IPO") in Refco in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement. Id., ¶¶7-9. See also id., 10-18, 22-26, 33, 46.

After the fraudulent scheme was uncovered in October 2005, Refco filed for bankruptcy and was subsequently de-listed by the New York Stock Exchange. Id., ¶¶56-59.

30.    Based on these allegations and others, the indictment accused Bennett of committing the following felonies in violation of federal law: conspiracy to commit securities fraud, wire fraud, bank fraud, money laundering, and to make false filings to the SEC; securities fraud; false filings with the SEC; wire fraud; material misstatements to auditors; and money laundering (collectively, "the Federal Felonies"). Id.

<u>Bennett's Prior Knowledge</u>

31.    During his plea allocution on February 15, 2008, Bennett admitted the following, under oath.

Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from... a related party, was instead due from an independent third-party customer.

The [hidden] receivable was composed of, among other things, historical customer losses, bad depts., and expenses that [another Refco entity] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the [hidden] receivable. We concealed the receivable from, amongst others, Refco's auditors...various lenders...and also investors in Refco's common stock.

The [hidden] receivable and related party transaction used to conceal it were material information that Refco investors and

lenders would have wanted to have known prior to investing in or
lending money to Refco. While I believe that I would be able to
pay the [hidden] receivable down over time, and did, in fact,
ultimately pay off the receivable balance in its entirety, I knew that
failing to disclose the receivable was wrong; I knew that obtaining
funds from Refco's investors and lenders based on misleading
financial statements was also wrong.

I also caused Refco to file documents with the SEC, namely S1,
S4, and 10-K that did not disclose the full extent of the [hidden]
receivable or the transactions used to conceal it; and, thus, were
false and misleading with respect to material facts. I knew that
failing to disclose these facts in public filings and in connection
with Refco's sale and registration of Refco's notes and common
stock was wrong, and I deeply regret having done so.

See IJX 21, at pp. 17:5-19:3.

32.    Bennett was CEO of Refco at all times relevant to the indictment (from the mid-
late 1990s to 2005).  See IJX 18 at ¶2; IJX 1 at ¶32 (noting that Bennett was CEO of Refco from
1998 until he was forced to resign in October 2005).

33.    On July 3, 2008, Bennett was sentenced to 16 years in prison as a result of his
conviction on the Federal Felonies.  See IJX 23.

34.    The Underlying Actions all arose out of or are attributable to the very same
fraudulent and criminal acts for which Bennett was indicted and convicted.  See citations in
paragraphs 26, 29-31.

35.    Furthermore, Bennett admitted in his plea allocution that he knew about (and
participated in) these fraudulent and criminal acts involving hundreds of millions of dollars for
approximately seven years prior to the inception of the Policy.  Compare id. IJX 21, at pp. 17:5-
19:3 with IJX 18, at ¶¶7-18, 22-26.

36.    Bennett's knowledge is imputed to all Insureds under the terms of the Policy.  See
IJX 29, at End. No. 3.

37.    But for the fraudulent scheme of Bennett to conceal and manipulate the Refco Receivable, the Insureds would not be subject to the various claims alleged in the Underlying Actions.  See IJX 18, at ¶¶7-18, 21-27, 41, 46, 49, 56-59.  See also citations in paragraphs 26, 29-31 above.

### The Bankruptcy Court Orders Allied World to Advance Defense Costs

38.    Prior to Bennett's conviction on the Federal Felonies, on March 13, 2008, the Insureds moved the United States Bankruptcy Court for the Southern District of New York for a preliminary injunction requiring Allied World to advance defense costs in the Underlying Actions.  See DiUbaldo Decl., Ex. G.

39.    The Bankruptcy Court granted the Insureds' motion and ordered Allied World to advance defense costs pending a determination that the Insureds' claims were not covered under the Policy.  Id. at 3.

40.    As of July 11th, Allied World will have advanced roughly $5.8 million of its $12.5 million limit of the Policy, and continues to advance at the rate of approximately $1 million every two weeks.  See DiUbaldo Decl., ¶38.

Dated:   July 11, 2008                                    Respectfully submitted,


                                         /s/ John D. Hughes
                                         John D. Hughes (admitted *pro hac vice*)
                                         Robert W. DiUbaldo (RD 4484)
                                         Edwards Angell Palmer & Dodge LLP
                                         750 Lexington Avenue
                                         New York, NY 10022
                                         (212) 308-4411

                                         Attorneys for Defendant
                                         Allied World Assurance Company (U.S.), Inc.

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                      :
                                      :
JOSEPH MURPHY, et al.,                :
                                      :
Plaintiffs,                           :
v.                                    :
                                      :        Case No. 1:08-cv-4196 (GEL)
ALLIED WORLD ASSURANCE                :
COMPANY (U.S.), INC. and ARCH         :
INSURANCE COMPANY,                    :
                                      :
Defendants.                           :
                                      :
                                      :
-------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2008, I caused a copy of Allied World's

motion for summary judgment, Rule 56.1 statement of undisputed material facts, memorandum

of law, declaration of Robert W. DiUbaldo and declaration of Jerome W. Brendle dated July 11,

2008 to be sent by electronic mail to the following:

Michael Francis Walsh, Esq.
Weil Gotshal & Manges LLP
767 Fifth Avenue New York, NY 10153
(212) 310-8372
*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaekel,
Thomas H. Lee, Ronald L. O Kelley, and Scott A. Schoen*

William A. Schreiner, Jr., Esq.

308072

Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1858
*Attorneys for Plaintiff Tone Grant*

Laura L. Neish, Esq.
Zuckerman Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600
*Attorneys for Plaintiff Tone Grant*

Helen Kim, Esq.
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
(310) 788-4525
*Attorneys for Plaintiff Dennis Klejna*

John R. Jerome, Esq.
Timothy Hoeffner, Esq.
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY 10167
*Attorneys for Plaintiff Joseph Murphy*

Claire P. Gutekunst, Esq.
Proskauer Rose, LLP
1585 Broadway
New York, NY 10036
(212) 969-3421
*Attorneys for Plaintiff Richard N. Outridge*

Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022
(212) 750-8700
*Attorneys for Plaintiffs William M. Sexton and Gerald Sherer*

Richard Cashman, Esq.
Heller Ehrman, LLP
Times Square Tower
7 Times Square

New York, NY 10036 (212) 847-8796
*Attorneys for Plaintiff Philip Silverman*

John H. Eickemeyer, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
*Attorneys for Defendant Arch Insurance Company*

Marc E. Rindner, Esq.
1776 K Street NW
Wiley Rein LLP
Washington, DC 20006
(202) 719-7486
*Attorneys for Defendant Arch Insurance Company*

William Fleming, Esq.
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900


Robert DiUbaldo
                    Robert W. DiUbaldo