UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                    )
JOSEPH MURPHY, et al.               )
                                    )
            Plaintiffs,             )
                                    )
     v.                             )     No. 1:08-CIV-4196 (GEL)
                                    )     *Electronically Filed*
ALLIED WORLD ASSURANCE              )
COMPANY (U.S.), INC. and ARCH       )
INSURANCE COMPANY,                  )
                                    )
            Defendants.             )
_____ )

### INSUREDS' STATEMENT OF ADDITIONAL MATERIAL FACTS AND RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED ON BEHALF OF ALLIED WORLD ASSURANCE COMPANY (U.S.), INC

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4525

   -and-

575 Madison Avenue
New York, NY 10022-2585
Telephone: (212) 940-8834

*Attorneys for Plaintiff
Dennis A. Klejna*


PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000

*Attorneys for Plaintiff Richard N. Outridge*

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700

*Attorneys for Plaintiffs William M. Sexton and Gerald M. Sherer*

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300

*Attorneys for Plaintiff Philip Silverman*


GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900

*Attorneys for Nominal Defendants John D. Agoglia and Peter McCarthy*

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000

*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen*


SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, New York 10167
Telephone: (212) 672-1996

*Attorneys for Plaintiff Joseph Murphy*

Pursuant to Rule 56.1 of the Local Rules for the Southern District of New York, Plaintiffs Dennis A. Klejna, William M. Sexton, Gerald Sherer, Joseph Murphy, Richard N. Outridge, Philip Silverman, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, and Nominal Defendants John D. Agoglia and Peter McCarthy (collectively, "the Insureds") respectfully submit the following Statement of Additional Material Facts and Response to Statement of Undisputed Material Facts submitted on behalf of Allied World Assurance Company (US), Inc.. ("AWAC"). Except as expressly indicated herein, the Insureds response of "Not Controverted" to any alleged fact should be construed as a response only for the purpose of responding to this motion and should not be taken as an admission of fact in any litigation other than the above-captioned action.

### A.   Response to AWAC's Rule 56.1 Statement

1. Refco Inc. ("Refco") became a publicly traded company pursuant to an August 2005 initial public offering. See Declaration of Robert W. DiUbaldo ("DiUbaldo Decl.") dated July 11, 2008, Ex. A, at ¶1; Ex. C, at ¶53.

   **Not Controverted for purposes of this motion.**

2. On October 10, 2005, two months after its initial public offering, Refco announced that it had discovered an undisclosed $430 million receivable (the "Refco Receivable") due from an entity controlled by its former Chief Executive Officer, Phillip Bennett ("Bennett"). Id., Ex. B, at *1; Ex. C, at ¶54.

   **Not Controverted for purposes of this motion.**

3. As a result of the Refco Receivable, the company declared that its financial statements could not be relied upon. Id., Ex. B, at *1; Ex. C, at ¶54.

   **Not Controverted for purposes of this motion.**

4. On October 17, 2005, Refco and many of its subsidiaries (collectively, also "Refco") filed for protection under Chapter 11 of Title 11 of the United States Bankruptcy Code. Id., Ex. A, at ¶30, Ex. C, at ¶53.

**Not Controverted for purposes of this motion.**

**Refco's 2004-2005 Insurance Tower**

5. Prior to Refco's August 2005 initial public offering, Refco Group Ltd., then Refco's parent company, obtained a "tower" of D&O liability insurance coverage for the policy period of August 5, 2004 to August 11, 2005, consisting of a primary policy and two excess policies. Id., Ex. B, at *2.

**Not Controverted for purposes of this motion.**

6. Specifically, U.S. Specialty Insurance Company ("U.S. Specialty") provided $10 million of primary coverage; Greenwich Insurance Company provided the first excess layer of coverage with $10 million in limits excess of $10 million; and Axis Reinsurance Company ("Axis") provided the second excess layer of coverage with $10 million in limits in excess of $20 million. Id.

**Not Controverted for purposes of this motion.**

7. The policy issued by U.S. Specialty for the 2004-2005 period contained an Inverted Warranty exclusion that provided, as follows:

> In consideration of the premium charged, the Insurer shall not be liable to make any payment of Loss in connection with any Claim <u>arising out of, based upon or attributable to any actual or alleged fact, circumstance, situation or Wrongful Act that occurred prior to 8/5/2004, if as of that date, any Insured knew or could have reasonably foreseen that such fact, circumstance, situation or Wrongful Act could give rise to a Claim against an Insured for a Wrongful Act</u>.

Id., Ex. D, End. No. 7 (emphasis added).

**Not Controverted for purposes of this motion.**

**Refco's 2005-2006 Insurance Tower**

8.    In advance of its August 2005 initial public offering, Refco obtained another "tower" of D&O insurance for the policy period of August 11, 2005 to August 11, 2006. See Insurers' Joint Exhibits ("IJX"), at 26-29[1]; Ex. A, at ¶¶ 35, 44, 47, 56.

**Not Controverted for purposes of this motion.**

9.    U.S. Specialty Insurance Company ("U.S. Specialty") again issued a primary policy to Refco with a limit of $10 million, excess applicable retentions (the "Primary Policy"). See IJX at 26; DiUbaldo Decl., Ex. A, at ¶35.

**Not Controverted for purposes of this motion.**

10.    For this policy year, Lexington Insurance Company issued the first excess policy (the layer above the Primary Policy) with a limit of $7.5 million excess of $10 million. See IJX at 27; DiUbaldo Decl., Ex. A, at ¶44.

**Not Controverted for purposes of this motion.**

11.    Axis again provided a second excess layer of coverage for this policy year, with a limit of $10 million in excess of $17.5 million (the "Axis Policy"). See IJX at 28; DiUbaldo Decl., Ex. A, at ¶47.

---

[1] As stated in the joint letter sent to the Court on July 8, 2008, Allied World, XL Specialty Insurance Company ("XL") and Arch Insurance Company (the "Insurers") agreed, at the Court's suggestion, to serve and file a set of joint exhibits ("Insurers' Joint Exhibits" or "IJX"). The joint exhibits are referenced in the DiUbaldo Declaration in support of Allied World's motion for summary judgment and will be served and filed jointly on behalf of all the Insurers by XL, though they will only be electronically filed under the docket number for the XL action before the Court (No. 08 Civ. 3821). **[For clarity, this footnote, and the footnotes that follow, appear in AWAC's Rule 56.1 Statement]**

**Not Controverted for purposes of this motion.**

12. Allied World provided the third excess layer of insurance coverage to Refco pursuant to its Excess Directors and Officers Insurance Company Reimbursement Policy No. AW0418197 (the "Allied World Policy" or the "Policy"). The Allied World Policy provided a limit of liability of $12.5 million in excess of $27.5 million. See IJX at 29; DiUbaldo Decl.; Ex. A, at ¶¶1, 56.

**Not Controverted for purposes of this motion.**

**The Issuance of the Allied World Policy**

13. On August 9, 2005, prior to the inception of the Allied World Policy, Allied World's underwriter, Jerome Brendle, sent a Quote Confirmation to Refco's broker, Marsh USA, Inc. ("Marsh") concerning the proposed insurance. See Declaration of Jerome W. Brendle in Support of Allied World's Motion for Summary Judgment ("Brendle Decl.") dated July 11, 2008, Ex. A and 12.

**Controverted. It is not controverted that Jerome Brendle, AWAC's underwriter, sent a Quote Confirmation to Refco's broker, Marsh, on August 9, 2005 concerning the proposed insurance. The Quote Confirmation sent to Marsh, however, did not contain the last page of the Quote Confirmation attached as Exhibit A to the Brendle Declaration but, instead, consisted only of the first four pages of that Exhibit. Declaration of Pamela Sylwestrzak submitted in opposition to AWAC's motion for summary judgment ("Sylwestrzak Decl.") at ¶ 11.**

14. The Quote Confirmation contained a draft of a "Prior Knowledge Exclusion." Id., Ex. A, End. No. 1 and ¶3. See also IJX 29, at End. No. 3.

4

**Controverted.** *See* **Sylwestrzak Decl. at ¶ 11.**

15. In defining the scope of coverage, the Quote Confirmation noted in the "Applicable Endorsements" section that a "Warranty exclusion" would be included in the Policy as of the date it incepted. See Brendle Decl., Ex. 1, at 2 and ¶3-4.

**Controverted insofar as the paragraph is not a complete or accurate reference to the document (which is Exhibit A, not Exhibit 1, to the Brendle Declaration). The "Applicable Endorsements" section includes the following language regarding the Warranty exclusion: "Warranty exclusion date as of inception (wording to follow.)."**

16. On the following day, August 10, 2005, Mr. Brendle sent a "Binder Confirmation" to Marsh, which set forth the terms and conditions of the coverage to be afforded by the Policy. See id., Ex. B and ¶5.

**Not Controverted for purposes of this motion.**

17. The terms and conditions set forth in the Binder Confirmation were derived from Allied World's August 9, 2005 Quote Confirmation. They stated that the Policy would include an "Inverted Warranty Exclusion" as of its inception. Id., Ex. B, at 2 and ¶6.

**Not Controverted, with the understanding that the Quote Confirmation consisted of the first four pages of Exhibit A to the Brendle Declaration, and did not include the final page made part of that exhibit.** *See* **Sylwestrzak Decl. at ¶ 11.**

<u>The Terms of the Allied World Policy</u>

18. The Allied World Policy incepted on August 11, 2005. See IJX at 29.

5

**Controverted. While the first day of the policy period was August 11, 2005, the actual Policy was not issued until on or about March 16, 2006, and prior to that date the operative contract of insurance was the Binder Confirmation.**

19. Section I of the Policy, the Insuring Agreement, provided, in relevant part:

> This policy shall provide the Insured(s) with Excess Directors and Officers Insurance and Company Reimbursement coverage for Loss or Damages resulting from any claim or claims first made against the Insured(s) and reported to the Insurer pursuant to the terms of this policy in accordance with the same warranties, terms, conditions, exclusions and limitations of the Followed Policy... <u>subject to the.... exclusions…. of this policy including any and all endorsements attached hereto</u>....

<u>Id.</u>

**Not Controverted but refer to Section I of the Policy for its true and complete contents (and note that the underlining in the paragraph is not in the Policy).**

20. The Policy also contained a Prior Knowledge Exclusion, referenced at Item 11 of the Policy's Declarations page and Endorsement No. 3, which provided, as follows:

> It is hereby understood and agreed that the Insurer shall not be liable for Loss in connection with any claim or claims made against the Insureds:
>
> alleging, arising out of, based upon, in consequence of, or attributable to facts or circumstances of which <u>any Insured</u> had knowledge as of inception and (i) which a reasonable person would suppose might afford valid grounds for a claim which would fall within the scope of the coverage hereunder, or (ii) which indicate the probability of any such claim.

<u>Id.</u> (emphasis added), Declarations page, Item 11 and End. No. 3.

**Controverted. It is not controverted that, when the Policy issued in March 2006, Item 11 of the AWAC Policy's Declarations page and Endorsement No. 3 reference a Prior Knowledge Exclusion. There is a material question of fact, however, as to whether**

**AWAC may rely upon the Prior Knowledge Exclusion, as it was not contained in the Binder Confirmation or the Quote Confirmation provided.  *See* Sylwestrzak Decl. at ¶ 11 and Ex. A.**

21. The Prior Knowledge Exclusion excludes coverage for all Insureds if "any Insured" had knowledge prior to the inception of the Policy of a fact or circumstance that might result in a claim arising under the Policy or would indicate the probability of such claim.  Id., End. No. 3.

**Controverted.  There is a material question of fact as to whether AWAC may rely upon the Prior Knowledge Exclusion (see responses to ¶¶ 13-14, 20 above). Further, and in any event, the U.S. Specialty Insurance Company policy ("U.S. Specialty Policy")— to which the AWAC Policy follows form—includes a "full severability" endorsement providing that "[n]o knowledge or information possessed by any Insured will be imputed to any other Insured," (*See* Sylwestrzak Decl. at ¶¶ 6, 10) so that the Prior Knowledge Exclusion does not exclude coverage for all insureds based on the knowledge of one insured.  In addition, Paragraph 21 misstates the language of the Prior Knowledge Exclusion.**

The Claims Asserted Against the Insureds Precipitated by Refco's Demise

22. The collapse of Refco in October 2005 triggered an onslaught of lawsuits and regulatory investigations (collectively, the "Underlying Actions") against certain Refco officers and directors (referred to herein as the "Insureds").  See DiUbaldo Decl., Ex. C, at ¶¶84-108, 118-36; Ex. B, at *1; Ex. A, at ¶32.

7

**Controverted. It is not controverted that a number of lawsuits and regulatory investigations related to Refco were commenced beginning in October 2005.**

23.     The Insureds sought coverage under the Policy for most of the Underlying Actions, many of which are pending before this Court, including <u>In re Refco, Inc. Securities Litigation</u>, No. 05 Civ. 8626 (GEL) (S.D.N.Y.); <u>American Financial International Group et al. v. Bennett et al.</u>, No. 05 Civ. 8988 (GEL) (S.D.N.Y.); <u>In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation</u>, No. 06 Civ. 643 (GEL) (S.D.N.Y.); <u>V.R. Global Partners, L.P. v. Bennett et al.</u>, No. 07 Civ. 8686 (GEL) (S.D.N.Y.); <u>Capital Management Select Fund Ltd. v. Bennett et al.</u>, No. 07 Civ. 8688 (GEL) (S.D.N.Y.); <u>Kirschner v. Thomas H. Lee Partners, LP. et al.</u>, No. 07 Civ. 7074 (GEL) (S.D.N.Y.); <u>Kirschner v. Grant Thornton LLP et al.</u>, No. 07 Civ. 11604[2] (GEL) (S.D.N.Y.); <u>Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al.</u>, No. 05 Civ. 9608 (GEL) (S.D.N.Y.); <u>Krys, et al. v. Sugrue, et al.</u>, No. 08-3065 (GEL) & No. 08-3086 (GEL).[3]  <u>See</u> IJX at 1, 2, 4, 6, 9, 11, 12, 14, 16.  <u>See also</u> DiUbaldo Decl., Ex. B, at *1; Ex. A, at ¶32.

**Not Controverted for purposes of this motion.**

24.     <u>Kirschner v. Agoglia, et al.</u>, No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) is an Underlying Action not before this Court.  <u>See</u> IJX at 7.

---

[2] The operative pleading in this action was filed in <u>Kirschner v. Grant Thornton LLP</u>, et al., No. 2007-1-008818 (Cook Cty., Ill.), which was removed to Illinois federal court and then subsequently transferred to this Court.

[3] <u>Kirschner v. Bennett et al.</u>, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) and <u>Kirschner v. Hackl, et al.</u>, No. 07 Civ. 9238 are also before the Court, though none of the plaintiffs-Insureds in this action are seeking coverage for that matter. <u>See</u> IJX at 8, 10.  <u>BAWAG v. Refco Inc., et al.</u>, No. 05-03161 (RDD) is before the U.S. Bankruptcy Court for the Southern District of New York, though no Insured is seeking coverage for this matter.  <u>See</u> IJX at 3.  Another action for which the Insureds are not seeking coverage is <u>Unovalores, Ltd. v. Bennett</u>, No. L1564-05 (Sup. Ct. N.J.).  <u>See</u> IJX at 15.

**Not Controverted for purposes of this motion.**

25.     Criminal proceedings were also initiated against several Refco officers who are Insureds under Allied World's policy—Bennett, Santo C. Maggio, Robert C. Trosten and Tone N. Grant—resulting in three guilty pleas (Bennett, Maggio and Trosten) and a conviction (Grant). See IJX at 17-23[4]; DiUbaldo Decl., Ex. B, at *1.

**Not Controverted for purposes of this motion.**

26.     The Underlying Actions, as well as the criminal proceedings, arose from and are attributable to a common set of facts and circumstances—namely, that Bennett engaged in a scheme to conceal the existence of the Refco Receivable by engaging in certain fraudulent and criminal acts to deceive Refco's investors, lenders, the public and regulators. See IJX 1 at ¶¶1, 3-7, 9-10, 12, 428-587; IJX 2 at ¶¶14-7, 9-10, 14-15, 25, 72-92; IJX 6 at ¶¶2-5, 7, 25, 28-29, 72-73, 109, 366-371, 375, 380; IJX 16 at ¶¶2-8, 13, 15-19, 23, 30-35, 111-115, 126-149, 181-182, 185-190, 236-43, 541-42, 544, 547-49; IJX 4 at ¶¶2-3, 6, 8-10, 14, 25-26, 62-63, 116-119, 155-162, 364-65, 369-71; IJX 11 at ¶¶1-3, 13, 57-61, 83, 192-200, 271, 288-89; IJX 9 at ¶¶ intro, 1-5, 13, 59-93; IJX 14 at ¶¶1-6, 8, 30-37, 45, 47, 51; IJX 7 at ¶¶1-5, 56-81; IJX 12 at ¶¶1, 6-8, 151, 193-99, 212-243; IJX 18 at ¶¶7-18, 21-27, 33, 38, 41, 46, 49, 56-59; IJX 19 at ¶¶6-8, 13, 15, 17, 20-26, 32, 34-37, 41, 52, 54, 59-60.[5]

---

[4] The S4 indictment is the operative indictment for the insured Grant, although it contains similar and/or identical allegations to the S3 indictment which Bennett pled guilty to. A copy of the S4 indictment is attached as Exhibit 19 to the IJX.

[5] Fine v. Bennett, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) and Mehta v. Bennett, et al., No. 05 Civ. 8748 (GEL) (S.D.N.Y.) were dismissed. Nonetheless, the allegations in those complaints arise from and are attributable to the fraudulent concealment of the Refco Receivable and related scheme. See IJX 5 at ¶¶11-12, 15, 43, 46-48, 52, 55, 68; IJX 13 at ¶¶11-12, 15, 43, 45-49, 52, 55, 59, 66. Similarly, actions for which the Insureds are not seeking coverage also arose from the fraudulent scheme to conceal the Refco Receivable and related transactions. See, e.g., BAWAG v. Refco Inc., et al., No. 05-03161 (IJX 3 at 112-4, 17, 23, 30, 37, 40, 42) and Kirschner v. Hackl, et al., No. 07 Civ. 9238 (IJX 10 at ¶¶1-4, 27, 30-39, 44).

9

**Controverted. The Underlying Actions and the criminal proceedings arose from and are attributable to a variety of facts and circumstances, as is set forth in the applicable underlying pleadings.**

**Allied World Denies Coverage for the Claims Against the Insureds**

27. By letter dated March 28, 2006, Allied World initially denied coverage for all the Underlying Actions, criminal proceedings and regulatory investigations then noticed to it arising from the collapse of Refco based on, among other grounds, the Prior Knowledge Exclusion contained in the Policy. See DiUbaldo Decl., Ex. E.

**Not Controverted for purposes of this motion.**

28. Allied World thereafter reaffirmed its coverage denial based on subsequent developments, including Bennett's plea of guilty on February 15, 2008 to a 20-count indictment filed against him. Id., Ex. F.

**Not Controverted for purposes of this motion.**

29. The 20-count indictment to which Bennett pled guilty alleged, in part:

> From at least as early as in or about the late 1990s, Bennett, together with others at Refco, sought to hide from, among others, Refco's auditors, customers and investors, losses sustained by Refco through its own and its customers' trading in the financial markets in order to sell the company for their own benefit and that of Refco's owners and senior management. See IJX 18 at ¶17, 10-17, 21, 25, 33, 41.
>
> In furtherance of this scheme, Bennett and others caused Refco to file on its behalf false and fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to create false audited financial statements and false public filings with the SEC. Id., ¶8, 13, 21, 26-27, 38, 41, 49.
>
> In furtherance of this scheme, Bennett and others at Refco engaged in a series of transactions to transfer losses from Refco to a

> company controlled by Bennett, directed a repeated series of transactions designed to conceal those losses at year- and quarter-end from Refco's auditors and others, and caused Refco to make false and fraudulent public filings with the SEC. This fraudulent scheme (begun at least as early as in or about the late 1990's) culminated in the August 2005 initial public offering of stock ("IPO") in Refco in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement. Id., ¶77-9. See also id., 10-18, 22-26, 33, 46.
>
> After the fraudulent scheme was uncovered in October 2005, Refco filed for bankruptcy and was subsequently de-listed by the New York Stock Exchange. Id., ¶756-59.

**Controverted. To the extent this Paragraph purports to quote from the indictment referred to, the quotations are not accurate. Moreover, the indictment speaks for itself, and the content of it is not controverted.**

30. Based on these allegations and others, the indictment accused Bennett of committing the following felonies in violation of federal law: conspiracy to commit securities fraud, wire fraud, bank fraud, money laundering, and to make false filings to the SEC; securities fraud; false filings with the SEC; wire fraud; material misstatements to auditors; and money laundering (collectively, "the Federal Felonies"). Id.

**Not Controverted that the crimes listed were the charges against Bennett but refer to the indictment against Bennett for its true and complete contents.**

### Bennett's Prior Knowledge

31. During his plea allocution on February 15, 2008, Bennett admitted the following, under oath.

> Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to

> make it appear as if a receivable due to Refco from... a related party, was instead due from an independent third-party customer.
>
> The [hidden] receivable was composed of, among other things, historical customer losses, bad depts., and expenses that [another Refco entity] had incurred on behalf of Refco.
>
> I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the [hidden] receivable. We concealed the receivable from, amongst others, Refco's auditors...various lenders...and also investors in Refco's common stock.
>
> The [hidden] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believe that I would be able to pay the [hidden] receivable down over time, and did, in fact, ultimately pay off the receivable balance in its entirety, I knew that failing to disclose the receivable was wrong; I knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was also wrong.
>
> I also caused Refco to file documents with the SEC, namely SI, S4, and 10-K that did not disclose the full extent of the [hidden] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts. I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong, and I deeply regret having done so.

See IJX 21, at pp. 17:5-19:3.

**Controverted. The word "[hidden]," which AWAC includes in the excerpt from the allocution, does not appear in the printed transcript; rather, "IGHI" appears in the transcript. In any event, the plea allocution speaks for itself.**

32. Bennett was CEO of Refco at all times relevant to the indictment (from the mid-late 1990s to 2005). See IJX 18 at ¶2; IJX 1 at ¶32 (noting that Bennett was CEO of Refco from 1998 until he was forced to resign in October 2005).

**Not Controverted for purposes of this motion.**

33. On July 3, 2008, Bennett was sentenced to 16 years in prison as a result of his conviction on the Federal Felonies. See IJX 23.

**Not Controverted for purposes of this motion.**

34. The Underlying Actions all arose out of or are attributable to the very same fraudulent and criminal acts for which Bennett was indicted and convicted. See citations in paragraphs 26, 29-31.

**Controverted. The Underlying Actions and the criminal proceedings arose from and are attributable to a variety of facts and circumstances, as is set forth in the applicable underlying pleadings.**

35. Furthermore, Bennett admitted in his plea allocution that he knew about (and participated in) these fraudulent and criminal acts involving hundreds of millions of dollars for approximately seven years prior to the inception of the Policy. Compare id. IJX 21, at pp. 17:5-19:3 with IJX 18, at ¶¶7-18, 22-26.

**Controverted. It is not clear what "these fraudulent and criminal acts" refers to. The transcript of the plea allocution sets forth what Bennett admitted.**

36. Bennett's knowledge is imputed to all Insureds under the terms of the Policy. See IJX 29, at End. No. 3.

**This statement is a conclusion, not a fact, but in any event is controverted (see response to Paragraph 21).**

37. But for the fraudulent scheme of Bennett to conceal and manipulate the Refco Receivable, the Insureds would not be subject to the various claims alleged in the Underlying Actions. See IJX 18, at ¶¶17-18, 21-27, 41, 46, 49, 56-59. See also citations in paragraphs 26, 29-31 above.

**This statement is a conclusion, not a fact, but in any event is controverted. The "evidence" cited to in Paragraph 37 does not support the assertion as to causation. The Underlying Actions and the criminal proceedings arose from and are attributable to a variety of facts and circumstances, as is set forth in the applicable underlying pleadings.**

**The Bankruptcy Court Orders Allied World to Advance Defense Costs**

38. Prior to Bennett's conviction on the Federal Felonies, on March 13, 2008, the Insureds moved the United States Bankruptcy Court for the Southern District of New York for a preliminary injunction requiring Allied World to advance defense costs in the Underlying Actions. See DiUbaldo Decl., Ex. G.

**Not Controverted for purposes of this motion.**

39. The Bankruptcy Court granted the Insureds' motion and ordered Allied World to advance defense costs pending a determination that the Insureds' claims were not covered under the Policy. Id. at 3.

**Not Controverted for purposes of this motion.**

40. As of July 11th, Allied World will have advanced roughly $5.8 million of its $12.5 million limit of the Policy, and continues to advance at the rate of approximately $1 million every two weeks. See DiUbaldo Decl., ¶38.

**Controverted. The Insureds have no way of knowing the truth or falsity of this statement and, therefore, deny it. Furthermore, the amount that AWAC has advanced and continues to advance is immaterial to the issues before this Court.**

\* \* \*

B.   **Pursuant to Local Rule 56.1(b), the Insureds respectfully submit the following Statement of Additional Material Facts.**

    1.    AWAC did not include a Prior Knowledge Exclusion in the Quote Confirmation it sent to Marsh on August 9, 2005. *See* Sylwestrzak Decl. at ¶ 11.

    2.    The "non-imputation" provision of the "Full Severability" Endorsement to the U.S. Specialty Policy was not intended to be limited to matters in the Application. *See id.* at ¶ 6; IJX, Ex. 26 at Endorsement No. 10.

    3.    The "inverted warranty" that Marsh authorized AWAC and the other excess insurers to add "if needed to bind" was intended to operate as a substitute for, and with the same effect as, the warranty that would have resulted from Bennett answering Question 12(b) in the Application. See Sylwestrzak Decl. at ¶ 9

    4.    AWAC never requested any modification of the non-imputation provision in Endorsement No. 10 to the U.S. Specialty Policy. *See id.* ¶ 10.

    5.    AWAC never clearly and unambiguously indicated that an "inverted warranty" or a Prior Knowledge Exclusion would not be subject to the severability provisions of the Primary Policy *See id.*

    6.    A reasonable reading of the Prior Knowledge Exclusion (if it may be relied upon by AWAC), in conjunction with the Full Severability Endorsement, is that it excludes coverage for an insured who had knowledge of any facts or circumstances likely to afford grounds for a claim, while maintaining coverage for insureds who had no such knowledge.

15

7. AWAC's interpretation of the Prior Knowledge Exclusion would render its Policy illusory.

Dated: New York, New York
       August 8, 2008

| | |
|---|---|
| /s/ Helen B. Kim | /s/ John J. Jerome |
| HELEN B. KIM (HK-8757) | JOHN J. JEROME (JJ-2413) |
| KATTEN MUCHIN ROSENMAN LLP | TIMOTHY E. HOEFFNER |
| 2029 Century Park East, Suite 2600 | SAUL EWING LLP |
| Los Angeles, CA 90027 | 245 Park Avenue, 24th Floor |
| Telephone: (310) 788-4525 | New York, NY 10167 |
| Facsimile: (310) 788-4471 | Telephone: (212) 672-1996 |
| | Facsimile: (212) 672-1920 |
| KATTEN MUCHIN ROSENMAN LLP | *Attorneys for Plaintiff* |
| Philip A. Nemecek (PN-3319) | *Joseph Murphy* |
| 575 Madison Avenue | |
| New York, NY 10022-2585 | |
| Telephone:   212-940-8834 | |
| Facsimile:   212-940-8776 | |
| *Attorneys for Plaintiff Dennis A. Klejna* | |

| | |
|---|---|
| /s/ Michael F. Walsh | /s/ Richard Cashman |
| GREG A. DANILOW (GD-1621) | RICHARD CASHMAN (RC-4769) |
| MICHAEL F. WALSH (MW-8000) | HELLER EHRMAN LLP |
| WEIL, GOTSHAL & MANGES LLP | Times Square Tower |
| 767 Fifth Avenue | 7 Times Square |
| New York, NY 10153-0119 | New York, NY 10036-6524 |
| Telephone: (212) 310-8000 | Telephone: (212) 832-8300 |
| Facsimile: (212) 310-8007 | Facsimile: (212) 763-7600 |
| *Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen* | *Attorneys for Plaintiff Philip Silverman* |

| | |
|---|---|
| /s/ Ivan Kline | /s/ Claire P. Gutekunst |
| STUART I. FRIEDMAN (SF-9186) | CLAIRE P. GUTEKUNST (CG-0117) |
| IVAN KLINE (IK-9591) | JESSICA MASTROGIOVANNI |
| FRIEDMAN & WITTENSTEIN | PROSKAUER ROSE LLP |
| A Professional Corporation | 1585 Broadway |
| 600 Lexington Avenue | New York, New York 10036-8299 |
| New York, NY 10022 | Telephone: (212) 969-3000 |
| Telephone: (212) 750-8700 | Facsimile: (212) 969-2900 |
| Facsimile: (212) 223-8391 | *Attorneys for Plaintiff Richard N. Outridge* |
| *Attorneys for Plaintiffs William M. Sexton and Gerald M. Sherer* | |

/s/ William Fleming
WILLIAM FLEMING (WF-0411)
GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900
*Attorneys for Nominal Defendants John D. Agoglia and Peter McCarthy*

17