John D. Hughes (admitted *pro hac vice*)
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH MURPHY, et al., Plaintiffs, v. ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY, Defendants. | Case No. 1:08-cv-4196 (GEL) (KNF) *Electronically filed* |

**DECLARATION OF ROBERT W. DIUBALDO IN SUPPORT OF ALLIED WORLD'S MOTION FOR SUMMARY JUDGMENT AND TO MODIFY ORDER**

I, ROBERT W. DIUBALDO, hereby declare as follows:

1. I a member of the bar of this Court and of the firm Edwards Angell Palmer & Dodge LLP, attorneys for defendant Allied World Assurance Company (U.S.), Inc. ("Allied World"). I respectfully submit this declaration in support of Allied World's motion for summary judgment against Tone E. Grant and to modify the Order of the United States Bankruptcy Court for the Southern District of New York dated April 21, 2008 with regard to Mr. Grant.

2.      Attached as Exhibit A is a true and correct copy of the transcript of Mr. Grant's sentencing on August 7, 2008 in the matter entitled United States of America v. Grant, No. 05 Cr. 1192 (NRB) (S.D.N.Y.).

3.      Attached as Exhibit B is a true and correct copy of the judgment of conviction entered against Mr. Grant in United States of America v. Grant, No. 05 Cr. 1192 (NRB) (S.D.N.Y.).

4.      Attached as Exhibit C is a true and correct copy of Allied World's amended answer to the first amended complaint filed in this action.

5.      Attached as Exhibit D is a true and correct copy of Allied World's letter to counsel for certain Insureds, including Mr. Grant's counsel, dated May 1, 2008.

6.      Attached as Exhibit E is a true and correct copy of Allied World's letter to Mr. Grant's counsel dated August 13, 2008.

7.      The Insurers' Joint Exhibits and the documents referred to in my declaration dated July 11, 2008 in support of Allied World's motion for summary judgment against the Insureds are incorporated by reference into this motion.

8.      As of September 4, 2008, Allied World has advanced $1,328,058.57 to Mr. Grant's attorneys pursuant to the Bankruptcy Court's Order dated April 21, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2008

Robert DiUbaldo

Robert W. DiUbaldo

**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

v. 05 Cr. 1192 (NRB)

TONE N. GRANT,

Sentence

Defendant.

------------------------------x

New York, N.Y.
August 7, 2008
11:00 a.m.

Before:

HON. NAOMI REICE BUCHWALD

District Judge

APPEARANCES

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
CHRISTOPHER L. GARCIA
NEIL M. BAROFSKY
Assistant United States Attorneys

ROGER ZUCKERMAN, ESQ.
AITAN GOELMAN, ESQ.
NORMAN ELSEN, ESQ.
Attorneys for Defendant

(Case called)

THE CLERK: Is the government ready to proceed?

MR. GARCIA: Yes. Good morning, your Honor. On behalf of the government, Christopher Garcia and Neil Barofsky. Sitting with us at counsel table is Mary Beth Allen, our paralegal.

THE CLERK: Is the defense ready to proceed?

MR. ZUCKERMAN: Good morning, your Honor. We are. I'm Roger Zuckerman. I'm accompanied by my partner Aitan Goelman, by Benjamin Block, and my partner Norman Elsen. And of course Mr. Grant is here. We're ready to proceed.

THE COURT: Mr. Zuckerman, is there any reason that we ought not to proceed to sentence at this time?

MR. ZUCKERMAN: No, your Honor.

THE COURT: Let me begin by reviewing the documents that I received in connection with the sentencing to be sure that I have them all. Although, given the quantity, I'd be shocked if I didn't have them all.

In any event, we have the initial sentencing memorandum submitted on behalf of Mr. Grant, accompanied by a book of letters. We also have Mr. Grant's reply sentencing memorandum. We have government's sentencing memorandum. And finally, the report of the probation office.

MR. ZUCKERMAN: I think that's it.

MR. GARCIA: That's it, your Honor.

THE COURT: Let me confirm, please, that both of you have also received the report of the probation department.

MR. ZUCKERMAN: Your Honor, we have received it, we have reviewed it. We have made our input, which is known in one respect or another, and we are satisfied with the report as it now appears.

MR. GARCIA: The same is true for the government, your Honor.

THE COURT: Mr. Zuckerman, are you speaking?

MR. ZUCKERMAN: Thank you.

May it please the Court. I want to begin by expressing our gratitude to Ms. Colleen Tyler, who we think did a thorough job in the preparation of the pre-sentence report and, as best one can in a report of that kind, captured biographically and in other respects who Mr. Grant is.

I want also to thank the Court. You have taken a great deal of your time with this case in the four weeks that you gave us to try the case, in the rather extensive pretrial proceedings that we had before the case. Obviously, you have taken a great deal of time in reading what from us I think is about 90 pages of submission. So I thank you.

It was a hotly contested trial. The advocacy on both sides was appropriately zealous. We are before the Court because, after that four-week trial and the verdict of guilty that was entered on April 17 of this year, Mr. Grant must

confront the Court and appear here for sentence, as he does today.

In the common wisdom, this is amongst the most difficult tasks that a court has. It is, I think, particularly difficult and challenging, after Gall and Kimbrough and other cases from the Supreme Court that dramatically broaden the kind of discretion your Honor has, to fashion a sentence that is fair and appropriate and balanced under 3553.

I do not return to it here before the Court, but we have urged that the sentencing guidelines in these circumstances provide little guidance. We have urged specifically, and I do not wish to argue it, but we have urged specifically that given the circumstances of Mr. Grant's behavior, he really, in the oddity of this case, supervised no one who may be said to be a co-conspirator. Therefore, the enhancement under 3B1.1 is unsupported and inappropriate. I do

not wish to argue that; I note that. I'm sure the Court has reviewed that in our papers.

What I do wish to argue is that your Honor's sentence is driven essentially by three values which underlie section 3553. Those values and the imperatives in the statute are essentially these.

First, there is the imperative that the sentence be personal, personal to the defendant, that is, that it reflect his personal behavior, his personal behavior, and his personal

history and characteristics. I characterize the personal aspect of that command that the statute has as the notion of justice. The sentence must be just in its personal reference to the defendant.

Second, the sentence must be proportional. It must in some sense reflect correctly his culpability in comparison to others, be that culpability more severe or less severe.

Third, the sentence must clearly serve the general notions that all of us, from our days in law school onward, learn that sentence must serve: It must be retributive, it must promote respect for the law, and it must clearly have a general deterrent effect. That is the third imperative that drives, we believe, the sentence in this case.

There are two other notions that I would identify in the mix. The first is the command from the statute and the courts of virtually all of the jurisdictions that the mix of factors that I have identified be balanced -- I'm using that word carefully -- in the sentence that results, that no one factor drive the sentence, that the court endeavor as best it can to balance the personal behavior of the defendant, the proportionality of his sentence, and the need in this case for general deterrence.

The second concept, which I know the Court is familiar with, is what has been called from time to time the notion of parsimony, the notion that the sentence be no greater than

necessary to achieve the appropriate balance between the defendant's personal conduct and his characteristics, background, proportionality, and the need to serve general deterrence.

Our thesis has been, and I wish to speak in some measure but not extensively, our thesis has been that if one balances, balances, all of those factors and gives due consideration to the doctrine of parsimony, one must give a sentence to this man who appears before the Court that is a fraction, a small fraction, of the sentence which the Court rendered and gave Phillip Bennett on July 3, 2008, a sentence of 16 years.

The government disagrees. That's the nub, I think, of the issue that we have all written about and argued about over the last couple of weeks or longer. The government's view is that Mr. Grant, who is 64, should, because of his behavior and notwithstanding his personal characteristics and out of a need to serve general deterrence, Mr. Grant, at the age of 64, should be incarcerated for a period of time that keeps him in jail until he is 80 or close to 80.

That is a sentence that is in par -- that's the phrase

887RGRAS

that the government repeatedly uses -- with the sentence that Mr. Bennett received. We believe such a sentence is inappropriate and indeed unreasonable under 3553, and any sentence of that order of magnitude or order of magnitude close

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0 7

887rgras Sentence

to that is inappropriate under 3553.

I want to pass to the three factors that I have identified in 3553 that I believe drive the sentence. The first is: What are the personal characteristics, the history and characteristics of the individual before the Court whom the Court is sentencing?

I've tried to figure out a way to encapsulate that that's meaningful and decided that what I would try to do is simply list for the Court the lives, the lives, that over a 50-year span the man before your Honor for sentencing today has touched and how he has touched them.

The Court I think is aware that Mr. Grant, as a youth, was a leader of his classmates and essentially an icon of integrity and scholarship and humility. As a youth, a teenager, he was in an automobile accident with his family. His mother suffered a broken back. He had the courage and the presence of mind, not for the first time in his life, to go into the burning vehicle to pull his mother, whose clothes were burning at the time, out, and he literally saved her life.

Thereafter, also as a young man, he chose willingly to serve his country as a marine and, when he did not have to, to see combat in Vietnam. Notwithstanding that he was a JAG officer, he chose to go to Vietnam. He chose to see combat as a leader, platoon squad officer, leader.

Whenever he could, he defended. Your Honor has heard

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0 8

887rgras Sentence

from a marine sergeant who was charged with negligent mortar fire that killed any number of Marines. Mr. Grant defended him, defended him as a JAG officer successfully, and in order to defend him risked his life going into the bush and taking enemy fire in order to develop the case that ultimately resulted in Sergeant Aragon's acquittal. He thereafter became a life-long friend of Sergeant Aragon, who named one of his children Tone, using the spelling Tone, after Mr. Grant.

He was awarded, as few JAG officers were, a combat action ribbon. Most JAG officers don't get combat ribbons. In a letter that is extraordinarily moving, the Court heard from Professor Gary Solis, who was also a marine officer and whose duty it was to write the official history of the Marine Corps and the application of the rule of law in Vietnam.

Professor Solis essentially wrote that Mr. Grant was the finest JAG officer that he could find in the military at that time, and the sole combat action fitness report that Professor Solis quoted in the official military history of the rule of law and the JAG Corps in Vietnam was the combat action report of Mr. Grant.

As a maturing adult, Mr. Grant married Kathy Schmidt. He took her stepchildren, as the Court is aware -- the Court has heard from the children -- as his own. One of the children, Susan, had an extraordinarily difficult and traumatic relationship with her husband that affected deeply her three

SOUTHERN DISTRICT REPORTERS, P.C.
Page 4

children. Mr. Grant took these stepgrandchildren essentially as his own and gave them care, love, and, most importantly, protection in a way that a number of people have written about that I do not articulate here publicly.

Mr. Grant worked for several decades after he left the Marine Corps in a variety of fields. He worked at Cooley Godward initially in his early days as a lawyer. He then went to the Commerce Bank in Nashville, and he worked at Refco. Putting aside his specific tasks, he is universally perceived as a kind, decent, caring, and generous person. We have produced a number of letters to that effect.

Apart from his courage and his commitment to his country and his innate decency as a person, he was and is committed in a way few of us are, I suspect, to enduring social justice and equality in this country. When he was a student at Vanderbilt, he endeavored to make the law school more accessible to women and to minorities. Indeed, he mentored a minority student when he was at Vanderbilt, who is now a prominent attorney in the Washington, D.C. area.

When he was at Vanderbilt, he and a number of other students lived in a poor area of Nashville, and he took an interest in the youngsters there and engaged them, as indeed he taught English, when he was a Marine officer in Vietnam, to a group of Vietnamese school children who were in school there.

As the Court is aware, we heard testimony of this at

trial, he was a co-founder of the Music City Track Club, which is a well known organization nationally that cares for and develops underprivileged children who have academic and athletic potential in the Nashville area. He is and has been personally engaged in relationships with these kids and in supporting this institution for 20 or 30 years.

He is a co-founder. Over the course of that period of time, no fewer than 200 of these children have developed into mature adults after having attended, as a consequence of what it is the Music City Track Club has been able to give them, some of the this country's best colleges and universities. There is a list that one of the writers gave of the 20 or 30 colleges and universities to which these Nashville children have gone that speaks powerfully to the effect that the organization has had on young people.

He fought racial discrimination directly. He had experiences in Nashville where he engaged in counseling sessions at Hillsboro High School, which is a school that is 40 percent minority and had its own racial tensions, in an effort to diffuse those. There is a vignette that your Honor has heard in which one of his friends, a minority friend, and he and a third person were in a bar in Alabama and he confronted and dealt with discrimination that was directed toward his minority friend at that point.

As an adult, as the Court I think is also aware from

the trial, he has lived a life that is a testament to that value. He has declined to join clubs or other organizations

that he believes would not welcome his friends. And his friends number across the vast and varied demographic that is 21st century America.

He has supported numerous good causes in the Chicago area. He takes his good works personally, and he personally engages kids and mentors them in a variety of ways. He has contributed -- I will not list them for the Court, with one exception -- to any number of institutions. The one I do mention in particular is the National Marine Corps. Museum, which is a particularly worthy endeavor.

Again consistent with the humility that has characterized his life, many of his contributions are not in his name. They are done either anonymously or they are done in the names of those, including some who are deceased, who are unable to make the contributions.

Much of that which he has done, I want to emphasize, indeed most of that which was done, was done before 1997. Much of it harkens back to the early or mid 1970's and the late 1970's. He actually borrowed money in the old days, in the late 1970's, to help fund the Music City Track Club. So this is not one of those instances in which the good works that the Court confronts are good works that may be said to derive only from the proceeds of the crime for which this man was

convicted.

His ultimate devotion is to his children and his grandchildren, whom he reveres and protects with his heart and his soul. The Court is aware that one of his grandchildren, because of her situation, is a person to whom he is so devoted that he calls each and every day of his life and has called her 7 days a week, 365 days a year, for decades to this point because of her needs and her situation.

He is a man, I don't know how to put this more powerfully, he is a man of extreme humility. He grew up in a lower middle class family probably. He has been humble throughout his life. He never joined a country club. He never showed a great interest in wealth. He lived and lives in a one-bedroom condominium over the last 20 years and has driven a 10-year-old Range Rover.

The money that he earned he has used to support his wife, from whom he has been separated, but not divorced, for about 20 years; to his daughter Susan, whom he supports and protects; and I suppose to the benefit of her children.

You have heard from about 50 people who have written about this unusual man. In the brief amount of time that I have taken, I really have not done justice to his life. But I commend to the Court -- I know the Court has read them.

THE COURT: I've read every letter.

MR. ZUCKERMAN: Thank you, your Honor.

His life is a life that has been profoundly driven by a desire to try to protect and help others, to be a good person, to show respect, to show honor and humility, to have his life defined not by money but by good works, to serve his country, and to try to help achieve some sense of social justice in this world.

That's the history and those are the characteristics

of the man who stands before the Court to be sentenced today.

Two, what is the nature of the offense? What is his personal behavior? What is it that he has done that merits the sanction that within the next hour the Court will visit on him? The government and we take a very different view of that behavior. We've written about it.

Again, I want only to give you the summary of our position. I believe it is a position of great force and, respectfully to my colleagues, who are zealous advocates, I believe their position is without merit and quite unsupported in the record.

We have argued and urged briefly, and the Court has heard testimony, that by any rational measure the conduct of Phillip Bennett, when examined in an objective way, in the commission of this offense dwarfed the conduct of Mr. Grant. I want simply to outline what I believe fairly put is the conduct of Mr. Bennett. I'm going to outline fairly put what is the conduct of Mr. Grant.

We have jousted around about this, but I think the record is clear that the fraud began in the mid 90's. It began with these so-called trade and marine losses that the company suffered. The company's situation was exacerbated by the Asian losses. The Asian trading losses were somewhere between 180 and $300 million.

At some point in the late summer of 1997, the company was in a lot of trouble. Apparently, round-tripping occurred in February of 1997. All of this was known to and done by Mr. Bennett. All of this was kept from Mr. Grant. Mr. Grant did not know about the trade and marine losses.

We believe the evidence is clear he didn't know about the Asian losses at the time, he didn't know about the round-tripping in February of 1997. I believe the record fairly allows the inference he didn't know about the Philip Morris losses that occurred at RCN, something like $9 million worth of losses in mid 1997 that were Philip Morris losses.

This is Mr. Bennett's handiwork. One, it's just inconsistent with rational analysis to suggest that Mr. Grant was the co-creator of the fraud. This is stuff that Mr. Bennett did for years before the event which marked, in the government's view, Mr. Grant's entry into this problem, the Niederhoffer transaction.

When the Niederhoffer transaction occurs, if one looks at it, Mr. Bennet is the principal in the Niederhoffer

transaction. It is he who arranges the intraday loan that keeps the company afloat. It is he who deals with Mr. Niederhoffer, who gets the collateral, who manages the collateral. And when he steals it in 2004, it's really he who disposes of the collateral.

I'm going to get to Mr. Grant's role in the Niederhoffer event. Mr. Grant made a statement to the press, to Greg Burns, that the company was in good shape, a statement for which you may hold him culpable, although at the time he made the statement the records suggest he was not aware of the Asian trading losses and some of the other machinations that Mr. Bennet had engaged in up to that point.

It was Mr. Bennett who thereafter initiated the round-tripping in February of 1998. It was Mr. Bennett who padded revenue. It was Mr. Bennett who made up billions of dollars in fictitious trades between RGHI and Refco. It was Mr. Bennett who expense shifted.

It was Mr. Bennett who caused money to be taken from customer accounts to meet Refco's daily needs. It was Mr. Bennett who interacted with Lee, with the Lee investors, with the banks. It was Mr. Bennett who continued to deceive the Refco board in 2005.

It was Mr. Bennett who engaged and corrupted and needed Mr. Rossi and Mr. Trosten and Mr. Mutterer, not Grant. Mr. Grant he sent off and decided he would deal with by phone.

But it was Mr. Bennet who kept these people on for the five years after Mr. Grant left. It was Mr. Bennett who enmeshed Mr. Clinton and Mr. Sexton and Mr. Murphy in this.

It was Mr. Bennett who had the sprawling mansion in New Jersey and who had the Park Avenue house and who had 11 cars, including 6 Ferraris worth $15 million, and $29 million worth of art. And it was Mr. Bennett whom every witness, virtually, identified as the consummate liar, a man who was demonically impressive, a man who was skilled almost beyond description at manipulating facts and figures and people.

That's what we have in the book of life on one side of the ledger for Phillip Bennett.

Here's what we have for Mr. Grant. On several occasions in 1997 and again probably during the first six months of 1998 -- and he shouldn't have done this, so I'm going to acknowledge, taking the jury's verdict, there's culpability here -- on several occasions he was present at and sometimes active in meetings -- in one case over the telephone with Greg Burns, the newspaper reporter, in other instances with representatives of banks or financial institutions -- when things were said either by him or by Mr. Bennett that weren't true.

The number of these sessions probably numbers between five and eight. I went back and tried to count them. There are between five and eight sessions in which he either says or

affirms the view that the company's in good shape financially and he knew or should have known better. That's one.

On two occasions he says or is present when somebody else, Bennett, is saying we don't engage in proprietary trading, and he knew or should have known better. So you have between five and eight of these sessions in the last half of '97 and the first half of '98 in which Mr. Grant is present and does these things.

During that period as well, he signed two documents that he shouldn't have. He signed a letter to UBS Warburg which had, again, either a proprietary trading or our company is healthy representation in it, and he signed the 1998 financial in the middle of the year which presented the company as healthy notwithstanding that the Niederhoffer events had occurred.

So you have between five and eight meetings and you've got him signing two things. It's all in this '98 period.

What he does thereafter is he has some contact with an investment banking firm. What's that investment banking firm? Allen & Company. He's got some kind of contact with Allen & Company thereafter.

He has a bunch of calls with Mr. Maggio, a few, in which he tells Mr. Maggio things like, Merry Christmas, you're doing a good job, keep it up, hang in there. These are "atta boy" calls. If you find, as the jury found, that he knew or

should have known at the time that Mr. Maggio was engaged in things he shouldn't have been doing, these are called supportive calls to Mr. Maggio, telling him to hang in there.

In August of 2004 he signs the stock purchase agreement and he signs the equity purchase and merger agreement knowing, knowing -- he knew or should have known -- that those agreements were (a) necessary to the transaction which was going to yield money for a lot of people, including him, and (b) that probably Lee didn't know at the time or other downstream participants at the time didn't know the full extent of this very large related party receivable that hadn't been paid off yet. That's something else that one has to assert from this record he did.

That's it: The five to eight meetings, the two documents signed in 1998, the SPA, and the equity purchase and merger agreement, maybe I can throw Allen & Company in -- he introduced the company to Allen & Company -- and the "atta boy" calls to Mr. Maggio. That's sort of it for his behavior.

I did this I think kind of speculative exercise. I tried to figure out long, if you add it up, if you add it up, how long those activities took. What's the aggregate amount of time that his culpable behavior occupied over a seven- or eight-year period? How long did these meetings take? How long did it take to sign these documents? How long did the telephone calls to Maggio take? It probably took less than a

day. So his culpable behavior over a seven-year period probably occupies less than a day.

And these vignettes that I have talked about, they are vignettes that were argued I think with great skill by the government to the jury. The point, though, of the vignettes, there is no way to balance what's in the book of life as his wrongs, what I have just listed to you, with what's in the book of life for Mr. Bennett's wrongs. They don't come close. They are reasonably and fairly and objectively not remotely in par.

Another way to try to see whether the behavior of these two individuals Bennett and Grant are in par -- I have three ways. My second I'll be quick about. One way to tell whether or not people are co-equal is to see the nature of their relationship: Was one superior? Was one inferior? Were they both equal?

If you look at the relationship between Mr. Bennett and Mr. Grant, you must come away with the notion, respectfully, that Mr. Bennett was the superior person in the relationship, vastly superior. If information needed to be withheld from Mr. Grant, Mr. Bennett did it. If round-tripping information needed to be withheld Mr. Mr. Grant, Mr. Bennett did it.

887RGRAS

If by the latter half of 1998 Mr. Grant was misplaced as the president of Refco, Mr. Bennett saw to it that he was moved out. If by early 1999 Mr. Grant was misplaced as an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20
887rgras Sentence

executive in any respect at Refco, Mr. Bennett saw to it that he was out of the place. If by early 1999 it was better that Mr. Bennett have him completely off the premises, better to deal with Tone by telephone even if it involves hundreds of telephone calls, Mr. Bennett took him off the premises.

If in 2002 it was better that executives receive bonuses and the bonuses not include Mr. Grant, Mr. Bennett saw to that. If in 2004 it was better to get Mr. Grant alone in a position in which he didn't get any of the substantial proceeds from the LBO, he got nothing from the LBO until the entire $1.1 billion hole was paid. Not true for Mr. Bennett, and in a functional proposition really not true for Mr. Trosten or others.

The key participants in the company received $105 million immediately from the transaction, including Mr. Bennett and Mr. Trosten and others. The $275 million figure that the government keeps pushing on this case, unlike Mr. Bennett, the $275 million figure they push on is money that this man never, ever would have seen until the entire $1.1 billion hole was paid.

If it's better ultimately for Mr. Bennett that Mr. Grant not have any of the NavTech stock and that Mr. Bennett take it all, Mr. Bennett saw to that as well.

So I respectfully suggest to you that Mr. Grant was a nice fellow, he wasn't motivated by money, he was trusting, he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21
887rgras Sentence

was off-site and kept off-site. He was probably not a numbers person or at least an extensive numbers person. And in that circumstance the controlling person in the relationship, demonstrably controlling from the record, was Mr. Bennett.

That's what we're dealing with in terms of the comparative role in the offense that these two individuals had. If you were to approach this kind of as a social scientist, you might say, I can judge behavior in a number of ways, let me judge the comparative behavior under the following measures to see whether the behavior is in parity or not; let me look at its duration, let me look at its intensity, let me look at its motivation, let me see who was the more creative; let me look at the harm intended, let me look at the harm caused, let me look at the individuals enmeshed, let me look at venality and greed; let me look at the significance of conduct, let me look at general character and inclination.

There is no measure, there's no measure that doesn't score Phillip Bennett not just higher but off the charts in comparison to Mr. Grant. Mr. Grant probably scores below Maggio and Trosten as well. But it's indisputable, we believe respectfully, that his culpable behavior is a small fraction, I could say tiny but I'll go with small, of Mr. Bennett's.

I come now, your Honor, to the last of the values, the imperatives in 3553. It's the one that the government relies on and presses hard on in its effort to persuade the Court to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 10

give Mr. Grant a harsh sentence. That is that the value of retribution and general deterrence cannot be served unless the Court looks away from, almost disregards, the defendant's personal characteristics and his history.

I may be exaggerating, but I'm trying not to, the degree to which the government asserts that that characteristic is obliterated by the need for general deterrence and that general deterrence as well requires that the Court not pay much attention to the actual nature of the defendant's behavior. I think, respectfully, that the government's position is flawed, if I may, in four respects, and I would like to list very briefly the four respects.

First, as I have said, it's the command of the courts, it's the command of 3553, that each and every factor in that calculus be a part of the Court's decision, that there be, and I'm using the word again advisedly, that there be a balance that the Court makes between all of those factors.

The Court cannot render a decision, a sentencing decision, based solely on any one. It can't provide a lenient sentence, obviously, based solely on the defendant's good works and his 50 years of exemplary life any more than it can provide a harsh sentence that is based solely on the need for general deterrence. It has got to engage in a balance. I think this is, if I may, inconsistent with the way in which the Court is presented the sentencing equation by the government.

Second, we have analogized this to Adelson, we've argued about it. I don't want to argue about the facts in the Adelson case. I simply want to look at 42 months. What does 42 months mean to a person who is 464 years old? Is that a sentence that would be perceived as a short sentence? Is that a sentence that would be perceived not as a stiff sentence?

I'm not going to cite my own perceptions, at the age of 65. I would simply urge that the Court at least be mindful of Judge Rakoff's view that, putting everything else aside, at the age of 64, 42 months in the slammer, that's significant. That's by no means short. That's meaningful. It's not a short sentence in any practical sentence of the term. It may seem short from the perspective of youth, but it's not short from the perspective of one who is of that age.

Third, there is an obligation that one might say the government has, if one wants to put a 64-year-old man in prison until he's 75 or 80, to present something empirical that suggests that general deterrence requires, requires, that an individual of that age be hammered to that extent. One might say we know empirically that 42-month sentences given to 64-year-old men who have done what this man has done and who present his profile really do not serve as a deterrent, here is our empirical data. On this record we have none of that.

My fourth reason why I think the government's position is flawed is that when you look at general deterrence, it's

really a function not just of the length of the sentence -- and I beg your Honor not just to look at the length of the sentence -- it's a function of and takes us back to the first

command of 3553, and that is, what's the conduct of the defendant? What did he do that caused him to have to pay this price? That's the general deterrence equation. People look not just at the sentence but the conduct that generated the sentence.

If you look at the conduct that generates the sentence in this case, you can't say that general deterrence is not served by a sentence that's a small fraction of Mr. Bennett's, because the conduct that will have caused the defendant to pay that price is in parity with the sentence.

If you agree with the government that Mr. Grant's conduct was in par with Mr. Bennett, I'm in trouble on that argument, because I think that in those circumstances general deterrence obviously requires a sentence that deters very bad conduct. If you believe that the conduct was not in par, that it was dramatically less, then general deterrence as well says you don't force a person to pay a price that isn't also dramatically less.

I can't emphasize enough that the price he must fairly pay is for conduct that bore no relation to the Bennett conduct. He wasn't responsible for the financial affairs of the company. He got periodic inaccurate information. He

wasn't involved in any of the financial machinations. He was moved to the side of the company. He was moved out of the company. He was kept physically out of the company.

He was not a part of the Lee negotiations. He had his stock taken from him. He had nothing to do with the IPO. And apart from that, he lived as worthy and noble and decent and modest and committed a life I suspect as any defendant has who has ever appeared before this Court for sentence.

It's hard to see how giving this man a several-year sentence for what he did in these circumstances could be perceived as anything other than firm and rational and stiff. Such a sentence meets the criteria of section 3553(a). It is just and personal, it is proportional, it's retributive, and it provides for general deterrence. In that sense we think it is compelled by the statute.

Thank you.

THE COURT: Mr. Garcia.

MR. GARCIA: Your Honor, we are all aware that you are very familiar with the record in this case, both from the trial and the pre-sentence report that's been prepared here. As a result, I intend to keep my remarks brief. I do think, though, that certain of the points raised in the brief submitted by Mr. Grant and his attorneys and some of the comments made here today merit some clarification.

To begin with, your Honor, the point that Mr.

Zuckerman raises both in his brief and here today about the defendant's good works, I want to address that first and foremost. I think government made very clear in its submission to your Honor, and the government wants to reiterate here today, that clearly this defendant is entitled to credit for the good works he's done in his life. Clearly, it's the government's position, your Honor, that it is appropriate for the Court to consider that and to balance his good works

against a variety of things.

But, your Honor, the focus, or our focus today anyway, is going to be how you value those good works when you balance them against the conduct of this defendant in connection with the fraud that occurred at Refco and also the fact that he went to trial. As Mr. Zuckerman noted, there was a rather wide and disparate view between the parties as to what this defendant's conduct was during trial. I don't intend to go through all of his fraudulent acts in an attempt to rebut and clarify the record.

Your Honor, the government submits to the Court that this defendant, Mr. Grant, while clearly at various times during this conspiracy did not have the same role as Mr. Bennett, clearly did not have his hands on the levers of the fraud from 1999 to 2004, clearly was not in as many meetings as Mr. Bennett, didn't do the same things Mr. Bennett did, clearly this defendant was present and active and a full thoroughgoing

participant in this fraud at every critical juncture. It goes back to the beginning of this fraud, your Honor, and it goes back to the Niederhoffer losses.

I want to talk just briefly about the Niederhoffer losses, and then I'm going to move on to some other things. Your Honor, the Niederhoffer losses are a significant event to consider, and his conduct in connection with that event, because it was the moment that this company that had difficulties, that had problems, that had losses, had to confront those problems publicly.

When the company had to present the problem of its losses, the problems presented by Victor Niederhoffer's losses that were absorbed by the company, to the public, the person who was the public face of that answer for Refco was the person who was the lead executive of the company at that time, not Phil Bennett, but this man, Tone Grant.

And when he was asked by Greg Burns of the Chicago Tribune whether or not the company had suffered any losses, the answer wasn't, as Mr. Zuckerman suggests here today, that the company is in fine shape. It was very specific and it was very criminal. It was: We have suffered no losses.

As your Honor knows from the record, this defendant knew at the time that he made that statement, from, among other things, having had a conversation with Santo Maggio, that that statement was false. And it was pivotal because at that

moment, your Honor, this defendant told the world that Refco had suffered no losses in connection with Victor Niederhoffer.

The Niederhoffer affair is also very important to consider, your Honor, because it shows the level and extent to which this defendant was involved. He didn't simply just make a statement to Greg Burns of the Chicago Tribune. He was instrumental and involved in planning about how to deal with those losses when it came out to the public and when it came to customers. Here I'm talking about representations made to Doug Reid of Soros.

Your Honor, the record in this case clearly reflects what happened when Soros indicated and Doug Reid indicated they were considering taking their money out of Refco. The record

clearly indicates that when the call was initially made by Doug Reid and by Soros to Refco and there was a conversation with Santo Maggio, Santo Maggio clearly, clearly, gave a misimpression as to what was going on in the company. He lied, and he testified to that, your Honor.

But he also testified, your Honor, that the reason he knew what the story was about the losses was because he had seen the press release. He knew what the public position of the company was, and that public position, your Honor, came from this defendant.

Mr. Maggio further testified that before they ever walked into that meeting with Soros, Maggio, Bennett, and Grant

sat together and had a planning meeting. Mr. Maggio told you what happened during that meeting. This defendant didn't sit idly by. He wasn't wallpaper on the conference room wall. He was instrumental. He initiated. He set forth the plan: This is what we're going to do, we're going to go into the meeting with Soros and we'll going to tell him to call the Merc, we're going to tell him we suffered no losses, and we're going to get through this.

Of course, you know what happened, your Honor. They went to that meeting and those lies were told. This is not the passive participant of the fraud that Mr. Zuckerman and Mr. Goelman would want the Court to believe, and frankly, most importantly, it's just not the view that's supported by the record.

Your Honor, Mr. Zuckerman has, I think effectively, attempted to convince the Court today that this defendant's fraudulent conduct can be reduced to a single day. Now, I don't know where he gets that estimate, I don't know how he can come up with that estimate, but I would urge the Court that it was more extensive by any measure and it was more deep and personal of an involvement than has been suggested.

Your Honor, this is a man who told lies to people, to their face. Unaddressed in the recent round of briefing by Mr. Zuckerman and Mr. Goelman -- this is just one example, your Honor -- is the lie that this man told to the ratings agencies.

This is an important lie for a number of reasons. First, why was the lie told? Mr. Maggio told you when it comes to what this defendant knew, Mr. Maggio told you that this defendant knew that the company was cash-starved that, they needed cash.

You know from the testimony at trial that the company had a plan, several plans. One was to sell the company. One was to raise cash, raise debt, in order to fill the hole that the company had. Your Honor further knows from the evidence at trial that it was critical, in order to raise the debt, to have a rating.

This defendant, knowing all of that -- not Mr. Bennett, this defendant the testimony is -- walked into a ratings agency presentation, looked people in the eye, and said, we do not engage in proprietary trading. Your Honor, this defendant repeatedly lied to people in a very personal and direct way, and it was all for the greater goal of the fraud: To sell the company and to make money.

Your Honor, we have talked at trial and we have talked

here today about the period between 1999 and 2004 and what this defendant's role is or was. Your Honor, there is no question that during this period the defendant was not an officer of the company, and that's largely why he didn't have his hands on the levers of the fraud during that period.

But, your Honor, again, at critical junctures, in important ways, this defendant was involved. Keep in mind

during this period of 1999 to 2004, after he's been kicked out of the company, this defendant knows exactly everything that's going on in that company. He knows it, and we know he knows it, because of, for example, the testimony of Mr. Maggio.

But even putting that to the side, the February 26, 1999 meeting, where Steve Rossi sat down with the principals of the company, including Mr. Grant, and described for him in all its gory detail every element of the fraud: Revenue padding, hidden losses, a receivable balance that at this point, if accurately calculated, would have been up to $900 million.

And this defendant in the aftermath of that meeting didn't take any conduct that we can see or that's in the evidence in the record to correct the problem, to do anything about it. He gave Steve Rossi the cold shoulder, and his ownership interest in the company increased to 50 percent.

Now, your Honor, respectfully, the government stated that the Court should consider his history and characteristics as a credit to him. But it cuts both ways. They have portrayed Mr. Grant as a person who has lived his life as someone who was a take-charge individual, a person of principle and character, who was willing to step into the breech in any number of circumstances in his life to do the right thing.

Your Honor, he became a 50-percent owner of a company knowing all the fraud that was going on. Given that record, the only thing that could explain his conduct of not

disassociating himself from the company, not taking any action to correct anything, was because it was about the money and to avoid detection because he had been part of a fraud and he knew it.

Your Honor, briefly turning to the LBO, the leveraged buyout, again there is a very clear effort on Mr. Zuckerman and Mr. Goelman, and I don't blame them, to minimize the conduct of their client in connection with the LBO. But this is another important and significant moment in this fraud, maybe the most critical one.

Again we see this defendant appear on the scene in a pivotal fashion. The deal with Thomas H. Lee Partners does not happen if Tone Grant does not sign on the dotted line. He has to agree to be bought out and he has to sign the equity purchase and merger agreement.

At the time that this leveraged buyout is being negotiated and dealt with, this defendant knows exactly what the financial state of the company is. He knows from having talked to Santo Maggio just in advance of his meeting with Mr. Bennett on May 17, 2004. He knows from the conversation with Mr. Bennett in 2004.

More than that, your Honor, he knows from his time at the company, he knows from his meeting with Mr. Rossi. He

887RGRAS

knows that the company is continuing to be a fraud because he's seen the financial statements all those years. There's no way

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

887rgras Sentence

that the company could have a receivable balance of between 250 million and zero dollars when at the point he left the company it rightly should have been somewhere in the vicinity of $900 million.

He knew all this, your Honor. And what did he do? He did two things. He negotiated a buyout agreement for himself that had the promise of $275 million.

Let's make no mistake about this. There was a suggestion by Mr. Goelman and Mr. Zuckerman that somehow Mr. Bennett, this omnipotent individual, coerced the defendant to sign that agreement. Left unaddressed in Mr. Zuckerman's oral comments today is a point that we brought out in our brief, your Honor.

We provided the Court with evidence that this was a negotiated transaction. If he didn't think he was going to get a payout and if it didn't matter to him, why over the course of a couple-week period do we see the numbers incrementally increasing? Phil Bennett was not in the job of giving away money. This man was negotiating for it.

Your Honor, I think Mr. Zuckerman maybe misspoke, but I don't want the Court to have a misimpression either. I think Mr. Zuckerman said that at the time of the LBO everybody got a payout except for Mr. Grant, who just had this promise of a payout. Well, Mr. Grant, of course, got $60 million at the time of the leveraged buyout.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

887rgras Sentence

Your Honor, again, at every critical point in this company's history this defendant knew what was going on at the company and took action that was fraudulent. The result of those actions, and Mr. Zuckerman talked about this briefly, and what the impact of the actions of the defendant are, the actions and the results therefrom are tremendously great: $2.4 billion literally stolen from people. Your Honor, on the record before the Court it is clear that this defendant was a thoroughgoing member of a long-term fraud and participated in important and pivotal ways throughout.

Now, your Honor, putting the conduct to one side, I want to talk briefly about the fact that the defendant went to trial. I don't want to belabor this point, but when the Court considers how this defendant compares to the other individual who has been sentenced in this case, Mr. Bennett, obviously the Court has discretion to consider and ought to consider that he went to trial.

If, as is indicated in the initial brief by Mr. Grant, the benchmark here is Mr. Bennett's sentence, then the starting point for consideration for this defendant is actually a sentence north of Mr. Bennett, because he did go to trial and he did not accept responsibility and continues not to do so.

Your Honor, I want to, before I conclude, talk about deterrence for a second. This is something that Mr. Zuckerman focused on, and I want to be very clear about this. Mr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

Page 16

Zuckerman implored the Court to focus, when considering deterrence in this case, on the conduct of this defendant, and the government agrees. Critical to the deterrent value of the sentence you give today will be what his conduct was and what it is perceived to be by the public. Your Honor, the government submits, though, that fairly on this record it indicates deeply long-term fraudulent conduct.

Your Honor, in talking about deterrence and in talking about what an appropriate sentence would be, Mr. Zuckerman mentioned the Adelson case. I don't want to talk about Adelson long either, but it really is where they derive what they believe the appropriate sentence to be, 42 months. They have gone on record saying that's the appropriate sentence, it comes from Adelson. They think that's basically right here.

Your Honor, the government knows what your Honor's views of the sentence in that case is. But since they brought it up, I think it is fair to focus on what Judge Rakoff said was the reason that he gave the sentence of 42 months, because it's instructive. Judge Rakoff said that he gave a 42-month sentence to Mr. Adelson because, in his view, Mr. Adelson was an accessory after the fact and deserving of a punishment coordinate to that level of responsibility.

Effectively, your Honor, I think that their presentation is trying to paint Mr. Grant as just that, an accessory after the fact: When he was at the company, he

didn't say much and he didn't know much; he was gone from the company for a really, really, really long time; and when it came to the fraud in 2004, well, he was lied to and he didn't know much there either; or at the very least, very grudgingly, at that moment he signed the EPMA, he just are barely crossed the threshold from an innocent state of mind to a guilty one.

Your Honor, if that's the benchmark that they're using, an accessory after the fact type of liability, that's clearly not what this case is. As a result, this defendant deserves far greater than 3½ years' imprisonment.

Your Honor, to conclude, the government is not going to discuss, unless the Court has any questions, the enhancement in this case. You know the government's position about the appropriateness of an enhancement of four levels because of his being a leader and organizer.

Your Honor, the government only points out in conclusion that when the Court considers whether or not the goals of sentencing are met here, whether it be just punishment, deterrence, retribution, the Court consider all of this defendant's conduct over the entire period.

Your Honor obviously has not only the government's submission in this case and the defendant's submission in this case, but the Court also has the benefit of the probation office's recommendation. I think all parties agree here that Ms. Tyler did a very, very thorough job in preparing her

pre-sentence report both for Mr. Bennett and for this case.

Your Honor, the probation department, considering all of those goals of sentencing, considering all the arguments basically that have been raised here today -- the history and

characteristics of the defendant, his conduct, the ways in which it varied from Mr. Bennett's, the fact that this defendant went to trial -- they suggested and recommended a sentence of 13 years, on par with the sentence that Mr. Bennett got.

Your Honor, the government respectfully suggests that a sentence in that range, which is a sentence on par with Mr. Bennett, is entirely appropriate given the conduct of this defendant over the many years of this fraud, being a pivotal player in a fraud that ultimately bilked people out of $2.4 billion.

MR. ZUCKERMAN: May I respond just briefly, please? I feel almost like I did when I stood up two or three months ago, four months ago, in my opening statement. But I do want to remind the Court, I'm sure I don't have to, that the man before your Honor is being sentenced for his conduct, for his conduct.

What the government has done is it has speculated, indeed as we have noted, without calling Mr. Bennett, repeatedly about his state of mind, that he must have known certain things at the time of the LBO -- as we have tried to argue, the record is not as clear as the government would have

it -- he must have known certain things during 2001, '02, and '03, although we do not have the elucidation of Mr. Bennett and we only have minimal elucidation from Mr. Maggio.

So I do take issue with the notion that the defendant is being sentenced for anything more here than conduct, things that he did, things that he engaged in that the government has been able to prove advanced the fraud. That's one.

Two, the fraud did not begin with Niederhoffer, as we have argued. Three, the government continues to exaggerate the Niederhoffer affair. It misplaces the Maggio conversation.

Four, there is no evidence, I believe -- the record will speak what it will speak -- I believe there is no evidence that puts a statement in Mr. Grant's mouth at the Duff & Phelps rating agency meeting that the company did not engage in proprietary trading, although I accept that he should not have said it when he did say it. I accept that.

Five, Judge Rakoff did not find that Mr. Adelson was an accessory after the fact. He found that he was closer to, although not identical to, an accessory after the fact, and Mr. Adelson was indeed 40 years old.

Six, it is true that Mr. Grant exercised his constitutional right to go to trial. It is also true, however, that Mr. Bennett has an offset because he was an officer and director of a publicly held company, a three- or four-level increase against which his acceptance of responsibility is set

off, and Mr. Grant doesn't. So for guidelines purposes, indeed they are in the same spot.

Finally, Mr. Garcia, in my view, is a good advocate and in my view gave a version of what I thought was a very effective closing argument to the Court. The man before your Honor has been found guilty. Make no mistake about that, he has been found guilty.

But the issue is not his guilt. The issue is what relation to the overall offense his conduct bears, what

relation his conduct bears to Mr. Bennett's in connection with the overall offense. In that regard, accepting his guilt, I urge the Court that there can be no doubt by any rational measure but that his conduct is but a fraction, a small fraction, of the conduct that Phillip Bennett engaged in in furtherance of this offense.

You've been very patient all along, and I thank you your Honor very much.

THE COURT: Mr. Grant, you have the opportunity to speak if you wish to.

THE DEFENDANT: Thank you, your Honor.

First, as a matter of sort of logistics, your Honor, for the last year and a half I've been reporting to two pretrial services officers in Chicago whom I believe report technically to the Court. I would like to bring to your attention how professional and courteous they were to me at all

times. For the first several months I reported to Jennifer Bowers, and for the last several months, maybe a year, Justin Werzenfeld. I bring it to your attention because I guess they do report to you or to the court.

THE COURT: Indirectly to me.

THE DEFENDANT: The letters submitted to the court on my behalf reflect the opinions of people who have known me through the my life. I extend my heartfelt thanks to those people that took the time to express themselves.

Given the several life-threatening situations which I have encountered in my life, both as a civilian and as an officer in the Marine Corps, I have always considered it a privilege to have the chance to live life. I am thankful and grateful for having had that opportunity.

My family. Ever since my family arrived in the United States, we have felt and continue to feel that it is a privilege to live in this country and have tried to fulfill our responsibilities to the country. It has included, among other things, four members of my family who sacrificed their lives while serving in the military during wartime. I and we all grew up with that grief.

As a member of the California and Tennessee bar associations, I have taken oaths which make me an officer of the court. Moreover and in addition, when I became an officer in the U.S. Marine Corps during the Vietnam War, I took an oath

to defend and uphold the entire Constitution. I take these oaths very seriously.

I have always done everything within my power and control to respect the law and to make a positive contribution to and be a positive influence upon the lives of others, and I fully intend to do so in the future.

Thank you, your Honor.

THE COURT: You can return to your seats, please.

Let me deal with two aspects of the sentence that are, shall I say, a little more technical before I make the remarks that I intend to.

First, this morning I got a copy of a forfeiture order. I don't know if that's been previously made available to the defendant and whether there are any issues about it.

MR. ZUCKERMAN: It has. We've looked at it, and the government has been very candid in discussing it with us this morning. We have looked at it. There are a couple of listings on there we don't quite understand. What we would like to do is have a few days to kind of look at it and then make any comments we want to the Court before the Court considers signing it.

MR. GARCIA: That's fine, your Honor.

THE COURT: The other things. Let me dispose of the only guidelines issue that's been raised. I think everyone recognizes that as a practical matter it's irrelevant. Under

any calculation of the guidelines, they are so excessive of what I intend to sentence that my ruling on the applicability of any one of them is of no practical significance.

In any event, to the extent that it may matter to someone, I think the enhancement under 3B1.1 is appropriate. I think that to suggest that someone who is the president of the company and a 50-percent stockholder is not a leader or to deny they are entitled to that enhancement would undermine the whole purpose of this provision of the guidelines. I think the law is that the leader must be directing others, and if I had to find that, I would as well.

The trial in this case lasted for close to four weeks. Summations on behalf of Mr. Grant were presented by two attorneys and lasted for more than half a day. Every issue presented here and in the lengthy sentencing submissions was presented to the jury, which needed only a few hours to convict Mr. Grant on all counts.

At the outset of the defense summation, the jury was told, and I'm quoting, "The fact is that you had two very different pictures of who this man is. You need to decide which one to credit when you decide this case."

In no particular order, to support the defendant's position, counsel argued to the jury:

1. The co-conspirators are liars whose testimony should be tossed aside;

2. Tone Grant is a man of character who couldn't commit the crimes he was charged with;

3. Phillip Bennett is a consummate liar who lied to Grant, who should be considered a victim;

4. Grant didn't know that Lee didn't know about the $1.1 billion related party receivable; and

5. Tone Grant had no criminal intent, and in particular that a person who was a criminal wouldn't have turned over his notes of his meeting with Phillip Bennett at the Marriott Hotel on May 17, 2004, to the SEC.

While there was a lot of discussion and briefing about those notes pretrial, there is one obligation that I would like to make for the record, having sat through the trial, and that is that you need to have a great deal of knowledge to appreciate the meaning and significance of those notes.

Despite all those arguments, as I noted, the jury convicted Mr. Grant on all counts swiftly.

Also, there are some arguments that have been made repeatedly that I found singularly unpersuasive. I want to

mention those now because a trial should lead to some clarity. First, at least up until this morning, I guess, there was the argument that Tone Grant doesn't lie. His counsel, during summation, described Mr. Grant's statements to the Chicago Tribune after the Niederhoffer debacle in which Grant's own Refco, Inc. suffered losses of approximately $90 million as

"optimistic."

Let's look at the actual article. I'm quoting: "Refco executive Tone Grant flatly denied the firm was on the hook." And now from the article itself, I quote Grant's words: "'It's not true,' he said Wednesday. 'We have no problem. We certainly have no losses.'" Optimistic? Let's try totally false. The firm was on the hook and it had released Mr. Niederhoffer.

Another example of Tone Grant's willingness to lie involves whether Refco engaged in proprietary trading. Indisputably, it did. But Tone Grant told William Pappas of Prudential Securities the opposite and similarly made such representations to clients such as Banque Paribas. These statements were described by Mr. Grant's counsel in summation as "not entirely accurate." Again, let's try totally false.

These are just two examples from the trial testimony. This is a side of Tone Grant that his many friends and others who wrote letters for him are unfamiliar with, but they are part of the record of this case.

Second, it has been repeatedly argued that Tone Grant was barred from Refco and put out to pasture in Chicago after the spring of 1999 in a way that makes him not responsible for what went on after he no longer held office. This is a gross exaggeration. It can never be forgotten that Tone Grant remained a 50-percent owner of RGHI, which gave him the legal

right to get any information he wanted. And we know that Refco's books actually reflected the fraud.

Moreover, the trial record establishes that Grant in fact remained in contact with Mr. Bennett and with Refco. Even discounting for calls of minimal duration, there were over a hundred calls each year between Mr. Bennett and Mr. Grant during the period between 1999 and 2005. Most tellingly, there were 26 calls of significant duration between Mr. Bennett and Mr. Grant over the seven days after Scott Schoen of Thomas H. Lee reached Mr. Bennett in Japan and informed him of the discovery of the related party receivable, and not while he was totally out of the loop.

Third, it has been argued over and over again that Mr. Grant doesn't bear responsibility for the launching of this massive fraud. In his reply brief, Grant is described as having only "some involvement" in the Niederhoffer situation. This is a gross understatement of the facts, which cannot be disputed.

Fourth, it has been contended that Mr. Grant doesn't bear responsibility for the Lee transaction because he wasn't in face-to-face meetings with Lee. The bottom line is that without his signatures, there is no transaction. That's responsibility.

Finally, all the references to NavTech stock are

887RGRAS

misplaced.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46
887rgras Sentence

All that being said, the remaining question, and the reason we are here today, is what are the facts and factors which should guide and determine Mr. Grant's sentence? I have thought about this for many weeks. While I totally respect Mr. Grant's constitutional right to remain silent, I regret that I was not the recipient of more information. As the record stands, there is the trial testimony, the jury's verdict, and the government's narrative. The incongruities between Mr. Grant's service, charity, family ties, and the evidence and the verdict remain.

The bottom line for me is that without Mr. Grant's participation and willingness to go along, there would have been no case, no fraud of enormous proportions. The numbers remain staggering. Based on the false portrayal of the financial health of Refco, $2.4 billion was raised. And even now, after various recovery efforts, the losses still exceed $1.5 billion.

There are three indisputable and major points of involvement by Mr. Grant, and they span a period of eight years. The first is the Niederhoffer losses. Mr. Grant knew the extent of those losses, approximately $90 million, signed documents relieving Niederhoffer of responsibility, and lied about the effect on Refco. Whether he knew or not about the trade and marine losses, there is no question that the Niederhoffer events were seminal in the creation of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47
887rgras Sentence

receivable.

Next, and again without relying on the testimony of any cooperating witness -- all of whom, parenthetically, we found believable -- Mr. Grant got a full education about the true state of Refco's finances in February of 1999, during the meeting with Mr. Rossi.

Finally, after meeting with Mr. Bennett on May 17, 2004, at the Marriott Hotel and learning that the real debt was $1.1 billion and the amount of the real net debt, Mr. Grant negotiated a stock purchase agreement with Bennett for an eventual payout of $275 million and a more immediate payment of $16 million. Grant then signed the equity purchase and merger agreement for warranty purposes. Again, had Mr. Grant declined to sign either of those agreements, there would have been no Lee transaction, no private debt offering, or the IPO which ultimately followed.

There are two other matters that I would like to comment on given Mr. Grant's persistent argument that he lacks criminal intent and was a victim of Phillip Bennett.

The first is something that I commented on earlier, and that is that when Bennett learned that new management at Refco had discovered the related party debt, there were 26 calls of substantive length between Bennett and Mr. Grant during the next seven days. The first of these calls reached Mr. Grant at 3:45 in the morning and lasted over 19 minutes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48
887rgras Sentence

Page 22

The second is that within three weeks of Mr. Bennett's arrest, Mr. Grant transferred the house to his wife, from whom he had been separated many years, and transferred an apartment to a long-time friend. These are not the acts of a guilt-free mind.

We have now discussed many of the important matters which weigh on the negative side of the ledger. There is no question but that Mr. Grant has many traits and accomplishments that weigh on the positive side of the ledger. These include his military service, his founding and continued support of the Music City Track Club, his other charitable contributions, and his contributions to his college, Yale, his law school, Vanderbilt, and the Marine Corps, among others, and his financial and emotional support of his wife, stepchildren, and stepgrandchildren.

But as we credit Mr. Grant for his life's work, we must also consider the opportunities he had and the training and knowledge those opportunities gave him. That education and his work experience taught him that what he did violated the law. Nevertheless, he made the moral choice over and over again to join with Bennett, not to extricate himself from the fraud, and to profit from the activities which he had to know were legally, ethically, and morally wrong. Regardless of whether he chose to blow the whistle or to come clean, he always had the chance to walk away.

I sentence you, Mr. Grant, with a view that Mr. Bennett was more culpable but not as disproportionately so as your lawyers would suggest given your irreplaceable role in this fraud. I also sentence you with the hope that this sentence will deter others who might think that it is excusable to not get their hands as dirty but nevertheless profit enormously from the dirty work of others.

Accordingly, having considered all the sentencing submissions and, as I said earlier, having read every letter submitted on Mr. Grant's behalf, I sentence Mr. Grant to a total of 10 years in custody. That breaks down as 5 years on Count One and 10 years each on Counts Two, Three, Four, and Five, all to run concurrently.

There is, further, a period of supervised release of 3 years on all counts, to run concurrently. In light of the forfeiture, there is no fine. I assume that any restitution order will be deferred. And there is a special assessment of $500.

I welcome any requests with respect to a place of confinement.

MR. ZUCKERMAN: I'm sorry?

THE COURT: I said I welcome any suggestions that you have with respect to a place of confinement.

MR. ZUCKERMAN: I have none today, your Honor. I would ask if the Court would permit a self-surrender of the

defendant.

THE COURT: I don't have any problem with that. By the way, something I don't know, what are Mr. Grant's bail conditions?

MR. ZUCKERMAN: He is on a $10 million bond co-signed

by his brother-in-law.

THE COURT: OK.

MR. ZUCKERMAN: May I advise the Court as to the question of bail pending appeal, what we would like to do in an orderly way is file a written application with the Court in order that the government may respond if it sees fit and present the issue to your Honor in that fashion.

THE COURT: Didn't you know that the government opposes bail pending appeal?

MR. ZUCKERMAN: I'm assuming they do, but I don't know. They do. We'll file something, a written application, with the Court.

THE COURT: Is there anything that I haven't covered?

MR. GARCIA: Your Honor, you may have said it, but I don't think I heard you advise the defendant of his appellate rights. You did?

THE COURT: No, I didn't, and I should have. But I sort of knew he was intending to appeal, since he told me that in his memorandum.

MR. GARCIA: That's fair enough.

THE COURT: In any event, I do advise Mr. Grant that he has the right to appeal.

MR. GARCIA: The only other thing, your Honor, is the government would move to dismiss underlying indictments as to this defendant.

THE COURT: The motion is granted.

(Adjourned)

# Exhibit B

# UNITED STATES DISTRICT COURT

SOUTHERN District of NEW YORK

UNITED STATES OF AMERICA
V.
Tone N. Grant

**JUDGMENT IN A CRIMINAL CASE**

Case Number: S4 05 Cr. 1192-03

USM Number: 59692-054

Roger Zuckerman, Esq.
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ______

☐ pleaded nolo contendere to count(s) ______ which was accepted by the court.

X was found guilty on count(s) I through V after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | Conspiracy to Commit Securities Fraud, Wire Fraud, Bank Fraud, and Money Laundering | Oct. 2005 | 1 |
| 15 U.S.C. 78j(b) & 78ff | Securities Fraud | Oct. 2005 | 2 |
| 18 U.S.C. 1343 | Wire Fraud | Oct. 2005 | 3 |
| 18 U.S.C. 1344 | Bank Fraud | Oct. 2005 | 4 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ______

X Count(s) Underlying Indictments ☐ is X are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 7, 2008
Date of Imposition of Judgment

[signature]
Signature of Judge

Naomi Reice Buchwald, U.S. District Court Judge
Name and Title of Judge

August 22, 2008
Date

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 8/22/08

AO 245B  (Rev. 06/05) Judgment in a Criminal Case
Sheet 1A

Judgment—Page  2  of  7

DEFENDANT:       Tone Grant
CASE NUMBER:    S4 05 Cr. 1192-03

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 1957(a) | Money Laundering | Oct. 2005 | 5 |

DEFENDANT: Tone N. Grant
CASE NUMBER: S4 05 Cr. 1192-03

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

10 years in total (5 years on Count I, and 10 years on Counts II through V, all terms to run concurrently)

X The court makes the following recommendations to the Bureau of Prisons:

If otherwise qualified, the defendant shall be incarcerated in a prison camp.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ____________ ☐ a.m. ☐ p.m. on ____________ .

☐ as notified by the United States Marshal.

X The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

X before 2 p.m. on October 7, 2008 .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ____________ to ____________

a ____________ , with a certified copy of this judgment.

____________
UNITED STATES MARSHAL

By ____________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Tone N. Grant
CASE NUMBER: S4 05 Cr. 1192-03

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

3 years (to run concurrently on all counts)

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

X The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 06/05) Judgment in a Criminal Case
Sheet 3C — Supervised Release
Judgment—Page 5 of 7

DEFENDANT: Tone N. Grant
CASE NUMBER: S4 05 Cr. 1192-03

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall be supervised in his district of residence.

DEFENDANT: Tone N. Grant
CASE NUMBER: S4 05 Cr. 1192-03

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 500.00 | $ -- | $ see below |

X The determination of restitution is deferred until 10/1/08 . An *Amended Judgment in a Criminal Case* (AO 245C) will be after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **TOTALS** | $ $0.00 | $ $0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ ____________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

X The court determined that the defendant does not have the ability to pay interest and it is ordered that:

X the interest requirement is waived for the ☐ fine X restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Tone N. Grant
CASE NUMBER: S4 05 Cr. 1192-03

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

Defendant is ordered to comply with the Forfeiture Order dated August 14, 2008. The Government and the defendant have entered into a stipulation providing for the entry of a preliminary order of forfeiture which shall be treated as if it entered at the time of sentence. The signing of the order is deferred until the Court has had the opportunity to resolve certain issues raised by the defendant. However, it is the intent of the Court that the forfeiture order when signed by a part of this judgment.

**Exhibit C**

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH MURPHY, et al., Plaintiffs, v. ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY, Defendants. | Case No. 1:08-cv-4196 (GEL) AMENDED ANSWER TO FIRST AMENDED COMPLAINT |

FIRST DEFENSE

Defendant Allied World Assurance Company (U.S.), Inc. ("Allied World") answers the first amended complaint of plaintiffs as follows:

1. Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 of the complaint, except admits that Allied World provided excess directors and officers liability insurance to Refco Inc. ("Refco") for the policy period of August 11, 2005 to August 11, 2006 pursuant to Excess Directors and Officers Insurance Company Reimbursement Policy No. AW0418197 (the "Allied World Policy" or the "Policy"), that Refco undertook its initial public offering in August 2005, that Arch Insurance Company ("Arch") provided directors and officers liability insurance to Refco, that plaintiffs have been named in

various civil proceedings and, in the case of Tone Grant, a criminal proceeding, related to the collapse of Refco (the "Underlying Actions").

2.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the complaint, except admits that plaintiffs have sought coverage and advancement of defense costs from Allied World for the Underlying Actions, that Allied World denied coverage for the Underlying Actions and refused to advance defense costs to plaintiffs, but denies that each of the Underlying Actions constitutes a "Claim" under the Policy and that Allied World has continued to refuse to advance defense costs pursuant to the Bankruptcy Court's order.

3.    The Court's rulings in the actions between Axis Reinsurance Company ("Axis") and plaintiffs speak for themselves and to the extent the allegations in paragraph 3 of the complaint are inconsistent therewith, Allied World denies them.

4.    Lacks knowledge of information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the complaint, except admits Allied World was notified by certain underlying insurers, including Axis, that the limits of their policies issued to Refco have been exhausted.

5.    Denies the allegations of paragraph 5 of the complaint, except admits Allied World has denied coverage to plaintiffs for the Underlying Actions and that plaintiffs have submitted invoices for defense costs to Allied World.

6.    Admits the allegations of paragraph 6 of the complaint.

7.    In response to paragraph 7 of the complaint, does not respond to the extent the allegation is directed at Arch; but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

8.      In response to paragraph 8 of the complaint, Allied World does not respond to the
extent that the allegations contain legal conclusions; but if a responsive pleading is required,
lacks knowledge or information sufficient to form a belief as to the truth of the allegations of
paragraph 8 of the complaint, except admits that plaintiffs seek the relief stated.

9.      In response to paragraph 9 of the complaint, does not respond to the extent that
the allegations contain legal conclusions; but if a responsive pleading is required, denies the
allegations of paragraph 9 of the complaint.

10.     In response to paragraph 10 of the complaint, does not respond to the extent that
the allegations contain legal conclusions; but if a responsive pleading is required, denies the
allegations of paragraph 10 of the complaint.

11.     In response to paragraph 11 of the complaint, does not respond to the extent that
the allegations contain legal conclusions; but if a responsive pleading is required, denies the
allegations of paragraph 11 of the complaint.

12.     Lacks knowledge or information sufficient to form a belief as to the truth of the
allegations of paragraphs 12-25, except admits that plaintiffs are former officers and directors of
Refco.

13.     Admits the allegations of paragraph 26 of the complaint.

14.     Lacks knowledge or information sufficient to form a belief as to the truth of the
allegations of paragraph 27 of the complaint.

15.     As to the allegations of paragraph 28 of the complaint, Allied World states that
the Policy is in writing and speaks for itself and that to the extent the allegations contained in
paragraph 28 are inconsistent therewith, Allied World denies them.

16.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 29 of the complaint.

17.     Admits the allegations of paragraph 30 of the complaint.

18.     Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31 of the complaint, except admits that plaintiffs have been named as defendants in certain civil actions and Grant in a criminal action, which recently concluded with his conviction.

19.     Admits the allegations of paragraph 32 of the complaint.

20.     In response to paragraph 33 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations, except admits that plaintiffs have notified Allied World of certain Underlying Actions and requested that Allied World advance defense costs for those actions.

21.     As to the allegations of paragraphs 34-35 of the complaint, Allied World states that Refco's coverage and the U.S. Specialty Policy are in writing and speak for themselves and that to the extent the allegations contained in paragraphs 34-35 are inconsistent therewith, Allied World denies them.

22.     In response to paragraph 36 of the complaint, does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the U.S. Specialty Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 36 are inconsistent therewith, Allied World denies them.

23.     In response to paragraph 37 of the complaint, does not respond to the extent that the allegation contains a legal conclusion; but if a responsive pleading is required, denies that all

of the Underlying Actions constitutes a "Claim" for a "Wrongful Act" under the U.S. Specialty Policy.

24. Admits the allegations of paragraph 38 of the complaint.

25. As to the allegations of paragraph 39 of the complaint, does not respond to the extent that the allegations contain a legal conclusion; but if a responsive pleading is required, Allied World states that the U.S. Specialty Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 39 are inconsistent therewith, Allied World denies them.

26. As to the allegations of paragraph 40 of the complaint, does not respond to the extent that the allegations contain a legal conclusion; but if a responsive pleading is required, Allied World states that the U.S. Specialty Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 40 are inconsistent therewith, Allied World denies them.

27. As to the allegations of paragraph 41 of the complaint, does not respond to the extent that the allegations contain a legal conclusion; but if a responsive pleading is required, Allied World states that the U.S. Specialty Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 41 are inconsistent therewith, Allied World denies them.

28. As to the allegations of paragraph 42 of the complaint, does not respond to the extent that the allegations contain a legal conclusion; but if a responsive pleading is required, Allied World states that the U.S. Specialty Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 42 are inconsistent therewith, Allied World denies them.

29.    In response to paragraph 43 of the complaint, does not respond to the extent that the allegations are directed at U.S. Specialty and contain legal conclusions; but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations, except admits that the U.S. Specialty Policy is exhausted.

30.    Admits the allegations of paragraph 44 of the complaint.

31.    In response to paragraph 45 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Lexington Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 45 are inconsistent therewith, Allied World denies them.

32.    Lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 46 of the complaint, except admits that the Lexington Policy is exhausted.

33.    Admits the allegations of paragraph 47 of the complaint.

34.    In response to paragraph 48 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Lexington Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 48 are inconsistent therewith, Allied World denies them.

35.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 49-54 of the complaint, except admits that Axis commenced a proceeding against certain plaintiffs in the Bankruptcy Court seeking, among other things, a declaration of no coverage with respect to the Axis Policy, that certain plaintiffs sought

injunctive relief to compel Axis to advance defense costs, which was granted by the Bankruptcy Court, and that the Axis Policy is exhausted.

36.    Admits the allegations of paragraphs 55-57 of the complaint.

37.    In response to paragraph 58 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 58 are inconsistent therewith, Allied World denies them.

38.    In response to paragraph 59 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 59 are inconsistent therewith, Allied World denies them.

39.    In response to paragraph 60 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 60 are inconsistent therewith, Allied World denies them.

40.    In response to paragraph 61 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 61 are inconsistent therewith, Allied World denies them.

41.    In response to paragraph 62 of the complaint, does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, denies the allegations.

42.    In response to paragraph 63 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 63 are inconsistent therewith, Allied World denies them.

43.    In response to paragraph 64 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, denies that plaintiffs' defense costs are covered under the Policy, but states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 64 are inconsistent therewith, Allied World denies them.

44.    In response to paragraph 65 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 65 are inconsistent therewith, Allied World denies them.

45.    Admits the allegations of paragraph 66 of the complaint.

46.    In response to paragraph 67 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the Arch Policy is in writing and speaks for itself and that to the extent the allegations contained in paragraph 67 are inconsistent therewith, Allied World denies them.

47.    Lacks knowledge or information sufficient to form a belief as to the allegations of paragraph 68 of the complaint.

48.    In response to paragraphs 69-74 of the complaint, does not respond to the extent the allegations contain legal conclusions and are directed at Arch; but if a responsive pleading is required, Allied World states that the Arch Policy is in writing and speaks for itself and that to

the extent the allegations contained in paragraphs 69-74 are inconsistent therewith, Allied World denies them.

49.    Admits the allegations of paragraphs 75-76 of the complaint.

50.    In response to paragraph 77 of the complaint, Allied World does not respond to the extent that the allegations contain legal conclusions; but if a responsive pleading is required, Allied World states that the March 28th letter is in writing and speaks for itself and that to the extent the allegations contained in paragraph 77 are inconsistent therewith, Allied World denies them.

51.    As to the allegations of paragraph 78 of the complaint, Allied World states that the March 28th letter is in writing and speaks for itself and that to the extent the allegations contained in paragraph 78 are inconsistent therewith, Allied World denies them.

52.    Admits the allegations in the first sentence of paragraph 79 of the complaint, but as for the remainder of the allegations, Allied World states that the September 11th letter is in writing and speaks for itself and that to the extent the allegations contained in paragraph 79 are inconsistent therewith, Allied World denies them.

53.    Denies the allegations of paragraph 80 of the complaint.

54.    As to the allegations of paragraph 81 of the complaint, admits that Allied World refused to advance defense costs, but denies that Allied World has continued to refuse to advance defense costs pursuant to the Bankruptcy Court's order.

55.    In response to paragraphs 82-87 of the complaint, does not respond to the extent the allegations are directed at Arch; but if a responsive pleading is required, lacks knowledge or information sufficient or information to form a belief as to the allegations.

56. In response to paragraph 88 of the complaint, restates the responsive paragraphs of this answer.

57. In response to paragraph 89 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, denies the allegations.

58. Admits the allegations of paragraph 90 of the complaint.

59. In response paragraph 91 of the complaint, admits that Allied World has denied coverage under the Policy and initially refused to advance of defense costs, but denies that Allied World has continued to refuse to advance defense costs in light of the Bankruptcy Court's order.

60. Denies the allegations of paragraph 92 of the complaint.

61. In response to paragraphs 93-94 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, admits that Refco paid all premiums for the Allied World Policy, but denies the remainder of the allegations.

62. In response to paragraph 95 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, admits that Allied World issued the Policy for the period of August 11, 2005 to August 11, 2006.

63. In response to paragraph 96 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, denies that plaintiffs are entitled to coverage or advancement of defense costs under the Policy and that Allied World has failed to advance defense costs to plaintiffs pursuant to the Bankruptcy Court's order.

64. Denies the allegations of paragraph 97 of the complaint.

65. In response to paragraph 98 of the complaint, restates the responsive paragraphs of this answer.

66. In response to paragraphs 99-101 of the complaint, does not respond to the extent the allegations are moot or contain legal conclusions; but if a responsive pleading is required, denies the allegations.

67. In response to paragraph 102 of the complaint, does not respond to the extent the allegation is moot; but if a responsive pleading is required, denies the allegation for this reason.

68. In response to paragraph 103 of the complaint, restates the responsive paragraphs of this answer.

69. In response to paragraph 104 of the complaint, does not respond to the extent the allegation contains legal conclusions; but if a responsive pleading is required, denies the allegation.

70. In response to paragraph 105 of the complaint, admits that Allied World refused to advance defense costs to plaintiffs, but denies that Allied World has continued to refuse to advance defense costs pursuant to the Bankruptcy Court's order.

71. In response to paragraph 106 of the complaint, does not respond to the extent the allegation contains legal conclusions, but if a responsive pleading is required, denies the allegation.

72. In response to paragraph 107 of the complaint, restates the responsive paragraphs of this answer.

73. In response to paragraphs 108-109 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, denies the allegations, except admits that Allied World has denied coverage under the Policy.

74.    In response to paragraph 110 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, admits that Refco paid all premiums for the Allied World Policy, but denies the remainder of the allegations.

75.    In response to paragraph 111 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, denies the allegations.

76.    In response to paragraph 112 of the complaint, does not respond to the extent the allegation contains a legal conclusion; but if a responsive pleading is required, admits that the Allied World Policy was in effect for the policy period of August 11, 2005 through August 11, 2006.

77.    In response to paragraphs 113-116 of the complaint, does not respond to the extent the allegations contain legal conclusions; but if a responsive pleading is required, denies the allegations.

78.    In response to paragraph 117 of the complaint, restates the responsive paragraphs of this answer.

79.    In response to paragraphs 118-125 of the complaint, does not respond to the extent the allegations are directed at Arch and not Allied World; but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

80.    In response to paragraph 126, restates the responsive paragraphs of this answer.

81.    In response to paragraphs 127-129, does not respond to the extent the allegations are directed at Arch and not Allied World, but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

82. In response to paragraph 130, restates the responsive paragraphs of this answer.

83. In response to paragraphs 131-139, does not respond to the extent the allegations are directed at Arch and not Allied World; but if a responsive pleading is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations.

SECOND DEFENSE

84. The Insuring Agreement in the Allied World Policy states that it follows form to the terms and conditions of the U.S. Specialty Policy, subject to the terms, conditions and exclusions and endorsements contained in the Allied World Policy itself. As such, plaintiffs are not entitled to coverage pursuant to Endorsement No. 3 of the Policy, since at least several insureds—including Santo C. Maggio, Phillip R. Bennett and Robert C. Trosten—had knowledge of facts or circumstances prior to the inception of the Policy for which a reasonable person would suppose might afford grounds for a claim under the Policy or which would indicate the probability of such a claim, barring coverage for all other insureds.

THIRD DEFENSE

85. Plaintiffs are not entitled to coverage for certain Underlying Actions that do not constitute a "Claim" as defined in the U.S. Specialty Policy.

FOURTH DEFENSE

86. Upon information and belief, plaintiffs are not entitled to coverage for certain claims, because plaintiffs failed to provide Allied World with notice of circumstances of such claims during the Policy Period.

FIFTH DEFENSE

87. Upon information and belief, plaintiffs are not entitled to coverage for certain claims, because they were not first made against the insureds and/or reported to Allied World during the Policy Period.

SIXTH DEFENSE

88. There is no coverage for plaintiffs' claims to the extent such claims derive from the same essential facts or same interrelated wrongful acts as alleged in any pending or prior litigation, administrative or regulatory proceeding or investigation as of (a) June 4, 2004 and/or (b) August 11, 2005.

SEVENTH DEFENSE

89. Plaintiffs are not entitled to the continued advancement of defense costs, to the extent that the Underlying Actions are not covered under the Policy.

EIGHTH DEFENSE

90. Allied World's obligation to indemnify plaintiffs is limited by the availability of other insurance for which plaintiffs may be entitled to coverage.

NINTH DEFENSE

91. Upon information and belief, the doctrine of estoppel bars certain plaintiffs from coverage under the Policy.

TENTH DEFENSE

92. There is no coverage for plaintiffs' claims pursuant to Exclusion B of the U.S. Specialty Policy to the extent such claims arise out of, are based upon or attributable to "the commission by any Insured of any criminal or deliberately fraudulent or dishonest act...."

ELEVENTH DEFENSE

93. There is no coverage for plaintiffs' claims pursuant to Exclusion A of the U.S. Specialty Policy to the extent such claims arise out of, are based upon or attributable to "the gaining by any Insured of any profit or advantage to which the Insured was not legally entitled...."

TWELFTH DEFENSE

94. Plaintiffs' claims against Allied World are or may be barred in whole or in part by Exclusion F of the U.S. Specialty Policy, because Allied World will not be liable to make any payment of "Loss" in connection with any claim "brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person…."

WHEREFORE, defendant Allied World respectfully requests entry of a judgment in its favor denying plaintiffs' demand for coverage under the Policy, relieving Allied World of any obligation to advance defense costs to plaintiffs, denying plaintiffs' request for damages for Allied World's alleged breach of the Policy, awarding Allied World its attorneys' fees, costs and disbursements incurred in defending this action, and granting such other relief to Allied World as the Court deems just and appropriate.

Dated: New York, NY
June 17, 2008

Robert DiUbaldo

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant Allied World
750 Lexington Avenue, 8th floor
New York, NY 10022
Tel. (212) 308-4411
Fax (212) 308-4844

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH MURPHY, et al.,<br><br>Plaintiffs,<br>v.<br><br>ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY,<br><br>Defendants. | Case No. 1:08-cv-4196 (GEL) |

## RULE 7.1 STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, defendant Allied World Assurance Co. (U.S.) Inc. ("Allied World") makes the following disclosure concerning its corporate affiliation:

> Allied World is a wholly owned subsidiary of Allied World Assurance Company Holdings, Ltd., a publicly traded corporation.[1]

Date: June 18, 2008

[signature]
Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP

[1] Allied World already filed a Rule 7.1 statement in the adversary proceeding previously before Judge Drain, which has been transferred to this Court. Our understanding is that relevant documents from the adversary proceeding will be transferred to this action, and thus there is no need to file another Rule 7.1 Statement. Nonetheless, we do so again in the abundance of caution.

Attorneys For Defendant Allied World
750 Lexington Avenue, 8th floor
New York, NY  10022
(212) 308-4411

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH MURPHY, et al.,

Plaintiffs,

v.

ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY,

Defendants.

Case No. 1:08-cv-4196 (GEL)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of June 2008, I caused a copy of Allied World's amended answer to plaintiffs' first amended complaint to be sent by electronic mail and/or regular mail to the following:

William Fleming, Esq.
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900
*Attorneys for Nominal Defendants John D. Agoglia and Peter J. McCarthy*

Michael Francis Walsh, Esq.
Weil Gotshal & Manges LLP
767 Fifth Avenue New York, NY 10153

(212) 310-8372
*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaekel, Thomas H. Lee, Ronald L. O Kelley, and Scott A. Schoen*

Martin R. Bennett, Esq.
Kugle Skelton & Bennett, PC
130 E. Corsicana, Ste. 302 Athens, TX 75751
(903) 675-5151
*Attorneys for Nominal Defendant Edwin Cox*

Neil A. Goteiner, Esq.
Farella, Braun & Martel
235 Montgomery Street, 30th Floor
San Francisco, CA 94104
(415) 954-4485
*Attorneys for Nominal Defendants Sukhmeet Dillon and Eric Lipoff*

Thomas C. Wolford, Esq.
Neal Gerber & Eisenberg, LLP
2 North LaSalle Street
Chicago, IL 60602
(312) 269-5675
*Attorneys for Nominal Defendant Thomas H. Dittmer*

Lawrence J. Kotler, Esq.
Duane Morris & Heckscher, LLP
30 South 17th Street
Philadelphia, PA 19103 (215) 979-1514
*Attorneys for Nominal Defendant Stephen Grady*

William A. Schreiner, Jr., Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1858
*Attorneys for Plaintiff Tone Grant*

Laura L. Neish, Esq.
Zuckerman Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600
*Attorneys for Plaintiff Tone Grant*

Helen Kim, Esq.
Katten Muchin Rosenman, LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067
(310) 788-4525
*Attorneys for Plaintiff Dennis Klejna*

John R. Jerome, Esq.
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY 10167
*Attorneys for Plaintiff Joseph Murphy*

Janet Costello, Esq.
Gibbons, P.C.
One Gateway Center
Newark, NJ 07102
973-596-4825
*Attorneys for Nominal Defendant Frank Mutterer*

Claire P. Gutekunst, Esq.
Proskauer Rose, LLP
1585 Broadway
New York, NY 10036
(212) 969-3421
*Attorneys for Plaintiff Richard N. Outridge*

Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022
(212) 750-8700
*Attorneys for Plaintiffs William M. Sexton and Gerald Sherer*

Richard Cashman, Esq.
Heller Ehrman, LLP
Times Square Tower
7 Times Square
New York, NY 10036 (212) 847-8796
*Attorneys for Plaintiff Philip Silverman*

Frank Mutterer
2043 Bay Blvd.
Seaside Heights, N.J. 08751-1001
*Nominal Defendant*

Eric G. Lipoff

16 Clay Rd.
Irvine, CA 92620-3322
*Nominal Defendant*

John H. Eickemeyer, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
*Attorneys for Defendant Arch Insurance Company*

Michael L. Cook, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
(212) 756-2000
*Attorneys for Eric G. Lipoff*

Marc E. Rindner, Esq.
1776 K Street NW
Wiley Rein LLP
Washington, DC 20006
(202) 719-7486
*Attorneys for Defendant Arch Insurance Company*

Thomas Hackl
c/o Avi Moskowitz
Moskowitz & Book LLP
1372 Broadway
New York, N.Y. 10018
(212) 221-7999

Robert DiUbaldo
Robert W. DiUbaldo

# Exhibit D

EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue Boston, MA 02199 617.239.0100 fax 617.227.4420 eapdlaw.com

John D. Hughes
617.951.3373
fax 617.227.4420
jhughes@eapdlaw.com

May 1, 2008

***Via Electronic Mail***

Helen B. Kim
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
helen.kim@kattenlaw.com

Richard Cashman
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
richard.cashman@hellerehrman.com

John J. Jerome
Timothy E. Hoeffner
Saul Ewing LLP
245 Park Avenue, 24th Floor
New York, NY 10167
jjerome@saul.com
thoeffner@saul.com

Claire P. Gutekunst
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
cgutekunst@proskauer.com

Stuart I. Friedman
Ivan Kline
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022
sfriedman@friedmanwittenstein.com
ikline@friedmanwittenstein.com

Norman L. Eisen
Zuckerman Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036
neisen@zuckerman.com

Greg A. Danilow
Michael F. Walsh
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119
greg.danilow@weil.com
michael.walsh@weil.com

**Re:** ***Joseph Murphy, et al. v. Allied World Assurance Company (U.S.), Inc., Defendant***
**United States Bankruptcy Court for the Southern District of New York, Chapter 11 Case No. 05-60006 (RDD); Adversary Proceeding No. 08-01133 (RDD)**

Dear Counselors:

Pursuant to Judge Drain's Order of April 21, 2008 commanding Allied World Assurance Company (U.S.), Inc. ("Allied World") to advance defense costs, Allied World anticipates making the first such advancement by the end of the day tomorrow by wire transferring funds to the accounts of certain law firms for which it has received bills from its Insureds. Please understand, however, that these payments are being made by Allied World pursuant to Judge

Drain's Order and not because of any change in Allied World's position regarding coverage. Allied World continues to believe that the claims asserted against the Insureds are not covered by its Policy. Accordingly, Allied World reminds the Insureds that upon a final determination that any defense costs paid by it are not covered under its Policy, the Insureds are bound to repay such non-covered defense costs to Allied World.

Allied World continues to reserve all of its rights under both its Policy, as well as at law and in equity. We recognize that the Insureds continue to mutually reserve their rights as well.

Sincerely,

John D. Hughes

JDH:aa

cc: Marjorie Thompson

# Exhibit E

EDWARDS ANGELL PALMER & DODGE LLP

Three Stamford Plaza 301 Tresser Boulevard Stamford, CT 06901 203.975.7505 *fax* 203.975.7180 eapdlaw.com

**Michael P. Thompson**
203.353.6806
*fax* 888.325.9476
mthompson@eapdlaw.com

August 13, 2008

***VIA EMAIL AND FEDERAL EXPRESS***

Blake T. Hannafan, Esq.
Hannafan & Hannafan, Ltd.
One East Wacker Drive
Suite 2800
Chicago, IL. 60601
(312) 527-0055
(312) 527-0220 (fax)
bth@hannafanlaw.com

Norman L. Eisen, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807
(202) 778-1824
(202) 822-8106(fax)
neisen@zuckerman.com

Re: Murphy, et al. v. Allied World Assurance Company (U.S.), Inc., et al., No. 08-CV-4196 (GEL) (KNF)

Dear Mr. Hannafan and Mr. Eisen:

We write on behalf of Allied World Assurance Company (U.S.), Inc. ("Allied World).

Pursuant to Judge Drain's order, dated April 21, 2008 (the "Order"), Allied World has been advancing defense costs to your firms on behalf of your client, Tone N. Grant ("Grant"). To date, Allied World has made payments to Hannafan & Hannafan of $96,584.54 and to Zuckerman Spaeder of $1,094,544.18.

As you are aware, Mr. Grant is an insured under two "towers" of D & O insurance procured by Refco Inc. and its predecessor (collectively, "Refco"). The primary insurance policy in the

EDWARDS ANGELL PALMER & DODGE LLP

Mr. Blake T. Hannafan, Esq.
Mr. Norma L. Eisen, Esq.

second tower was issued by U.S. Specialty Insurance Company (the "U.S. Specialty Policy").[1] Allied World issued the third excess layer of insurance coverage in that tower, pursuant to Excess Directors and Officers Insurance Company Reimbursement Policy No. AW0418197 (the "Allied World Policy").

Under Exclusion (B) of the U.S. Specialty Policy, which is incorporated into the Allied World Policy, coverage is precluded for any claim "arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act...if there has been a final adjudication adverse to such Insured establishing that the Insured so acted." Mr. Grant was convicted on April 17, 2008 of conspiracy, securities fraud, wire fraud, bank fraud and money laundering arising out of his role in the fraudulent concealment of a $430 million Refco receivable. He was sentenced on August 7, 2008.

Mr. Grant's sentencing constitutes a "final adjudication" of a criminal, deliberately fraudulent or dishonest act under Exclusion (B) of the U.S. Specialty and Allied World Policies. See, e.g., In Re Enron Corporation Securities, Derivative and "ERISA" Litigation, 391 F.Supp 2d 541 (S.D. Tex. 2005); New England Insurance Company v. Sylvia, 783 F.Supp. 6 (D. N.H. 1991); People v. Stevens, (91 N.Y.2d 270, 692 N.E.2d 985, 669 N.Y.S.2d 962)(1998).

As a result, Mr. Grant is no longer entitled to the advancement of defense costs pursuant to the terms of the Allied World Policy. On the contrary, your respective firms to which Allied World has made the advancement payments are obligated to refund those advancements in full and immediately. See, U.S. Specialty Policy, at "Conditions", paragraph D(2).

Therefore, Allied World hereby demands the return of all defense costs and expenses advanced to your firms on behalf of Mr. Grant. Allied World advanced a total of $1,191,128.72 on behalf of Mr. Grant and must be reimbursed immediately and in full. For your reference, attached

[1] Specifically, U.S. Specialty Policy No. 24-MGU-05-A10821.

EDWARDS ANGELL PALMER & DODGE LLP

Mr. Blake T. Hannafan, Esq.
Mr. Norma L. Eisen, Esq.

hereto is a chart outlining all advancements that Allied World made to your respective firms on Mr. Grant's behalf.

Very truly yours,

Michael P. Thompson

cc: Kevin Windels, Esq. (*by e-mail*)
Michael Manire, Esq. (*by e-mail*)
John D. Hughes, Esq. (*by e-mail*)
Robert W. DiUbaldo, Esq. (*by e-mail*)

Robert W. DiUbaldo
EDWARDS ANGELL PALMER & DODGE LLP
Attorneys for Defendant
750 Lexington Avenue, 8th floor
New York, New York 10022
(212) 308-4411

Attorneys for Defendant Allied World Assurance Company (U.S.), Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

JOSEPH MURPHY, et al.,

Plaintiffs,
v.

ALLIED WORLD ASSURANCE COMPANY (U.S.), INC. and ARCH INSURANCE COMPANY,

Defendants.

---------------------------------------------------x

Case No. 1:08-cv-4196 (GEL) (KNF)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of September 2008, I caused a copy of Allied World's notice of motion and motion for summary judgment and to modify order, Rule 56.1 statement of undisputed material facts, memorandum of law, and declaration of Robert W. DiUbaldo dated September 4, 2008 to be sent by electronic mail to the following:

Michael Francis Walsh, Esq.
Weil Gotshal & Manges LLP
767 Fifth Avenue New York, NY 10153
(212) 310-8372
*Attorneys for Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaekel, Thomas H. Lee, Ronald L. O Kelley, and Scott A. Schoen*

William A. Schreiner, Jr., Esq.

Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, D.C. 20036
(202) 778-1858
*Attorneys for Plaintiff Tone Grant*

Laura L. Neish, Esq.
Zuckerman Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036
(212) 704-9600
*Attorneys for Plaintiff Tone Grant*

Helen Kim, Esq.
Katten Muchin Rosenman, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
(310) 788-4525
*Attorneys for Plaintiff Dennis Klejna*

John R. Jerome, Esq.
Timothy Hoeffner, Esq.
Saul Ewing, LLP
245 Park Avenue
24th Floor
New York, NY 10167
*Attorneys for Plaintiff Joseph Murphy*

Claire P. Gutekunst, Esq.
Proskauer Rose, LLP
1585 Broadway
New York, NY 10036
(212) 969-3421
*Attorneys for Plaintiff Richard N. Outridge*

Ivan Kline, Esq.
Friedman & Wittenstein, P.C.
600 Lexington Avenue
New York, NY 10022
(212) 750-8700
*Attorneys for Plaintiffs William M. Sexton and Gerald Sherer*

Richard Cashman, Esq.
Heller Ehrman, LLP
Times Square Tower
7 Times Square

New York, NY 10036 (212) 847-8796
*Attorneys for Plaintiff Philip Silverman*

John H. Eickemeyer, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700
*Attorneys for Defendant Arch Insurance Company*

Marc E. Rindner, Esq.
1776 K Street NW
Wiley Rein LLP
Washington, DC 20006
(202) 719-7486
*Attorneys for Defendant Arch Insurance Company*

William Fleming, Esq.
Gage Spencer & Fleming, LLP
410 Park Avenue
New York, NY 10022
(212) 768-4900

Robert DiUbaldo
Robert W. DiUbaldo